## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

STATE OF RHODE ISLAND;
STATE OF CONNECTICUT; and
KATHERINE DYKES, Commissioner of the
Connecticut Department of Energy and Environmental
Protection,

               Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF THE
INTERIOR; DOUGLAS BURGUM, Secretary of the
Interior, in his official capacity; BUREAU OF OCEAN
ENERGY MANAGEMENT; MATTHEW GIACONA,
Acting Director of Bureau of Ocean Energy
Management, in his official capacity; BUREAU OF
SAFETY AND ENVIRONMENTAL
ENFORCEMENT; and KENNETH STEVENS,
Principal Deputy Director of the Bureau of Safety and
Environmental Enforcement, in his official capacity,

               Defendants.

C.A. No. 1:25-cv-00439

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## COMPLAINT

### INTRODUCTION

1.     After years of rigorous environmental review, intergovernmental coordination, and substantial public and private investment, the Revolution Wind project—a cornerstone of Connecticut and Rhode Island's clean energy future—was abruptly halted by federal officials without statutory authority, regulatory justification, or factual basis. The Revolution Wind project is not speculative. It is real, fully permitted, and nearly complete. Located fifteen nautical miles off Rhode Island's shore, Revolution Wind is a wind energy facility that is expected to deliver

1

enough electricity to the New England grid to power 350,000 homes, the equivalent of 2.5% of the region's electricity supply. Connecticut and Rhode Island are relying on Revolution Wind to meet their electricity needs and renewable energy goals.

2.      The 704 megawatts (MW) of power that Revolution Wind is expected to produce on an annual basis is the subject of power purchase agreements—in Connecticut with Eversource and United Illuminating for 304 MW and in Rhode Island with Rhode Island Energy for 400 MW. Revolution Wind makes landfall in North Kingstown, Rhode Island.

3.      The Project has been vetted through every layer of the federal and state regulatory process, culminating in a 2,800-page Final Environmental Impact Statement and a joint Record of Decision issued by the Bureau of Ocean Energy Management (BOEM) and several other federal agencies. It is also supported by binding contracts, state law mandates, and the urgent need to secure a reliable, affordable, and emissions-free energy supply for the people of New England.

4.      Construction on the Revolution Wind project began in 2023 and is now approximately 80% complete. All offshore foundations are installed, and approximately 70% (45 of 65) of its turbines are ready for operation once construction is complete in 2026. The submerged array cables have been installed at 34 of the 65 wind turbine sites. The utility export cable has 84 of the 85 miles installed. One of the two offshore wind utility substations on a monopile foundation has been installed in federal waters.

5.      Over 90% of the physical construction has been substantially completed at the mainland interconnection site at the Quonset Development Business Park in North Kingstown, Rhode Island, where the power from the Revolution Wind project will be delivered into the regional energy system.

6.      Yet in the face of this exhaustive record and the States' deep reliance interests, the federal government has arbitrarily reversed course without explanation, factual findings, or legal authority. On August 22, 2025, the Acting Director of BOEM issued a Stop Work Order requiring Revolution Wind's developer, Ørsted, to immediately stop construction. Ex. A (Order). The Order does not identify any violation of law, any imminent threat to safety, or any judicial decree requiring suspension. It instead abstractly cites BOEM's general regulatory authority under the Outer Continental Shelf Lands Act (OCSLA) and directs Ørsted to stop constructing Revolution Wind so that BOEM can address purported "concerns" it has with the Project. The Order does not bother to mention what those concerns are, provide any reasoned explanation for an indefinite halt of a Project that BOEM has already extensively reviewed and approved, or provide any guidance about whether the Order is a lease suspension, cessation order, notice of noncompliance, or other defined agency action.

7.      The Administrative Procedure Act (APA) and OCSLA do not permit such arbitrary and capricious government conduct. Rather, these laws demand reasoned decision-making, fidelity to statutory limits, and respect for the settled expectations of sovereign States and regulated parties.

8.      The States of Connecticut and Rhode Island sue to vindicate those principles. They seek to restore the rule of law, protect their energy and economic interests, and ensure that the federal government honors its commitments.

9.      The Stop Work Order is arbitrary and capricious under the APA. First, the Order was issued with no rational explanation for halting Revolution Wind. Second, the Stop Work Order offers no justification for BOEM's abrupt change in position. It fails to identify any deficiency in the nine-year regulatory review process that resulted in BOEM's joint Record of Decision approving Revolution Wind and finding that it complies with OCSLA's requirements. Third, the

Stop Work Order contradicts recent federal policy that calls for increased domestic-energy production—a category into which wind energy falls—and expedites environmental review for those projects. Finally, the Stop Work Order ignores the serious reliance interests that Connecticut and Rhode Island have developed since the federal government approved Revolution Wind.

10.     The Stop Work Order also violates OCSLA and its implementing regulations, which allow the United States Department of the Interior and BOEM to temporarily halt wind energy project construction only if certain conditions are met. They were not met here, and so in addition to violating OCSLA, the Order is ultra vires and contrary to law under the APA.

11.     The Stop Work Order's immediate and indefinite halt to the construction of Revolution Wind represents an existential threat to Revolution Wind that has disrupted the project and threatens its viability. The wind energy industry operates in a complex logistical and regulatory environment where even minor setbacks can dramatically increase costs, including the costs of delays, and jeopardize a project's future.

12.     The Stop Work Order also harms Connecticut and Rhode Island. Revolution Wind represents the fruition of the States' decades-long efforts to secure reliable, diversified, and affordable sources of energy to meet their ever-increasing demand for electricity. It is also the result of the States' statutory- and policy-based efforts to protect public health and welfare from harmful greenhouse-gas emissions. The States will not realize Revolution Wind's benefits as scheduled in 2026 unless the Stop Work Order is enjoined.

13.     Because the Stop Work Order jeopardizes a project that is critical to the States' economic vitality, energy mix, and climate goals, the States ask this Court to declare the Stop Work Order unlawful and enjoin Agency Defendants from halting Revolution Wind's development.

## PARTIES

14.     Plaintiff State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

15.     Plaintiff State of Connecticut is a sovereign state in the United States of America. Connecticut is represented by Attorney General William Tong, who is the chief law enforcement officer of Connecticut.

16.     Plaintiff Katherine Dykes, Commissioner of the Department of Energy and Environmental Protection of the State of Connecticut, is an executive agent of the State of Connecticut and has a broad mandate to ensure access to safe, reliable utility service at just and reasonable rates, while protecting the natural environment.

17.     Defendant United States Department of the Interior (DOI) is a cabinet agency within the executive branch of the United States government. 43 U.S.C. § 1451. DOI has responsibility over leasing, permitting, construction, and operation of offshore wind projects on the Outer Continental Shelf under OCSLA, 43 U.S.C. §§ 1331 *et seq*., and its implementing regulations.

18.     Defendant Douglas Burgum is the Secretary of DOI (Interior Secretary) and that agency's highest-ranking official. 43 U.S.C. § 1451. He is sued in his official capacity. Secretary Burgum is the federal official ultimately responsible for the management and oversight of leasing, permitting, construction, and operation of offshore wind projects on the Outer Continental Shelf under OCSLA, and for all official actions or inactions of DOI, BOEM, and BSEE challenged in this Complaint.

19.     Defendant BOEM is a bureau within DOI. Dep't of Interior, Secretarial Order 3299, Section 3 (May 19, 2010). BOEM is responsible for the administration of leasing and permitting of offshore energy projects on the Outer Continental Shelf under OCSLA.

20.     Defendant Matthew Giacona is the Acting Director of BOEM, and that agency's highest-ranking official. Dep't of Interior, Secretarial Order 3299, Section 3 (May 19, 2010). He is sued in his official capacity. Acting Director Giacona issued the Stop Work Order.

21.     Defendant Bureau of Safety and Environmental Enforcement (BSEE) is a bureau within DOI. Dep't of Interior, Secretarial Order 3299, Section 4 (May 19, 2010). BSEE is responsible, among other things, for safety and environmental enforcement functions including, but not limited to, the authority to permit activities; inspect, investigate, cancel or suspend activities; and oversee safety, response, and removal preparedness.

22.     Defendant Kenneth Stevens is the Principal Deputy Director of BSEE. He is sued in his official capacity. Principal Deputy Director Stevens is responsible for the issuance of cessation orders by BSEE, a prerequisite to the issuance of a Stop Work Order.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction over this case because it arises under the laws of the United States. 28 U.S.C. §§ 1331, 2201(a). The Court also has jurisdiction under the judicial-review provisions of the APA. 5 U.S.C. § 702, as well as OCSLA, 43 U.S.C. § 1349(b).

24.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (e)(1). Defendants are United States officers and agencies sued in their official capacities, and they perform their official duties in Rhode Island. A substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within Rhode Island. Rhode Island is the "State nearest the place the cause of action arose." 43 U.S.C. 1349(b)(1).

## LEGAL BACKGROUND

25.    OCSLA states that the Outer Continental Shelf is "a vital national resource reserve held by the Federal Government for the public," and directs the Interior Secretary to facilitate its "expeditious and orderly development" while maintaining competition and environmental safeguards. 43 U.S.C. § 1332(3).

26.    In 2005, Congress amended OCSLA to authorize the Interior Secretary to issue leases on the Outer Continental Shelf for renewable energy production. *See* Energy Policy Act of 2005, Pub. L. No. 109-58 § 388, 119 Stat. 594, 744–45 (2005). Under subsection 8(p) of OCSLA, the Interior Secretary, in consultation with relevant federal agencies, may "grant a lease, easement, or right-of-way" for activities that "produce or support production, transportation, or transmission of energy from sources other than oil and gas," including offshore wind. 43 U.S.C. §§ 1337(p)(1)(C), 1356c. The Interior Secretary "shall ensure that any activity" authorized "is carried out in a manner that provides for" a set of twelve enumerated factors, including safety, national security, protection of the environment, prevention of waste, and prevention of interference with other reasonable uses of the Outer Continental Shelf. 43 U.S.C. § 1337(p)(4).

27.    BOEM administers the Outer Continental Shelf leasing program, including identifying leasing areas, conducting environmental assessments before leasing, and then leasing the areas out, usually through a competitive bidding process. *See* 30 C.F.R. §§ 585.102, 585.210.

28.    Once a lease is sold, a lessee must submit a Site Assessment Plan for site-assessment activities. 30 C.F.R. §§ 585.600, 585.605–585.613. If BOEM approves the Site Assessment Plan, the lessee has five years to conduct site assessment activities to gather necessary data. *Id.* § 585.235(a)(2). The lessee must then prepare a proposal for the development of a wind energy facility and submit an application for a Construction and Operations Plan. *Id.* §§ 585.600,

585.620–585.629. Next, BOEM must prepare "an appropriate [National Environmental Policy Act, 42 U.S.C. §§ 4321–4370m-12] analysis." 30 C.F.R. § 585.628. BOEM must review the application to ensure compliance with OCSLA and its regulations, and then "approve, disapprove, or approve [the plan] with modifications." 30 C.F.R. §§ 585.613(e), 585.628(f).

29.    Section 585.102(a) of BOEM's regulations require BOEM to ensure that activities authorized under BOEM's renewable energy regulations are carried out "in a manner that provides for and reaches a rational balance among" the twelve factors enumerated by OCSLA. 30 C.F.R. § 585.102(a). The regulations also state that "[t]o the extent [the factors] conflict or are otherwise in tension, none of [the factors] inherently outweighs or supplants any other[.]" *Id.*

30.    OCSLA authorizes DOI to suspend or temporarily prohibit any operation or activity pursuant to a lease at the request of a lessee, or if there is "a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment." 43 U.S.C. 1334(a)(1).

31.    BOEM may order a lease suspension in only two circumstances: (1) "[w]hen necessary to comply with judicial decrees prohibiting some or all activities under [the] lease" and (2) "[w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417. If BOEM orders a suspension, it must issue a written order that "will explain the reasons for its issuance and describe the effect of the suspension order on [the] lease." 30 C.F.R. § 585.418.

32.    BSEE, a separate bureau within DOI, is tasked with issuing cessation orders. BSEE is authorized to do so when a lessee "fail[s] to comply with an applicable law; regulation; order; or provision of a lease, grant, plan, or BSEE or BOEM approval." 30 C.F.R. § 285.401(a). With certain exceptions, BSEE will allow time for a lessee to correct any noncompliance before issuing

a cessation order. *Id.* A cessation order must set forth the measures the lessee must take to resume activities on the lease. *Id.* § 285.401(b).

33.    In addition, BSEE may suspend a lease: (1) "[w]hen necessary to comply with judicial decrees prohibiting some or all activities under [the] lease," or (2) "[w]hen continued activities pose an imminent threat of serious or irreparable harm or damage to natural resources; life (including human and wildlife); property; the marine, coastal, or human environment; or sites, structures, or objects of historical or archaeological significance." 30 C.F.R. § 285.417. Activities may not be conducted on the lease during the period of suspension, unless expressly authorized. 30 C.F.R. § 285.415(c).

## FACTUAL ALLEGATIONS

### I.    Energy Standards and Solicitation of Proposals

#### a.   Connecticut

34.    The State of Connecticut is reducing carbon dioxide emissions from fossil fuel-burning power plants by participating in the multi-state, market-based program known as the Regional Greenhouse Gas Initiative.

35.    Connecticut has worked to shift reliance away from fossil fuels and toward renewable energy sources, including wind. Connecticut has had a Renewable Portfolio Standard (RPS) in some form since 1998. The RPS requires electric suppliers to obtain a specified percentage of the energy they sell or distribute to Connecticut customers from renewable sources through the purchase of Renewable Energy Certificates. The total renewable output targets increase each year. *See* Conn. Gen. Stat. § 16-245a.

36.    Public Act 18-82, "An Act Concerning Climate Change Planning and Resiliency," requires Connecticut by 2030 to reduce economy-wide greenhouse-gas emissions by at least 45%

from 2001 greenhouse-gas emissions levels, and at least 80% by 2050. Likewise, Public Act 22-5, "An Act Concerning Climate Change Mitigation," requires Connecticut to achieve a 100% greenhouse-gas emissions-free electricity supply by 2040.

37.    The October 2021 Integrated Resources Plan by the Connecticut Department of Energy and Environmental Protection (CT DEEP) found that, to achieve Connecticut's target of a 100% greenhouse-gas emissions-free electricity supply by 2040, significant additions of new zero-carbon generation will be required.[1] This goal requires potentially 3,745 to 5,710 MW of new offshore wind by 2040 under a range of assumptions and scenarios, including availability of other generating resources.

38.    In addition, in passing Public Act 19-71, "An Act Concerning the Procurement of Energy Derived from Offshore Wind," codified as Conn. Gen. Stat. § 16a-3n, the Connecticut General Assembly created a process for CT DEEP to work with other state officials to solicit competitive proposals for offshore wind projects. The Act also authorizes CT DEEP to direct Connecticut's electric distribution companies to secure long-term contracts with bidders meeting certain criteria, which CT DEEP has done. CT DEEP also has similar procurement authority for additional Class I renewable energy resources, including offshore wind. Conn. Gen. Stat. §§ 16a-3f, 16a-3g, 16a-3h, 16a-3j, 16a-3m.

39.    Connecticut relies on Revolution Wind to satisfy its statutory mandates and achieve its policy goals. In 2018 and 2019, CT DEEP exercised its authority under Conn. Gen. Stat. §§ 16a-3n and 16a-3m to select 200 MW and 104 MW from the Revolution Wind offshore wind project in two separate competitive solicitations. The Connecticut Public Utilities Regulatory

---

[1] *See* State of Connecticut, Integrated Resources Planning, https://portal.ct.gov/deep/energy/integrated-resource-planning/integrated-resource-planning; State of Connecticut, Integrated Resources Plan at 132 (Oct. 2021), https://portal.ct.gov/-/media/deep/energy/irp/2020-irp/2020-connecticut-integrated-resources-plan-10-7-2021.pdf.

Authority later approved contracts between Revolution Wind and Connecticut's electric distribution companies (Eversource and United Illuminating). The Project is expected to reach commercial operation in 2026, at which point it will deliver electricity, and associated renewable energy credits to Connecticut, as well as provide wholesale energy and capacity market and reliability benefits to the broader New England grid.

40.    Connecticut also has an interest in future procurements of wind energy. Public Act 19-71 provides CT DEEP with authority to conduct competitive solicitations for up to 2,000 MW of additional offshore wind energy to meet Connecticut's energy needs and clean energy targets. CT DEEP also has authority to conduct new competitive solicitations for onshore and offshore wind projects under Conn. Gen. Stat. §§ 16a-3f, 16a-3g, 16a-3h, 16a-3j, and 16a-3m.

41.    Connecticut is working to advance wind energy with other states and ISO-New England, which is the organization that oversees New England's power system and wholesale electricity markets. On March 31, 2025, ISO-New England issued a request for proposals from transmission developers to upgrade the transmission grid in Maine to accommodate the interconnection of at least 1,200 MW of onshore wind generation to the New England grid.

### b. Rhode Island

42.    Like Connecticut, Rhode Island relies on Revolution Wind to satisfy its statutory and regulatory requirements under federal and state law.

43.    Rhode Island is committed to transitioning away from fossil fuels and towards sustainable clean energy intended to offset the impacts of harmful greenhouse-gas emissions. The 2021 Act on Climate sets decarbonization mandates, including requirements that greenhouse gas emissions are reduced to 45% below 1990 levels by 2030, 80% below 1990 levels by 2040, and that the state reaches net-zero emissions by 2050. *See* R.I. Gen. Laws § 42-6.2-9.

44.    The State of Rhode Island also participates in the Regional Greenhouse Gas Initiative. *See* R.I. Gen. Laws §§ 23-82-1–23-82-7.

45.    Rhode Island's Renewable Energy Standard (RI RES) was originally enacted in 2004 to protect the public health and the environment and to promote the general welfare of the State. *See* R.I. Gen Laws §§ 39-26-1–39-26-10, as enacted June 29, 2004, and amended on June 27, 2022. As a result of 2022 amendments, the RI RES requires that 100% of Rhode Island's electricity demand is met by renewable energy by 2033. R.I. Gen. Laws § 39-26-4(a)(14).

46.    The RI RES seeks to facilitate "the development of new renewable energy resources to supply electricity to customers in Rhode Island with goals of stabilizing long-term energy prices, enhancing environmental quality, and creating jobs in Rhode Island in the renewable energy sector." R.I. Gen Laws § 39-26-3.

47.    The RI RES also requires obligated entities, including utility companies that sell at retail to Rhode Island end-use customers, to increase the percentage of their energy that comes from eligible renewable energy. This requires annual increases, adding between 7% and 9.5% each year from 2026 to 2033. R.I. Gen Laws § 39-26-4.

48.    Rhode Island's Affordable Clean Energy Security Act (RI ACES), was enacted in 2014 and aims to utilize coordinated and competitive processes in the New England region to encourage a multi-state or regional approach to energy policy that advances the objectives of achieving a reliable, clean-energy future that is consistent with meeting regional greenhouse gas reduction goals at reasonable cost to ratepayers. R.I. Gen. Laws § 39-31-2.

49.    On February 7, 2019, pursuant to the RI ACES, the Narragansett Electric Company, d/b/a National Grid, filed a proposed 20 year Power Purchase Agreement (PPA) between it and DWW Rev I, LLC, also known as the Revolution Wind offshore wind project. The Narragansett

Electric Company, in consultation with Rhode Island's Office of Energy Resources and Department of Public Utilities and Carriers, voluntarily selected the 400 MW project to pursue a long-term PPA under RI ACES.

50.     The agreement between Rhode Island Energy and Revolution Wind includes commitments for an additional $40,000,000 investment in Rhode Island ports, including significant investments in the Port of Davisville, which is owned by the quasi-state agency known as the Quonset Development Corporation, as well as $4,500,000 to fund workforce training and development initiatives to grow clean energy in the State.

51.     The agreements with Revolution Wind govern the distribution of 704 MW of electrical energy to Connecticut and Rhode Island on an annual basis, with 400 MW going to Rhode Island and 304 MW to Connecticut.

52.     Rhode Island state agencies carefully reviewed Revolution Wind's proposed PPA to ensure that the multistate/regional approach to energy policy among participating states achieves the collective goal of a reliable, clean-energy future at a reasonable cost to Rhode Islanders.

53.      Following full review, evidentiary hearings, and the issuance of testimony and/or advisory opinions from the Rhode Island Department of Environmental Management, Office of Energy Resources, Department of Public Utilities and Carriers, and the Commerce Corporation, the PPA between Rhode Island Energy and Ørsted was approved by the Rhode Island Public Utilities Commission on May 28, 2019.

54.     Rhode Island, like Connecticut, is actively involved and invested in regional efforts to promote renewable energy with other states and ISO-NE, including the initiatives referenced above.

## II.     Federal Permitting of Revolution Wind

55.     The States, Ørsted, and the federal government have been working together for more than a decade to create a wind energy facility off Rhode Island's shore. In 2009, BOEM established an intergovernmental task force to coordinate the leasing process for this offshore wind project. Record of Decision at 2.[2] In 2013, Deepwater Wind New England, LLC—which Ørsted later acquired—won a BOEM auction for the lease area off the Rhode Island Shore (OCS-A 0486). *Id.* at 3. Later that year, BOEM signed and executed Deepwater Wind's commercial wind energy lease (Deepwater Wind Lease).[3]

56.     The lease states: "The Lessor reserves the right to suspend the Lessee's operations in accordance with the national security and defense provisions of section 12 of [OCSLA] and applicable regulations." Deepwater Wind Lease at 2. The lease further states that BOEM may order operations to cease "[i]f the Lessee fails to comply with (1) any of the applicable provisions of [OCSLA] or [its] regulations, (2) the approved [Site Assessment Plan] or [Construction and Operations Plan], or (3) the terms of this lease." *Id*. at 3–4.

57.     In 2016, Deepwater Wind submitted its Site Assessment Plan[4] to BOEM for lease OCS-A 0486, and BOEM approved it the next year.[5]

---

[2] BOEM, Record of Decision for Revolution Wind Farm and Revolution Wind Export Cable Project Construction and Operations Plan (Aug. 21, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_Redacted.pdf (Record of Decision).

[3] BOEM, Commercial Lease of Submerged Lands for Renewable Energy Development on the Outer Continental Shelf (Oct. 1, 2013), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/2013-10-01-OCS-A-0487-Lease.pdf.

[4] Deepwater Wind, Site Assessment Plan Deepwater Wind North Lease OCS-A 0486 (Apr. 2016), https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/RI/2016-11-16_Deepwater_North-Lease-SAP_Final_Clean-%281%29.pdf.

[5] James F. Bennett, BOEM Office of Renewable Energy Programs, Letter to Jeffrey Grybowski, Deepwater Wind New England, LLC (Oct. 12, 2017), https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/RI/SIGNED_BOEM-to-DWW_SAP-Approval-for-OCS-A-0486_101217-%281%29.pdf.

58.    In 2018, Ørsted acquired Deepwater Wind.[6]

59.    In 2020, BOEM approved splitting the lease to accommodate two projects: Revolution Wind and the South Fork Wind Farm. Record of Decision at 3. Revolution Wind took 83,000 acres (OCS-A 0486) and the remaining 13,000 acres were devoted to South Fork (OCS-A 0517). Record of Decision at 3.

60.    Later in 2020, Ørsted submitted a proposed Construction and Operations Plan for the Project.[7]

61.    In April 2021, BOEM published a Notice of Intent to prepare an Environmental Impact Statement for Revolution Wind. Notice of Intent to Prepare an Environmental Impact Statement for Revolution Wind LLC's Proposed Wind Energy Facility Offshore Rhode Island, 86 Fed. Reg. 22972 (Apr. 30, 2021). Rhode Island's Coastal Resources Management Council (CRMC) and the Rhode Island Department of Environmental Management (RIDEM) collaborated with BOEM to produce the Environmental Impact Statement.[8]

62.    In 2022, BOEM published a Draft Environmental Impact Statement.[9] BOEM accepted public comment on the Draft Environmental Impact Statement and held three virtual public meetings. Several state entities submitted comments on the Draft Environmental Impact Statement, including the Connecticut Port Authority, the University of Connecticut, RIDEM, CRMC, and the Rhode Island Historic Preservation and Heritage Commission.

---

[6] *See* Ørsted, Ørsted acquires Deepwater Wind and creates leading U.S. offshore wind platform (Aug. 12, 2018), https://orsted.com/en/company-announcement-list/2018/10/1819975.
[7] Deepwater Wind, Revolution Wind Farm Construction and Operations Plan (Mar. 2020), https://www.boem.gov/renewable-energy/state-activities/revolution-wind-farm-construction-and-operations-plan.
[8] *See* Revolution Wind Final EIS, https://www.boem.gov/renewable-energy/state-activities/revolution-wind-final-eis.
[9] BOEM, Revolution Wind Draft Environmental Impact Statement (Aug. 2022), https://www.boem.gov/renewable-energy/state-activities/revolution-wind-deis.

63.     In 2023, BOEM published the Final Environmental Impact Statement (FEIS).[10] In preparing this report, the federal government spent almost two and a half years analyzing Revolution Wind's environmental impact. The 2,800-plus page FEIS "assesses the potential biological, socioeconomic, physical, and cultural impacts that could result from the construction, operations and maintenance (O&M), and decommissioning of" Revolution Wind. FEIS at 1-1. BOEM considered a range of alternatives and selected a combination of alternatives (labelled the Preferred Alternative) that would reduce or mitigate the effects of the Project.

64.     In August 2023, BOEM, the National Oceanic and Atmospheric Administration, the National Marine Fisheries Service, and the U.S. Army Corps of Engineers issued a joint Record of Decision for the Project, approving construction of up to 100 wind turbines within the leased area. Record of Decision at 1, 8. The Record of Decision concluded that approving the Construction and Operations Plan, as modified by the Preferred Alternative and proposed terms and certain conditions, "would be in accordance with the regulations at 30 CFR part 585 and would ensure that all the activities on the [Outer Continental Shelf] are carried out in a manner that provides for the factors in subsection 8(p)(4) of OCSLA." *Id.* at B-26. Likewise, BOEM found that approving the Project with the selected mitigation measures "is consistent with the duties required under subsection 8(p)(4) of OCSLA" because it "balances the orderly development of [Outer Continental Shelf] renewable energy with the prevention of interference with other uses of the [Outer Continental Shelf] and the protection of the human, marine, and coastal environments." *Id.* at 25.

65.     In reaching that conclusion, BOEM considered all twelve factors required under 43 U.S.C. § 1337(p)(4), including national security and interference with other reasonable uses of the

---

[10] BOEM, Revolution Wind Final Environmental Impact Statement (July 2023), https://www.boem.gov/renewable-energy/state-activities/revolution-wind-final-eis.

Outer Continental Shelf. Neither, BOEM found, would be undermined by Revolution Wind. *Id.* at B-2.

66.    First, BOEM found Revolution Wind would not undermine national security. BOEM, in consultation with the Department of Defense, found that any national security impacts from developing offshore wind in the Revolution Wind project's lease area "would be negligible and avoidable." *Id.* at B-15–B-16. Likewise, before approving the Construction and Operation Plan, BOEM consulted with the U.S. Coast Guard, U.S. Air Force, North American Aerospace Defense Command, U.S. Army Corps of Engineers, and Federal Aviation Administration (FAA). *Id.* at B-15.

67.    To mitigate any national security concerns, BOEM and the Department of Defense conditioned their approval on Ørsted agreeing to "specific mitigation measures" for the Project. Those measures required Ørsted to notify North American Aerospace Defense Command when the Project was nearing completion so that it could complete a Radar Adverse Impact Management assessment, for which Ørsted would contribute $80,000. *Id.* at B-16. Ørsted similarly was required to coordinate with the Department of Defense before using "distributed fiber-optic sensing technology as part of the Project or associated transmission cables." *Id.* at B-16.

68.    Second, BOEM found that Revolution Wind would "not unreasonably interfere with other uses of the [Outer Continental Shelf]." *Id.* at B-18. After assessing nearby ports and shipping lanes, BOEM concluded that primary vessel traffic is outside the Project's area. *Id.* at B-19. BOEM's navigation risk assessment also confirmed that fishing vessels can safely navigate through the lease area. *See id.* Most fisheries also derive less than 1% of their income from the Project area. *See id.* at B-21. Any impact on aviation would be minimal too because more than 90% of air traffic occurs at altitudes unaffected by the wind turbines. *See id.* at B-20.

69.    BOEM adopted mitigation measures to minimize Revolution Wind's marginal impacts. BOEM required compliance with all FAA marking and lighting standards to mitigate aviation risks. *Id.* It also required Revolution Wind to coordinate with the U.S. Coast Guard to implement a mariner communication plan. *Id.* Requiring the wind turbines to be installed in a uniform grid pattern also ensured "functional equivalent of numerous navigation corridors" for transit and fishing boats. *Id.* at B-19. Finally, to mitigate any lost fishing revenue, Revolution Wind will establish "compensation/mitigation funds" totaling over $19,000,000. *Id.* at B-22.

70.    With these mitigation measures in place, BOEM approved Revolution Wind's Construction and Operations Plan in November 2023, allowing construction of the Project to proceed.[11]

### III.    Rhode Island Permitting and Approval of Revolution Wind

71.    Revolution Wind secured all Rhode Island state permits and licenses required for construction and operation with respect to its facility.

72.    In February 2023, Rhode Island's CRMC approved Revolution Wind's Application to Construct and Maintain Two 23 Mile Submarine Export Cables through the West Passage of Narragansett Bay to the Cable Landing Location in North Kingstown and Other Associated Facilities. The CRMC found that the Revolution Wind project "does not have a reasonable probability of causing a detrimental impact upon the coastal resources of the State of Rhode Island."

---

[11] Karen Baker, BOEM Office of Renewable Energy Programs, Letter to Peter Allen, Revolution Wind LLC (Nov. 17, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/COP%20Appv%20Ltr_REV%20OCS-A%200486.pdf.

73.     In May 2023, CRMC completed its Coastal Zone Management Act federal consistency review and issued a concurrence, finding the Revolution Wind project is consistent and complies with the enforceable policies of Rhode Island's approved management program.

74.     Revolution Wind additionally applied for and received all required RIDEM water quality certificates arising from Revolution Wind's export cable, interconnection facility in North Kingstown, Rhode Island, and related logistical and operational functions.

75.     As a major energy facility, Revolution Wind also required Rhode Island licensing by the Rhode Island Energy Facility Siting Board. *See* R.I. Gen. Laws § 42-98-4. The Energy Facility Siting Board approved the facilities associated with Revolution Wind's connection to the transmission system in Rhode Island and cited, *inter alia*, that the project served a crucial winter reliability need. The Energy Facility Siting Board found that Revolution Wind was cost-justified, in that it could be expected to transmit energy at the lowest reasonable cost to the consumer, and that the facility would not cause unacceptable harm to the environment.

76.     The Energy Facility Siting Board approved a permit subject to certain conditions on June 23, 2022.

**IV.     Construction of Revolution Wind**

77.     After successfully completing this yearslong state and federal regulatory approval process, Ørsted and Global Infrastructure Partners' Skyborn Renewables, another developer, jointly began developing the Project.

78.     Construction began in 2023 and is now approximately 80% complete. All offshore foundations are installed and approximately 70% (45 of 65) of its turbines are in place.

79.     The submerged array cables have been installed at 34 of the 65 wind turbine sites. The utility export cable has 84 of the 85 miles installed. One of the two offshore wind utility substations on a monopile foundation has been installed in federal waters.

80.     Over 90% of the physical construction has been substantially completed at the mainland interconnection site at the Quonset Development Business Park in North Kingstown, Rhode Island, where the power will be delivered into the regional energy system from the Revolution Wind project.

81.     The Project is expected to reach commercial operation in 2026. Revolution Wind will deliver enough electricity to the New England grid to power 350,000 homes in Connecticut and Rhode Island, the equivalent of 2.5% of the region's electricity grid.

**V.    President Trump's Wind Memorandum and the BOEM Acting Director's Stop Work Order**

82.     On January 20, 2025, President Trump issued a memorandum that halted all federal approvals necessary for the development of offshore and onshore wind energy. *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 29, 2025) (Wind Memo).

83.     Section 1 of the Wind Memo prohibits "consideration of any area in the [Outer Continental Shelf] for any new or renewed wind energy leasing." *See id.* It notes, however, that "[n]othing in this withdrawal affects rights under existing leases in the withdrawn areas." *Id.*

84.     Section 2 of the Wind Memo states that the Interior Secretary and the heads of all other relevant agencies "shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices." *Id.* at 8364. Without

citing any evidence, the Wind Memo asserts that this assessment is needed "[i]n light of various alleged legal deficiencies underlying the Federal Government's leasing and permitting of onshore and offshore wind projects, the consequences of which may lead to grave harm . . . and in light of potential inadequacies in various environmental reviews required by the National Environmental Policy Act to lease or permit wind projects." *Id*. at 8363–64.

85.     On August 22, 2025, BOEM's Acting Director Matthew Giacona issued a Stop Work Order to Ørsted. The Order directed it "to halt all ongoing activities related to the Revolution Wind Project on the [Outer Continental Shelf] to allow time for [BOEM] to address concerns that have arisen during the review that the Department is undertaking pursuant to [the Wind Memo]." Ex. A.

86.     The Order states:

BOEM is acting to ensure that all activities authorized under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq*., and the implementing regulations at 30 C.F.R. Part 585 are carried out in a manner that provides for protection of the environment, among other requirements. 43 U.S.C. § 1337(p)(4); 30 C.F.R. § 585.102(a). In particular, BOEM is seeking to address concerns related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in that subsection of OCSLA. *Id*. The BOEM Director is taking this action to ensure compliance with the requirements of the Part 585 regulations and applicable law.

*Id.*

87.     BOEM did not characterize the Stop Work Order as a cessation order, a notice of noncompliance, or a lease suspension. It stated that Ørsted could appeal the decision under 30 C.F.R. § 585.118.

88.     Upon receiving the Stop Work Order, Ørsted immediately suspended construction activities for the Revolution Wind offshore wind project.

89.    The Stop Work Order threatens the viability of Revolution Wind. The wind energy industry operates in a tremendously complex logistical and regulatory environment, where even minor setbacks can dramatically increase costs, leading to projects being severely delayed and even abandoned. Thus, the Stop Work Order represents an existential threat to Revolution Wind. The longer the Stop Work Order remains in place, the less likely it is that the Project will be constructed and come to fruition.

## VI.    Other Federal Developments

90.    The same day the Wind Memo was issued, President Trump declared a "National Energy Emergency," purportedly brought on by the country's alleged "insufficient energy production," to shore up the "inadequate energy supply" by facilitating the development of "a reliable, diversified, and affordable supply of energy." Executive Order 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 20, 2025) (Energy Emergency Memo).

91.    In response to the Energy Emergency Memo, on April 23, 2025, DOI announced it "will implement emergency permitting procedures to accelerate the development of domestic energy resources."[12] As part of these procedures, DOI "will be adopting an alternative National Environmental Policy Act compliance process to allow for more concise documents and a compressed timeline." Under the compressed timeline, "[p]rojects requiring a full environmental impact statement, typically a two-year process, will be reviewed in roughly 28 days."

92.    On April 14, 2025, the United States Government Accountability Office (GAO) issued a report that describes "the mechanisms [BOEM], in coordination with other agencies, has in place to oversee offshore wind energy development and to what extent they address potential

---

[12] DOI, Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply (Apr. 23, 2025), https://www.doi.gov/pressreleases/department-interior-implements-emergency-permitting-procedures-strengthen-domestic.

impacts."[13] GAO found that "BOEM obtains input from multiple federal agencies, state governments, Tribes, and other stakeholders to identify and mitigate potential impacts of offshore wind energy projects." GAO Report at 29. The report also noted that "BOEM requires . . . that offshore wind developers take steps to mitigate potential adverse environmental impacts." *Id*. at 31. GAO did not find any programmatic failures regarding BOEM's environmental analysis and mitigation of offshore wind projects.

93.    Meanwhile, the federal government has been *defending* its approval of Revolution Wind in litigation brought by several environmental advocacy groups. *See Green Oceans v. Dep't of the Interior*, No. 1:24-cv-00141-RCL (D.D.C); *Se. Lighthouse Foundation v. Haaland*, No. 1:23-cv-03515-RCL (D.D.C); *Pres. Society of Newport County v. Haaland*, No. 1:23-cv-03513-RCL (D.D.C.). In that litigation, the Agency Defendants acknowledged that their review of Revolution Wind "culminated in thousands of pages of thorough environmental analysis and yielded a comprehensive suite of measures to avoid and minimize any negative impacts to marine species and habitats." *Green Oceans*, Dkt. No. 38, at 1 (government defendants' memorandum in opposition to plaintiffs' motion for preliminary injunction); *id.* at 8 ("BOEM considered and balanced a wide range of environmental concerns."). Those cases remain ongoing as of the filing of this complaint.

**VII.    The Order Significantly Harms the States and their Residents.**

**a.    The Stop Work Order Harms the States' Energy Interests.**

94.    Connecticut and Rhode Island have a strong interest in the timely completion of Revolution Wind. As detailed above, the States selected Revolution Wind to provide electricity and Renewable Energy Certificates, through contracts with electric distribution companies, to help

---

[13] GAO, Offshore Wind Energy, Actions Needed to Address Gaps in Interior's Oversight of Development 52 (Apr. 2025), https://www.gao.gov/assets/gao-25-106998.pdf (GAO Report).

meet their energy needs and RPS requirements. Revolution Wind was supposed to begin delivering power and Renewable Energy Certificates to Connecticut, Rhode Island, and the New England regional grid in the second half of 2026.

95.     Revolution Wind would supply enough power to meet about 2.5% of New England's electricity load. Connecticut, Rhode Island, and New England's independent regional grid operator, ISO-NE, have been counting on Revolution Wind to come online to contribute to grid reliability. Without the power from Revolution Wind, the region's reserve power margin is estimated to drop from 14.8% to 12.2%. This impairs the grid operator's ability to meet power demand during peak periods such as heat waves and cold snaps.

96.     On August 25, 2025, in response to the Stop Work Order, ISO-NE warned that delaying the Revolution Wind project would "increase risks to reliability," including potential "near-term impacts to reliability in the summer and winter peak periods," and "adversely affect New England's economy and industrial growth."[14] ISO-NE also stated that "[u]npredictable risks and threats to resources—regardless of technology—that have made significant capital investments, secured necessary permits, and are close to completion will stifle future investments, increase costs to consumers, and undermine the power grid's reliability and the region's economy now and in the future."

97.     Analysis by ISO-NE shows the importance of bringing offshore wind online for regional reliability, particularly during the winter months, which is when the New England grid faces its greatest reliability challenges. While offshore wind projects provide energy throughout the year, they perform especially well in the winter.

---

[14] ISO-NE, Statement on Revolution Wind Stop Work Order (Aug. 25, 2025), https://isonewswire.com/2025/08/25/iso-ne-statement-on-revolution-wind-stop-work-order/.

98.    Performance in the winter is critical because that is when energy demand in New England spikes and natural gas supplies are tight due to increased demand for, and prioritization of, natural gas for heating. When spikes occur, there is less fuel reserve, and an insufficient amount of reserve can lead to rolling blackouts. Rolling blackouts also occur in the summer because of high energy demand for cooling.

99.    ISO-NE's analysis shows that offshore wind can help reduce reliance on natural gas and other fossil fuels, helping to prevent fuel shortages, reduce price volatility, and strengthen grid reliability—again, especially during the winter. Operational data from South Fork Wind, which is the first commercial-scale offshore wind project operating in the United States and is also located in the Rhode Island/Massachusetts Wind Energy Area, show that this project's output has been highest during the winter.

100.    The winter output from Revolution Wind will, if it is not crippled by this indefinite halt to its operations, provide a steady baseload of energy. This will allow more gas and oil to be reserved to support spikes in energy consumption, such as when heating fuel supply is constrained.

101.    Along with the States' general interests in ensuring the reliability of New England's regional electric grid, of which the States are a part, Connecticut specifically is counting on the 304 MW share of Revolution Wind to meet 5% of its electric distribution company load once the project comes online in 2026.

102.    In Rhode Island, the annual reduction in greenhouse gas emissions from Revolution Wind is projected to be approximately 102,000 tons of carbon dioxide per year, a 10% reduction for the Rhode Island Electric Power Consumption sector.

103.    There is no ready substitute for Revolution Wind in the timeframe that the Project is expected to come online. If the indefinite halt prevents Revolution Wind's completion, the States

will be without a vital energy source they were relying on to meet their increasing demands and will be without any reliable substitute option.

104.    Once operational, Revolution Wind will also yield substantial cost savings to the States' ratepayers and to the States themselves, which also purchase electricity. The Revolution Wind contracts are expected to act as a hedge against rising electricity rates. Direct savings to ratepayers from the contracts are estimated to be hundreds of millions of dollars over 20 years due to the fixed contract prices for Revolution Wind. The contract prices are lower than the average projected cost of energy and Renewable Energy Certificates over this period.

105.    By providing a new source of low-marginal cost power in New England, Revolution Wind will further cause wholesale energy and capacity market costs in ISO-NE to be lower, providing additional indirect cost savings to ratepayers in Connecticut and Rhode Island, including the States' themselves. These indirect electric bill cost savings will apply to all purchases of energy and capacity in the ISO-NE markets that are needed to meet energy demand in the States. Regionally, these wholesale market benefits from Revolution Wind are expected to be in the hundreds of millions of dollars each year, of which approximately 25% of the benefits will accrue to Connecticut ratepayers, based on its share of total regional load.

106.    If BOEM's Stop Work Order prevents the fully permitted Revolution Wind project from entering service in 2026 as planned, Connecticut and Rhode Island ratepayers would not receive the benefits of these direct and indirect electric bill savings. The result instead would be tens of millions of dollars in higher electricity costs on average for ratepayers each year. The potential cost to ratepayers and to the States' economies could be much higher, because, as ISO-NE has warned, the loss or delay of Revolution Wind "will increase risks to reliability" in the region.

107.    In sum, the energy from power purchase agreements with Revolution Wind that the States have relied on receiving starting in 2026 will not be available at the time the States anticipated. The longer the indefinite delay in the construction of Revolution Wind persists, the longer the States will need to make up for that loss of energy. Delays additionally risk less favorable contracts for replacement energy and ultimate cost increases for ratepayers.

**b. The Stop Work Order Harms the States' Economic and Contractual Interests.**

108.    To support Revolution Wind and other offshore wind projects, Connecticut has invested in facilities, including the redeveloped Connecticut State Pier Terminal in New London. Connecticut has spent over $200,000,000 to redevelop the State Pier Terminal into a world-class heavy-lift maritime facility and hub for offshore wind. The Terminal is one of only three marshaling facilities on the East Coast that are assembling offshore wind turbines for deployment and was the first one with open ocean access.

109.    The State Pier Terminal is leased to Ørsted, which is using it to construct Revolution Wind. The financial impact to Ørsted resulting from the indefinite halt to the construction ultimately impacts the Connecticut Port Authority's lease agreement.

110.    The Revolution Wind project supports approximately 1,200 jobs in Connecticut and Rhode Island. At the State Pier Terminal, more than 100 jobs are tied directly to staging and assembly for offshore wind.

111.    An indefinite halt to the Project will impact the employment of the 1,200 people living and working in Connecticut and Rhode Island. If those people become unemployed, the States will experience negative financial and social repercussions.

112.    An indefinite halt to the Project will cause the States to expend resources, which were already expended once, to follow their statutory mandates for procurement of an appropriate replacement to the power purchased from the Revolution Wind Project.

113.    The indefinite halt has immediate impacts on the States' interests in this sector of the economy. The Stop Work Order is also likely to undermine investor confidence and set a chilling precedent for future projects. This type of shock to the industry hurts the States' investments to support this industry and damages the credibility of regional energy markets.

114.    In Rhode Island, the same fiscal consequences are present in a future without Revolution Wind.  Revolution Wind is expected to generate $87,000,000 in energy market price reductions over the next two decades.

115.    The Stop Work Order also harms Rhode Island's economic interests by depriving its energy customers of the benefits of a clear and known contracted-for cost of renewable energy that was reviewed and approved by Rhode Island's Public Utilities Commission.

116.    The Revolution Wind project supports over 2,500 jobs nationwide in the construction, operations, shipbuilding and manufacturing sectors, including over 1,000 union construction jobs. The Revolution Wind project, once completed, is expected to generate 86 full-time jobs and $8,120,000 as an annual increase in Rhode Island's GDP.

117.    The Community College of Rhode Island has provided nearly 200 union workers anticipating this federal and state approved project in the offshore wind industry.

118.    Ørsted signed the first-ever U.S. offshore wind helicopter agreement for new crew helicopters, including a $1,800,000 investment in Quonset State Airport where the helicopters are

based. Rhode Island shipyards built five crew vessels to support Revolution Wind and other installations during and after its construction.[15]

119.    Rhode Island's efforts to build a strong local offshore wind industry are thwarted by the instability and risk created by the federal government's arbitrary halt to a fully permitted and nearly complete project.

120.    Rhode Island will suffer economic harm if the Stop Work Order remains in place, including lost benefits from investments made by Rhode Island to facilitate the infrastructure needed to support Revolution Wind, and significant lost tax revenue should the offshore wind industry that Rhode Island has encouraged and developed ultimately leave Rhode Island.

   **c.    The Stop Work Order Imperils Compliance with State Mandates for Greenhouse Gas Emissions and Renewable Portfolio Standards.**

121.    The Stop Work Order undermines the States' ability to procure energy from offshore wind generation as needed to meet the States' energy and environmental requirements, including statutory requirements to reduce in-state greenhouse-gas-emitting sources of power.

122.    Connecticut mandates that electric distribution companies must demonstrate that a percentage of their output or services is generated by renewable energy sources. *See* Conn. Gen. Stat. § 16-245a. The Commissioner ensures that the distribution companies can comply with this mandate by reviewing Requests for Proposal and choosing the suppliers, which enter into contracts with the distribution companies. The indefinite halt to Revolution Wind endangers the distribution companies' ability to comply with 2026's mandate. *See id.* § 16-245a(a)(21).

123.    Connecticut also has mandatory emission reductions targets that will be impacted negatively by an indefinite halt to the Revolution Wind project. By 2030, Connecticut must reduce

---

[15] Ørsted, Press Release (Jan. 27, 2022), https://us.orsted.com/news-archive/2022/01/rhode-island-shipyards-to-build-five-new-offshore-wind-crew-vessels.

the levels of greenhouse gas emitted to a level at least 45% below the level emitted in 2001. *Id.* § 22a-200a. Connecticut is counting on Revolution Wind to meet that goal, and the indefinite halt to the Project undermines Connecticut's ability to meet that climate goal.

124.    The 2020 Integrated Resources Plan, which is a statutorily mandated review of Connecticut's energy outlook, *see id.* § 16-3a, lists the Revolution Wind as a significant contributor to achieving Connecticut's RPS and greenhouse gas reduction goals. The power purchase contracts the distribution companies entered into to obtain supply from the Revolution Wind project were executed beginning in 2018. Revolution Wind has been so thoroughly integrated into the Connecticut's planning about RPS and greenhouse gas emissions, that Connecticut has experienced immediate harm by the prospect that Revolution Wind may not be timely completed due to the immediate halt of operations to the Project.

125.    There is not an immediate and obvious replacement for the energy that Revolution Wind was going to supply to Connecticut. Revolution Wind was chosen for a reason—it was the best way to reduce costs for ratepayers, comply with RPS mandates, and ensure a long-term stable energy source. The multi-year process that Connecticut engaged in before selecting Revolution Wind cannot be recreated in a timely fashion.

126.    Connecticut faces immediate uncertainty in the future composition of its energy composition resulting from the indefinite halt of Revolution Wind. Revolution Wind has been counted on to meet Connecticut's future energy needs, greenhouse-gas reduction goals and RPS objectives for seven years. Suddenly removing it through an indefinite halt to the Project leaves Connecticut's energy future uncertain.

127.    In Rhode Island, the Stop Work Order undermines the State's efforts to diversify its energy supply and enhance grid resiliency and capacity. This includes efforts to comply with

statutory mandates set by Rhode Island's legislature in the RI RES and Rhode Island's 2021 Act on Climate.

128.    As of July 2022, Rhode Island has identified approximately 1,149 MW of clean energy generation capacity. Nearly 35% of what Rhode Island has been able to secure in furtherance of its energy and climate goals comes from counting on the 400 MW from the Revolution Wind facility.

129.    Rhode Island is relying on the 400 MW from Revolution Wind and the long-term negotiated pricing to cost-effectively comply with the requirements under the RI RES. There is no readily-known alternative to this renewable energy.

130.    As outlined in Rhode Island's 2022 Climate Update, Revolution Wind is expected to reduce Rhode Island's greenhouse gas emissions by a very significant 11 million metric tons of carbon dioxide. Without this reduction, it will become much more difficult for Rhode Island to comply with its Act on Climate greenhouse gas emission reduction mandates.

### CLAIMS FOR RELIEF

### COUNT I
**Violation of Administrative Procedure Act - 5 U.S.C. § 706(2)(A)**
**(Arbitrary and Capricious Agency Action)**
**(Against All Defendants)**

131.    The States incorporate by reference the above allegations.

132.    DOI, Interior Secretary Burgum, BOEM, and BOEM Acting Director Giacona (collectively, Agency Defendants) are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

133.    Agency Defendants have ordered Ørsted to indefinitely halt construction of Revolution Wind. This order constitutes final agency action subject to an APA challenge because it "mark[s] the consummation of the agency's decisionmaking process" and is an action "from

which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotations omitted); *see* 5 U.S.C. § 704.

134.    The Stop Work Order marks the end of the Agency Defendants' decision-making because it halts construction on Revolution Wind, even if only temporarily. The Agency Defendants are not still debating whether to pause the Project—they have done so. They cannot now avoid judicial review by suggesting they might later reconsider their final decision. *See, e.g.*, *NRDC v. Wheeler*, 955 F.3d 68, 80 (D.C. Cir. 2020) ("[A]s long as an agency has completed its decisionmaking on a challenged rule—even one interim in nature—the rule satisfies the first prong of the finality test.").

135.    Legal consequences also unquestionably flow from the Stop Work Order, which "affects regulated parties' rights or obligations" and threatens imminent harm to the States for all the reasons detailed above. *Bennett*, 520 U.S. at 178. There also will be consequences if Ørsted fails to comply with the Stop Work Order. BOEM threatened to "take additional corrective action" if Ørsted continues work on Revolution Wind, citing the regulation that gives it authority to impose civil penalties on noncomplying companies. As such, the Stop Work Order constitutes a final agency action.

136.    When presented with a final agency action, the APA requires that a court "hold unlawful and set aside agency action . . . found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

137.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm*

*Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). "A command in an Executive Order does not exempt an agency from the APA's reasoned decision-making requirement." *Louisiana v. Biden*, 622 F. Supp. 3d 267, 295 (W.D. La. 2022).

138.    Additionally, agencies must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

139.    When an agency changes its existing policy, it must "display awareness that it is changing position" and "show that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *Id*. An "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (internal quotation marks omitted).

140.    Finally, agencies also must provide a more detailed justification "when its prior policy has engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515.

141.    Here, Agency Defendants have provided no reasoned basis for halting construction of the fully permitted Project, let alone a more detailed justification that acknowledges or reconciles its stark departure from their previous approval and permitting of the Project or the significant reliance interests that have developed based on that approval and permitting.

142.    The Agency Defendants' stated justifications for indefinitely halting construction of the fully permitted Revolution Wind are not reasoned explanations. BOEM Acting Director Giacona said in the Stop Work Order that it is intended to "ensure that all activities" are "carried out in a manner that provides for protection of the environment, among other requirements," and that it "is seeking to address concerns related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in that subsection of OCSLA." The Stop Work Order, he added, was intended to "ensure compliance with the requirements of Part 585 regulations and applicable law."

143.    On their face, these stated justifications do not reflect the reasoned decision-making the APA requires. The Agency Defendants cite the applicable regulatory framework and two factors BOEM must consider when permitting an offshore project like Revolution Wind—national security and interference with other uses of the Outer Continental Shelf. *See* 43 U.S.C. § 1337(p)(4)(F), (I). But the Agency Defendants did not find or reference any facts suggesting that the Project imperils national security or interferes with other Outer Continental Shelf uses. In fact, they did not even mention what their "concerns" with the Project are. Without any factual basis, there is no way to decipher from the Stop Work Order "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Even assuming there were legitimate concerns about national security or interference, the Agency Defendants did not bother even trying to explain how those concerns justify indefinitely halting construction of a multi-billion dollar, fully permitted project. *See Louisiana v. Biden*, 622 F. Supp. 3d at 295 (finding DOI's stop work order for offshore drilling arbitrary and capricious "[b]ecause no rational explanation was given" for it).

144. The Stop Work Order also is an unexplained reversal of the federal government's prior finding that Revolution Wind satisfies OCSLA's requirements. Agency Defendants fail to explain the stark departure from this prior position, much less provide "a more detailed justification" to explain its conflicting position, as the APA requires. *Encino Motorcars, LLC*, 579 U.S. at 222. BOEM and other government agencies spent *nine years* reviewing Revolution Wind, culminating in the joint Record of Decision and a 2,800-page Final Environmental Impact Statement approving the Project. Unlike the exhaustive administrative record backing Revolution Wind's permits, the Stop Work Order fails to provide any "satisfactory explanation for its action[.]" *State Farm*, 463 U.S. at 43.

145. The Stop Work Order contradicts not just the Agency Defendants' past approvals, but also their more recent assertions in the ongoing litigation with environmental advocacy groups that Revolution Wind complies with the Endangered Species Act and Clean Water Act. *See Defs. of Wildlife v. Dep't of the Interior*, 931 F.3d 339, 352 (4th Cir. 2019) ("Absent a reasoned discussion of the agency's apparently contradictory positions . . . we can only conclude that [the agency] acted arbitrarily."). The contradictions extend to other federal agencies and actions too. The GAO recently found no programmatic or implementation problems in BOEM's environmental analyses of offshore wind projects. In his Energy Emergency Order, President Trump declared that the United States is facing an "energy emergency," which prompted DOI to begin expediting fossil fuel projects. None of these actions square with halting Revolution Wind. These "unexplained inconsistenc[ies]" between the Stop Work Order and the federal government's energy policies show that the Stop Work Order is arbitrary and capricious. *Encino Motorcars, LLC*, 579 U.S. at 222.

146.    Moreover, the administration's action is arbitrary and capricious because it undermines the certainty of the federal permitting process. The States and Ørsted have invested in the leasing and permitting of Revolution Wind for nearly a decade and have developed significant reliance interests in the project—interests that the Agency Defendants did not consider in issuing the Stop Work Order.

147.    The States and other Project stakeholders have relied on the Agency Defendants' approvals for Revolution Wind in making significant policy and financial decisions, including whether to pursue other wind-energy projects. The States are depending on Revolution Wind to help meet their statutorily required emission-reduction targets and have allocated significant agency resources to permitting and contracting related to existing wind-energy projects or with transmission projects intended to serve wind energy.

148.    The States have invested significant state financial resources in industries and Project components associated with building out Revolution Wind.

149.    Those financial resources include Connecticut's $210,000,000 investment in upgrading the Connecticut Port Authority's State Pier Terminal in the Port of New London.

150.    In Rhode Island, the public-private partnership includes infrastructure at ProvPort and Quonset Point, and investment in job training through Rhode Island state educational institutions.

151.    Agency Defendants' actions ignore and fundamentally harm the States' significant reliance interests. Agency Defendants' Stop Work Order could "necessitate systemic" or at least "significant change[s]" to the States' approach for supporting their growing energy needs, diversifying their energy portfolios, and achieving their climate goals. *Encino Motorcars*, 579 U.S.

at 222. Yet Agency Defendants failed to provide "a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox*, 556 U.S. at 515.

152.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, the States are entitled to a declaration that the Agency Defendants' Stop Work Order suspending the fully approved and nearly complete Project violates the APA because it is arbitrary and capricious.

153.    Under 5 U.S.C. § 706, the States are entitled to vacatur of the Agency Defendants' Stop Work Order, as well as a preliminary and permanent injunction preventing Agency Defendants from enforcing the Stop Work Order and taking further unlawful action to block Revolution Wind.

### COUNT II
**Violation of Administrative Procedure Act - 5 U.S.C. § 706(2)(A), (C)**
**(Contrary to Law and Ultra Vires Agency Action)**
**(Against All Defendants)**

154.    The States incorporate by reference the above allegations.

155.    An agency may not take any action that exceeds the scope of its statutory authority. Under the APA, a reviewing court must set aside a challenged agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or ultra vires, that is, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

156.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt*, 338 U.S. 632, 644 (1950)).

157.    The Stop Work Order is a final agency action, which marks the consummation of the agency's decision-making process and are actions from which legal consequences will flow. *See Bennett*, 520 U.S. at 177–78.

158.    The Stop Work Order is untethered from DOI and BOEM's regulatory authority under OCSLA. Because Agency Defendants' actions lack authority under OCSLA, they are ultra vires. 5 U.S.C. §§ 706(2)(C), 706(2)(A).

159.    OCSLA grants DOI authority to temporarily prohibit any activity under a wind energy lease, but only if there is "a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment." 43 U.S.C. § 1334(a)(1). Here, the Stop Work Order makes no such finding of any threat.

160.    BOEM's implementing regulations allow it to suspend a lease in only two circumstances: (1) "[w]hen necessary to comply with judicial decrees prohibiting some or all activities under [the] lease" and (2) "[w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417. This statutory standard relates purely to suspending a lease. The Stop Work Order does not purport to suspend the lease, nor could it because there is no evidence that suspending the lease is necessary to comply with a judicial decree or protect national security.

161.    The Defendant Agencies have not found that Ørsted violated any of the conditions of its lease with BOEM.

162.    The BSEE is authorized to halt offshore wind construction, but only (1) when the agency has found that the Project is violating "an applicable law; regulation; order; or provision of a lease, grant, plan, or BSEE or BOEM approval," 30 C.F.R. § 285.401(a); (2) " [w]hen necessary to comply with judicial decrees prohibiting some or all activities under [the] lease," 30 C.F.R. § 285.417; or (3) "[w]hen continued activities pose an imminent threat of serious or irreparable harm or damage to natural resources; life (including human and wildlife); property; the

marine, coastal, or human environment; or sites, structures, or objects of historical or archaeological significance," *id*. None of these three provisions are even referenced in the Stop Work Order.

163.    Rather than rely on the specific provisions that allow it to stop construction, BOEM's Stop Work Order cites the generic standard under which the government must review offshore wind projects for approval. 43 U.S.C. § 1337(p)(4); 30 C.F.R. § 585.102(a). But this standard does not give BOEM authority to indefinitely halt construction of a fully permitted project like Revolution Wind. Rather, it contains twelve factors that BOEM must considered in authorizing renewable energy activities on the Outer Continental Shelf. *Id*. BOEM already determined that the Project complies with these twelve factors, and cites no facts or law to justify changing course now. Record of Decision at B-2-26. So neither 43 U.S.C. § 1337(p)(4) nor 30 C.F.R. § 585.102(a) authorize the Stop Work Order.

164.    Moreover, DOI and BOEM's actions violate their clear mandate to administer OCSLA's permitting program to promote "expeditious and orderly development" of Outer Continental Shelf resources. 43 U.S.C. § 1332. Halting the fully permitted Revolution Wind project without basis is hardly "orderly" administration of OCSLA.

165.    The Agency Defendants' Stop Work Order is "not in accordance with law," 5 U.S.C. § 706(2)(A), and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), so it violates the APA as well as the statutory and regulatory provisions cited above.

166.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, the States are entitled to a declaration that the Stop Work Order violates APA Sections 706(2)(A) and 706(2)(C).

167.    The States are also entitled to vacatur of the Agency Defendants' Stop Work Order under 5 U.S.C. § 706.

## COUNT III
### OCSLA Citizen Suit - 43 U.S.C. § 1349
### (Against All Defendants)

168.    The States incorporate by reference the allegations contained in the preceding paragraphs.

169.    OCSLA provides that "any person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person, including the United States, and any other government instrumentality or agency (to the extent permitted by the Eleventh Amendment to the Constitution) for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease issued by the Secretary under this subchapter." 43 U.S.C. § 1349(a)(1).

170.    "The term 'person' includes, in addition to a natural person, an association, a State, a political subdivision of a State, or a private, public, or municipal corporation." 43 U.S.C. § 1331(d).

171.    An OCSLA citizen suit may be brought "immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3).

172.    The Stop Work Order immediately harms the States' legal interests in the "expeditious and orderly development," 43 U.S.C. § 1332(3), of the fully approved Project.

173.    As shown above, the States have invested time and resources into the Project's success and acted in reliance on the planned benefits to the States and their citizens.

174.    The States are relying on the energy produced from the Project to help meet their emission reduction goals required by state law, to decarbonize their electricity grids, and mitigate greenhouse-gas emissions to offset the impacts of climate change, which poses a significant threat to the wellbeing and stability of the States' communities and economies.

175.    The States are further counting on the Project to provide grid stability and reliability, economic relief for its citizens facing high electric rates, and continuing employment for approximately 1,200 residents of the States.

176.    The longer the Stop Work Order is in effect the more likely it is that the Project will not be constructed or the delays in construction will have permanent impacts on the States' aforementioned interests.

177.    The Stop Work Order violates OCSLA because it orders that all work stop on the Project without making the necessary finding that either: (1) the Project creates "a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment," 43 U.S.C. 1334(a)(1), or (2) a suspension is "necessary to comply with judicial decrees prohibiting some or all activities under [the] lease" or "is necessary for reasons of national security or defense," 30 C.F.R. § 585.417.

178.    The Stop Work Order also violates OCSLA and its regulations by ignoring the statute's clear mandate that DOI and BOEM follow its procedures to administer the Outer Continental Shelf leasing and permitting program.

179.     Under 28 U.S.C. § 2201, the States are entitled to a declaration that the Stop Work Order violates OCSLA because it is inconsistent with the statute and its implementing regulations.

180.     The States are also entitled to a preliminary and permanent injunction preventing further unlawful interference with the Project.

## PRAYER FOR RELIEF

WHEREFORE, the States respectfully request that this Court:

1.     Declare that the BOEM Acting Director's Stop Work Order is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A);

2.     Declare that the BOEM Acting Director's Stop Work Order is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right and otherwise not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(C), (A);

3.     Declare that the BOEM Acting Director's Stop Work Order violates OCSLA as inconsistent with the statute and its implementing regulations;

4.     Under 5 U.S.C. § 706(2), order vacatur of the BOEM Acting Director's Stop Work Order;

5.     Under 5 U.S.C. § 706(2), preliminarily and permanently enjoin and stay Agency Defendants from enforcing the BOEM Acting Director's Stop Work Order; and

6.     Grant all other relief as the Court may deem just and proper, including, but not limited to, attorney's fees and costs.

Dated: September 4, 2025

PETER F. NERONHA
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Nicholas M. Vaz*
Katherine Connolly Sadeck (Bar No. 8637)
*Solicitor General*
Sarah W. Rice (Bar No. 10588)
*Assistant Attorney General*
Nicholas M. Vaz (Bar No. 9501)
*Special Assistant Attorney General*
Alex Carnevale (Bar No. 10724)
*Special Assistant Attorney General*
Leonard Giarrano IV (Bar No. 10731)
*Special Assistant Attorney General*
Judy M. Shih* (CA Bar No. 206394)
*Special Assistant Attorney General*
Maithreyi Ratakonda* (NY Bar No. 5060124)
*Special Assistant Attorney General*
Max Jordan Kober* (NY Bar No. 5911409)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
Tel.: (401) 274-4400
ksadeck@riag.ri.gov
srice@riag.ri.gov
nvaz@riag.ri.gov
acarnevale@riag.ri.gov
lgiarrano@riag.ri.gov
judy@statesunited.org
mai@statesunited.org
max@statesunited.org

*Counsel for the State of Rhode Island*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Evan O'Roark*
Michael K. Skold* (CT Bar No. ct28407)
*Solicitor General*
Matthew I. Levine* (CT Bar No. ct18898)
*Deputy Associate Attorney General*
Evan O'Roark* (CT Bar No. ct30562)
*Deputy Solicitor General*
Benjamin Cheney* (CT Bar No. ct29685)
*Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
Tel.: (860) 808-5316
michael.skold@ct.gov
matthew.levine@ct.gov
evan.oroark@ct.gov
benjamin.cheney@ct.gov

*Counsel for the State of Connecticut and
Katherine Dykes*

*Motion for admission pro hac vice
forthcoming*