# Exhibit 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| STATE OF RHODE ISLAND;<br>STATE OF CONNECTICUT; and<br>KATHERINE DYKES, Commissioner of the<br>Connecticut Department of Energy and Environmental<br>Protection,<br><br>         Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR; DOUGLAS BURGUM, Secretary of the<br>Interior, in his official capacity; BUREAU OF<br>OCEAN ENERGY MANAGEMENT; MATTHEW<br>GIACONA, Acting Director of Bureau of Ocean<br>Energy Management, in his official capacity;<br>BUREAU OF SAFETY AND ENVIRONMENTAL<br>ENFORCEMENT; and KENNETH STEVENS,<br>Principal Deputy Director of the Bureau of Safety and<br>Environmental Enforcement, in his official capacity,<br><br>         Defendants. | C.A. No. 1:25-cv-00439 |

**DECLARATION OF KATHERINE S. DYKES**
**COMMISSIONER OF THE CONNECTICUT DEPARTMENT**
**OF ENERGY AND ENVIRONMENTAL PROTECTION**

I, Katherine S. Dykes, declare as follows:

1.  I am the Commissioner of the State of Connecticut Department of Energy and Environmental Protection (DEEP). I submit this declaration in support of Plaintiffs' preliminary injunction motion.

2.  I was appointed Commissioner of DEEP by Connecticut Governor Ned Lamont and confirmed by the Connecticut General Assembly on February 20, 2019. Prior to becoming

1

Commissioner, I served DEEP as Deputy Commissioner for Energy (2012-2016) and as Chair of the Connecticut Public Utilities Regulatory Authority (2016-2019).

3.    I hold a bachelor's degree in history and environmental studies from Yale University, a master's degree in history, also from Yale, and a juris doctor from Yale Law School.

4.    In 2011, Connecticut Governor Dannel P. Malloy recognized the interconnectivity of effective energy and environmental policies. Along with the Connecticut General Assembly, he merged three entities—the Department of Environmental Protection, the Department of Public Utility Control, and an energy office within the Office of Policy and Management—to create the single agency of DEEP. This action more successfully aligned Connecticut's energy and environmental policies.

5.    I submit this declaration in support of the Plaintiffs' motion for a preliminary injunction and challenge to the August 22, 2025, Stop Work Order issued by the Acting Director of the Bureau of Ocean Energy Management (BOEM), Matthew Giacona, requiring Revolution Wind's developer, Ørsted, to immediately stop construction (Stop Work Order).

6.    This declaration outlines the range of existing interests, from statutory to economic to environmental, that Connecticut has in the Revolution Wind offshore wind project and the harms that have and will come from the Stop Work Order.

**Connecticut Has a Legislative Mandate to Transition to Clean, Renewable Energy.**

7.    As Commissioner of DEEP, I am responsible for carrying out programs that protect Connecticut's air, water, and land that power the State with clean, reliable, and affordable energy. My role in leading and creating energy policies is to firmly place Connecticut on a successful clean energy trajectory to meet the State's energy needs affordably and reliably and to achieve the State's legislatively adopted climate change mitigation requirements using a multifaceted approach.

8.     For instance, Connecticut is reducing carbon dioxide ($CO_2$) emissions from fossil fuel-burning power plants through participation in the multistate, market-based initiative known as the Regional Greenhouse Gas Initiative (RGGI).

9.     Connecticut is focused on implementing energy efficiency programs to reduce the demand for electricity and the amount of fuel needed to generate power and to in turn reduce costs and improve electric reliability for Connecticut residents and businesses.

10.     Connecticut has had a Renewable Portfolio Standard (RPS) in some form since 1998. The RPS requires electric load serving entities to obtain a specified percentage of the electricity they sell or distribute to Connecticut customers from renewable energy sources through the purchase of Renewable Energy Certificates (RECs). The total renewable energy output requirements increase each year. The RPS requires load serving entities to obtain at least 33% of the electricity they sell or distribute in Connecticut from renewable energy sources, such as wind, by January 1, 2030.

11.     Conn. Gen. Stat. § 22a-200a, amended as recently as the State's 2025 legislative session, requires Connecticut to achieve State economy-wide greenhouse gas (GHG) emission reductions of at least 45% below 2001's GHG emissions level by January 1, 2030, 65% below 2001 levels by January 1, 2040, and, by January 1, 2050, to an economy-wide net-zero level, provided GHG emissions are at least 80% below the 2001 level. In the electricity sector specifically, Conn. Gen. Stat. § 22a-200a further requires the State to achieve a 100% GHG emissions free (zero-carbon) electricity supply by January 1, 2040.

12.     Conn. Gen. Stat. §§ 16a-3a(a) and 16a-3d(a) also incorporate GHG reductions into Connecticut's Integrated Resources Plan (IRP), Comprehensive Energy Strategy, and various other State planning documents and efforts.

13.     To help achieve these climate change and renewable energy requirements and meet Connecticut's need for reliable and affordable electricity, the Connecticut Legislature has provided DEEP with authority to procure new renewable energy resources, including offshore wind, for the State. In 2019, the Connecticut Legislature passed an offshore wind Act, codified in Conn. Gen. Stat. § 16a-3n, that created a process for DEEP to work with other Connecticut state officials to solicit competitive proposals for offshore wind projects. This section also authorizes DEEP to direct the State's electric distribution companies to enter into long-term contracts with bidders meeting certain criteria, which DEEP has done. DEEP also has similar procurement authority for additional renewable energy resources, including offshore wind, codified in Conn. Gen. Stat. §§ 16a-3f, 16a-3g, 16a-3h, 16a-3j, and 16a-3m.

14.     Conn. Gen. Stat. § 16a-3a requires DEEP to assess and plan through an IRP for the State's electric sector needs, including electric reliability and achievement of the State's GHG reduction goals. DEEP last published an IRP in October 2021 and is currently working on the next iteration. The October 2021 IRP included electric sector modelling, a detailed reliability analysis, and recommendations on actions, including future procurements of renewable energy, to achieve the 2040 zero-carbon electricity supply requirement.

**Connecticut Is Pursuing Offshore Wind Generation to Meet the State's Energy and Environmental Needs.**

15.     To meet the 100% zero-carbon electricity supply by 2040 requirement, the State will need higher levels of renewable energy or other zero-carbon energy resources than it has today. Currently, Connecticut's electricity supply is approximately 71% zero-carbon.

16.     Most of this existing zero-carbon energy comes from Connecticut's contract with the Millstone nuclear generating facility, which accounts for approximately 87% of the 71% figure. Connecticut's zero-carbon electricity supply percentage may drop significantly when the long-

4

term contract that Connecticut has with Millstone expires in 2029. Connecticut currently purchases nearly all zero-carbon environmental attributes associated with the power from Millstone. After the existing Millstone contract expires, other zero-carbon energy resources may be needed to replace some or all of Millstone's current contributions to the State's zero-carbon electricity supply. Even with Millstone included, additional zero-carbon energy sources will be needed to close the gap between Connecticut's current 71% level of zero-carbon electricity supply and the requirement to achieve a 100% zero-carbon electricity supply by January 1, 2040. The need to procure additional zero-carbon energy to achieve this requirement will likely increase further over time as electricity demand increases in the State and more zero-carbon energy is needed to meet this growing demand.

17.     One way in which Connecticut is working to shift reliance away from climate change-causing fossil fuels and toward renewable energy sources—as needed to achieve the RPS and the State's broader climate change requirements, including the 100% zero-carbon electricity supply requirement—is through offshore wind generation that the State is procuring directly.

18.     In 2018 and 2019, using its authority under Conn. Gen. Stat. §§ 16a-3n and 16a-3m, DEEP selected 200 megawatts (MW) and 104 MW from the Revolution Wind offshore wind project in two separate competitive solicitations. For each solicitation, DEEP spent approximately one year of staff time developing the solicitation documents, reviewing and evaluating bids, and developing materials justifying its selection decision in each solicitation before the State's Public Utilities Regulatory Authority (PURA). Each solicitation required expenditure of significant staff time by DEEP, DEEP's consultant hired to do electric sector modeling, PURA, the State's Office of Consumer Counsel, and the State's electric distribution companies, which is all paid for by the State's electric ratepayers. If Connecticut needed to go out and purchase additional zero-carbon

generation to replace the Revolution Wind project, the significant time and ratepayer money spent to enter into the contracts with Revolution Wind would be wasted and additional time and ratepayer money would be needed to find a replacement.

19. Rhode Island separately selected an additional 400 MW from Revolution Wind, for a total project size of 704 MW.

20. In Connecticut, the Revolution Wind project entered into contract negotiations with Connecticut's electric distribution companies, Eversource and United Illuminating. The resulting contracts were submitted to PURA for review and approval. PURA approved those contracts in Docket Nos. 18-06-37 and 18-05-04. Rhode Island's utility regulator separately approved that state's contract with Revolution Wind.

21. On its own, Connecticut's procurement of 304 MW of Revolution Wind will not achieve the State's climate change and renewable energy requirements, but these 304 MW of offshore wind would help significantly by providing new zero-carbon energy and associated RECs equivalent to approximately 5% of the State's current electricity supply.

22. Revolution Wind has received all necessary federal permits and is currently under construction, both onshore and in federal waters. The project is approximately 80% complete, with all its offshore foundations and 45 of its 65 turbines already installed, and is expected to reach commercial operation in 2026. At that point, the project will deliver electricity and RECs to Connecticut and Rhode Island, as well as provide wholesale energy and capacity market and reliability benefits to the broader New England grid.

23. Revolution Wind has been thoroughly studied by both federal and state regulators over more than a decade, including the initial lease area identification and execution, and has received all its required federal and state permits, including final approval of its Construction and

Operations Plan (COP) by BOEM on November 20, 2023. BOEM's approval of a COP includes thorough environmental review as well as review to ensure the offshore wind project will not unreasonably interfere with other uses of the outer continental shelf, including those involved with national security or defense. BOEM's COP approval for Revolution Wind includes all those conditions and protections.

24.     In addition to the procurement of offshore wind energy from Revolution Wind, Connecticut also has an interest in potential future procurements of offshore wind energy. Conn. Gen. Stat. § 16a-3n provides DEEP with further statutory authority to conduct competitive solicitations for up to 2,000 MW of additional offshore wind to meet Connecticut's energy and environmental requirements. DEEP also has authority to conduct additional new competitive solicitations for offshore wind, and other renewable energy resources, under Conn. Gen. Stat. §§ 16a-3f, 16a-3g, 16a-3h, 16a-3j, and 16a-3m.

25.     DEEP's October 2021 IRP relied on the fact that Revolution Wind would come online and contribute to the State's 2040 zero-carbon electricity supply requirement. If DEEP had not been able to rely on the clean power from Revolution Wind, this statutorily mandated planning effort would have, for example, included accelerated procurement efforts for other zero-carbon energy resources.

**Offshore Wind Generation Provides Electricity Reliability and Affordability Benefits to Connecticut.**

26.     Connecticut procuring offshore wind energy is critical to both reliability and affordability.

27.     New England's grid operator, ISO New England (ISO-NE), issued a December 2023 report on the "Operational Impact of Extreme Weather Events" concluding that New England must add additional electricity generation. That additional generation would include potentially

4,000 MW of new offshore wind generation (over and above projects already under construction like Revolution Wind) as well as thousands of megawatts of other new renewable energy resources by 2032.

28.     Wind generation contributes to grid reliability by reducing Connecticut's and New England's reliance on fossil fuels, all of which must be imported from outside the region. New England currently relies on natural gas to generate approximately half of the region's electricity. This creates reliability concerns during the winter, when there is high natural gas demand for heating, or in cases where unanticipated disruptions to the pipeline system or unavailability of gas limit the ability of natural gas-fired generators to run. Wind energy can help fill these gaps and reduce the region's reliance on natural gas.

29.     ISO-NE's "Operational Impact of Extreme Weather Events" report further identifies a need for New England to replace over 5,000 MW of aging fossil fuel generation in the coming years with new sources of power generation to maintain a reliable grid. By contributing new power generation and diversifying the region's electricity mix, offshore wind can help address these reliability concerns.

30.     In addition to contributing to reliability, wind energy generation does not require fuel to operate and thus has low or no marginal production costs. ISO-NE chooses the cheapest generation to meet the demand load. Revolution Wind will have a $0 (or even negative) marginal cost, which means that whenever the wind is blowing, ISO-NE will, with very few exceptions, dispatch Revolution Wind because it will (along with other renewable sources) have the lowest marginal cost. Therefore, it can lower wholesale energy market costs in New England, which are paid for by Connecticut ratepayers in their electric rates, by displacing more expensive marginal cost generation from fossil fuels.

31.     A December 2018 assessment by ISO-NE found that if 1,600 MW of offshore wind generation had been available in the region during an extended cold weather period from December 24, 2017, to January 8, 2018, it could have (1) lowered regional electricity production costs by $80-85 million, resulting in an $11-13 per megawatt-hour reduction in ISO-NE day-ahead energy market prices; (2) avoided emissions of 219,200 short tons of $CO_2$, reducing regional $CO_2$ emissions from electricity production during the period by 11%; and (3) avoided consumption of 5,300 short tons of coal, 1.81 billion cubic feet of natural gas, and 160,200 barrels of oil.

32.     A July 2025 study by Daymark Energy Advisors found that 3,500 MW of offshore wind generation operating in the region during the winter from December 2024 to February 2025 could have lowered regional wholesale electricity prices by 11%, saving New England ratepayers $400 million, while reducing $CO_2$ emissions by 1.8 million tons, which is equivalent to the annual emissions from nearly 400,000 passenger vehicles.

33.     By reducing reliance on fossil fuels, Connecticut's efforts to bring offshore wind energy online also help insulate the State's electricity ratepayers from price spikes and volatility associated with these fossil fuels. Fossil fuels like natural gas and oil are traded on global markets and the prices of these fuels are impacted by geopolitical events. For example, Russia's 2022 invasion of Ukraine led to increases in natural gas prices, which contributed to increased costs to generate electricity using natural gas and higher electricity bills in Connecticut. Reducing Connecticut's reliance on natural gas to generate electricity by bringing offshore wind and other renewable energy resources online helps to limit these impacts on Connecticut ratepayers.

**Connecticut's Investments in Offshore Wind Support Economic Development.**

34.     Connecticut's focus on regional collaboration, supportive policies, and strategic infrastructure investments has positioned the State as a key player in the offshore wind industry in the United States, which benefits the State's economy.

35.     In October 2023, Connecticut released an "Offshore Wind Strategic Roadmap" and launched the Connecticut Wind Collaborative, a public-private organization, to leverage the State's strengths in infrastructure, manufacturing, workforce, and research and development and to catalyze further economic growth, attract investment, and foster innovation in the State's offshore wind industry.

36.     To support Revolution Wind and other offshore wind projects, Connecticut has invested in facilities. The most prominent example is the redeveloped State Pier Terminal in New London, Connecticut (State Pier or Terminal). So far, Connecticut has spent over $200 million to redevelop State Pier into a world-class heavy-lift maritime facility and hub for offshore wind. State Pier is one of only three marshaling facilities on the East Coast that are assembling offshore wind turbines for deployment; and it was the first such facility with open ocean access.

37.     Ørsted leases the State Pier Terminal.

38.     Ørsted is using the Terminal to construct Revolution Wind. State Pier has been supporting the assembly and delivery of turbines for the project.

39.     Nationwide, the Revolution Wind project is supporting approximately 2,500 direct jobs in the construction, operations, shipbuilding, and manufacturing sectors, including approximately 1,200 jobs in Connecticut and Rhode Island. At the State Pier Terminal, more than 100 union jobs and nearly 200 jobs overall are tied directly to staging and assembly for offshore wind.

**The August 22, 2025, Revolution Wind Stop Work Order.**

40.     On August 22, 2025, BOEM—a federal agency within the Department of the Interior (DOI)—ordered Ørsted "to halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf (OCS) to allow time for [BOEM] to address concerns that have arisen during the review that the Department is undertaking pursuant to the President's Memorandum of January 20, 2025." A true and accurate copy of the Stop Work Order is attached as **Exhibit 1**.

41.     The Stop Work Order provides that Revolution Wind "may not resume activities until BOEM informs you that BOEM has completed its necessary review." *See* Exhibit 1. The order does not provide a timeline for completion of this review, despite the adverse impacts of delaying this project. Such a timeline has not been provided elsewhere.

42.     BOEM stated that the Stop Work Order is intended to "ensure that all activities" are "carried out in a manner that provides for protection of the environment, among other requirements," and that it "is seeking to address concerns related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in that subsection of [the Outer Continental Shelf Lands Act]." *Id.* The Stop Work Order does not explain how or in what respects BOEM believes the federal government's prior evaluations inadequately addressed these issues during the multiyear permitting process, including on the environmental or national security concerns that BOEM alleges have arisen during its review of the Revolution Wind project. The Stop Work Order does not seek any additional information related to these issues.

43.     With respect to national security specifically, the Record of Decision (ROD) for Revolution Wind's COP, issued by BOEM, the Department of Defense (U.S. Army Corps of

Engineers), and the Department of Commerce (National Marine Fisheries Service) on August 21, 2023, notes "[a]t each stage of the regulatory process . . . BOEM has consulted with the [Department of Defense] for the purposes of assessing national security considerations in its decision-making processes." The ROD states national security impacts from developing offshore wind in the Revolution Wind project's lease area "would be negligible and avoidable." The ROD further states BOEM in coordination with the Department of Defense, developed specific mitigation measures for the project to protect national security. As documented separately in the COP, development of the Revolution Wind project leading up to BOEM's November 2023 COP approval involved numerous meetings between the developer and relevant federal and state agencies, including the U.S. Coast Guard, U.S. Naval Undersea Warfare Center, U.S. Air Force, North American Aerospace Defense Command, U.S. Army Corps of Engineers, and Federal Aviation Administration. BOEM's Stop Work Order does not provide any details on what specific national security concerns would justify ordering Revolution Wind to stop work. The Stop Work Order also does not explain why the prior extensive review of national security by BOEM and other federal agencies, or the existing conditions that BOEM incorporated into its COP approval for the project, were insufficient.

### Connecticut's Interest in Revolution Wind and Harm from the Stop Work Order.

44.     Connecticut has a strong interest in the timely completion of Revolution Wind.

45.     DEEP selected the project to provide electricity and RECs to Connecticut through contracts with the State's electric distribution companies to help meet the State's energy, climate, and RPS needs and requirements.

46.     Until the Stop Work Order, Revolution Wind was actively under construction, both onshore and in federal waters. The project is approximately 80% complete. All its offshore foundations are installed, as are 45 of its 65 turbines.

47.     The project received all required federal and state permits, including final approval of its COP from BOEM on November 20, 2023.

48.     In total, Revolution Wind went through more than a decade of reviews across multiple federal administrations, from lease area identification and execution to final federal permitting of the project.

49.     The project began offshore construction in 2024 and has been on track to reach commercial operation and begin delivering power and RECs in the second half of 2026 to Connecticut, Rhode Island, and the New England regional grid.

50.     Both Connecticut and ISO-NE have been counting on Revolution Wind to come online to contribute to grid reliability. In total, the 704 MW Revolution Wind project would supply power sufficient to meet about 2.5% of New England's regional electricity load.

51.     On August 25, 2025, in response to the Stop Work Order, ISO-NE warned that delaying the Revolution Wind project would "increase risks to reliability," including potential "near-term impacts to reliability in the summer and winter peak periods," and "adversely affect New England's economy and industrial growth." ISO-NE also stated that "[u]npredictable risks and threats to resources—regardless of technology—that have made significant capital investments, secured necessary permits, and are close to completion will stifle future investments, increase costs to consumers, and undermine the power grid's reliability and the region's economy now and in the future."

52.     ISO-NE's analysis demonstrated the importance of bringing offshore wind online for regional reliability, particularly during the winter months, which is when the New England grid currently faces its greatest reliability challenges. While offshore wind projects provide energy throughout the year, they perform especially well in the winter. This coincides with when natural gas supplies are often constrained for electricity production because the demand for natural gas for heating uses increases. ISO-NE's analysis shows that offshore wind can help reduce reliance on natural gas and other fossil fuels, helping to prevent fuel shortages, reduce price volatility, and strengthen grid reliability—again, especially during the winter.

53.     Connecticut also is specifically counting on the State's 304 MW share of Revolution Wind to meet approximately 5% of the State's own electric distribution company load, and to contribute the same percentage in renewable, zero-carbon electricity toward Connecticut's RPS and 100% zero-carbon electricity supply requirements, once the project comes online in 2026.

54.     Once operational, Revolution Wind will save Connecticut ratepayers money. The Revolution Wind contracts are expected to act as a successful hedge against rising electricity rates in the future as the fixed contract prices for Revolution Wind are lower than the average projected cost of energy and RECs over this period. As noted above, Revolution Wind also will lower electricity costs for Connecticut and the region by bringing online more zero-marginal cost energy. Anticipated savings from the contract to Connecticut ratepayers are hundreds of millions of dollars over the contract.

55.     The State itself is a ratepayer. The five-year average electricity consumption for Connecticut executive branch agencies between fiscal years 2019 and 2023 was over 270,000 kilowatt-hours (kWh). In 2023, for example, executive branch agencies consumed over 260,000 kWh. In 2023, the average retail electricity rate across all ratepayers in Connecticut was 24.24

cents/kWh, according to the U.S. Energy Information Administration. If the State paid this average electricity rate, the State paid approximately $63 million for electricity in 2023. This simplified approach does not take into account the different rates that individual State accounts are charged, and it includes rates of municipal electric cooperatives in addition to the electric distribution companies that contracted with Revolution Wind. This estimate therefore is not a complete account. Rather, the estimate provides an order of magnitude of costs and underscores that the State is a significant ratepayer and therefore has a real interest in reducing costs that is distinct from the significant interest it also has in achieving the lowest possible electric rates for its residents.

56. If BOEM's Stop Work Order prevents the fully permitted and mostly constructed Revolution Wind project from entering service in 2026 as planned, Connecticut ratepayers, including the State itself, would not receive these electric bill savings. The result instead would be tens of millions of dollars in higher electricity costs on average for Connecticut ratepayers each year. The potential cost to Connecticut ratepayers and to the State's broader economy could be much higher, because, as ISO-NE has warned, the loss or delay of Revolution Wind also "will increase risks to reliability" in the region.

57. As described above, Revolution Wind supports about 1,200 jobs in Connecticut and Rhode Island alone, including more than 100 union jobs and nearly 200 jobs at State Pier. The project is supporting approximately 2,500 jobs across the country. A recent study by the Connecticut Wind Collaborative found that at least 50 Connecticut companies are working on offshore wind and associated port development. The Stop Work Order has and will continue to impact the employment of hundreds of people living and working in Connecticut and Rhode

Island. Connecticut will experience negative financial and social repercussions if they lose those jobs.

58.     Connecticut has spent over $200 million to redevelop the State Pier Terminal into a world-class heavy-lift maritime facility and hub for offshore wind. The developers of Revolution Wind, which are the first tenants of the redeveloped facility, have further contributed approximately $100 million to the redevelopment.

59.     The Stop Work Order, unless lifted in time, will harm Connecticut's interests at the State Pier Terminal. For example, the State Pier Terminal was redeveloped to be a heavy-lift facility able to service offshore wind projects. The Stop Work Order threatens to chill or put a halt to that industry. A Harbor Development Agreement was reached between the Connecticut Port Authority, the developer, and terminal operator, including a 10-year sublease to coincide with near-term regional project development. A shift in cargo accommodation due to a wind down in wind activities is a complex arrangement that requires months or years of advance booking time.

60.     The Connecticut Port Authority, a quasi-public agency, owns the State Pier Terminal, and much of the profits from the State Pier Terminal lease are reinvested into the State.

61.     As described above, Connecticut is counting on Revolution Wind to provide renewable, zero-carbon electricity sufficient to meet approximately 5% of the State's load once the project comes online in 2026, which is a significant contribution toward achieving both the RPS and the State's 100% zero-carbon electricity supply by 2040 requirements. These planned contributions from Revolution Wind have been incorporated into the State's energy plans, including the IRP.

62.     The Stop Work Order, unless it is lifted in time to enable Revolution Wind to move forward, will force Connecticut to expend duplicate resources to follow the State's statutory

mandates to mitigate climate change by procuring an appropriate replacement to the power and RECs to be purchased from the Revolution Wind Project. There are no readily available substitutes for this zero-carbon energy. If Revolution Wind cannot come online as scheduled, it will likely be years before Connecticut is able to secure replacement zero-carbon energy. Connecticut already was facing a challenge in securing significant zero-carbon and renewable energy to meet the State's statutory requirements, even with Revolution Wind.

63.     The Stop Work Order is likely to undermine investor confidence and set a chilling precedent for future projects. This type of shock to the industry hurts Connecticut's investments to support this industry. This type of shock also damages the credibility of regional energy markets.

64.     In conclusion, the Stop Work Order, which halted the fully-permitted and mostly-constructed Revolution Wind project, immediately harms and will continue to harm the State of Connecticut and its residents, including by undermining compliance with the State's climate and renewable energy laws; damaging grid reliability; forcing reliance on other, more environmentally damaging, import-constrained, and price-volatile sources of electricity; increasing electricity rates to consumers and hurting the State's economy through job losses, foregone job creation, and long-term damage to the development of the wind energy industry in the State.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Hartford, Connecticut on September 16, 2025.


_____

Katherine S. Dykes

Commissioner of the Connecticut Department of
Energy and Environmental Protection

# EXHIBIT 1



# United States Department of the Interior

BUREAU OF OCEAN ENERGY MANAGEMENT
WASHINGTON, DC 20240-0001

Director's Order
August 22, 2025

Rob Keiser
Head of Asset Management
Orsted North America Inc.
399 Boylston Street, 12th Floor
Boston, MA 02116

Dear Mr. Keiser,

The Bureau of Ocean Energy Management (BOEM) is issuing this Director's Order to
Revolution Wind, LLC to halt all ongoing activities related to the Revolution Wind Project on
the outer continental shelf (OCS) to allow time for it to address concerns that have arisen during
the review that the Department is undertaking pursuant to the President's Memorandum of
January 20, 2025. 90 Fed. Reg. 8363 (January 29, 2025).

BOEM is acting to ensure that all activities authorized under the Outer Continental Shelf Lands
Act, 43 U.S.C. §§ 1331 *et seq.*, and the implementing regulations at 30 C.F.R. Part 585 are
carried out in a manner that provides for protection of the environment, among other
requirements. 43 U.S.C. § 1337(p)(4); 30 C.F.R. § 585.102(a). In particular, BOEM is seeking to
address concerns related to the protection of national security interests of the United States and
prevention of interference with reasonable uses of the exclusive economic zone, the high seas,
and the territorial seas, as described in that subsection of OCSLA. *Id*. The BOEM Director is
taking this action to ensure compliance with the requirements of the Part 585 regulations and
applicable law.

You may not resume activities until BOEM informs you that BOEM has completed its necessary
review. If you fail to comply with the terms of this order, BOEM may take additional corrective
action as appropriate. 30 C.F.R. § 585.106(a).  This order applies only to activities on the OCS. It
does not apply to activities that are necessary to respond to emergency situations; to prevent
impacts to health, safety and the environment; or to comply with the conditions of approval,
including any conditions associated with the Biological Opinions for the project.

Pursuant to 30 C.F.R. § 585.118, you may appeal this determination. If you elect to file an appeal
under 30 C.F.R. § 590.4, your Notice of Appeal must be filed with this office and served on the
Associate Solicitor, Division of Mineral Resources, within 60 days of receipt of this letter (see
43 C.F.R. § 4.413). If you file an appeal, please send a courtesy copy of the Notice of Appeal via
e-mail to the contact e-mail address provided below.



If you have any questions, please contact David Diamond, Deputy Associate Director for Operations, Office of Renewable Energy Programs, at (703) 787-1660 or David.diamond@boem.gov.

Sincerely,


Matthew N. Giacona
Acting Director