# Exhibit 3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF RHODE ISLAND;<br>STATE OF CONNECTICUT; and<br>KATHERINE DYKES, Commissioner of the<br>Connecticut Department of Energy and Environmental<br>Protection,<br><br>        Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR; DOUGLAS BURGUM, Secretary of the<br>Interior, in his official capacity; BUREAU OF OCEAN<br>ENERGY MANAGEMENT; MATTHEW GIACONA,<br>Acting Director of Bureau of Ocean Energy<br>Management, in his official capacity; BUREAU OF<br>SAFETY AND ENVIRONMENTAL<br>ENFORCEMENT; and KENNETH STEVENS,<br>Principal Deputy Director of the Bureau of Safety and<br>Environmental Enforcement, in his official capacity,<br><br>        Defendants. | C.A. No. 1:25-cv-00439 |

## DECLARATION OF SARAH W. RICE

SARAH W. RICE, an attorney duly admitted to practice before the Courts of this State, does hereby state the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     I am Sarah W. Rice, Deputy Chief of the Civil Division and Assistant Attorney General in the Office of the Attorney General for the State of Rhode Island, who appears on behalf of the State of Rhode Island in this action.

2.     I submit this declaration in support of Plaintiffs States' Motion for Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65. The facts set forth herein are based upon my personal knowledge and/or a review of the files in my possession.

1

3.     I have attached hereto this affirmation true and correct copies of factual declarations, previously filed in *Revolution Wind, LLC v. Burgum*, 01:25-cv-02999, and which I have been authorized to submit in support of this motion, as noted herein:

    a.  Declaration dated September 5, 2025 of Melanie Gearon, Head of Northeast Permitting for Orsted North America, Inc. (Exhibit A);

    b.  Declaration dated September 5, 2025 of Paul Murphy, Senior Engineering, Permitting, and Construction Director for the commercial-scale Revolution Wind Farm and Revolution Wind Export Cable for Orsted North America, Inc. (Exhibit B);

4.     The State of Rhode Island and the State of Connecticut submitted a citizen-suit notice to the Defendants in this action by electronic mail and hand-delivery prior to filing this action.  A true and accurate copy of the same is attached as Exhibit C (the "Notice of Intent").


I hereby declare under penalty of perjury that the following is true and correct and that I am authorized to file this declaration.


Dated: Providence, Rhode Island
       September 17, 2025

Sarah W. Rice
Assistant Attorney General

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

REVOLUTION WIND, LLC,

        *Plaintiff,*

   v.

DOUG BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior;

UNITED STATES DEPARTMENT OF THE
INTERIOR;

MATTHEW GIACONA, in his official capacity
as Acting Director of the Bureau of Ocean Energy
Management;

BUREAU OF OCEAN ENERGY
MANAGEMENT;

KENNETH STEVENS, in his official capacity as
Principal Deputy Director Exercising the
Delegated Authorities of the Director of the
Bureau of Safety and Environmental Enforcement;
and

BUREAU OF SAFETY AND
ENVIRONMENTAL ENFORCEMENT,

        *Defendants.*

Civil Action No. 1:25-cv-2999

## DECLARATION OF MELANIE GEARON IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND STAY PENDING REVIEW

Pursuant to 28 U.S.C. § 1746(2), I, Melanie Gearon, declare as follows:

1.     I am employed by Orsted North America Inc. ("Ørsted") as the Head of Northeast Permitting, including for the commercial-scale Revolution Wind Farm and Revolution Wind Export Cable (together, the "Project"). The Project is owned by Revolution Wind, LLC

1

("Revolution Wind"), which is a joint venture indirectly owned in equal part by Ørsted and an investment joint venture partner.

2.    I have been employed at Ørsted since November of 2018 as a manager of permitting and environmental affairs and have held the position of the Head of Northeast Permitting since March 2022.  From 2017 to 2018, I was an employee of Deepwater Wind, LLC, an entity subsequently acquired by an Ørsted affiliate.  Collectively, I have worked on the Revolution Wind Project for approximately 7 years, participating in and overseeing all aspects of the permitting and environmental studies and surveys conducted for the Project.  I have over 18 years of professional experience in environmental science, impact assessment, and offshore permitting.  I obtained my Bachelor of Science in Marine Science and Biology from Southampton College of Long Island University and a Master of Science in Fisheries Science from the University of Rhode Island.

3.    As Ørsted's Head of Northeast Permitting, I am and have been involved in and aware of numerous aspects of the Project, including: site investigation activities; project layout and design; local, state, and federal permitting, including the Project's Endangered Species Act ("ESA"), Magnuson-Stevens Fishery Conservation and Management Act, and Marine Mammal Protection Act consultations; and stakeholder and market affairs management.

4.    I have reviewed the August 22, 2025 order issued by the Acting Director of the Bureau of Ocean Energy Management ("BOEM") to Revolution Wind "to halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf" and to "not resume activities until BOEM informs [Revolution Wind] that BOEM has completed its necessary review"

(the "Stop Work Order").  A true and correct copy of BOEM's Stop Work Order has been attached to Revolution Wind's Complaint, Dkt. 1-1.[1]

5.      I am personally familiar with the Project's environmental permitting, its development history, and the ongoing and future impacts of the Stop Work Order if not enjoined.

6.      I execute this Declaration in support of Revolution Wind's Motion for a Preliminary Injunction and Stay Pending Review in this case based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto. I am over 18 years of age and competent to testify about the matters set forth herein.

**A.      The Revolution Wind Project's Multi-Year Development Process**

7.      Revolution Wind has invested significant resources in the extensive, multi-year planning and development process for the Project, including through years of site characterization surveys and data collection, the development of voluminous technical and scientific submissions to federal, state, and local agencies, participating in public consultation and review processes, and years constructing the Project.

8.      BOEM's environmental, national security and safety review for the Project and its lease area dates back nearly 16 years when the Agency conducted a review and environmental assessment, including through a task force, which included participants from the Department of Defense ("DOD"), on potential wind energy areas offshore Massachusetts and Rhode Island.  For

---

[1] The Stop Work Order is also available on BOEM's website at https://www.boem.gov/sites/default/files/documents/renewable-energy/Director%26%23039%3BsOrder-20250822.pdf?VersionId=Y674sNo8zi7jLu3VWRvq2hFb_8KtMldc.

example, materials from the December 10, 2010,[2] May 2, 2011,[3] and March 1, 2012[4] task force meetings reflect early and ongoing participation by the U.S. Navy, including the Office of the Chief of Naval Operations, N43-Navy Fleet Readiness Division, and the Naval Undersea Warfare Center - Division Newport.   This review was conducted for a variety of purposes, including to assess whether the Project's planning, leasing, and National Environmental Policy Act ("NEPA") processes for the COP review complied with 43 U.S.C. § 1337(p)(4).   After issuing a draft environmental assessment and soliciting public comment, BOEM issued a final environmental assessment in May 2013, concluding leasing and site assessment activities in the proposed lease sale area would result in no significant environmental effects.   As described in that environmental assessment, after considering agency and public comments BOEM defined the wind energy area to exclude high value fishing grounds so those areas would not be considered for leasing.[5]   After this extensive process, on July 31, 2013, BOEM conducted a competitive lease sale for commercial leasing for wind power on the outer continental shelf ("OCS") offshore Rhode Island and Massachusetts.   After the competitive bidding process, Deepwater Wind New England, LLC

---

[2] BOEM, Attendees at Massachusetts/Rhode Island Joint Task Force Meeting (December 10, 2010), available at https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/TaskForceMeetingAttendees.pdf.

[3] BOEM, Attendees at Massachusetts/Rhode Island Joint Task Force Meeting (May 2, 2011), available at https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/BOEMREJointRI-MA_TFMAttendees5-2-11.pdf.

[4] BOEM Rhode Island Renewable Energy Task Force Webinar (March 1, 2012), available at https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Renewable_Energy_Program/State_Activities/BOEM%20RI%20Task%20Force%20March%201%20Presentation.pdf.

[5] BOEM, Revised Environmental Assessment: Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf Offshore Rhode Island and Massachusetts (May 2013) at Section 1.5, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/BOEM%20RI_MA_Revised%20EA_22May2013.pdf.

acquired Lease OCS-A 0486 with an effective date of October 1, 2013.[6]  In 2020, Deepwater Wind New England, LLC segregated a portion of the Lease, resulting in the creation of Lease OCS-A 0517, which was assigned to another entity.[7]  The remaining portion of the Lease was assigned to DWW Rev I, LLC, which later changed its name to Revolution Wind, LLC.[8]

9.    To understand and characterize the environment and the Project site, Revolution Wind and its affiliates conducted extensive surveys of the Project area pursuant to the leases and a Site Assessment Plan that BOEM approved on October 12, 2017.  These surveys included meteorological, bathymetric, geological, geotechnical, geophysical, biological, archeological, hazard, and oceanographic surveys.[9]

10.    Revolution Wind submitted a detailed Construction and Operations Plan ("COP") to BOEM in March 2020, describing the planned facilities and construction and operation activities for the Project.  Revolution Wind also submitted updates and revisions to the COP throughout the multi-year review process in response to comments received and requests for additional information from BOEM, other agencies, and the public, as well as to refine Project design details to support consultations and align with information in other federal and state permitting processes. The final version of the Project's COP is thousands of pages long, including appendices.[10]

---

[6] Commercial Lease for Renewable Energy Development OCS-A 0486 (Sept. 9, 2013), available at https://www.boem.gov/sites/default/files/documents/oil-gas-energy/Lease-Issued.pdf.
[7] Notice of Assignment of Lease (March 23, 2020), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Notice-Assignment-Approved-Lease-Segregated.pdf.
[8] Notice of Assignment of Lease (March 24, 2020), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Notice-Assignment-Approved-RI.pdf.
[9] These surveys were included in appendices to the Project's Construction and Operations Plan, available at https://www.boem.gov/renewable-energy/state-activities/revolution-wind-farm-construction-and-operations-plan.
[10] The COP is available at https://www.boem.gov/renewable-energy/state-activities/revolution-wind-farm-construction-and-operations-plan.

11.     On April 30, 2021, BOEM issued a Notice of Intent ("NOI") to prepare an Environmental Impact Statement ("EIS") under NEPA for BOEM's review of the proposed COP.[11] The NOI began a more than two-year period of extensive environmental, national defense, and safety review under NEPA by the federal government involving Revolution Wind, 15 federal and state agencies, and a variety of other stakeholders, including American Indian tribes, the commercial and for-hire fishing industries, historic preservation organizations, private recreational fishers/recreational boaters, commercial shipping, and local community members.[12]  The other federal agencies that reviewed the Project include the Bureau of Safety and Environmental Enforcement ("BSEE"), DOD, the Department of the Navy, the Environmental Protection Agency ("EPA"), the U.S. Army Corps of Engineers ("USACE"), the Fish and Wildlife Service ("FWS"), the National Oceanic and Atmospheric Administration  ("NOAA") (including its National Marine Fisheries Service ("NMFS")), the North American Aerospace Defense Command ("NORAD"), the United States Air Force, the U.S. Coast Guard ("USCG"), the Federal Aviation Administration ("FAA"), and the National Park Service.[13]

---

[11] BOEM, Notice of Intent to Prepare an Environmental Impact Statement for Revolution Wind LLC's Proposed Wind Energy Facility Offshore Rhode Island 86 Fed. Reg. 22,972 (April 30, 2021) available at https://www.govinfo.gov/content/pkg/FR-2021-04-30/pdf/2021-09048.pdf.
[12] BOEM, USACE, NMFS, Record of Decision Revolution Wind Farm and Revolution Wind Export Cable Project Construction and Operations Plan (Aug. 21, 2023) at B-8 – B-10, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_Redacted.pdf.
[13] *Id*. at B-15.

12. BOEM published notice of the Project's Draft EIS on September 2, 2022.[14] BOEM published the Project's Final EIS on July 21, 2023,[15] after responding to federal, state, and local agency comments and public comments from over a hundred individual submissions.[16]

13. Appendix A to the Final EIS describes the extensive consultations and public involvement BOEM undertook in the process of its NEPA review. BOEM's NEPA process included three public scoping meetings following the NOI where interested parties were invited to offer feedback and identify issues and potential alternatives for BOEM to consider in the EIS. BOEM held five additional public hearings on the Draft EIS. Revolution Wind attended all of these meetings. Revolution Wind also submitted comments as part of the NEPA process.[17]

14. On August 21, 2023, BOEM issued a Record of Decision ("ROD") memorializing the Department of the Interior's decision to approve the COP, with some revisions.[18] On August 24, 2023, BOEM published a notice of availability of the ROD in the Federal Register.[19] On

---

[14] BOEM, Notice of Availability of a Draft Environmental Impact Statement for Revolution Wind, LLC's Proposed Revolution Wind Farm Offshore Rhode Island, 87 Fed. Reg. 54,248 (Sept. 2, 2022) available at https://www.govinfo.gov/content/pkg/FR-2022-09-02/pdf/2022-18915.pdf.

[15] BOEM, Notice of Availability of the Revolution Wind Farm and Revolution Wind Export Cable Project Final Environmental Impact Statement, 88 Fed. Reg. 47,171 (July 21, 2023) available at https://www.govinfo.gov/content/pkg/FR-2023-07-21/pdf/2023-15387.pdf.

[16] The Draft EIS and Final EIS are available under the "Environmental Review" tab at https://www.boem.gov/renewable-energy/state-activities/revolution-wind.

[17] BOEM-2022-0045-0086 available at https://www.regulations.gov/comment/BOEM-2022-0045-0086; Final EIS, Appendix L, Table L-2.

[18] BOEM, USACE, NMFS, Record of Decision Revolution Wind Farm and Revolution Wind Export Cable Project Construction and Operations Plan (Aug. 21, 2023) available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_Redacted.pdf.

[19] Notice of Availability of a Joint Record of Decision for the Revolution Wind Farm and Revolution Wind Export Cable Project, 88 Fed. Reg. 57,967 (Aug. 24, 2023), https://www.govinfo.gov/content/pkg/FR-2023-08-24/pdf/2023-18244.pdf.

November 17, 2023, BOEM issued its letter documenting COP approval for the Project.[20] The COP's Conditions of Approval mandate multiple measures to address navigational and aviation safety, national security considerations, potential impacts to marine life, and commercial fisheries and for-hire and recreational fishing.[21] The Project's ROD documents BOEM's determination that the COP complies with the Outer Continental Shelf Lands Act's ("OCSLA") subsection 8(p)(4), 43 U.S.C. § 1337(p)(4), and BOEM's regulations implementing that subsection, and that approval of the COP with modifications and Conditions of Approval "would be in accordance with the regulations at 30 CFR part 585 and would ensure that all the activities on the OCS are carried out in a manner that provides for the factors in subsection 8(p)(4) of OCSLA."[22] For example, the ROD details how BOEM has assessed the Project in accordance with the 8(p)(4) factors and the 30 C.F.R. part 585 regulations, including how the Project will be carried out in a manner that protects the national security interests of the United States and that prevents interferences with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas; BOEM specifically explains how, throughout the Project's planning, leasing, and NEPA processes, BOEM "considered numerous other OCS uses in order to minimize or eliminate interference."[23]

15. Extensive additional time, effort, and financial resources were also expended to secure other required permits and approvals for the Project. Overall, Revolution Wind has

---

[20] BOEM Letter of COP Approval (Nov. 17, 2023) available at https://www.boem.gov/renewable-energy/state-activities/cop-appv-ltrrev-ocs-0486pdf; Conditions of COP Approval (Nov. 17, 2023) available at https://www.boem.gov/renewable-energy/state-activities/cond-cop-apprrev-ocs-0486. On April 25, 2024, BOEM published an errata to its Conditions of COP Approval for the Project on its website that included corrections to the Conditions of COP Approval, noting that none of the edits or corrections were substantive or affect the analysis or conclusions in the Conditions of COP Approval.
[21] Conditions of COP Approval at 27-31, 86-93.
[22] ROD at Appendix B.
[23] *Id*. at B-10, B-15 – B-17, B-18 – B-23.

obtained over 20 local, state and federal permits and approvals issued for the Project and has spent over $100 million to obtain these permits and approvals.  I discuss several of the key permits and approvals below.

16.     The Project was also reviewed by DOD, USCG, and FAA.  For example, as provided in the ROD, at each stage of the regulatory process involving the Project's lease, BOEM consulted with DOD to assess national security considerations.[24]  As part of this consultation, BOEM and DOD developed measures to protect against potential liabilities and impacts on DOD activities as well as to protect the Nation's security interests.[25]  These measures are included in Appendix A of the ROD and as Conditions of the Project's COP Approval.[26]

17.     Representatives of the Project also engaged in numerous communications with agencies regarding national security, aviation and navigation safety, including USCG, U.S. Naval Undersea Warfare Center, U.S. Air Force, NORAD, USACE, and FAA.  As explained by BOEM in its approval of the Project, BOEM coordinated with DOD and requested that the DOD's Military Aviation and Installation Assurance Siting Clearinghouse ("DOD Clearinghouse") coordinate within DOD to review the COP before its approval.[27]  After the conclusion of consultation with DOD Clearinghouse, Revolution Wind entered into an agreement with DOD, acting through DOD Clearinghouse, and the Department of the Air Force to minimize national security risks and to mitigate potential impacts on military operations and readiness, including to protect military radar systems.  A true and correct copy of the agreement is attached hereto as **Exhibit 1**.  Under this agreement, the parties "agree that the terms [set forth] will allow the mutual goals of the Parties to

---

[24] ROD at B-15.
[25] *Id*. at B-16.
[26] *Id*. at A-30 – A-31; Conditions of COP Approval at 29-31.
[27] ROD at B-16; Conditions of COP Approval at 30-31 (Conditions 4.2 and 4.3).

be met, including the protection of the radar, which promotes national security, and protection of the National Airspace System, while supporting military readiness."  Exhibit 1 at 2.  For example, per the agreement, "[u]pon request by NORAD, Revolution Wind agrees to immediately curtail wind turbine operations for a National Security or Defense Purpose."  Exhibit 1 at 6.  The agreement expressly states that, except as otherwise provided, "[t]he DoD Parties agree not to object to the construction and operation of the Project before any federal, state, or local regulatory entity with jurisdiction over the Project[.]"  Exhibit 1 at 6.  On December 13, 2024, DOD Clearinghouse sent a letter to the Project stating that "[a]s a result of discussions between Ørsted and the U.S. Air Force and a resulting mitigation agreement", DOD Clearinghouse found that construction of the Revolution Wind Project "would not have adverse impacts to DoD missions in the area."  A true and correct copy of this letter is attached hereto as **Exhibit 2.**

18.     FAA also assessed the Project's potential impacts on radar system and navigation safety within its jurisdiction and concluded that the Project's wind turbine generators ("WTGs") would **not** have a "substantial adverse effect on the safe and efficient utilization of the navigable airspace by aircraft or on the operation of air navigation facilities."[28]

19.     BOEM and other cooperating agencies conducted ESA Section 7 consultations for the threatened and endangered species in NMFS's and FWS's jurisdictions pursuant to 16 U.S.C. § 1536.  BOEM submitted a draft Biological Assessment to NMFS in April 2022 and a separate Biological Assessment to FWS in August 2022.  BOEM subsequently updated the NMFS

---

[28] The Project received Determinations of No Hazard from the Federal Aviation Administration for each applicable structure.  An example of one of these Determination of No Hazard approvals is attached as **Exhibit 3**.

Biological Assessment multiple times during the consultation.[29]  Revolution Wind responded to numerous requests for information from NMFS and BOEM throughout their preparation and review of the Biological Assessment to assist NMFS in completing ESA Section 7 consultation.

20.    In July 2023, NMFS issued a Biological Opinion ("BiOp") ("2023 BiOp"), which assessed the potential effects of construction, operation, maintenance, and decommissioning of the Project on ESA-listed whales, sea turtles, fish, corals, and designated critical habitat in the Project area.[30]  The 2023 BiOp concluded that the Project was not likely to adversely affect, or would have no effect on, several ESA-listed species or critical habitat designated for several ESA-listed species.[31]  The 2023 BiOp also concluded that the Project is not likely to jeopardize the continued existence of any ESA-listed species, including the North Atlantic right whale.[32]

21.    In response to requests from NMFS and BOEM, on March 12, 2024, NMFS and BOEM reinitiated the Project's ESA Section 7 consultation process, which concluded with the issuance of a superseding BiOp on April 30, 2024 ("2024 BiOp").[33]  The 2024 BiOp concluded that the Project is not likely to jeopardize the continued existence of any ESA-listed species and that the Project is not likely to adversely affect, or would have no effect on, several ESA-listed species.[34]  The 2024 BiOp also concluded that the Project will have no effect on the critical habitat designated for several ESA-listed species, including the North Atlantic right whale.[35]  The 2024

---

[29] NMFS, Endangered Species Act Biological Opinion for Construction, Operation, Maintenance, and Decommissioning of the Revolution Wind Offshore Energy Project ("BiOp") at 9-10 (Apr. 30, 2024), https://www.fisheries.noaa.gov/s3/2024-05/2024-Rev-Wind-BiOp-508.pdf. .

[30] The 2023 BiOp is available at https://repository.library.noaa.gov/view/noaa/51759.

[31] *Id*. at 424.

[32] *Id.*

[33] The operative 2024 BiOp is available at https://www.fisheries.noaa.gov/s3/2024-05/2024-Rev-Wind-BiOp-508.pdf.

[34] *Id*. at 469; *see also id.* at 474.

[35] *Id*. at 469.

BiOp included an Incidental Take Statement pursuant to ESA Section 7(b)(4), 16 U.S.C. § 1536(b)(4), identifying the permitted take incidental to the Revolution Wind Project and enforceable mitigation measures and requirements to minimize impacts to listed species.[36]

22.     BOEM also consulted with FWS pursuant to its ESA Section 7 obligations.  FWS issued a separate BiOp on May 30, 2023, concluding that the Project is not likely to jeopardize the continued existence of the two ESA-listed bird species in the Project's action area and included an Incidental Take Statement.[37]

23.     On October 8, 2021, Revolution Wind submitted a request to NMFS to promulgate Incidental Take Regulations ("ITRs") and to issue of a Letter of Authorization ("LOA") for the taking of marine mammals incidental to the Project's construction and operation.  In response to NMFS's comments and following extensive information exchange, Revolution Wind submitted a final application on February 23, 2022, which NMFS determined was adequate and complete on February 28, 2022.[38]  On March 21, 2022, NMFS published a Federal Register notice confirming receipt of Revolution Wind's application, and then held a 30-day public comment period.[39]  On December 23, 2022, NMFS published a proposed rule and then held a 45-day public comment

---

[36] *Id*. (Sec. 11.0 – Incidental Take Statement).

[37] FWS, Biological opinion for the Revolution Wind offshore wind energy project (May 30, 2023) available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/20230530%20BOEM%20Revolution%20Wind%20BO%202022-0023298_FINAL%20alm.pdf.

[38] Taking and Importing Marine Mammals; Taking Marine Mammals Incidental to Construction and Operation of the Revolution Wind Offshore Wind Farm Offshore of Rhode Island, 87 Fed. Reg. 15942, 15943 (March 21, 2022) available at https://www.govinfo.gov/content/pkg/FR-2022-03-21/pdf/2022-05947.pdf.

[39] *Id*.

period.[40]  NMFS published its final ITRs on October 20, 2023 [41] and issued its LOA for the Project

on November 20, 2023.[42]

      24.     Pursuant to the Marine Mammal Protection Act, the Project's ITRs and LOA allow

for the non-lethal incidental take of small numbers of marine mammals during construction-related

activities within the Project area from November 20, 2023, through November 19, 2028.  The LOA

includes more than 30 pages of mitigation, monitoring, and reporting requirements.[43]  The ITRs

and LOA authorize incidental take of small numbers of marine mammals by Level A and Level B

Harassment, but *do not* authorize, nor did Revolution Wind request, take of marine mammals by

mortality or serious injury.[44]

      25.     On June 3, 2022, Revolution Wind filed an application for the Project with the

USACE for an individual permit under Section 404 of the Clean Water Act and Sections 10 and

---

[40] NMFS, Taking Marine Mammals Incidental to the Revolution  Wind Offshore Wind Farm Project Offshore Rhode Island, 87 Fed. Reg. 79072 (Dec. 23, 2022), https://www.govinfo.gov/content/pkg/FR-2022-12-23/pdf/2022-27491.pdf.

[41] NMFS, Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the Revolution Wind Offshore Wind Farm Project Offshore Rhode Island, 88 Fed. Reg. 72,562 (Oct. 20, 2023) available at https://www.federalregister.gov/documents/2023/10/20/2023-22056/takes-of-marine-mammalsincidental-to-specified-activities-taking-marine-mammals-incidental-to-the; NMFS, Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the Revolution Wind Offshore Wind Farm Project Offshore Rhode Island; Correction, 88 Fed. Reg. 78,674 (Nov. 16, 2023) (providing corrections to the Oct. 20, 2023 ITR's vessel strike avoidance measures provision) available at https://www.federalregister.gov/documents/2023/11/16/2023-25366/takesof-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the.

[42] The Project's LOA is available at https://www.fisheries.noaa.gov/s3/2023-11/BL52-Revolution-Wind-LOA-OPR1-Final-signed-OPR1.pdf, https://www.fisheries.noaa.gov/s3/2024-09/RevWind_LOA-MOD2.1_correctformat_OPR1.pdf.

[43] LOA at 3-34; 34; 88 Fed. Reg. at 72,660-73; 50 C.F.R. §§ 217.274, 217.275.

[44] 88 Fed. Reg. at 72,610 ("Revolution Wind did *not request and we are not authorizing* take by mortality or non-auditory injury.") (emphasis added); LOA at 2 ("Take by mortality or serious injury of *any* marine species is *not* authorized.") (emphasis added). *See also* 50 C.F.R. § 217.272(c).

14 of the Rivers and Harbors Act of 1899.  On September 2, 2022, the USACE issued a public notice of Revolution Wind's permit application and requested public comment, establishing a 45-day comment period that was later extended.[45]  The USACE approved the Project's ROD on August 21, 2023, and subsequently issued the permit to Revolution Wind on October 2, 2023.[46] The USACE permit includes extensive environmental protection measures, annual compliance reporting requirements, coastal surveying, and other Project conditions.

26.     Pursuant to the Coastal Zone Management Act ("CZMA"), 16 U.S.C. § 1451, on June 7, 2021, Revolution Wind submitted consistency certifications to the Massachusetts Office of Coastal Zone Management and to the Rhode Island Coastal Resources Management Council.[47] Each State concurred with Revolution Wind's consistency certification, finding that the Project is consistent to the maximum extent practicable with the enforceable policies of each State's coastal management plan.[48]  The Rhode Island federal consistency review notes that Revolution Wind agreed to provide a financial mitigation package to directly compensate Rhode Island commercial and charter fishermen for potential loss of access or reduction of harvest.[49]  In addition, a mutually agreed-upon condition of the Rhode Island consistency determination was a reduction in the number of turbine foundations and modified project layout to "minimize the reasonably foreseeable effects

---

[45]USACE, Announcement of Public Meetings and Request for Public Comment, available at https://www.nae.usace.army.mil/Portals/74/docs/regulatory/PublicNotices/2022/NAE-2020-00707-20220901-Public-Notice.pdf; ROD at 32.
[46] The USACE Permit is available at https://www.nae.usace.army.mil/Missions/Regulatory/Permits-Issued/Orsted-Revolution-Wind-LLC-Oct-2023/.
[47] ROD at 61, B-9 – B-10; Final EIS Appendix A, A-3; COP Appendix B, Coastal Zone Management Consistency Certifications.
[48] ROD at B-9 – B-10.  BOEM received the CZMA concurrence letters from Rhode Island on May 12, 2023, and from Massachusetts on May 10, 2023.  *Id*. at B-9 – B-10.
[49] State of Rhode Island Coastal Resources Management Council, Re: CRMC Federal Consistency Review of the Revolution Wind Project at 6 (May 12, 2023), available at http://www.crmc.ri.gov/windenergy/revolution/RevWind_FedConDecision_20230512.pdf.

to Rhode Island coastal resources and uses including effects to those resources and uses with the same characteristics, values, and resources as found in Rhode Island State Waters."[50] The Massachusetts Office of Coastal Zone Management also issued a federal consistency determination of concurrence for the Project in May 2023, acknowledging that Revolution Wind would establish a direct compensation program to offset potential economic impacts to Massachusetts commercial and charter/for-hire fishing.[51]

27. BOEM also completed an Essential Fish Habitat consultation with NMFS in June 2023 under the Magnuson-Stevens Fishery Conservation and Management Act, and coordinated with USACE as well.[52] BOEM analyzed the Project's potential adverse impacts on Essential Fish Habitat in an Essential Fish Habitat Assessment deemed complete by NMFS on March 23, 2023.[53] Section 5 of the Project's Conditions of COP Approval include measures to protect important benthic and fish habitat.[54] For example, Condition 5.5.3 requires the Project to microsite WTG locations, inter-array cables, and export cable routes "to avoid or minimize impacts to complex habitat and boulders[.]"[55]

28. The Project has been and is committed to mitigating impacts to the commercial, for-hire, and recreational fishing communities during the development, construction, and operational phases. In addition to voluntary mitigation and deconfliction efforts during the early phases of offshore project development and site assessment, as well as the Project's agreement to

---

[50] *Id*. at 5.
[51] Office of Coastal Zone Management Massachusetts Federal Consistency Review of the Revolution Wind Farm at 2 (May 10, 2023), available at https://www.mass.gov/doc/offshore-wind-revolution-wind-farm-fcr-signed-decision-5-10-23/download.
[52] ROD at 21, 60.
[53] *Id*. at B-13.
[54] Conditions of COP Approval at 31-86.
[55] *Id*. at 49-50.

space the WTGs 1 nautical mile by 1 nautical mile apart to facilitate safe passage through the area, the Project has several permit requirements related to mitigating fishing impacts during construction and operations. Section 6 of the Project's Conditions of COP Approval include measures to protect commercial fisheries and for-hire and recreational fishing. For example, COP Condition 6.2 requires Revolution Wind to maintain a fisheries gear loss compensation program throughout the Project's lifetime to assist commercial and for-hire fishermen potentially impacted by the Project's actions or infrastructure, regardless of homeport.[56] Revolution Wind has implemented a gear loss claims and compensation program since early in the Project's development. COP Condition 6.1 requires Revolution Wind to establish and implement a direct compensation program to provide monetary compensation to commercial and for-hire fishermen potentially impacted by the Project, including in Rhode Island and Massachusetts: nearly $22 million in direct compensation for losses in federal and state waters; $900,000 in coastal community funds; and $833,333 for Navigational Enhancement and Training Programs.[57]

29. COP Appendix R includes the Project's Navigation Safety Risk Assessment ("NSRA") for USCG to evaluate the Project's potential effects on the marine transportation system, including navigation safety, traditional uses of the waterways, and USCG missions.[58] The "NSRA did not identify any major areas of concern regarding the Project's effect on marine navigation."[59] Furthermore, as provided in the NSRA, "[n]o specific military activities have been identified within the Lease Area; however, aircraft and submarine use occur nearby" and "[t]he closest identified military use is submarine transit lanes" approximately 9 nautical miles from the

---

[56] Conditions of COP Approval at 91.
[57] *Id*. at 86-87.
[58] NSRA at 1, available at https://www.boem.gov/renewable-energy/state-activities/revolution-wind-farm-construction-and-operations-plan.
[59] *Id*. at xi.

Project.[60] The NSRA includes mitigation measures to address potential navigational impacts, including potential radar effects.[61]  For example, to enhance navigation safety, Revolution Wind used a WTG layout of linear rows and columns oriented both north-south and east-west with 1 nautical mile spacing between WTGs, providing at least three lines of orientation and "alternative routes for vessels or aircraft transiting the wind farm and provide multiple options in case of high winds or seas."[62]  The Project implemented this WTG layout to facilitate safe passage through the lease area, based on consultation with the local mariner community.[63]  As provided in the NSRA, USCG[64] has examined and recommended this type of predictable grid pattern layout, concluding that this layout will maintain USCG's ability to conduct search and rescue operations within an offshore wind project's area.[65]  The NSRA affirms USCG's earlier conclusion in an October 27, 2020 letter to the Responsible Offshore Development Alliance, stating that "this combination of alignment and spacing [north/south/east/west orientation and minimum 1 nautical mile separation between structures] would also enable all routine Coast Guard operations, with a specific focus on

---

[60] *Id*. at 65.

[61] *Id*. at 140-45.

[62] *Id*. at 77, 105, C-1.

[63] *Id*. at C-1.

[64] To further understand the Project's potential impact on navigation safety and familiarity, USCG, BOEM, commercial fishermen, and other stakeholders have also attended simulation demonstrations that allowed them to observe visual models of the Project's turbines from the command centers of simulated vessels while virtually navigating through the simulated wind farm in different sized vessels.  These simulations also included differing sea states, weather conditions, and visibility.  Additional information about these simulations is available at https://www.mitags.org/case-study-offshore-wind-simulations-with-orsted/.

[65] NSRA at 77 (citing "U.S. Coast Guard (2020a), "The Areas Offshore of Massachusetts and Rhode Island Port Access Route Study", Final, USCG-2019-0131, dated 14 May 2020, published 27 May 2020"); *see also id*. at 126 (concluding that "[r]egularly spaced turbines can facilitate use of helicopters for [search and rescue] and radar-assisted search" and that "[i]ncreasing the spacing between WTGs generally decreases its effects on radar."); *see also* 85 Fed. Reg. 31,792, 31,395 (May 27, 2020) ("[T]he majority of commenters agreed with our recommendation for a standard and uniform grid pattern with 1 NM spacing between WTGs.").

Search and Rescue (SAR) by aircraft." The NSRA concluded that "[m]ost instances of [radar] interference can be mitigated through the use of radar gain controls."[66] Additionally, in response to mariner concerns about potential impacts to marine radars, especially older "tube" type radars, the Project implemented a unique Navigation Enhancement and Training Program ("NETP") to subsidize purchases of newer generation, higher-performance "solid-state" radars preferred by mariners. The NETP also subsidized purchases of other, newer, navigation electronics and professional training for crew. Part of the reason Revolution Wind created the NETP was to help fishermen buy newer solid-state radars, which also mitigates interference.

30. Per COP Condition 2.18, Revolution Wind entered into an agreement with the U.S. Department of Commerce, NOAA, the National Ocean Service, and the U.S. Integrated Ocean Observing System Office to mitigate potential interference to high frequency oceanographic radar, whose purposes include "predicting sea state for safe marine navigation."[67] A true and correct copy of the agreement is attached hereto as **Exhibit 4**.

31. On September 28, 2023, after a notice and public comment process, EPA issued a Clean Air Act ("CAA") OCS air quality permit to construct and operate the Project pursuant to Section 328 of the CAA, 42 U.S.C. § 4207, and Title 40, part 55 of the Code of Federal Regulations.[68] The CAA OCS air permit includes conditions on Revolution Wind's activities consistent with the CAA, including Nonattainment New Source Review offset requirements; testing, recordkeeping, reporting, and operating requirements; and emission limits.

---

[66] NSRA at xiv.
[67] Conditions of COP Approval at 19.
[68] The Project's CAA OCS air permit is available at
https://www.epa.gov/system/files/documents/2023-09/rw-ocs-air-permit-ocs-r1-05-final-permit.pdf.

32.     BOEM also conducted consultation under Section 106 of the National Historic Preservation Act to review potential impacts to historic properties.  This consultation process concluded with a final Memorandum of Agreement ("MOA") executed in August 2023.  The MOA was signed by BOEM, USACE, the Town of Aquinnah, Revolution Wind, the Advisory Council on Historic Preservation, and the New York, Rhode Island, Connecticut, and Massachusetts State Historic Preservation Officers.[69]  The MOA includes measures to resolve any adverse effects to historic properties in the Project's action area including avoidance, minimization, and mitigation measures.[70]

**B.     Continued Coordination with Federal Agencies Following COP Approval**

33.     After BOEM's approval of the Project's COP, Revolution Wind has continued to work in the ordinary course with multiple federal agencies, including BOEM, BSEE, NMFS, USCG, the USACE, and FAA, to ensure compliance with the Conditions of COP Approval for the Project, federal laws and regulations, and other applicable Project requirements.  Several examples of this continued coordination and cooperation are highlighted below.

34.     Throughout 2025, Revolution Wind continued to participate in routine meetings with BOEM and BSEE, approximately bi-weekly, to discuss construction updates, plans, reports, mitigation agreements and other matters relating to the Project.  The most recent of these bi-weekly meetings were held with BOEM on August 6, 2025 and August 20, 2025.  Despite the fact that this latter meeting was held only two days before BOEM's Director issued the Stop Work Order, at neither of these meetings – nor at any other recent Project meetings or in correspondence – did BOEM raise the possibility of a Stop Work Order or the need for any disruption of or conditions

---

[69] ROD at 24; The Project's MOA available at
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/RevolutionWindFarm_MOA.pdf.
[70] MOA at 5-24.

on the Project's ongoing construction relating to any concerns regarding national security or interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, or for any other reason.

35. Throughout 2025, Revolution Wind continued to meet regularly—at least monthly—with NMFS to discuss the Project's ITR compliance and implementation.

36. Throughout 2025, Ørsted's Marine Affairs team continued to meet approximately weekly with USCG for general check-ins regarding all of Ørsted's U.S. projects, including the Revolution Wind Project. Representatives from BOEM, BSEE, and NOAA were frequently in attendance at USCG's invitation. Navigation safety and potential impacts to mariners were routinely discussed and it was found that, as intended, the mitigations discussed above and others, such as lighting, marking, and signaling of structures, minimized potential impacts to and even enhanced navigation safety.

37. Throughout 2025, Revolution Wind certification team continued to meet regularly, typically weekly, with BSEE to discuss construction updates, design and installation compliance, and aspects of the certification and verification process.

38. Revolution Wind reports weekly to BOEM, BSEE, and NMFS regarding pile driving activities. All pile driving for the Project is now complete.

39. On April 3, 2025, USCG approved Revolution Wind's applications for four lighted research buoys. Following Revolution Wind's request, on August 19, 2025, USCG confirmed that it would terminate four "private aid to navigation" listings for Revolution Wind's research buoys that had been removed due to no longer being needed for acoustic monitoring of pile driving.

40.     From January to August 2025, BSEE's Technical Information Management System ("TIMS") accepted numerous general compliance reports, Protected Species Observer reports, pile driving reports, marine debris event reports, and other monitoring reports.

41.     Since approval of the COP in 2023, no notice of non-compliance has been issued by BOEM or BSEE to Revolution Wind.

**C.     Revolution Wind Will Provide Significant Benefits**

42.     If the Revolution Wind Project continues to be delayed or if the Project is cancelled, Connecticut and Rhode Island will be deprived of the Project's 704 MW of reliable energy and the associated public benefits corresponding to the delay period.  For example, ISO New England, New England's independent regional grid operator, has provided that "delaying the project will increase risks to [New England grid] reliability", including potential "near-term impacts to reliability in the summer and winter peak period."[71]  If the Project is cancelled, Connecticut and Rhode Island will not receive that energy and its corresponding benefits.

43.     Completion of construction and operation of the Project will help Connecticut and Rhode Island to reach their domestic energy and emissions reduction policy goals.  Connecticut's climate goals require the creation of 2 gigawatts of offshore wind by 2030 and the state has established a goal of delivering 100% zero-carbon electricity to customers by 2040.[72]  Similarly, in 2023, Rhode Island issued a Request for Proposals to call for approximately 1200 MW of new offshore wind to power the state's clean energy needs.[73]  Rhode Island's clean energy needs

---

[71] ISO Newswire, ISO-NE statement on Revolution Wind stop work order (Aug. 25, 2025) available at https://isonewswire.com/2025/08/25/iso-ne-statement-on-revolution-wind-stop-work-order/.

[72] Conn. Gen. Stat. § 22a-200a(3); ROD at 9.

[73] "Governor McKee Announces New Opportunity to Bring Approximately 1200 Megawatts of New Offshore Wind to Rhode Island" (Sept. 28, 2023), https://governor.ri.gov/press-releases/governor-mckee-announces-new-opportunity-bring-approximately-1200-megawatts-new.

include a goal of reaching 100% renewable energy by 2033[74] and could require the development

of an estimated 9 to 11 gigawatts of offshore wind by 2033.[75] A delay or cancellation of the Project

would impede Connecticut and Rhode Island's efforts to meet their GHG emissions reduction

goals.

44. Once operational, the Project will have a generating capacity of approximately 704

MW of needed and reliable energy, enough to power nearly 350,000 homes. In addition to its

climate-related greenhouse gas emission-reduction benefits, the Project will have significant

additional health benefits. For example, the Project is expected to result in estimated avoided

emissions of between 599 to 749 tons of nitrogen oxides per year and 318 to 398 tons of sulfur

oxides per year, stemming from displacement of fossil fuel generation.[76] Thus, the Rhode Island

Department of Environmental Management has concluded "that the [P]roject will reduce air

emissions that are harmful to human health and the environment."[77] Similarly, the Rhode Island

---

[74] *See* 39 R.I. Gen. Laws § 39-26-4(a)(14).

[75] Rhode Island, Office of Energy Resources, 100 Percent Renewable Electricity by 2030, available at https://energy.ri.gov/renewable-energy/100-percent-renewable-electricity-2030; Rhode Island Office of Energy Resource, The Road to 100% Renewable Electricity by 2030 in Rhode Island, (Dec. 2020) available at https://energy.ri.gov/sites/g/files/xkgbur741/files/documents/renewable/The-Road-to-100-Percent-Renewable-Electricity---Brattle-04Feb2021.pdf.

[76] EPA, Fact Sheet: Outer Continental Shelf Preconstruction Air Permit Revolution Wind Farm Project Revolution Wind, LLC at 130, available at https://www.epa.gov/system/files/documents/2023-03/fact-sheet-draft-revolution-wind-ocs-air-permit-ocs-r1-05.pdf.

[77] Rhode Island Department of Environmental Management's Advisory Opinion to the Rhode Island Public Utilities Commission at 3, available at https://ripuc.ri.gov/sites/g/files/xkgbur841/files/eventsactions/docket/4929-DEM_Advisory_Opinion_2019-3-22.pdf.

Office of Energy Resources has determined that the Project will result in significant public health benefits.[78]

45.     On April 22, 2022, Ørsted and the North America's Building Trades Unions entered into a "National Offshore Wind Agreement," a first-of-its kind U.S. project labor agreement that creates expansive job opportunities for workers in the building trade unions on offshore construction associated with Ørsted's offshore wind projects, including the Project.[79] Construction on the Project is also being performed pursuant to project labor agreements with the Norwich-New London Building Trades Council (offshore wind turbine pre-assembly at the New London State Pier) and the Rhode Island Building and Construction Trades Council (advance foundation component construction, as well as work on the onshore cable route and onshore substation). Consistent with these agreements, many of the jobs associated with the Project are union jobs. If the Project is delayed or cancelled, many if not all of these jobs will be lost.

46.     Over 2,000 workers have been involved in the construction of the Project. To date, approximately two million labor hours have been spent on construction, including more than 800 local union labor full-time equivalents. In addition, Revolution Wind has contributed to more than 200 union labor full-time equivalents supporting the redevelopment of the State Pier in New London, Connecticut, as part of a shared initiative with other projects. As explained in the FEIS, the Project was also anticipated to create thousands of full-time equivalent jobs through direct, indirect, and induced effects of the Project, during its construction, and an estimated 236 full-time

---

[78] Rhode Island Office of Energy Resources Advisory Opinion to the Rhode Island Public Utilities Commission at 29-31, 39-40, available at https://ripuc.ri.gov/sites/g/files/xkgbur841/files/eventsactions/docket/4929-OER-AdvisoryOpinion_3-22-19.pdf.

[79] Ørsted, "North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor" (May 5, 2022) https://us.orsted.com/news-archive/2022/05/national-offshore-wind-agreement.

equivalent jobs annually for the Project's operations and maintenance work.[80]  The Stop Work Order has already disrupted the work of many, and if the Project is delayed or cancelled these jobs will be lost.

47.     Revolution Wind and its parent companies are investing significantly in port infrastructure and domestic manufacturing.  In Rhode Island, Revolution Wind's parent companies are investing more than $100 million in an offshore wind construction hub at the Port of Providence, creating local union jobs, partnering with local shipyards, investing $1 million in a local training partnership, and collaborating with local fishermen.[81]  Additionally, Revolution Wind's parent companies have also contributed more than $100 million of funding to support the Connecticut Port Authority and the State of Connecticut's re-development of the State Pier Terminal in the Port of New London.  As another example, Revolution Wind's parent companies invested in the first-ever American-built, owned, and crewed offshore wind service operations vessel, which was built in shipyards in Louisiana, Mississippi and Florida.[82]

48.     Revolution Wind has also made commitments totaling more than $10 million to communities and institutions in Connecticut and Rhode Island, including the above-referenced $1 million towards a local training partnership.  While most of these commitments have already been paid, there remains approximately $1 million left to be paid to support local research initiatives,

---

[80] Final EIS at 3.11-45 – 3.11-46.

[81] Revolution Wind, "Governor McKee, Congressional Delegation, Mayor Smiley Mark New Phase of Offshore Wind Construction Hub at ProvPort" (May 1, 2023), https://revolution-wind.com/news/2023/05/new-phase-of-offshore-wind-construction-hub-at-provport.

[82] Ørsted, "Ørsted and Shipbuilder Edison Chouest Christen First-Ever American-Built, Offshore Wind Service Operations Vessel" (May 11, 2024), https://us.orsted.com/news-archive/2024/05/orsted-and-shipbuilder-edison-chouest-christen-american-built-offshore-wind-service-operations-vessel; Ørsted, "America's new fleet: Ørsted is investing nearly $700 million into U.S. vessels to secure our energy future", https://cdn.orsted.com/-/media/www/docs/corp/us/factsheets/orsted_vesselfactsheet.pdf?rev=b14a7bbdddcd4daf88d7726e957cd73a&hash=536C7E36976CC9869635A2B8EFCB23AB.

business attraction and workforce development, including at the University of Rhode Island and through the Rhode Island Department of Commerce. Additionally, some of Revolution Wind's community commitments do not become due until the Project's commercial operations date. This includes $28 million in personal property taxes and Host Community Agreement payments to the Town of North Kingstown, Rhode Island. If Revolution Wind cannot complete the Project due to the Stop Work Order, these community commitments will never materialize.

I declare under penalty of perjury pursuant to 28 U.S.C.§ 1746(2) that the foregoing is true and correct.

Executed on September 5, 2025, at Providence, Rhode Island.

_Melanie Gearon_

Melanie Gearon

# EXHIBIT 1

# AGREEMENT BETWEEN
# THE DEPARTMENT OF DEFENSE,
# THE DEPARTMENT OF THE AIR FORCE,
# AND
# REVOLUTION WIND, LLC,
# ADDRESSING THE REVOLUTION OFFSHORE WIND PROJECT
# NEAR RHODE ISLAND AND MASSACHUSETTS

This is an agreement between the Department of Defense (DoD), acting through the Military Aviation and Installation Assurance Siting Clearinghouse, the Department of the Air Force (DAF), acting through the Deputy Assistant Secretary of the Air Force for Installations (SAF/IEI) (collectively, the "DoD Parties"), and Revolution Wind, LLC (Project Owner).  Together, these three (3) entities are referred to as "Parties" and individually as a "Party."  Any reference to "DoD Parties" means all Parties (other than Revolution Wind, LLC), and does not indicate that one Party acts for or on behalf of the other.

This agreement is entered into pursuant to Section 183a of Title 10, United States Code (U.S.C.) and part 211 of Title 32, Code of Federal Regulations (CFR).

The Parties acknowledge that the Secretary of the Interior is responsible for administration of energy development, including identification of locations for leasing and development, on the outer continental shelf (OCS) as designated by the Outer Continental Shelf Lands Act (43 U.S.C. Section 1331 et. seq.).  The Secretary of the Interior, through the Bureau of Ocean Energy Management (BOEM), has issued Project Owner a lease, OCS-A 0486, for the construction and operation of the Revolution Offshore Wind Project.

The Parties acknowledge that part of the Project's turbine array is within the United States territorial waters, and part of the Project's turbine array is more than 12 nautical miles (nm) from shore.  The Parties agree that Federal Aviation Administration (FAA) jurisdiction will apply to the entire project, including the portion extending beyond 12 nm from the shore, pursuant to Executive Order 10854.

Attachments A, *Revolution Offshore Wind Project Structures in Lease Area OCS-A 0486*; B, *Revolution Offshore Wind Project Area Map and Wind Turbine Locations*; and C, *Curtailment Communications Protocol*, are attached to this agreement and made a part hereof.

For good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1 of 16

**AGREEMENT BETWEEN THE DEPARTMENT OF DEFENSE, THE DEPARTMENT OF THE AIR FORCE, AND REVOLUTION WIND, LLC, ADDRESSING THE DEVELOPMENT OF THE REVOLUTION OFFSHORE WIND PROJECT NEAR RHODE ISLAND AND MASSACHUSETTS**

## SECTION 1. PURPOSE.

**A. Objective.** The objective of this agreement is to mitigate any potential adverse impacts on military operations and readiness and to minimize risks to national security while allowing the Revolution Offshore Wind Project (Project), within the BOEM lease area OCS-A 0486, to proceed with development.

**B. De-confliction.** As the Project was originally filed, its spinning turbine blades would conflict with North American Aerospace Defense Command's (NORAD) operation of the Falmouth, Massachusetts Airport Surveillance Radar 8 (ASR-8). The Parties have focused on de-conflicting these activities and agree that the terms below will allow the mutual goals of the Parties to be met, including the protection of the radar, which promotes national security, and protection of the National Airspace System, while supporting military readiness. Additional mitigation, implemented as part of BOEM's approval of the Construction and Operations Plan, will also be sought by the DoD to de-conflict the Project with national defense interests. Those measures address the following concerns: 1. Coordination between the Project Owner and DoD at-sea operators during construction and operation of the Project; 2. DoD efforts to evaluate and mitigate risk from distributed optical fiber sensing and acoustic monitoring equipment deployed as part of the project; and 3. Evaluation and mitigation of risk related to foreign investment.

## SECTION 2. DEFINITIONS.

**A. Access.** Either to enter a physical space or to remotely read, copy, edit, divert, release, alter the state of, or otherwise affect information technology systems (e.g., network, data, security, software, hardware).

**B. Actual Curtailment Hours.** [RESERVED]

**C. ASN.** Federal Aviation Administration Aeronautical Study Number.

**D. Banked Hours.** [RESERVED]

**E. BOEM.** Bureau of Ocean Energy Management, a technical bureau of the Department of the Interior.

**F. CFIUS.** Committee on Foreign Investment in the United States.

**G. CFR.** Code of Federal Regulations.

**H. Curtailment.** The cessation of wind turbine operations when the wind turbine blades are not spinning and are either fully feathered with brakes applied (0 RPM) or fully feathered (typically less than 1 RPM), with the chosen method depending on both the reason for Curtailment and wind speeds at the time of the Curtailment request. Specifically, according to information from the manufacturer, the wind turbines can be held at 0 RPM through full feathering of blades and application of brakes in wind speeds up to and including 18 meters per second (m/s) (approximately

2 of 16

40 miles per hour). In wind speeds above 18 m/s, the wind turbine blades will be fully feathered without the application of brakes.

**I. DAF.** The Department of the Air Force, a military department of the United States.

**J. Day.** A calendar day, unless indicated otherwise.

**K. DoD.** The Department of Defense, an executive department of the United States.

**L. FAA.** Federal Aviation Administration, an agency of the United States Department of Transportation.

**M. Fiscal Year.** [RESERVED]

**N. Hour.** [RESERVED]

**O. Lease.** The commercial lease issued by BOEM to the Project Owner for the construction and operation of the Revolution Offshore Wind Project, OCS-A 0486.

**P. National Security or Defense Purpose.** An emergency circumstance where the President of the United States, the Secretary of Defense, or a combatant commander under 10 U.S.C. Section 164 directs a change to the mission of NORAD in support of emergency circumstances. An emergency circumstance does not include routine changes to the mission of NORAD. A NORAD air defense event is an emergency circumstance under this definition.

**Q. Project.** The Revolution Offshore Wind Project, which will consist of no more than two (2) offshore substations (OSS) and 65 wind turbines identified in Attachment A by turbine ID or by substitute turbine ID submitted in accordance with Sections 3.E.2 and 3.E.3 of this agreement.

**R. Project Area.** The location where the Project Owner plans to construct and operate its turbines within BOEM lease area OCS-A 0486, as shown in Attachment B.

**S. Project Owner.** Revolution Wind, LLC, and its successors and assigns.

**T. Radar Adverse-impact Management (RAM).** The technical process designed to minimize the adverse impact of obstruction interference on a radar system. Involves a visit to the radar site by technicians to adjust applicable radar parameters.

**U. Siting Clearinghouse.** The Military Aviation and Installation Assurance Siting Clearinghouse established pursuant to 10 U.S.C. Section 183a.

**V. U.S.C.** United States Code.

## SECTION 3. MITIGATION WITH VOLUNTARY CONTRIBUTION.

**A. In General.** This agreement is structured to ensure Project Owner may construct and operate the Project without adversely impacting DoD military operations and readiness. Project Owner agrees to limit the total number of Project wind turbines to 65 with a maximum height of 873 feet above sea level (ASL). Project Owner agrees to build no more than two (2) OSS with a maximum height of 228 feet ASL. Project Owner agrees to restrict the construction of the Project wind turbines and OSS to the specific geographic coordinates listed in Attachment A and Project Area, as shown in Attachment B. Project Owner shall notify NORAD via email (n-nc.peterson.nj3.mbx.norad-j36r-omb@mail.mil) and DAF via email (SAF.IEI.Encroachment@us.af.mil) when the Project is within 30-60 days of completion (for RAM scheduling purposes) and again when the Project is complete and operational such that the RAM can be accomplished. Parties agree wind turbine and OSS locations adjusted within 500 feet of the geographic coordinates provided in Attachment A shall not require additional review by the DoD Parties or an amendment to this agreement, as provided by Section 10.A of this agreement. Project Owner shall notify NORAD and DAF via email addresses above immediately after any new ASNs or structures associated with the Project are filed with the FAA or BOEM that are not listed in Attachment A.

**B. Impact Analysis during Test Energy Phase.** [RESERVED]

**C. Voluntary Contribution.** Subject to the terms and conditions of this agreement, Project Owner shall pay to DoD, within 10 days of the operational date of the Project, the amount of $80,000. It is expected that the time gap between the commissioning (including spinning) of the first and last wind turbine is less than a year. For projects where the expected time gap between commissioning of the first and last wind turbine is three (3) years or greater, the Project Owner shall contribute an additional $80,000 per radar to NORAD toward the execution of the RAM every 3 years until the last wind turbine array is commissioned. This allows NORAD to manage radar adverse impacts over an extended period of construction DoD will use these funds to offset the cost of measures undertaken by DoD to mitigate adverse impacts of this Project or other energy projects within the meaning of 10 U.S.C. Section 183a on military operations and readiness or to conduct studies of potential measures to mitigate such impacts. DoD will accept such payment as a voluntary contribution of funds pursuant to 10 U.S.C. Section 183a. Such voluntary contribution may be in addition to voluntary contributions made by other Project Owners, and such other contributions may be in amounts different from that made by Project Owner. DoD will accept the voluntary contribution on behalf of the DoD Parties and will transfer the funds to appropriate accounts. All voluntary contributions shall be paid electronically through Pay.gov.

    1. Project Owner shall use one of the following two methods of making payment:

        a. ACH Debit (preferred). ACH debit authorizes Pay.gov to request a payment immediately upon processing. Many institutions use ACH debit blocks as a precaution to prevent accidental withdrawals from unauthorized sources. In order to ensure the transaction is not blocked, Project Owner will use DoD's specified ID number as an exception for the debits authorized on the Pay.gov site. The ID for this specific collection is 00008522Z4.

        b. ACH Credit. ACH Credit is a promise to arrange a payment from the promisor's bank

4 of 16

account to the agency being paid.

2. To complete a voluntary contribution transaction:

    a. Visit the Pay.gov website: https://www.pay.gov/public/form/start/579188704.

    b. Fill out the form provided on the site.

    c. Once submitted, print a copy of the confirmation for your records.

3. Data to include on submittal:

    a. Collection Number: 2024RevolutionWindOrsted

    b. Description: $80,000.00

    c. For further assistance, visit Pay.gov Web Help section: https://www.pay.gov/WebHelp/HTML/about.html

DoD Office for voluntary contribution settlement:
WHS Financial Management Directorate
4800 Mark Center Drive
Alexandria, VA 22350
Office: 703-545-0048 / 0028
Email: whs.mc-alex.fmd.mbx.system-division@mail.mil

The DoD Parties agree to provide any information reasonably required by Project Owner to process the payment such that external auditors may verify the payment. Project Owners shall notify the Clearinghouse when the contribution has been transmitted.

**D. Amendment of Applications.** [RESERVED]

**E. Withdrawal of Objections.**

1. The DoD Parties have delivered to the FAA "No Objections with Provisions" for the 24 ASNs corresponding to the wind turbine and OSS locations listed in Attachment A. In addition to the 24 turbines for which there are FAA filings in OE/AAA, there are 43 turbines located beyond 12nm and therefore outside of FAA jurisdiction. The 43 other turbines are also covered by this agreement and are described in Attachments A and B.

2. All Parties agree that, if Project Owner requests to extend the effective period of FAA's Determination of No Hazard to Air Navigation in accordance with 14 CFR Section 77.35, then the DoD Parties will reassess the ASNs for additional mission impacts. If no new mission impacts are identified, DoD Parties will deliver to the FAA "No Objections with Provisions" to such an extension as requested, provided that the affected ASNs are listed on Attachment A (as amended, if applicable, in accordance with Section 10.A), do not exceed the maximum heights specified in Section 3.A, and are located within the siting parameters of the Project Area

specified in Attachment B of this agreement or any amendments to this agreement, that the total number of structures for the Project still does not exceed 65 wind turbines and two (2) OSS, and a statement is incorporated into FAA's OE/AAA system referencing this agreement.

3.  If the Project Owner submits any substitute structures to BOEM within 36 months of the execution of this agreement, the DoD Parties will reassess the substitute structure for additional mission impacts.  If no new mission impacts are identified, DoD Parties will deliver to BOEM written concurrence provided that the affected structures are listed on Attachment A, do not exceed the maximum height specified in Section 3.A, that the substitute structures are located within the siting parameters of the Project Area specified in Attachment B of this agreement or any amendments to this agreement, and that the total number of structures does not exceed 65 wind turbines and two (2) OSS after substitution.

4.  The DoD Parties agree not to object to the construction and operation of the Project before any federal, state, or local regulatory entity with jurisdiction over the Project (except as provided in sections 5 and 6.B of this agreement), provided that Project Owner is in material compliance with the terms of this agreement and that, as of the effective date of this agreement, Project Owner has disclosed to the DoD Parties in writing all material facts necessary for the DoD Parties to be able to fully assess the Project's potential adverse impacts on military operations and readiness and risks to national security.

**F.  Other Regulatory Actions.**  This agreement shall not prevent or limit the DoD Parties from communicating in any form with any regulatory body or agency with jurisdiction or possible jurisdiction over matters affecting NORAD and the Falmouth, Massachusetts ASR-8 beyond the Project.

## Section 4.  Curtailment.

**A.  Curtailment for Test Purposes.**  [RESERVED]

**B.  Curtailment for Training Purposes.**  [RESERVED]

**C.  Curtailment for a National Security or Defense Purpose.**  Upon request by NORAD, Project Owner agrees to immediately curtail wind turbine operations for a National Security or Defense Purpose utilizing the communication protocol set out in Attachment C.  Such Curtailment may not be requested except for a National Security or Defense Purpose.  Curtailment for a National Security or Defense Purpose will be temporary in nature and extend only so long as is absolutely necessary to meet the discrete, temporary, and stated National Security or Defense Purpose.  This agreement in no way precludes Project Owner from seeking any available legal remedies for any Curtailment associated with a national security emergency other than challenging the Curtailment itself.  Any request for Curtailment under this subsection will be communicated by either DoD Party or applicable NORAD Air Defense Sector (ADS) to Project Owner and will include the releasable portions of the President's, the Secretary's, or the combatant commander's mission order.

**D.  Curtailment for Establishing Baselines.**  [RESERVED]

**E. Wear and Tear.** It is a fundamental premise of this agreement that the limited Curtailment expected to be required from this agreement will not cause excess wear and tear on the Project. Project Owner agrees that it is responsible for any damage or wear and tear to the turbines as a result of Curtailment (as defined in Section 2.H) pursuant to this agreement.

**F. Disclosure of Curtailment Request.** Project Owner acknowledges that there may be national security considerations associated with any request by NORAD for Curtailment in accordance with the terms of this agreement and any Curtailment resulting therefrom. Project Owner therefore agrees not to disclose any such request or any Curtailment resulting therefrom, except for disclosure as specified in Section 10.O, without the prior consent of the DAF, and the DAF agrees that consent to disclose to a business entity with which a non-disclosure agreement is in place will not be unreasonably withheld.

### SECTION 5. PROTECTION OF DEFENSE CAPABILITIES.

It is a priority for the DAF to protect national defense capabilities and military operations, including military installations, research, development, test and evaluation activities, and military readiness activities from compromise and exploitation that may occur due to an activity under foreign control operating in the vicinity of those national defense capabilities and military operations. Nothing in this agreement shall relieve Project Owner or its successors or assigns from complying with 31 CFR Part 800 and 802 (Mergers, Acquisitions, and Takeovers by Foreign Persons) nor prevent or limit the parties from communicating in any form with the CFIUS.

### SECTION 6. ASSIGNMENT.

**A. Right to Assign.** This agreement shall be binding upon the Project Owner and its successors and assigns. If Project Owner and its successors or assigns (assignors) elect to sell, convey, mortgage, assign, or otherwise transfer all or any part of its interests and obligations in the assets comprising the Project (assignment) to any third party (assignee), assignor shall cause such assignee to expressly acknowledge the existence of this agreement. The assignor shall provide a copy of this agreement to the assignee. The assignee shall provide new point of contact information (as in Section 9) to the DoD Parties.

**B. Notice of Assignment to CFIUS.** If the prospective assignee is a foreign national or foreign-owned or -controlled business entity, assignor and the proposed assignee shall jointly provide notice of the proposed transaction to CFIUS to the extent required by applicable regulations (31 CFR Parts 800 and 802) and provide a copy of the notice to the DoD Parties. Nothing in this agreement shall prohibit or limit DoD from objecting to the transaction before CFIUS, nor limit communications with CFIUS during national security reviews and investigations, and should mitigation result, during mitigation, tracking, and post-consummation monitoring and enforcement, pursuant to applicable statutes and regulations.

**C. Effect of Assignment.** Upon an assignment, assignor shall be relieved of any obligations or liabilities under this agreement to the extent that the assignee has assumed in writing such

7 of 16

obligations or liabilities and provided that Project Owner has provided a copy of the assignment, including the assumption of obligations and liabilities, to the DoD Parties.

## SECTION 7. EFFECTIVE DATE AND EXPIRATION.

**A. Effective Date.** This agreement becomes effective on the date when all Parties have signed.

**B. Expiration.** This agreement shall expire and have no further force and effect upon the occurrence of the earlier of the following:

1. Termination of the BOEM lease agreement.

2. The Project is decommissioned.

3. Falmouth, Massachusetts ASR-8 permanently ceases operations. However, if the current radar is replaced with a radar system that has similar needs for mitigation, then this agreement shall not expire.

4. Termination of the agreement by written mutual agreement of the Parties.

**C. Actions Prior to Expiration.** Any activities engaged in by the Parties (including the expenditure of part or all of any voluntary contribution) that occurred prior to expiration of this agreement shall remain valid and continue in effect, notwithstanding the expiration of the agreement.

## SECTION 8. POINTS OF CONTACT AND NOTIFICATION.

**A. Points of Contact (POCs).** The following persons shall be the primary POCs for the Parties for purposes of this agreement. Any notice, request, or other communication to be provided pursuant to this agreement shall be delivered to the POCs. Any Party may change its POC by providing written notification of the change to the other Parties at least 30 days in advance of the change taking effect.

**1. DoD.**

a. Executive Director, Military Aviation and Installation Assurance Siting Clearinghouse, 3400 Defense Pentagon, Room 5C646, Washington, DC 20301-3400, osd.dod-siting-clearinghouse@mail.mil

b. Headquarters NORAD Radar Analysis Branch, 250 Vandenberg Street, Ste B016, Peterson AFB, CO, 80914, n-nc.peterson.nj3.mbx.norad-j36r-omb@mail.mil

**2. DAF.** Director, Air Force Mission Sustainment, Office of the Assistant Secretary of the Air Force for Installations, Environment, and Energy, 1665 Air Force Pentagon, Room 4B941, Washington, DC 20330-1665, SAF.IEI.Encroachment@us.af.mil

**3. Project Owner.** Revolution Wind, LLC, 56 Exchange Terrace, Suite 300, Providence, RI 02903, Attention: Asset Manager; with a copy to Orsted North America Inc., 399 Boylston Street, 12th Floor, Boston, MA 02116, Attention: Legalus_legal_notices@orsted.com

**B. Notification.** Any written notice required by or provided for in this agreement shall be sent by registered or certified mail, postage prepaid, sent by a nationally recognized overnight delivery service that provides a receipt for delivery, or hand delivered. A notice shall be deemed to be received when delivered to the recipient's address.

## SECTION 9. BREACH AND DISPUTE RESOLUTION.

If a Party believes that another Party has breached this agreement, it shall provide written notice of the breach within 60 days of discovery of the breach to all other Parties and provide the breaching Party a reasonable opportunity (but in all cases at least 60 days from delivery of such notice) to cure the breach. Failure to provide notice within such 60-day period only waives the rights with respect to the periods from after the expiration of such 60-day period and until the date when the notice was given. If there is a dispute between the involved Parties as to whether a breach occurred, the involved Parties agree to attempt to resolve the dispute beginning with Project Owner and representatives of the DoD Parties. Disputes may be elevated, on the part of the DoD Parties, to the DAF headquarters and then to the Executive Director of the Siting Clearinghouse. If the breach is not cured or resolved after this initial dispute resolution process, any Party may seek to enforce this agreement. Each Party specifically reserves any and all rights or causes of action it may have either at law or in equity to require compliance with any provision of this agreement. Each Party reserves the right to enforce or refrain from enforcing against another Party the terms of this agreement as it sees fit and failure to enforce does not act to excuse future breaches.

## SECTION 10. GENERAL PROVISIONS.

**A. Amendments.** Any Party to this agreement may request that it be amended, whereupon the Parties agree to consult to consider such amendments. Any amendment to this agreement shall become effective when signed by all of the Parties unless its terms provide for a different effective date. Wind turbine and OSS locations adjusted within 500 feet of the geographic coordinates provided in Attachment A shall not require additional review by the DoD Parties or an amendment to this agreement. However, wind turbine locations adjusted greater than 500 feet of the geographic coordinates provided in Attachment A shall require DoD Parties review, and if approved, will be included in an amendment to this agreement. Amendments only providing substitute structures within the Project boundary, with no change to height or total number of Project structures, need only be signed by the DoD Parties' and Project Owner's designated Project officers if filed with BOEM within 36 months of the effective date of this agreement. Project Owner shall notify NORAD via email (n-nc.peterson.nj3.mbx.norad-j36r-omb@mail.mil) and DAF via email (SAF.IEI.Encroachment@us.af.mil) immediately after any new ASNs or structures associated with the Project are filed with the FAA or BOEM that are not listed in Attachment A.

9 of 16

**B. Integration.** This agreement contains the entire agreement and understanding between the Parties with respect to all of the subject matter contained herein, thereby merging and superseding all prior agreements and representations by the Parties with respect to such subject matter.

**C. Governing Law.** This agreement shall be governed by and construed in accordance with the laws of the United States and the States of Rhode Island and Massachusetts, as may be applicable.

**D. Interpretation.** In the event an ambiguity or question of intent or interpretation arises, this agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any of the provisions of this agreement. Any reference to any Federal, state, interstate, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, as they may have been amended from time to time, unless the context requires otherwise.

**E. Headings and Titles.** The headings or section titles contained in this agreement are inserted solely for convenience and do not constitute a part of this agreement between the Parties, nor should they be used to aid in any manner in the construction of this agreement.

**F. Severability.** If any term, provision, or condition of this agreement is held to be invalid, void, or unenforceable by a governmental authority and such holding is not or cannot be appealed further, then such invalid, void, or unenforceable term, provision, or condition shall be deemed severed from this agreement and all remaining terms, provisions, and conditions of this agreement shall continue in full force and effect. The Parties shall endeavor in good faith to replace such invalid, void, or unenforceable term, provision, or condition with valid and enforceable terms, provisions, or conditions that achieve the purpose intended by the Parties to the greatest extent permitted by law.

**G. Waivers; Remedies Cumulative.** There is no implied waiver of rights under this agreement. No failure or delay on the part of a Party in exercising any of its rights under this agreement or in insisting upon strict performance of provisions of this agreement, no partial exercise by either Party of any of its rights under this agreement, and no course of dealing between the Parties shall constitute a waiver of the rights of any Party under this agreement, other than the requirement to raise a matter of breach within 30 days of discovery. Any waiver shall be effective only by a written instrument signed by the Party granting such waiver, and such waiver shall not operate as a waiver of, or estoppel with respect to, any subsequent failure to comply with this agreement. The remedies provided in this agreement are cumulative and not exclusive of any remedies provided by law.

**H. Anti-Deficiency.** For the DoD Parties, this agreement is subject to the availability of appropriated funds and sufficient resources. No provision in this agreement shall be interpreted to require obligation or payment of funds in violation of the Anti-Deficiency Act, 31 U.S.C. Section 1341.

**I. Disclosure.** The Parties may freely disclose this agreement with any person or entity. DoD will post the agreement on the Siting Clearinghouse website. Project Owner may mark any part of any document it believes to be proprietary or competition sensitive that it wants DoD or the DAF to

10 of 16

exempt from disclosure. The DoD Parties will only disclose any such marked information in accordance with the provisions of 5 U.S.C. Section 552 (the Freedom of Information Act).

**J.  No Third-Party Beneficiaries.**  Nothing in this agreement, express or implied, is intended to give to, or shall be construed to confer upon, any person not a Party any remedy or claim under or by reason of this agreement.  This agreement shall be for the sole and exclusive benefit of the Parties and their respective successors and assigns.

**K.  Full and Complete Satisfaction.**  The completion of the obligations of each of the Parties under this agreement constitute the full and complete satisfaction of those obligations.

**L.  Other Federal Agencies.**  This agreement does not bind any Federal agency, other than the DoD Parties, nor waive required compliance with any law or regulation.

**M. Completion of Construction.**  Within 60 days of the completion of construction of the Project, Project Owner shall deliver to DoD final coordinates for each turbine erected.

**N.  Grid Operator Protocols.**  Project Owner shall disclose this Curtailment requirement to the grid operator and shall comply with the mitigation agreement's curtailment provisions, including requesting waivers from the grid operator if grid protocols would interfere with this mitigation agreement.  If Curtailment for a National Security or Defense Purpose is requested by NORAD, the Project Owner shall notify the following of the request: the ISO-NW, Inc.; and the Narragansett Electric Company d/b/a Rhode Island Energy.

*[**Continued on the following page**]*

**O. Signature/Counterparts.** The Parties represent and warrant that the signatories below have authority to sign on behalf of and bind each respective Party, and that no other signature is required to bind that Party. This agreement may be executed in several counterparts, each of which shall be deemed an original, all of which shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the Parties have executed and delivered this agreement.

**FOR THE DEPARTMENT OF DEFENSE**

OWENS.BRENDA   Digitally signed by
N.M.1030451844   OWENS.BRENDAN.M.103045184
                 4
                 Date: 2024.11.04 21:38:40 -05'00'

11/4/24

Brendan M. Owens

Date

Assistant Secretary of Defense for
Energy, Installations, and Environment

**FOR THE DEPARTMENT OF THE AIR FORCE**

MORIARTY.ROBE   Digitally signed by
RT.E.1013267584   MORIARTY.ROBERT.E.10132675
                 84
                 Date: 2024.10.04 16:23:09 -04'00'

10/4/24

ROBERT E. MORIARTY, P.E., SES

Date

Deputy Assistant Secretary of the Air Force
(Installations)

**FOR REVOLUTION WIND, LLC**

# KELIN

Digitally signed by KELIN
Date: 2024.09.26 12:37:32
-04'00'

9/26/24

Kellen Ingalls

Date

Authorized Person

# RYACH

Digitally signed by: RYACH
DN: CN = RYACH email = RYACH@orsted.com
OU = DE-PRODJK. BRUGERE, Commercial
Date: 2024.10.01 15:32:30 -04'00'

10/1/24

Ryan Chaytors

Date

Authorized Person

12 of 16

# ATTACHMENT A
## Revolution Offshore Wind Project Structures in Lease Area OCS-A 0486

Coordinate Reference System NAD83 (2011)

| ASN | Turbine ID | US Coast Guard Turbine ID | Str. Type | Maximum Height (ASL) | Latitude | Longitude |
|---|---|---|---|---|---|---|
| | B07 | AE06 | Wind Turbine | 787' | 41.2259 | -71.1728 |
| | B08 | AE07 | Wind Turbine | 787' | 41.2263 | -71.1508 |
| | B09 | AE08 | Wind Turbine | 787' | 41.2267 | -71.1286 |
| | B10 | AE09 | Wind Turbine | 787' | 41.2271 | -71.1066 |
| 2021-WTE-2881-OE | B11 | AE10 | Wind Turbine | 873' | 41.2275 | -71.0847 |
| 2021-WTE-2882-OE | B12 | AE11 | Wind Turbine | 873' | 41.2279 | -71.0627 |
| | B13 | AF05 | Wind Turbine | 787' | 41.2088 | -71.1941 |
| | B14 | AF06 | Wind Turbine | 787' | 41.2092 | -71.1723 |
| | B15 | AF09 | Wind Turbine | 787' | 41.2105 | -71.1063 |
| 2021-WTE-2884-OE | B16 | AF10 | Wind Turbine | 873' | 41.2109 | -71.0842 |
| 2023-WTE-7639-OE | B17 | AF11 | Wind Turbine | 787' | 41.2113 | -71.0623 |
| | B18 | AG04 | Wind Turbine | 787' | 41.1917 | -71.2157 |
| | B19 | AG05 | Wind Turbine | 787' | 41.1922 | -71.1937 |
| | B20 | AG06 | Wind Turbine | 787' | 41.1926 | -71.1717 |
| | B21 | AG07 | Wind Turbine | 787' | 41.1930 | -71.1497 |
| | B22 | AG08 | Wind Turbine | 787' | 41.1934 | -71.1277 |
| | B23 | AG09 | Wind Turbine | 787' | 41.1938 | -71.1060 |
| | B24 | AH04 | Wind Turbine | 787' | 41.1751 | -71.2153 |
| | B25 | AH05 | Wind Turbine | 787' | 41.1755 | -71.1932 |
| | B26 | AH06 | Wind Turbine | 787' | 41.1758 | -71.1713 |
| | B27 | AH07 | Wind Turbine | 787' | 41.1764 | -71.1491 |
| | B28 | AH08 | Wind Turbine | 787' | 41.1768 | -71.1270 |
| | B29 | AH09 | Wind Turbine | 787' | 41.1772 | -71.1051 |
| | B30 | AJ02 | Wind Turbine | 787' | 41.1575 | -71.2588 |
| | B31 | AJ03 | Wind Turbine | 787' | 41.1578 | -71.2369 |
| | B32 | AJ04 | Wind Turbine | 787' | 41.1584 | -71.2149 |
| | B33 | AJ05 | Wind Turbine | 787' | 41.1588 | -71.1913 |
| | B34 | AJ06 | Wind Turbine | 787' | 41.1594 | -71.1707 |
| | B35 | AJ07 | Wind Turbine | 787' | 41.1596 | -71.1487 |
| | B36 | AJ08 | Wind Turbine | 787' | 41.1601 | -71.1269 |
| | B37 | AJ09 | Wind Turbine | 787' | 41.1605 | -71.1053 |
| | B38 | AJ10 | Wind Turbine | 787' | 41.1606 | -71.0825 |
| 2021-WTE-2889-OE | B39 | AJ11 | Wind Turbine | 873' | 41.1612 | -71.0603 |
| 2021-WTE-2890-OE | B40 | AJ12 | Wind Turbine | 873' | 41.1616 | -71.0383 |
| 2023-WTE-7640-OE | B41 | AJ13 | Wind Turbine | 787' | 41.1623 | -71.0159 |
| 2021-WTE-2892-OE | B42 | AJ14 | Wind Turbine | 873' | 41.1625 | -70.9942 |
| 2023-WTE-7641-OE | B43 | AJ15 | Wind Turbine | 787' | 41.1626 | -70.9728 |
| | B46 | AK10 | Wind Turbine | 787' | 41.1442 | -71.0823 |

13 of 16

| ASN | Turbine ID | US Coast Guard Turbine ID | Str. Type | Maximum Height (ASL) | Latitude | Longitude |
|---|---|---|---|---|---|---|
| 2021-WTE-2894-OE | B47 | AK12 | Wind Turbine | 873' | 41.1450 | -71.0377 |
| | B50 | AL10 | Wind Turbine | 787' | 41.1275 | -71.0807 |
| | B51 | AL12 | Wind Turbine | 787' | 41.1275 | -71.0371 |
| 2021-WTE-2900-OE | B55 | AL18 | Wind Turbine | 873' | 41.1306 | -70.9050 |
| 2021-WTE-2901-OE | B56 | AL19 | Wind Turbine | 873' | 41.1309 | -70.8828 |
| 2021-WTE-2902-OE | B57 | AL20 | Wind Turbine | 873' | 41.1313 | -70.8609 |
| 2023-WTE-7642-OE | B58 | AL21 | Wind Turbine | 787' | 41.1314 | -70.8398 |
| | B59 | AM11 | Wind Turbine | 787' | 41.1111 | -71.0591 |
| | B60 | AM12 | Wind Turbine | 787' | 41.1113 | -71.0375 |
| 2023-WTE-7643-OE | B61 | AM14 | Wind Turbine | 787' | 41.1117 | -70.9928 |
| 2023-WTE-7644-OE | B63 | AM17 | Wind Turbine | 787' | 41.1133 | -70.9269 |
| 2021-WTE-2908-OE | B64 | AM18 | Wind Turbine | 873' | 41.1139 | -70.9045 |
| 2021-WTE-2909-OE | B65 | AM19 | Wind Turbine | 873' | 41.1144 | -70.8823 |
| 2021-WTE-2910-OE | B66 | AM20 | Wind Turbine | 873' | 41.1146 | -70.8604 |
| 2023-WTE-7645-OE | B67 | AM21 | Wind Turbine | 787' | 41.1151 | -70.8387 |
| | B68 | AN11 | Wind Turbine | 787' | 41.0944 | -71.0583 |
| | B69 | AN12 | Wind Turbine | 787' | 41.0951 | -71.0353 |
| | B70 | AN13 | Wind Turbine | 787' | 41.0946 | -71.0139 |
| 2023-WTE-7646-OE | B71 | AN14 | Wind Turbine | 787' | 41.0967 | -70.9923 |
| 2021-WTE-2914-OE | B72 | AN15 | Wind Turbine | 873' | 41.0960 | -70.9704 |
| 2023-WTE-7647-OE | B73 | AN16 | Wind Turbine | 787' | 41.0965 | -70.9485 |
| | B74 | AP11 | Wind Turbine | 787' | 41.0778 | -71.0580 |
| | B75 | AP12 | Wind Turbine | 787' | 41.0783 | -71.0357 |
| | B76 | AP13 | Wind Turbine | 787' | 41.0788 | -71.0146 |
| | B77 | AP14 | Wind Turbine | 787' | 41.0791 | -70.9904 |
| | B78 | AP15 | Wind Turbine | 787' | 41.0794 | -70.9697 |
| 2021-WTE-2918-OE | B79 | AP16 | Wind Turbine | 873' | 41.0798 | -70.9476 |
| | B44 | AK08 | Wind Turbine (Alternate) | 787' | 41.1436 | -71.1260 |
| | B45 | AK09 | Wind Turbine (Alternate) | 787' | 41.1437 | -71.1031 |
| | Z01 | AL11 | Offshore Substation | 228' | 41.1278 | -71.0592 |
| | Z02 | AF08 | Offshore Substation | 228' | 41.2101 | -71.1284 |

## ATTACHMENT B
Revolution Offshore Wind Project Area Map
and Wind Turbine Locations



AGREEMENT BETWEEN THE DEPARTMENT OF DEFENSE, THE DEPARTMENT OF THE AIR FORCE, AND
REVOLUTION WIND, LLC, ADDRESSING THE DEVELOPMENT OF THE REVOLUTION OFFSHORE WIND PROJECT
NEAR RHODE ISLAND AND MASSACHUSETTS

**ATTACHMENT C**
Curtailment Communications Protocol

**Section 1. Notices**. The following persons shall be the primary points of contact ("POCs") for the Parties for purposes of administering this agreement. Any Party may change its POC by providing written notification of the change to the other Parties at least 30 days in advance of the change taking effect.

   **A. DoD.**

     1. Executive Director, Military Aviation and Installation Assurance Siting Clearinghouse, 3400 Defense Pentagon, Room 5C646, Washington, DC 20301-3400, osd.dod-siting-clearinghouse@mail.mil

     2. Headquarters NORAD Radar Analysis Branch, 250 Vandenberg Street, Ste B016, Peterson AFB, CO, 80914, n-nc.peterson.nj3.mbx.norad-j36r-omb@mail.mil

   **B. DAF.** Director, Air Force Mission Sustainment, Office of the Assistant Secretary of the Air Force for Installations, Environment, and Energy, 1665 Air Force Pentagon, Room 4B941, Washington, DC 20330-1665, SAF.IEI.Encroachment@us.af.mil

   **C. Project Owner.** Revolution Wind, LLC, 56 Exchange Terrace, Suite 300, Providence, RI 02903, Attention: us_legal_notices@orsted.com

**Section 2. Criteria for Curtailment**. The Parties agree that the following protocol will be used for communication between Project Owner and NORAD in the event curtailment of wind turbine operations will occur under circumstances delineated in Section 4 of the main agreement.

**Section 3. Communications Protocol for a National Security or Defense Purpose.**
Under circumstances described in Section 4.C of the main agreement, the applicable NORAD ADS will call the Project operations center at 401-223-2380 and request immediate curtailment. Advance notification is unlikely due to the unpredictable and dynamic nature of NORAD air defense events. If the wind speeds are up to and including 18 meters per second (m/s) (approximately 40 miles per hour) at the time of curtailment request, the wind turbine blades will be fully feathered with brakes applied (0 RPM). If the wind speeds are above 18 m/s at the time of curtailment request, the wind turbine blades will be fully feathered without the application of brakes. At any time during curtailment, if the wind speeds drop to 18 m/s or below, brakes will be applied to create a 0 RPM condition. If wind speeds subsequently exceed 18 m/s, brakes may be released on the fully feathered blades. The goal during NORAD curtailment is to create a 0 RPM condition to the maximum extent practical for the maximum amount of time. The applicable NORAD ADS will call the Project operations center as soon as possible after the air defense event is terminated and curtailment is no longer required.

If the Project operations center has not been notified by NORAD after 1 hour of fully feathered with brakes applied (0 RPM) Curtailment, the operations center is authorized to transition to fully feathered (less than 1 RPM) Curtailment until contacted by NORAD to confirm Curtailment is no longer required.

16 of 16

# EXHIBIT 2



**OFFICE OF THE ASSISTANT SECRETARY OF DEFENSE**
3400 DEFENSE PENTAGON
WASHINGTON, DC 20301-3400

December 13, 2024

Ms. Whitney Marsh
Ørsted
56 Exchange Terrace Suite 300
Providence, RI 02903

Reference: Federal Aviation Administration Aeronautical Study Number: 2021-WTE-2881-OE
and 23 associated structures

Dear Ms. Marsh,

Thank you for your participation in the Mitigation Response Team to assess and overcome military impacts from your proposed Revolution Wind project off the coast of Squibnocket Beach in Chilmark, Massachusetts. In a letter dated October 27, 2021, the Department of Defense (DoD) described the potential impacts to military operations for the project.

As a result of discussions between Ørsted and the U.S. Air Force and a resulting mitigation agreement signed by the Assistant Secretary of Defense for Energy, Installations, and Environment on November 4, 2024, the Military Aviation and Installation Assurance Siting Clearinghouse (Clearinghouse) has found that construction of the Revolution Wind Wind project, with no more than 65 wind turbines up to 873 feet above sea level and no more than two offshore substations up to 228 feet above sea level, would not have adverse impacts to DoD missions in the area. The Clearinghouse has entered a determination of "No Objection with Provision" for this project via the Federal Aviation Administration's (FAA) Obstruction Evaluation/Airport Airspace Analysis system.

Our response to the FAA included a notification that additional structure proposals or an increase to the current maximum structure height may present an adverse impact. We encourage you to engage DoD prior to any proposed expansion or height increase.

If you have any concerns, please contact Ms. Robbin Beard, Clearinghouse Deputy Director, at robbin.e.beard.civ@mail.mil.

Sincerely,

Steven J. Sample
Executive Director
Military Aviation and Installation
Assurance Siting Clearinghouse

# EXHIBIT 3



Mail Processing Center
Federal Aviation Administration
Southwest Regional Office
Obstruction Evaluation Group
10101 Hillwood Parkway
Fort Worth, TX 76177

Aeronautical Study No.
2021-WTE-2881-OE

Issued Date: 03/14/2024

Whitney Marsh
Orsted - RW
56 Exchange Terrace
Suite 300
Providence, RI 02903

## ** DETERMINATION OF NO HAZARD TO AIR NAVIGATION **

The Federal Aviation Administration has conducted an aeronautical study under the provisions of 49 U.S.C., Section 44718 and if applicable Title 14 of the Code of Federal Regulations, part 77, concerning:

| | |
|---|---|
| Structure: | Wind Turbine AE10 |
| Location: | Squibnocket, MA |
| Latitude: | 41-13-39.15N NAD 83 |
| Longitude: | 71-05-04.52W |
| Heights: | 0 feet site elevation (SE) |
| | 873 feet above ground level (AGL) |
| | 873 feet above mean sea level (AMSL) |

This aeronautical study revealed that the structure would have no substantial adverse effect on the safe and efficient utilization of the navigable airspace by aircraft or on the operation of air navigation facilities. Therefore, pursuant to the authority delegated to me, it is hereby determined that the structure would not be a hazard to air navigation provided the following condition(s) is(are) met:

As a condition to this Determination, the structure is to be marked/lighted in accordance with FAA Advisory circular 70/7460-1 M, Obstruction Marking and Lighting, white paint/synchronized red lights-Chapters 4,13(Turbines),&15.

Any failure or malfunction that lasts more than thirty (30) minutes and affects a top light or flashing obstruction light, regardless of its position, should be reported immediately to (877) 487-6867 so a Notice to Air Missions (NOTAM) can be issued. As soon as the normal operation is restored, notify the same number.

It is required that FAA Form 7460-2, Notice of Actual Construction or Alteration, be e-filed any time the project is abandoned or:

__X__ At least 60 days prior to start of construction (7460-2, Part 1)
__X__ Within 5 days after the construction reaches its greatest height (7460-2, Part 2)

See attachment for additional condition(s) or information.

While the structure does not constitute a hazard to air navigation, it would be located within or near a military training area and/or route.

This determination expires on 09/14/2025 unless:

(a)   the construction is started (not necessarily completed) and FAA Form 7460-2, Notice of Actual Construction or Alteration, is received by this office.

(b)   extended, revised, or terminated by the issuing office.

NOTE: REQUEST FOR EXTENSION OF THE EFFECTIVE PERIOD OF THIS DETERMINATION MUST BE E-FILED AT LEAST 15 DAYS PRIOR TO THE EXPIRATION DATE. AFTER RE-EVALUATION OF CURRENT OPERATIONS IN THE AREA OF THE STRUCTURE TO DETERMINE THAT NO SIGNIFICANT AERONAUTICAL CHANGES HAVE OCCURRED, YOUR DETERMINATION MAY BE ELIGIBLE FOR ONE EXTENSION OF THE EFFECTIVE PERIOD.

This determination is subject to review if an interested party files a petition that is received by the FAA on or before April 13, 2024. In the event an interested party files a petition for review, it must contain a full statement of the basis upon which the petition is made. Petitions can be submitted to the Manager, Rules and Regulations Group via email at OEPetitions@faa.gov, or via mail to Federal Aviation Administration, Air Traffic Organization, Rules and Regulations Group, Room 425, 800 Independence Ave, SW., Washington, DC 20591. FAA encourages the use of email to ensure timely processing.

This determination becomes final on April 23, 2024 unless a petition is timely filed. In which case, this determination will not become final pending disposition of the petition. Interested parties will be notified of the grant of any review. Any questions regarding your petition, contact Rules and Regulations Group via telephone (202) 267-8783.

This determination is based, in part, on the foregoing description which includes specific coordinates and heights. This determination is valid for coordinates within one (1) second latitude/longitude and up to the approved AMSL height listed above. If a certified 1A or 2C accuracy survey was required to mitigate an adverse effect, any change in coordinates or increase in height will require a new certified accuracy survey and may require a new aeronautical study.

If construction or alteration is dismantled or destroyed, you must submit notice to the FAA within 5 days after the construction or alteration is dismantled or destroyed.

Additional wind turbines or met towers proposed in the future may cause a cumulative effect on the national airspace system. All information from submission of Supplemental Notice (7460-2 Part 2) will be considered the final data (including heights) for this structure. Any future construction or alteration, including but not limited to changes in heights, requires separate notice to the FAA.

Obstruction marking and lighting recommendations for wind turbine farms are based on the scheme for the entire project. ANY change to the height, location or number of turbines within this project will require a reanalysis of the marking and lighting recommendation for the entire project. In particular, the removal of previously planned or built turbines/turbine locations from the project will often result in a change in the marking/lighting recommendation for other turbines within the project. It is the proponent's responsibility to contact the FAA to discuss the process for developing a revised obstruction marking and lighting plan should this occur.

In order to ensure proper conspicuity of turbines at night during construction, all turbines should be lit with temporary lighting once they reach a height of 200 feet or greater until such time the permanent lighting configuration is turned on. As the height of the structure continues to increase, the temporary lighting should be relocated to the uppermost part of the structure. The temporary lighting may be turned off for periods when they would interfere with construction personnel. If practical, permanent obstruction lights should be installed and operated at each level as construction progresses. An FAA Type L-810 steady red light fixture shall be used to light the structure during the construction phase. If power is not available, turbines shall be lit with self-contained, solar powered LED steady red light fixture that meets the photometric requirements of an FAA Type L-810 lighting system. The lights should be positioned to ensure that a pilot has an unobstructed view of at least one light at each level. The use of a NOTAM (D) to not light turbines within a project until the entire project has been completed is prohibited.

This determination does include temporary construction equipment such as cranes, derricks, etc., which may be used during actual construction of the structure. However, this equipment shall not exceed the overall heights as indicated above. Equipment which has a height greater than the studied structure requires separate notice to the FAA.

This determination concerns the effect of this structure on the safe and efficient use of navigable airspace by aircraft and does not relieve the sponsor of compliance responsibilities relating to any law, ordinance, or regulation of any Federal, State, or local government body.

This aeronautical study considered and analyzed the impact on existing and proposed arrival, departure, and en route procedures for aircraft operating under both visual flight rules and instrument flight rules; the impact on all existing and planned public-use airports, military airports and aeronautical facilities; and the cumulative impact resulting from the studied structure when combined with the impact of other existing or proposed structures. The study disclosed that the described structure would have no substantial adverse effect on air navigation.

An account of the study findings, aeronautical objections received by the FAA during the study (if any), and the basis for the FAA's decision in this matter can be found on the following page(s).

If we can be of further assistance, please contact Lan Norris, at (404) 305-6645, or Lan.norris@faa.gov. On any future correspondence concerning this matter, please refer to Aeronautical Study Number 2021-WTE-2881-OE.

**Signature Control No: 491643983-615655835**                    ( DNH -WT )
Eric F Johnston
Manager, Obstruction Evaluation Group

Attachment(s)
Additional Information
Map(s)

**Additional information for ASN 2021-WTE-2881-OE**

All FAA determinations and circularized cases are public record and available at the FAA's public website; https://oeaaa.faa.gov. The distribution for proposals circularized for public comments includes all "known" aviation interested persons and those who do not have an aeronautical interest but may become involved with specific aeronautical studies. Notification includes both postcard mailers and email notifications to those with registered FAA accounts. The FAA does not have a database for all persons with an aeronautical and non-aeronautical interest. Therefore, the public is encouraged to re-distribute and forward notices of circularized cases to the maximum extent possible. Additionally, it is incumbent upon local state, county and city officials to share notice of circularized cases with their concerned citizens.

A list of commonly used acronyms and abbreviations is available at the end of this document. A full list is available at the FAA's public website at https://oeaaa.faa.gov/oeaaa/downloads/external/content/FAA_Acronyms.pdf.

1. PROPOSAL DESCRIPTION

Proposed are 24 wind turbines for an offshore wind farm project located approximately 18.65 nautical miles (NM) to 25.00 NM southwest of the airport reference point (ARP) for Martha's Vineyard (MVY) Vineyard Haven, MA. and approximately 22.30 NM to 33.50 NM east of the ARP for Block Island State (BID) Block Island, RI.

For the sake of efficiency, all of the Aeronautical Study Numbers (ASN) filed for this proposal have similar impacts and are included in this narrative. The proposals described heights and locations are expressed in Above Ground Level (AGL) height, Above Mean Sea Level (AMSL) height and latitude / longitude.

| ASN | / | AGL | / | AMSL | / | Latitude | / | Longitude |
|---|---|---|---|---|---|---|---|---|
| 2021-WTE-2881-OE | / | 873 | / | 873 | / | 41-13-39.15N | / | 71-05-04.52W |
| 2021-WTE-2882-OE | / | 873 | / | 873 | / | 41-13-40.58N | / | 71-03-45.02W |
| 2021-WTE-2884-OE | / | 873 | / | 873 | / | 41-12-39.13N | / | 71-05-02.62W |
| 2021-WTE-2889-OE | / | 873 | / | 873 | / | 41-09-40.51N | / | 71-03-37.49W |
| 2021-WTE-2890-OE | / | 873 | / | 873 | / | 41-09-41.92N | / | 71-02-18.07W |
| 2021-WTE-2892-OE | / | 873 | / | 873 | / | 41-09-44.70N | / | 70-59-39.23W |
| 2021-WTE-2894-OE | / | 873 | / | 873 | / | 41-08-41.90N | / | 71-02-16.21W |
| 2021-WTE-2900-OE | / | 873 | / | 873 | / | 41-07-50.03N | / | 70-54-18.05W |
| 2021-WTE-2901-OE | / | 873 | / | 873 | / | 41-07-51.34N | / | 70-52-58.66W |
| 2021-WTE-2902-OE | / | 873 | / | 873 | / | 41-07-52.63N | / | 70-51-39.27W |
| 2021-WTE-2908-OE | / | 873 | / | 873 | / | 41-06-50.01N | / | 70-54-16.31W |
| 2021-WTE-2909-OE | / | 873 | / | 873 | / | 41-06-51.31N | / | 70-52-56.94W |
| 2021-WTE-2910-OE | / | 873 | / | 873 | / | 41-06-52.60N | / | 70-51-37.57W |
| 2021-WTE-2914-OE | / | 873 | / | 873 | / | 41-05-45.98N | / | 70-58-12.62W |
| 2021-WTE-2918-OE | / | 873 | / | 873 | / | 41-04-47.30N | / | 70-56-51.50W |
| 2023-WTE-7639-OE | / | 787 | / | 787 | / | 41-12-40.54N | / | 71-03-44.26W |
| 2023-WTE-7640-OE | / | 787 | / | 787 | / | 41-09-44.19N | / | 71-00-57.25W |
| 2023-WTE-7641-OE | / | 787 | / | 787 | / | 41-09-45.45N | / | 70-58-22.05W |
| 2023-WTE-7642-OE | / | 787 | / | 787 | / | 41-07-53.20N | / | 70-50-23.20W |
| 2023-WTE-7643-OE | / | 787 | / | 787 | / | 41-06-42.29N | / | 70-59-34.04W |
| 2023-WTE-7644-OE | / | 787 | / | 787 | / | 41-06-47.76N | / | 70-55-36.87W |
| 2023-WTE-7645-OE | / | 787 | / | 787 | / | 41-06-54.21N | / | 70-50-19.48W |

| 2023-WTE-7646-OE | / | 787 | / | 787 | / | 41-05-48.08N | / | 70-59-32.25W |
| 2023-WTE-7647-OE | / | 787 | / | 787 | / | 41-05-47.53N | / | 70-56-54.68W |

## 2. TITLE 14 CFR PART 77 - OBSTRUCTION STANDARDS EXCEEDED

a. Section 77.17(a)(1); exceeds a height of 499 feet AGL at the site of the object. The proposed wind turbines at 873 feet AGL would exceed this standard by 374 feet. The proposed wind turbines at 787 feet AGL would exceed this standard by 288 feet.

b. Section 77.17(a)(3); a height within a terminal obstacle clearance area, including an initial approach segment, a departure area, and a circling approach area, which would result in the vertical distance between any point on the object and an established minimum instrument flight altitude within that area or segment to be less than the required obstacle clearance.

- Boston Consolidated TRACON (A90)

A90_MVA_FUS3_2023_v2, Sector II and A90_MVA_FUS5_2023, Sector FF; the following would increase the Minimum Vectoring Altitude (MVA) from 1500 feet to _____.

    1900 feet
2021-WTE-2881-OE
2021-WTE-2882-OE
2021-WTE-2884-OE
2021-WTE-2889-OE
2021-WTE-2890-OE
2021-WTE-2892-OE
2021-WTE-2894-OE
2021-WTE-2900-OE
2021-WTE-2901-OE
2021-WTE-2902-OE
2021-WTE-2908-OE
2021-WTE-2909-OE
2021-WTE-2910-OE
2021-WTE-2914-OE
2021-WTE-2918-OE

    1800 feet
2023-WTE-7639-OE
2023-WTE-7640-OE
2023-WTE-7641-OE
2023-WTE-7642-OE
2023-WTE-7643-OE
2023-WTE-7644-OE
2023-WTE-7645-OE
2023-WTE-7646-OE
2023-WTE-7647-OE

A90_MVA_FUS3_2023_v2, Sector HH; the following would increase the MVA from 1800 feet to 1900 feet:

2021-WTE-2889-OE
2021-WTE-2890-OE
2021-WTE-2892-OE
2021-WTE-2894-OE
2021-WTE-2884-OE
2021-WTE-2914-OE

A90_MVA_FUS5_2023_v2, Sector II; the following would increase the MVA from 1800 feet to 1900 feet:

2021-WTE-2881-OE
2021-WTE-2882-OE
2021-WTE-2884-OE
2021-WTE-2889-OE
2021-WTE-2890-OE
2021-WTE-2892-OE
2021-WTE-2894-OE
2021-WTE-2900-OE
2021-WTE-2901-OE
2021-WTE-2902-OE
2021-WTE-2908-OE
2021-WTE-2909-OE
2021-WTE-2910-OE
2021-WTE-2914-OE
2021-WTE-2918-OE

- Providence ATCT/TRACON (PVD)

PVD_MVA_FUS5_2023 and PVD_MVA_FUS3_2023; the following would increase the MVA for Sector C from 1500 feet to _____.

   1900 feet
2021-WTE-2881-OE
2021-WTE-2882-OE
2021-WTE-2884-OE
2021-WTE-2889-OE
2021-WTE-2890-OE
2021-WTE-2892-OE
2021-WTE-2894-OE
2021-WTE-2900-OE
2021-WTE-2901-OE
2021-WTE-2902-OE
2021-WTE-2908-OE
2021-WTE-2909-OE
2021-WTE-2910-OE
2021-WTE-2914-OE
2021-WTE-2918-OE

   1800 feet
2023-WTE-7639-OE

2023-WTE-7640-OE
2023-WTE-7641-OE
2023-WTE-7642-OE
2023-WTE-7643-OE
2023-WTE-7644-OE
2023-WTE-7645-OE
2023-WTE-7646-OE
2023-WTE-7647-OE

- Martha's Vineyard (MVY)

ILS LOC RWY 24 & VOR RWY 6; the following would increase the Minimum Safe Altitude (MSA), 180 degrees (deg.) inbound, clockwise to 090 deg. inbound from 1600 feet to _____.

    1900 feet
2021-WTE-2881-OE
2021-WTE-2882-OE
2021-WTE-2884-OE
2021-WTE-2889-OE
2021-WTE-2890-OE
2021-WTE-2892-OE
2021-WTE-2894-OE
2021-WTE-2900-OE
2021-WTE-2901-OE
2021-WTE-2902-OE
2021-WTE-2908-OE
2021-WTE-2909-OE
2021-WTE-2910-OE
2021-WTE-2914-OE
2021-WTE-2918-OE

    1800 feet
2023-WTE-7639-OE
2023-WTE-7640-OE
2023-WTE-7641-OE
2023-WTE-7642-OE
2023-WTE-7643-OE
2023-WTE-7644-OE
2023-WTE-7645-OE
2023-WTE-7646-OE
2023-WTE-7647-OE

- Cape Cod Coast Guard Air Station (FMH)

ILS Z OR LOC Z RWY 23, ILS Z OR LOC Z RWY 32, COPTER ILS Y OR LOC Y RWY 23 and COPTER ILS Y OR LOC Y RWY 32; the following would increase the MSA, 270 deg. inbound, clockwise to 090 deg. inbound from 1500 feet to 1900 feet.

2021-WTE-2881-OE

2021-WTE-2882-OE
2021-WTE-2884-OE
2021-WTE-2889-OE
2021-WTE-2890-OE
2021-WTE-2892-OE
2021-WTE-2894-OE
2021-WTE-2900-OE
2021-WTE-2901-OE
2021-WTE-2902-OE
2021-WTE-2908-OE
2021-WTE-2909-OE
2021-WTE-2910-OE
2021-WTE-2914-OE
2021-WTE-2918-OE

ILS or LOC Z RWY 32, COPTER ILS or LOC Y RWY 32 and COPTER ILS Y OR LOC Y RWY 32; the following would increase the MSA, 270 deg. inbound, clockwise to 090 deg. inbound from 1500 feet to 1800 feet.

2023-WTE-7639-OE
2023-WTE-7640-OE
2023-WTE-7641-OE
2023-WTE-7642-OE
2023-WTE-7643-OE
2023-WTE-7644-OE
2023-WTE-7645-OE
2023-WTE-7646-OE
2023-WTE-7647-OE

- Cape Cod Gateway (HYA)

ILS OR LOC RWY 15, ILS OR LOC RWY 24 and VOR RWY 6; the following would increase the MSA, 180 deg. inbound, clockwise to 090 deg. inbound from 1700 feet to _____.

1800 feet
2023-WTE-7639-OE
2023-WTE-7640-OE
2023-WTE-7641-OE
2023-WTE-7642-OE
2023-WTE-7643-OE
2023-WTE-7644-OE
2023-WTE-7645-OE
2023-WTE-7646-OE
2023-WTE-7647-OE

1900 feet
2021-WTE-2881-OE
2021-WTE-2882-OE
2021-WTE-2884-OE

2021-WTE-2889-OE
2021-WTE-2890-OE
2021-WTE-2892-OE
2021-WTE-2894-OE
2021-WTE-2900-OE
2021-WTE-2901-OE
2021-WTE-2902-OE
2021-WTE-2908-OE
2021-WTE-2909-OE
2021-WTE-2910-OE
2021-WTE-2914-OE
2021-WTE-2918-OE

- Block Island State (BID)

VOR/DME RWY 10 and VOR RWY 28; the following would increase the MSA, 240 deg. inbound, clockwise to 060 deg. inbound from 1700 feet to _____.

        1900 feet
2021-WTE-2881-OE
2021-WTE-2882-OE
2021-WTE-2884-OE
2021-WTE-2889-OE
2021-WTE-2890-OE
2021-WTE-2892-OE
2021-WTE-2894-OE
2021-WTE-2914-OE
2021-WTE-2918-OE

        1800 feet
2023-WTE-7639-OE
2023-WTE-7640-OE
2023-WTE-7641-OE
2023-WTE-7643-OE
2023-WTE-7646-OE
2023-WTE-7647-OE

- General Edward Lawrence Logan International (BOS)

OOSHN FIVE ARRIVAL (RNAV); the following would increase the Minimum Obstruction Clearance Altitude (MOCA), CUTOX to CUJKE from 1200 feet to _____.

        1900 feet
2021-WTE-2901-OE
2021-WTE-2902-OE
2021-WTE-2908-OE
2021-WTE-2909-OE
2021-WTE-2910-OE
2021-WTE-2914-OE

2021-WTE-2918-OE

    1800 feet
2023-WTE-7642-OE
2023-WTE-7644-OE
2023-WTE-7645-OE
2023-WTE-7646-OE
2023-WTE-7647-OE

c.  Section 77.17(a)(4); a height within an en route obstacle clearance area, including turn and termination areas, of a Federal Airway or approved off-airway route, that would increase the minimum obstacle clearance altitude.

- T300

The following would increase the MOCA, MINNK to DEEPO from 1200 feet to _____.

    1900 feet
2021-WTE-2881-OE
2021-WTE-2882-OE
2021-WTE-2884-OE
2021-WTE-2889-OE

    1800 feet
2023-WTE-7639-OE

The following would increase the MOCA from NEWBE to DEEPO from 1200 feet to _____.

    1900 feet
2021-WTE-2881-OE
2021-WTE-2882-OE
2021-WTE-2884-OE
2021-WTE-2889-OE
2021-WTE-2890-OE
2021-WTE-2892-OE
2021-WTE-2894-OE
2021-WTE-2900-OE
2021-WTE-2901-OE
2021-WTE-2902-OE
2021-WTE-2908-OE
2021-WTE-2909-OE
2021-WTE-2910-OE
2021-WTE-2914-OE
2021-WTE-2918-OE

    1800 feet
2023-WTE-7639-OE
2023-WTE-7640-OE
2023-WTE-7641-OE

2023-WTE-7642-OE
2023-WTE-7643-OE
2023-WTE-7644-OE
2023-WTE-7645-OE
2023-WTE-7646-OE
2023-WTE-7647-OE

## 3. TITLE 14 CFR PART 77 - EFFECT ON AERONAUTICAL OPERATIONS

a. Section 77.29 (a)(1); the impact on arrival, departure, and en route procedures for aircraft operating under visual flight rules. At a height greater than 499 feet AGL, the proposed wind farm would extend into airspace normally used for VFR en route flight and located within 2 statute miles (SM) of a potential VFR Route as defined by FAA Order 7400.2, Section 6-3-8. The turbines within 2 SM of a VFR route would have an adverse effect upon VFR air navigation. Further study was required to determine whether the structures would affect a significant volume of VFR aircraft resulting in a substantial adverse effect on VFR en route traffic.

b. Section 77.29(a)(6); effect on ATC radar, direction finders, ATC tower line-of-sight visibility, and physical or electromagnetic effects on air navigation, communication facilities, and other surveillance systems. The wind farm would be located within Radar Line of Sight (RLOS) of the Falmouth, MA. (FMH) ASR-8, Coventry, RI. (PVD) ASR-9, and Nantucket, MA. (ACK) ASR-9 radar facilities. The wind turbines may affect the quality and/or availability of the primary radar signals in the area of the proposed wind farm.

## 4. TITLE 14 CFR PART 77 - FURTHER STUDY AND PUBLIC COMMENTS

In order to facilitate the public comment process, all 24 studies were circularized under ASN 2021-WTE-2892-OE on 01/26/2024, to all known aviation interests and non-aeronautical interests that may be affected by the proposal. There were no comments received as a result of the circularization concluding on 03/03/2024.

## 5. BASIS FOR DETERMINATION

a. IFR Effects - The aeronautical study identified an IFR effects for A90, PVD, MVY, FMH, HYA, BID, BOS AND T300. Minimum Vectoring Altitudes (MVA) are solely used by ATC, not published for public use and therefore are not circulated for public comment. A review by the controlling facility determined that increasing the altitude in the sector would ensure the required obstacle clearance is maintained and therefore the proposal would not have a substantial adverse effect on IFR operations for A90 or PVD. Minimum Obstruction Clearance Altitudes (MOCA) assure obstacle clearance over the entire route segment to which they apply and assure navigational signal coverage within 22 NM of the associated VOR navigational facility. For that portion of the route segment beyond 22 NM from the VOR, where the MOCA is lower than the MEA and there are no plans to lower the MEA to the MOCA, a structure that affects only the MOCA would not be considered to have substantial adverse effect. Other situations require study as ATC may assign altitudes down to the MOCA under certain conditions. A review by the controlling ATC facilities determined that increasing the MOCAs would ensure the required obstacle clearances are maintained and therefore the proposal would not have a substantial adverse effect on IFR operations for BOS or T300. Minimum Safe Altitudes (MSA) are the minimum obstacle clearance altitudes within a specified distance from the navigation facilities upon which procedures are predicated. MSA altitudes are designed for emergency use only and are not routinely used by pilots or by air traffic control. Consequently, MSAs are not circulated for public comment as they are not considered a factor in determining the extent of adverse effect and therefore the proposal would not have a substantial adverse effect on IFR operations for MVY, FMH, HYA or BID. The proposed structures would have no effect on any other existing or proposed arrival, departure, or en route IFR operations or procedures.

b. VFR Effects - The aeronautical study identified no effect on any existing or proposed VFR arrival or departure operations. The proposals would be located beyond the traffic pattern airspace for any known public use or military airports. At 787 and 873 feet AGL, the structures would be located within the altitudes commonly used for en route VFR flight. In coordination with ATC, an analysis of potential VFR Routes and available traffic data indicated that an average of less than one VFR aircraft per day may be affected by the proposed wind farm. In accordance with FAA Order 7400.2, the proposed wind farm would not affect a significant volume of aircraft and therefore, it is determined they will not have a substantial adverse effect on en route VFR flight operations. The proposed structures would be charted on VFR sectional aeronautical charts and appropriately obstruction marked/lighted to make them more conspicuous to airmen should circumnavigation be necessary.

c. NAVAIDs/Radar Effects - The aeronautical study identified the proposed turbines as being within the RLOS of the Falmouth, MA. (FMH) ASR-8, Coventry, RI. (PVD) ASR-9, and Nantucket, MA. (ACK) ASR-9 radar facilities as described above. Impacts to radar only require a review by the responsible ATC facility and military services. Further study determined the structures would have no substantial adverse effect on military or air traffic operations at this time.

d. Cumulative Effect - The cumulative impact of the proposed structures, when combined with other proposed and existing structures, is not considered to be significant. Study did not disclose any substantial adverse effect on existing or proposed public-use or military airports or navigational facilities, nor would the proposals affect the capacity of any known existing or planned public-use or military airport.

e. Military Airspace - The aeronautical study included a review by the Army, Navy, Air Force, Department of Defense (DOD) and Department of Homeland Security (DHS). In accordance with JO 7400.2, Par. 6-3-6-f., military personnel are responsible for evaluating the effect on airspace and routes used by the military. The Air Force and DOD identified the structures as being located within the confines or near a military radar line of sight. Additional or taller structures which encroach upon radar line of sight may result in mission impacts that warrant further study.

6. DETERMINATION

It is determined that the proposed construction would not have a substantial adverse effect on the safe and efficient utilization of the navigable airspace by aircraft or on any air navigation facility and would not be a hazard to air navigation providing the conditions set forth in this determination are met.

*****************************************************************************************

ACRONYMS & ABBREVIATIONS

AGL, Above Ground Level
AMSL, Above Mean Sea Level
ARP, Airport Reference Point
ARSR, Air Route Surveillance Radar
ARTCC, Air Route Traffic Control Center
ASN, Aeronautical Study Number
ASR, Airport Surveillance Radar

ATC, Air Traffic Control
ATCT, Air Traffic Control Tower
CARSR, Common Air Route Surveillance Radar
CAT, Category
CFR, Code of Federal Regulations
CG, Climb Gradient
DA, Decision Altitude
DME, Distance Measuring Equipment
FAA, Federal Aviation Administration
FUS, Fusion
GPS, Global Positioning System
IAF, Initial Approach Fix
IAP, Instrument Approach Procedure
ICA, Initial Climb Area
IFR, Instrument Flight Rules
INT, Intersection
LAT, Latitude
LNAV, Lateral Navigation
LOC, Localizer
LONG, Longitude
LP, Localizer Performance
LPV, Localizer Performance with Vertical Guidance
MDA, Minimum Descent Altitude
MEA, Minimum En route Altitude
MET, Meteorological Evaluation Tower
MIA, Minimum IFR Altitude
Min, Minimum
MOCA, Minimum Obstruction Clearance Altitude
MSA, Minimum Safe Altitude
MSL, Mean Sea Level
MVA, Minimum Vectoring Altitude
NA, Not Authorized
NAS, National Airspace System
NAVAID, Navigational Aid
NDB, Non-Directional Radio Beacon
NEH, No Effect Height
NM, Nautical Mile
NOTAM, Notice to Airmen
NPF, Notice of Preliminary Findings
OCS, Obstacle Clearance Surface
OE, Obstruction Evaluation
OEG, Obstruction Evaluation Group
Part 77 - Title 14 Code of Federal Regulations (CFR) Part 77, Safe, Efficient Use and Preservation of the
 Navigable Airspace.
P-NOTAM, Permanent Notice to Airmen
RLOS, Radar Line of Sight
RNAV, Area Navigation
RNP, Required Navigation Performance
RWY, Runway

S-, Straight-in
SE, Site Elevation
S-LOC, Straight-in Localizer
SM, Statute Miles
Std., Standard
TAA, Terminal Arrival Area
TACAN, Tactical Air Navigation System
TERPS, Terminal Instrument Procedures
TPA, Traffic Pattern Airspace
TRACON, Terminal Radar Approach Control
V, Victor Airway
VFR, Visual Flight Rules
VHF, Very High Frequency
VOR, VHF Omnidirectional Radio Range System
VORTAC, VOR/TACAN System
WTE, Wind Turbine East
WTW, Wind Turbine West

**Sectional Map for ASN 2021-WTE-2881-OE**



# EXHIBIT 4

AN UNFUNDED PROGRAMMATIC AGREEMENT

Between The

U.S. DEPARTMENT OF COMMERCE
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
NATIONAL OCEAN SERVICE
U.S. INTEGRATED OCEAN OBSERVING SYSTEM OFFICE

And

REVOLUTION WIND, LLC

For The

MITIGATION OF MISSION DEGRADING OFFSHORE WIND TURBINE
INTERFERENCE TO OCEANOGRAPHIC HIGH-FREQUENCY RADAR
BY THE REVOLUTION OFFSHORE WIND FARM

NOS Agreement Code:  MOA-2024-070/12900

**TABLE OF CONTENTS**

ABBREVIATIONS AND ACRONYMS ........................................................................................ 4

1    PARTIES ...................................................................................................................................... 6

2    BACKGROUND .......................................................................................................................... 6

  2.1    Project Overview and Description of Lease Area ............................................................ 6

  2.2    Project Impact to NOAA IOOS Operations .................................................................... 6

3    AUTHORITIES ........................................................................................................................... 7

  3.1    Coast and Geodetic Survey Act ...................................................................................... 7

  3.2    Integrated Coastal and Ocean Observation System Act.................................................. 8

4    PURPOSE .................................................................................................................................... 8

5    RESPONSIBILITIES OF THE PARTIES ................................................................................. 9

  5.1    IOOS ............................................................................................................................... 9

  5.2    RWF ................................................................................................................................ 9

  5.3    Met-Ocean Data Collection for Mitigation .................................................................... 9

    5.3.1    Data Types to be Collected ...................................................................................... 9

    5.3.2    Sensors ................................................................................................................... 10

      5.3.2.1    Wave and Current Radar at RWF OSS ............................................................ 10

      5.3.2.2    Met-ocean Buoy .............................................................................................. 10

      5.3.2.3    Wave and Current Radar at South Fork Wind Farm OSS ............................... 10

    5.3.3    Operation and Maintenance .................................................................................... 10

      5.3.3.1    Real Time Monitoring Requirements ............................................................... 10

      5.3.3.2    Maintenance Requirements .............................................................................. 11

      5.3.3.3    Downtime Reporting ........................................................................................ 11

    5.3.4    Decommissioning ................................................................................................... 12

  5.4    Data Sharing and Analysis ............................................................................................ 12

    5.4.1    WTRIM DAC Contacts .......................................................................................... 12

6    CONTACTS ............................................................................................................................... 13

7    FUNDING .................................................................................................................................. 14

8    DURATION OF AGREEMENT, AMENDMENTS, OR TERMINATION ....................... 14

9    ASSIGNMENT .......................................................................................................................... 14

10   RESOLUTION OF DISAGREEMENTS ................................................................................ 14

11   OTHER TERMS AND CONDITIONS ................................................................................... 15

12   APPROVALS ............................................................................................................................. 15

REFERENCES ................................................................................................................................ 16

Appendix A:  Technical Specifications, MSI G300 Metocean Buoy ............................................ 17

Appendix B:  Technical Specifications, RADAC WG5 Wave Monitoring Radar ...................... 71

## ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| AMAG | Amagansett high-frequency radar |
| ATTN | attention |
| Ave. | avenue |
| BISL | Block Island standard range high-frequency radar |
| BLCK | Block Island long-range high-frequency radar |
| Bldg. | building |
| BOEM | Bureau of Ocean Energy Management |
| CGSA | Coast and Geodetic Survey Act |
| cm | centimeters |
| COORA | Coordinated Ocean Observation and Research Act of 2020 |
| CPVN | Camp Varnum high-frequency radar |
| DAC | data assembly center |
| DOC | Department of Commerce |
| DOI | Department of the Interior |
| *et al.* | *et alia* (English:  "and others") |
| *et seq.* | *et sequens* (English:  "and the following") |
| HBSR | Horseneck Beach State Reservation high-frequency radar |
| HFR | high-frequency radar |
| Hwy | highway |
| ICOOS | Integrated Coastal and Ocean Observation System |
| *inter alia* | (English:  "among other things") |
| IOOS | U.S. Integrated Ocean Observing System |
| km | kilometers |
| L. | law |
| LERA | least expensive radar |
| LLC | limited liability company |
| LOS | line of sight |
| LPWR | Long Point Wildlife Refuge high-frequency radar |
| m | meters |
| MA | Massachusetts |
| MARACOOS | Mid-Atlantic Regional Association Coastal Ocean Observing System |
| MD | Maryland |
| ME | Maine |
| mi. | statute miles |
| MRCH | Moriches high-frequency radar |
| MVCO | Martha's Vineyard high-frequency radar |
| N | north |
| NANT | Nantucket Island high-frequency radar |
| NAUS | Nauset high-frequency radar |
| NERACOOS | Northeastern Regional Association of Coastal Ocean Observing Systems |

| | |
|---|---|
| NH | New Hampshire |
| nm | nautical miles |
| NOAA | National Oceanic and Atmospheric Administration |
| NOS | National Ocean Service |
| NWTP | Nantucket high-frequency radar |
| NY | New York |
| OCS | outer continental shelf |
| OSS | offshore sub-station |
| Ph.D. | Doctor of Philosophy |
| Pub. | public |
| REV | Revolution Wind, LLC |
| RI | Rhode Island |
| RWF | Revolution Wind Farm |
| s | seconds |
| Sr. | senior |
| SSMC3 | Silver Spring Metro Center 3 |
| St. | street |
| T | true |
| U.S. | United States |
| U.S.C. | United States Code |
| UH-HFDR | University of Hawaiʻi - High Frequency Doppler Radar |
| W | west |
| WTG | wind turbine generator |
| WTRIM | wind turbine radar interference mitigation |

## 1   PARTIES

This document constitutes an agreement between the U.S. Integrated Ocean Observing System (IOOS) Office, National Ocean Service (NOS), National Oceanic and Atmospheric Administration (NOAA), U.S. Department of Commerce (DOC); and Revolution Wind, LLC (REV), the owner of the Revolution Wind Farm (RWF).

## 2   BACKGROUND

### 2.1   Project Overview and Description of Lease Area

RWF includes up to 67 structures (65 wind turbine generators (WTGs) and two offshore substations (OSS)) located in federal waters on the Outer Continental Shelf (OCS) in the designated Bureau of Ocean Energy Management (BOEM) Renewable Energy Lease Area OCS-A 0486 (Lease Area).  RWF is approximately 18 statute miles (mi.) (15 nautical miles [nm]) southeast of Point Judith, RI, approximately 15 mi. (13 nm) east of Block Island, RI, approximately 8.5 mi. (7.5 nm) south of Noman's Land Island National Wildlife Refuge (uninhabited island), and between approximately 12 to 14 mi. (10 to 12.5 nm) south/southwest of varying points of the Rhode Island and Massachusetts coastlines (Figure 1).  RWF will commence offshore construction in May 2024 and continue through mid-2025, and operate for approximately 25 years.  WTGs are anticipated to commence installation as early as June 2024.



Figure 1.  RWF (at blue cable) and adjacent South Fork Wind Farm (at green cable).

### 2.2   Project Impact to NOAA IOOS Operations

The Lessee's RWF project is currently within the line of sight (LOS) of eleven oceanographic high-frequency radar (HFR) systems (SeaSonde® and LERA types):

- AMAG (Amagansett, NY SeaSonde)
- BLCK (Block Island Long Range, RI SeaSonde)
- BISL (Block Island Standard Range, RI SeaSonde)
- CPVN (Camp Varnum, RI UH-HFDR )
- HBSR (Horseneck Beach State Reservation, MA UH-HFDR[1])
- LPWR (Long Point Wildlife Refuge, MA UH-HFDR)
- MVCO (Martha's Vineyard, MA SeaSonde)
- MRCH (Moriches, NY SeaSonde)
- NWTP (Nantucket, MA UH-HFDR)
- NANT (Nantucket Island, MA SeaSonde)
- NAUS (Nauset, MA SeaSonde)

The number and configuration of HFRs within LOS of RWF is subject to change by IOOS.

Recent BOEM research (Colburn, et al. 2020) has determined that WTGs within the LOS proximity of HFRs degrade those sensors' ocean surface current velocity and wave measurements, which are used by NOAA IOOS in support of mission objectives including tracking and predicting the movement of spills of hazardous materials or other pollutants, monitoring water quality, and predicting sea state for safe marine navigation.

# 3 AUTHORITIES

The programmatic and legal authorities for NOAA IOOS and REV to enter into this Agreement are the *Coast and Geodetic Survey Act* ("CGSA"), 33 U.S.C. 883a *et seq.* and the *Integrated Coastal and Ocean Observation System Act of 2009* (Pub. L. 111-11) ("ICOOS Act"), as amended by the *Coordinated Ocean Observation and Research Act of 2020* (Pub. L. 116-271, Title I) ("COORA"), codified at 33 U.S.C. §§ 3601–3610.

## 3.1 <u>Coast and Geodetic Survey Act</u>

The CGSA, 33 U.S.C. § 883e (2020), authorizes the Secretary of DOC to, *inter alia*, enter into cooperative agreements, or any other agreements, with any State or subdivision thereof, any Federal agency, or any public or private organization, or individual for performing activities authorized under 33 U.S.C. 883a *et seq*., and to establish the terms of any agreement entered into under this section.

Programmatic authorities for NOAA to enter into this Agreement include the CGSA, 33 U.S.C. §§ 883a, 883b, and 883d (2020), which authorize the Secretary of DOC to, *inter alia*:

- provide information for the safe navigation of marine commerce, and to provide basic data for engineering and scientific purposes and for other commercial and industrial needs, including tide and current observations;
- that full public benefit may be derived, disseminate data from the analysis and prediction of tide and current data, and to process and publish data, information, compilations, and reports; and

---

[1] University of Hawai'i High Frequency Doppler Radars (UH-HFDR), also known colloquially as "least expensive radar" (LERA).

- conduct investigations and research in geophysical sciences (including oceanography).

3.2   Integrated Coastal and Ocean Observation System Act

The ICOOS Act, as amended by COORA, authorizes the Secretary of DOC to execute an agreement with any State or subdivision thereof, any Federal agency, any public or private organization, or any individual to carry out activities under this chapter.  Further, the ICOOS Act, 33 U.S.C. § 3603(c)(3)(C)(iv) (2020), authorizes the Administrator for NOAA to enter into and oversee contracts, leases, grants, or cooperative agreements with non-Federal assets to support the purposes of this chapter on such terms as the Administrator deems appropriate.  Per 33 U.S.C. § 3602(5) (2020), the term "non-Federal assets" means all relevant coastal and ocean observation technologies, related basic and applied technology research and development, and public education and outreach programs that are managed through States, regional organizations, universities, nongovernmental organizations, or the private sector and integrated into the System by a regional coastal observing system, NOAA, or the agencies participating in the Interagency Ocean Observation Committee.

Programmatic authorities for NOAA to enter into this Agreement include the ICOOS Act, as amended by COORA, which authorize the Administrator of NOAA to, *inter alia*:

- establish and sustain a national integrated System of ocean, coastal, and Great Lakes observing systems, comprised of Federal and non-Federal components that includes *in situ*, remote, and other coastal and ocean observation capabilities, technologies, data management systems, communication systems, and product development systems, and is designed to address regional and national needs for ocean and coastal information, to gather specific data on key ocean, coastal, and Great Lakes variables, and to ensure timely and sustained dissemination and availability of these data—to the public; to support search and rescue operations, marine commerce, navigation safety, weather, climate, and marine forecasting, energy siting and production, economic development, ecosystem-based marine, coastal, and Great Lakes resource management, and public safety; and to provide easy access to ocean, coastal, and Great Lakes data and promote data sharing between Federal and non-Federal sources and promote public data sharing;
- use non-Federal assets to fulfill regional and national observation missions and priorities;
- ensure all data collected by the System regarding ocean and coastal waters of the United States, including the Great Lakes, are made available to all end-user communities; and
- sustain a national surface current mapping network designed to improve fine scale sea surface mapping using HFR technology and other emerging technologies that— is comprised of existing HFR and other sea surface current mapping infrastructure; incorporates new HFR assets or other fine scale sea surface mapping technology assets, and other assets needed to fill gaps in coverage on United States coastlines; and follows a deployment plan that prioritizes closing gaps in HFR infrastructure in the United States, starting with areas demonstrating significant sea surface current data needs, especially in areas where additional data will improve Coast Guard search and rescue models.

## 4   PURPOSE

The purpose of this Mitigation Agreement is to mitigate the demonstrated impacts to oceanographic HFR systems including those listed above in § 2.2 from radar interference, caused

by RWF, to the degree that radar performance is no longer within the specific radar systems' operational parameters or fails to meet the IOOS's mission objectives.

# 5 RESPONSIBILITIES OF THE PARTIES

## 5.1 IOOS

As soon as possible following initiation of RWF commercial operations, but no later than 60 days following the completion of RWF[2], consult with BOEM to determine if interference is unacceptable. Interference is considered unacceptable if, as determined by BOEM in consultation with NOAA IOOS, RWF causes interference such that the performance of any of the IOOS HFR system(s) in § 2.2 falls or may fall outside any of the specific radar systems' operational parameters or fails or may fail to meet IOOS's mission objectives.

IOOS shall be responsible for receiving the data telemetry provided by REV for the data types specified in § 5.3.1, using those data to mitigate the impact of HFR interference from the RWF described in § 2.2, and serving the data to the public per § 5.4.

## 5.2 RWF

REV will mitigate potential interference to NOAA IOOS Systems by sharing real-time met-ocean data in the period leading up to and including the installation of all rotor blades. In order to mitigate unacceptable interference throughout the life of the Project until the point of decommissioning when all rotor blades are removed, the Lessee REV will make available to NOAA IOOS near real-time, accurate numerical telemetry of surface current velocity, wave height, wave period and wave direction data measured at locations selected by the Lessee REV in coordination with NOAA IOOS (see § 5.3.2 below). As noted below, data are already being shared.

REV is responsible for the met-ocean data collection described in § 5.3—including purchasing, installing, operating, maintaining consistent with § 5.3.3—and reliably transmitting those data to IOOS.

## 5.3 Met-Ocean Data Collection for Mitigation

### 5.3.1 Data Types to be Collected

Table 1. Table of variables and minimum collection frequencies.

| Variables (units) | Collection and Reporting Frequency |
|---|---|
| Current Speed (cm s$^{-1}$) | 30 Minutes |
| Current Direction (°T) | 30 Minutes |
| Wave Height (m) | 30 Minutes |
| Wave Period (s) | 30 Minutes |
| Wave Direction (°T) | 30 Minutes |

---

[2] Tentative completion date in the second quarter of calendar year 2025.

### 5.3.2  Sensors

#### 5.3.2.1  Wave and Current Radar at RWF OSS

A wave monitoring radar will be installed on the RWF OSS at approximate position (41° 12.6' N, 71° 6.3' W).  This radar measures heave, water level, wave height, wave period, and wave direction, and, pending an update scheduled for early 2024 and following software benchmarking against the buoy described in § 5.3.2.2 below, surface currents.  See Appendix B:  Technical Specifications, RADAC WG5 Wave Monitoring Radar.  The wave monitoring radar, and/or other current monitoring sensor will transmit data to NOAA IOOS, should BOEM determine HFR performance falls or may fall outside any of the specific radar systems' operational parameters or fails or may fail to meet IOOS's mission objectives.

#### 5.3.2.2  Met-ocean Buoy

A met-ocean buoy is currently deployed in approximate position 41.0764° N, 71.1893° W.  This buoy measures wave height, direction, and period, current speed and direction, and visibility.  See https://orna.woodsholegroup.com/sfwb/index.html and Appendix A:  Technical Specifications, MSI G300 Metocean Buoy.  This device will be in place for approximately three (03) years.  This buoy currently provides NOAA IOOS with the desired oceanographic data per Table 1 for the duration of the buoy's deployment, including redeployments, regardless of determination results of § 5.1.  The buoy will be in place and transmitting data prior to RWF rotor blade installation.

#### 5.3.2.3  Wave and Current Radar at South Fork Wind Farm OSS

A wave monitoring radar is installed on the adjacent South Fork Wind Farm OSS at position (41.0759° N, 71.1680° W).  This radar measures heave, water level, wave height, wave period, and wave direction, and South Fork Wind, LLC in coordination with REV is in current talks with the manufacturer to include surface currents measurements.  See Appendix B:  Technical Specifications, RADAC WG5 Wave Monitoring Radar.  The wave monitoring radar, and/or other current monitoring sensor will assume monitoring duties on or before the disestablishment of the met-ocean buoy described in § 5.3.2.2, include data transmittal to NOAA IOOS, should BOEM determine HFR performance falls or may fall outside any of the specific radar systems' operational parameters or fails or may fail to meet IOOS's mission objectives.

### 5.3.3  Operation and Maintenance

#### 5.3.3.1  Real Time Monitoring Requirements

Met-ocean data collected by the sensors in § 5.3.2 will be reported live, in no slower than 30 minutes intervals, which matches the data capabilities of impacted HFR systems.  IOOS indicates the location of the sensors in § 5.3.2 is sufficient to allow mission objectives to be met; therefore at least 30 days prior to relocating any sensor, except temporarily for maintenance, REV will consult with IOOS.  Real-time blade rotation rates, nacelle bearing angles, and other operational state information is not currently desired by IOOS to meet mission parameters or objectives.  Accurate numerical time-series data of blade rotation rates, nacelle bearing angles, and other information about the operational state of each WTG in the Lease Area to aid

interference mitigation could be shared subject to limited rights appropriate to government handling of proprietary data.

### 5.3.3.2 Maintenance Requirements

Maintenance intervals and procedures described below are indicative, and are accomplished in accordance with the manufacturer's recommendations.

#### 5.3.3.2.1 Met-ocean Buoy

Annual standard system servicing will be undertaken offshore on board the servicing vessel, rather than having to return the system to port for regular service and maintenance. However, it should be noted that any major system maintenance beyond basic cleaning, checking, mooring replacement, or replacement of component parts could require shore-based servicing. Maintenance includes, but is not limited to:

- Cleaning of the buoy system components and mooring components.
- Uploading of all archived data recorded on the buoy system and securing of the data in multiple copies and via digital file transfer.
- Checking of the recorded data for correct system operation.
- Checking of all system sensors and buoy systems for good physical condition and correct operation.
- Assessment of the buoy mooring system components for unusual wear or degradation.
- Replacement of any batteries or system consumables as prescribed by the system manual.
- Reapplication of buoy system anti-fouling and replacement of buoy system sacrificial anodes.
- Replacement of the buoy system mooring components.

#### 5.3.3.2.2 Wave and Current Radars

Standard system servicing will be undertaken every 6 months: including but not limited to:

- Visual Inspection.
- Inspect connections.
- Clean mount and heads.
- Inspect data transfer from cabinet room.

### 5.3.3.3 Downtime Reporting

REV will target a 92% or greater sensor availability when determination of impacts or mission failure are indicated. Downtime will be reported to NOAA IOOS within 24 hours; infill data will not be available directly, but may be available indirectly through adjacent offshore wind project's sensors. Corrective maintenance by REV will be performed to restore system operation.

### 5.3.4 Decommissioning

RWF will be decommissioned in accordance with its Construction and Operations Plan and any Decommissioning Plan approved by BOEM. REV will provide 30 days' notice prior to decommissioning any sensor indicated above.

### 5.4 Data Sharing and Analysis

All data types given in § 5.3.1 from the sensors in § 5.3.2 will be telemetered at the frequency described in § 5.3.3.1 by REV to the wind turbine radar inference mitigation (WTRIM) data assembly center (DAC) provided by the IOOS Regional Associations noted below. Current WTRIM DAC contacts are listed in § 5.4.1. Data transmission protocols and other technical information needed for REV to share these sensors' measurements with the WTRIM DAC are available through consultation with those contacts.

Via the WTRIM DAC, IOOS will make all data types in § 5.3.1 received from REV publicly available without delay under the Creative Commons Zero 1.0 Universal Public Domain Dedication (CC0-1.0). IOOS may analyze the data quality of the measurements received from REV and, if results indicate a sensor malfunction, notify REV, which will conduct the maintenance per § 5.3.3.2 necessary to remedy the malfunction.

### 5.4.1 WTRIM DAC Contacts

Currently, the WTRIM DAC is being provided through a collaboration between IOOS Regional Associations the Northeastern Regional Association of Coastal Ocean Observing Systems (NERACOOS) and Mid-Atlantic Regional Association Coastal Ocean Observing System (MARACOOS). The present WTRIM DAC points of contact are listed below, all of whom shall be copied on communications regarding the WTRIM DAC. The Parties agree that if there is a change regarding the information in this section, IOOS will notify REV in writing, preferably via e-mail, of such change. This change does not require an amendment.

1. Tom Shyka
   Product and Engagement Manager, NERACOOS
   195 New Hampshire Ave., Suite 240
   Portsmouth, NH 03801
   Office: (603) 570-3025
   Business mobile: (207) 650-9766
   E-mail: tom@neracoos.org

2. Jake Kritzer, Ph.D.
   Executive Director, NERACOOS
   Office: (603) 570-3023
   Business mobile: (617) 869-1336
   E-mail: jake@neracoos.org

3. Gerhard Kuska, Ph.D.
   Executive Director, MARACOOS
   Phone: (302) 519-1971
   E-mail: kuska@maracoos.org

4.  Mary Ford
    Deputy Director, MARACOOS
    Phone:  (302) 605-2727
    E-mail:  mary@maracoos.org

5.  Riley Young Morse
    Sr. Program Manager, Ocean Data Products, Gulf of Maine Research Institute
    350 Commercial St.
    Portland, ME 04101
    Phone:  (207) 228-1663
    E-mail:  rmorse@gmri.org

6.  Kelly Knee
    Executive Director, Ocean Science, RPS North America
    Office:  (401) 661-8632
    Business mobile:  (401) 374-5245
    E-mail:  kelly.knee@tetratech.com

## 6   CONTACTS

The contacts of each Party to this Agreement are listed below, along with any technical, administrative, or other points of contact.  The Parties agree that if there is a change regarding the information in this section, the Party making the change will notify the other Party in writing, preferably via e-mail, of such change.  This change does not require an amendment.

1.  Carl Gouldman
    Director, U.S. IOOS Office
    1315 East-West Hwy, Bldg. SSMC3
    Silver Spring, MD 20910
    Mobile:  (240) 723-5784
    E-mail:  carl.gouldman@noaa.gov

2.  Brian Zelenke
    Surface Currents Program Manager, U.S. IOOS Office
    1315 East-West Hwy, Bldg. SSMC3
    Silver Spring, MD 20910
    Mobile:  (240) 676-6396
    E-mail:  brian.zelenke@noaa.gov

3.  ATTN:  Revolution Wind Asset Manager
    Elliott Reid
    399 Boylston St., 12th Floor
    Boston, MA 02116
    Business mobile:  (857) 286-1949
    E-mail:  EREID@orsted.com

4.  ATTN:  Revolution Wind Operations Manager
    Stephen Lanthier
    22 Research Way

East Setauket, NY 11733
Business mobile:  (224) 935-2219
E-mail:  SLANT@orsted.com

5.  ATTN:  Northeast Region Marine Affairs Manager
John Mansolillo
56 Exchange Terrace
Providence, RI
Business mobile:  (401) 450 5467
E-mail:  JOMAN@orsted.com

# 7    FUNDING

There is no transfer of funds between the Parties under this Agreement.

# 8    DURATION OF AGREEMENT, AMENDMENTS, OR TERMINATION

This Agreement becomes effective upon the signature of both Parties and will terminate ten (10) years thereafter.  The parties will review this agreement at least once every five (5) years to determine whether it should be revised, renewed, or canceled.

This Agreement may be amended within its scope or renewed prior to the expiration date through the written consent of both Parties.  An amendment or renewal will become effective upon signature of both Parties.

This Agreement may be terminated prior to expiration with the written consent of both Parties. Any Party may initiate termination of this agreement by providing 30 days written notice to the other Party.  During the intervening 30 days, the Parties agree to actively attempt to resolve any outstanding disputes or disagreements.

# 9    ASSIGNMENT

This Agreement and all of the terms hereof shall be binding upon the successors and assigns of REV.  No future assignment will in any way operate to enlarge, alter, or change any obligation of NOAA IOOS under this agreement.

# 10   RESOLUTION OF DISAGREEMENTS

Should disagreement arise as to the interpretation of the provisions of this Agreement, or amendments and/or revisions thereto that cannot be resolved at the operating level, the area(s) of disagreement will be stated in writing by each Party and presented to the other Party for consideration.  If agreement on interpretation is not reached within 30 days, the Parties shall forward the written presentation of the disagreement to respective higher officials for appropriate resolution.

## 11 OTHER TERMS AND CONDITIONS

1. In executing the terms and conditions of this Agreement, REV shall comply with all applicable federal, state, and local environmental laws, statutes, regulations, executive orders, and permits.
2. REV shall have the right to use sub-contractors to assist in performing the work of this agreement; nonetheless RWF shall remain responsible for all its obligations under this Agreement.
3. The total liability of REV, its officers, directors, employees, agents, and affiliates for any claims, demands, losses, costs, or damages, whether direct, indirect, consequential, special, exemplary, or incidental, arising out of or related to this agreement, shall be limited to the specific actions indicated in this agreement.
4. In no event shall REV be liable for any indirect, incidental, special, or consequential damages, including, but not limited to, loss of profits, data, or use, even if advised of the possibility of such damages as a result of the use of data as indicated in this agreement.
5. In no event is NOAA liable to REV for third party use of REV's data or products NOAA derives using REV's data.
6. This limitation of liability shall apply to the fullest extent permitted by law and shall survive termination or expiration of this agreement.

## 12 APPROVALS

Accepted and approved for the U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Ocean Service, U.S. Integrated Ocean Observing System Office.

By: GOULDMAN.CARL.CLEMENTS.1365845871
Digitally signed by GOULDMAN.CARL.CLEMENTS.1365845871
Date: 2024.07.03 12:19:06 -04'00'

Date: 07/03/2024

for Carl Gouldman
*Director, U.S. IOOS Office*


Accepted and approved for Revolution Wind, LLC by its agents, Ørsted Wind Power North America LLC.

By: EREID
Digitally signed by EREID
Date: 2024.07.03 13:09:53 -04'00'

Date: 07/03/2024

Elliott Reid
*Authorized Person*

By: (signature)
Digitally signed by ROSOD
Date: 2024.07.09 09:09:27 -04'00'

Date: 07/09/2024

Robert Soden
*Authorized Person*

# REFERENCES

Colburn, Russell J., Christian A. Randolph, Chelsea Drummond, Michael W. Miles, Frank C. Brody, Christian D. McGillen, Andrew S. Krieger, and Rachel E. Jankowski. 2020. *Radar Interference Analysis for Renewable Energy Facilities on the Atlantic Outer Continental Shelf.* OCS Study, Office of Renewable Energy Programs, U.S. Department of the Interior, Bureau of Ocean Energy Management, McLean, Virginia, U.S.A.: Booz Allen Hamilton, 189. https://www.boem.gov/sites/default/files/documents/environment/Radar-Interferance-Atlantic-Offshore-Wind_0.pdf.

**Appendix A:  Technical Specifications, MSI G300 Metocean Buoy**



# APPENDIX A - EQUIPMENT TECHNICAL SPECIFICATIONS

# Ørsted
# Real-Time Metocean Monitoring Buoy
# MSI G3000



# Ørsted
## Shallow Water Metocean Mooring
## (30-100m estimated depth range)



**Surface Buoy**
**MSI Guardian Buoy**

Includes:
- **Wave Sensor**
- **Current Speed & Direction ADCP**
- **Visibility Sensor**
- **Meteorological Sensor Suite**
- **AIS Beacon**
- **Camera**
- **Real-Time Data Aquisition System**
- **Satellite Telemetry unit**

**Sea Surface - 0m**

**3/4" Chain**
**10m Length**

**5/16" Jacketed Wire Rope**
**15 / 55 / 85m Length**

**3/4" Chain Catenary**
**35 / 50 / 70m Length**

**Sea Floor**
**30 / 70 / 100m depth**

**Ballast**
**(2600 lb / 1180 kg Clump Weight)**

# SURFACE BUOY SYSTEMS
## The Guardian Series

*Mooring Systems, Inc.* manufactures a wide range of surface buoys designed for use as meteorological and oceanographic instrumentation platforms. Our Guardian design incorporates durable self fendering hulls made of Surlyn foam. Surlyn foam is closed cell, extremely tough, and requires little maintenance. A steel frame and footed base provides a reliable construction that places the buoy system in compression while moored. A lightweight aluminum tower will support a host of instrumentation, solar panels, and navigation lights. The central well has a water tight compartment available for mounting batteries or electronics, and a removable topside end-cap allowing access while moored. Our versatile design approach allows for custom designed towers and instrument mounting for many inshore and offshore applications.



Model G-3000 Buoy



Water Tight Compartment End-Cap



Integral Radar Reflector



Steel Well and Base

**Features:**
* Rugged Self-fendering Surlyn Foam Hull
* Lightweight Aluminum Tower (Removable)
* Integral Radar Reflector
* Water Tight Battery/Electronics Compartment
* Steel Frame, Well, and Base
* Lifting and Handling Bails
* Self-Standing Base

**Options:**
* Marine Solar Powered Light
* Instrumentation Mounting Brackets
* Bi-moor Attachment Bail

## Specifications:

| MODEL | NET BUOYANCY (lbs) | SURLYN HULL DIAMETER | SURLYN HULL HEIGHT | TOWER HEIGHT | WELL DEPTH | WELL INSIDE DIAMETER | BASE HEIGHT | OVERALL HEIGHT w/o LIGHT | AIR WEIGHT (lbs) estimate |
|---|---|---|---|---|---|---|---|---|---|
| G-1000 | 1000 (454 kg) | 61" (1549 mm) | 16" (406 mm) | 72" (1829 mm) | 46" (1168 mm) | 12" (305 mm) | 32" (813 mm) | 10' (3.1 m) | 775 (350 kg) |
| G-2000 | 2000 (907 kg) | 61" (1549 mm) | 24" (610 mm) | 82" (2083 mm) | 54" (1372 mm) | 12" (305 mm) | 32" (813 mm) | 11.5' (3.5 m) | 850 (380 kg) |
| G-3000 | 3000 (1360 kg) | 82" (2082 mm) | 24" (610 mm) | 82" (2083 mm) | 54" (1372 mm) | 12" (305 mm) | 32" (813 mm) | 11.5' (3.5 m) | 1200 (545 kg) |
| G-4000 | 4000 (1814 kg) | 82" (2082 mm) | 30" (762 mm) | 82" (2083 mm) | 68" (1727 mm) | 12" (305 mm) | 32" (813 mm) | 12.6' (4.1 m) | 1500 (680 kg) |
| G-5000 | 5000 (2268 kg) | 82" (2082 mm) | 42" (1067 mm) | 94" (2388 mm) | 88" (2235 mm) | 12" (305 mm) | 48" (1219 mm) | 15.3' (4.7 m) | 2000 (907 kg) |

## Construction:

| | |
|---|---|
| Buoyancy Hull: | Surlyn Foam |
| Well / Frame: | Steel, zinc protected |
| Tower: | 6061-T6 Aluminum |
| Hardware: | 316 Stainless Steel |
| Isolation Bushings: | Nylon |
| Top-Side Paint: | Yellow Epoxy with Polyurethane Clear Coat |
| Bottom Paint: | Anti-fouling Below Waterline |
| Mooring Attachment: | Bail on Well Bottom for Single Point Mooring |



1227 Rt.28A, PO Box 413
Cataumet, MA 02534 USA
Tel: 508-564-4770, Fax: 4773

MOORING SYSTEMS

www.mooringsystems.com

# Nova-65 SC

## SELF-CONTAINED MARINE LANTERN

**The Nova-65 SC features unique and proprietary optics which provide a 360° beam at 5°, 10°, 20° or 30° vertical divergence. Utilizing a highly efficient compact lens, the Nova-65 SC is engineered to utilize the advanced and cost-effective technology of LEDs.**

Solar modules and high-grade batteries are housed in a compact self-contained marine lantern, designed for low maintenance with a projected service life of 10 years before any significant maintenance is needed. The 5° and 10° divergence lenses are ideal for fixed or floating aids to navigation while the 20° or 30° lens provides exceptional performance on buoys. The 5° lens can be used to meet specific needs that require a much longer range while still using a minimal amount of power.



### Characteristics

- User selectable power setting for visual range
- Photovoltaic system sized for demanding locations
- SignalView software to program user options
- Temperature compensated LED drive circuits ensure uniform brightness with ambient temperature change
- Availability in all IALA approved colors
- Constant current power source for maximum LED lifetime
- Optional GPS synchronisation module
- Optional GSM and Satellite monitoring
- Optional AIS AtoN module for message 21 and monitoring via message 6
- 256 user selectable flash characters
- Full monitor and control capability
- Optional 5°, 10°, 20° or 30° lens





TIDELAND

a **xylem** brand



# iBCN

- NOVATECH™ Iridium® beacons
- Superior lifetime
- Rugged and innovative design
- Iridium® and Bluetooth configuration

**TRACKING & MONITORING**



> NOVATECH™ products have been proven throughout the world's oceans and trusted around the globe for over 40 years.

The iBCN is the next-generation of NOVATECH™ Iridium® beacons, designed for tracking and locating assets. Rated to 7,500 m (24,600 ft), the self-contained submersible beacons use the bi-directional capabilities of the Iridium® satellite telemetry system, allowing end users to receive near real-time GPS location of their asset.

Designed to meet unique deployment needs, the iBCN offers five battery housing options: self-contained, remote head, OEM, and extended battery life with the option of lithium or alkaline batteries. The NOVATECH™ Iridium® beacons provide peace of mind for those unpredictable deployments.

# iBCN

## TECHNICAL SPECIFICATIONS

### ELECTRONICS
- Iridium 9603 - Short Burst Data Transceiver
- GPS Telit SE880: Ultra-sensitive receiver, 48 Channel SiRFstarIV™

### PROGRAMMING INTERFACE
- Local Configuration
  Bluetooth SPP (Serial Port Profile) communication via Windows application
- Over-The-Air Configuration, Bi-directional Iridium SBD communication

### ENVIRONMENTAL
- Operating Temperature: -30°C to +70°C (-22°F to 158°F)
- Storage Temperature: -40°C to +85°C (-40°F to +185°F)
- Ocean Depth Rating: 7,500 m (24,600 ft)
- Storage Life: 24 months

### PHYSICAL
- Hull Material: Titanium (Grade 2)
- Cap Material: PEEK and Titanium (Grade 5)
- Color: Natural

| Features | OEM | iBCN | iBCN-3 | iBCN-7 | iBCN-RH |
|---|---|---|---|---|---|
| Model N° | MMI-513-00000 | MMI-513-12000 | MMI-513-22000 | MMI-513-32000 | MMI-513-41100 |
| Dimensions (Battery Hull) | | 13.15" x 1.13" (335 mm x 28.7 mm) | 9.0" x 2.0" (228.5 mm x 50.8 mm) | 18.56" x 2.0" (471.4 mm x 50.8 mm) | 18.50" x 1.70 (470 mm x 43.0 mm) |
| Dimensions (Electronics Enclosure) | 2.18" x 2.20" (55.4 mm x 58,9) | 2.18" x 2.20" (55,4 mm x 58,9 mm) | 2.18" x 2.20" (55,4 mm x 55,9 mm) | 2.18" x 2.20" (55,4 mm x 55,9 mm) | 6,0" (1,83 m) Remote head cable |
| Mass in air (with batteries) | 0.22 lb (0,49 kg) | 1.78 lb (0.81 kg) | 3.30 lb (1.5 kg) | Alkaline 7.82 lb (3.55 kg) Lithium 7.05 lb (3.2 kg) | 5.94 lb (2.7 kg) |
| Mass in water (with batteries) | 0.24 lb (0.11 kg) | 1.11 lb (0.50 kg) | 2.0 lb (0.91 kg) | Alkaline 5.40 lb (2.45 kg) Lithium 4.62 lb (2.1 kg) | 3.55 lb (1.61 kg) |
| Hull Material | | Titanium (Grade 2) | Titanium (Grade 2) | Titanium (Grade 2) | Hard anodized aluminum |
| Cap Material | | Titanium (Grade 5) | Titanium (Grade 5) | Titanium (Grade 5) | |
| Battery | | 9 x CR123A Lithium | 3 x "D" cells Lithium | 7 x "D" cells Alkaline or Lithium | 6 x "C" cells Alkaline |
| On/Off Control | | Magnetic reed switch | Magnetic reed switch | Magnetic reed switch | Magnetic reed switch & pressure switch |
| Activation | | Surface sense (conductivity) GPS satellite check | Surface sense (conductivity) GPS satellite check | Surface sense (conductivity) GPS satellite check | Surface sense (conductivity) & pressure switch, GPS satellite check |
| Lifetime | | 2 years after being submerged for 1 year; 24 hour reporting once surfaced | 7 years after being submerged for 1 year; 24 hours reporting once surfaced | Alkaline: 11 years after being submerged for 1 year; 24 hours reporting once surfaced. Lithium: 19 years | 4 years after being submerged for 1 year; 24 hours reporting once surfaced |
| Options | | Optional remote head configuration | Optional remote head configuration | Optional remote head configuration | Optional remote head configuration |



21 Thornhill Drive, Dartmouth, Nova Scotia  B3B 1R9 CANADA
Tel: +1 902 468-2505  |  Email: sales@metocean.com

**metocean.com**

DEC. 2016 — V1.0.0

# Nova-65 SC

## Technical Details

| | |
|---|---|
| **Input Voltage** | 12VDC |
| **Power Consumption** | Variable up to 5W |
| **Power Consumption** | Field Selectable |
| **Colours Available Power Setting** | Red, green, yellow, white and blue |
| **Quiescent Current** | Light only < 2 mA ; with internal GPS < 3 mA |
| **Visibility** | 360° horizon (omnidirectional) |
| **Vertical Divergence** | 5°, 10°, 20° or 30° degrees at 50%; ± 1 degree |
| **Monitor and Control** | Capable |
| **Flash Codes** | Up to 256 codes, field selectable or via communication link |
| **Synchronisation** | GPS or hardwire options |
| **Sunswitch Threshold** | Adjustable |
| **Operation Temperature** | -40° C to +70° C |
| **Weight** | 20kg (44lbs) |
| **Size** | L 578mm (23in) x W 410mm (16in) x H 549mm (22in) plus an additional 75mm (3in) each for the two handles |
| **Relative Humidity** | 100% condensing |
| **Atmosphere** | Rated for continuous operation in a salty air |
| **Wind** | Designed to withstand speeds in excess of 300kmph (180mph) |
| **Solar Panels** | 4 Panels, each at 12 Volts 5.5W Nominal |
| **Battery Capacity** | 38 or 45 Amp-hour |
| **Battery Type** | Sealed Lead Acid |
| **Construction** | Rotationally moulded polyethylene |
| **Mounting** | 4 mounting 18mm (0.7in) holes on a 465mm (18in) diameter bolt hole |
| **Base** | Removable base |

NOTE: Specifications are subject to change.

Ideal For Adding AIS,
GSM, or Satellite Monitoring





Tideland Signal Corporation (USA)
us-sales@tidelandsignal.com

Tideland Signal Ltd (Canada)
canada-sales@tidelandsignal.com

Tideland Signal Ltd (Burgess Hill, UK)
emea-sales@tidelandsignal.com

Tideland Signal (The Netherlands)
emea-sales@tidelandsignal.com

Tideland Signal Ltd (Dubai, UAE)
emea-sales@tidelandsignal.com

Tideland Signal Pte Ltd (Singapore)
asia-sales@tidelandsignal.com

Tideland Signal Pte Ltd (Tianjin, China)
asia-sales@tidelandsignal.com

**www.tidelandsignal.com**

© 2016  Xylem, Inc.  All names are registered tradenames or trademarks of Xylem Inc. or one of its subsidiaries.  Technical changes reserved.

2016/11
BD22R05





PRODUCT

# CR1000X
## Measurement and Control Datalogger



# Flagship Data Logger

Accurate, rugged, reliable

## Overview

The CR1000X is our flagship data logger that provides measurement and control for a wide variety of applications. Its reliability and ruggedness make it an excellent choice for remote environmental applications, including weather stations, mesonet systems, wind profiling, air quality monitoring, hydrological systems, water quality monitoring, and hydrometeorological stations.

The CR1000X is a low-powered device that measures sensors, drives direct communication and telecommunications, analyzes data, controls external devices, and stores data and programs in onboard, nonvolatile storage. The electronics are RF-shielded by a unique sealed, stainless-steel canister. A battery-backed clock assures accurate timekeeping. The onboard, BASIC-like programming language, common to all contemporary Campbell Scientific data loggers, supports data processing and analysis routines.

## Benefits and Features

❯ Operational in extreme environments with a standard operating range of -40° to +70℃ and an extended operating range of -55° to +85℃

❯ Connects directly to a computer's USB port

❯ Captures quickly changing data values with fast analog measurement capabilities (300+ Hz)

❯ Differentiates even slight changes in data values with higher resolutions measurements (24 bit Adc)

❯ Includes two non-isolated current input channels for directly connecting sensors with 0-to-20 mA or 4-to-20 mA current outputs

❯ Contains an onboard CPI port for hosting Campbell high-speed sensors and distributed modules (CDM)

❯ Directly connects to Ethernet

❯ Includes microSD card drive for extended memory requirements

❯ Provides simple serial sensor integration and measurement with SDI-12, RS-232, and/or RS-485

❯ Supports full PakBus networking

❯ Includes embedded web page for direct connection via web browser

## Detailed Description

The CR1000X is a low-powered device designed to measure

sensors, drive direct communication and telecommunications,

For comprehensive details, visit: **www.campbellsci.com/cr1000x** 

analyze data, control external devices, and store data and programs in on-board, non-volatile storage. The electronics are RF-shielded and glitch-protected by a unique sealed, stainless-steel canister. A battery-backed clock assures accurate timekeeping. The on-board, BASIC-like programming language —common to all Campbell Scientific data loggers—supports data processing and analysis routines.

The CR1000X wiring panel includes two switchable 12 V terminals, analog grounds dispersed among 16 analog terminals, and unpluggable terminal blocks for quick deployment.

## Specifications

| | |
|---|---|
| -NOTE- | *Additional specifications are listed in the CR1000X Specifications Sheet.* |
| Operating Temperature Range | -40° to +70℃ (standard)<br>⟩ *Non-condensing environment*<br>⟩ -55° to +85℃ (extended) |
| Case Material | Anodized aluminum |
| Analog Inputs | 16 single-ended or 8 differential (individually configured) |
| Pulse Counters | 10 (P1 to P2 and C1 to C8) |
| Voltage Excitation Terminals | 4 (VX1 to VX4) |
| Maximum Source/Sink Current | ⟩ ±40 mA (voltage excitation)<br>⟩ 50 mA (switched regulated) |
| Communications Ports | ⟩ CPI<br>⟩ Ethernet<br>⟩ USB Micro B<br>⟩ CS I/O<br>⟩ RS-232<br>⟩ RS-422<br>⟩ RS-485 |
| Data Storage Ports | microSD |
| Switched 12 Volt | 2 terminals |
| Digital I/O | 8 terminals (C1 to C8) configurable for digital input and output. Includes status high/low, pulse width modulation, external interrupt, edge timing, switch closure pulse counting, high-frequency pulse counting, UART, RS-232, RS-485, SDM, SDI-12, I2C, and SPI function. Terminals are configurable in pairs for 5 V or 3.3 V logic for some functions. |
| Input Limits | ±5 V |
| Analog Voltage Accuracy | ⟩ ±(0.06% of measurement + offset) at -40° to +70℃ |

| | |
|---|---|
| | ⟩ ±(0.04% of measurement + offset) at 0° to 40℃<br>⟩ ±(0.08% of measurement + offset) at -55° to +85℃ (extended temperature range)<br>⟩ Accuracy specifications do not include sensor or measurement noise. |
| ADC | 24-bit |
| Power Requirements | 10 to 18 Vdc input |
| Real-Time Clock Accuracy | ±3 min. per year (Optional GPS correction to ±10 μs) |
| Internet Protocols | Ethernet, PPP, CS I/O IP, RNDIS, ICMP/Ping, Auto-IP(APIPA), IPv4, IPv6, UDP, TCP, TLS (v1.2), DNS, DHCP, SLAAC, SNMPv3, NTP, Telnet, HTTP(S), FTP(S), SMTP/TLS, POP3/TLS |
| Communication Protocols | CPI, PakBus, SDM, SDI-12, Modbus, TCP, DNP3, UDP, NTCIP, NMEA 0183, I2C, SPI, and others |
| Battery-backed SRAM for CPU Usage & Final Storage | 4 MB |
| Data Storage | 4 MB SRAM + 72 MB flash (Storage expansion of up to 16 GB with removable microSD flash memory card.) |
| Idle Current Drain, Average | < 1 mA (@ 12 Vdc) |
| Active Current Drain, Average | ⟩ 55 mA (20 Hz scan @ 12 Vdc)<br>⟩ 1 mA (1 Hz scan @ 12 Vdc) |
| Dimensions | 23.8 x 10.1 x 6.2 cm (9.4 x 4.0 x 2.4 in.)<br>Additional clearance required for cables and leads. |
| Weight | 0.86 kg (1.9 lb) |

For comprehensive details, visit: www.campbellsci.com/cr1000x

CAMPBELL SCIENTIFIC | Campbell Scientific, Inc. | 815 W 1800 N | Logan, UT 84321-1784 | (435) 227-9120 | www.campbellsci.com
AUSTRALIA | BRAZIL | CANADA | CHINA | COSTA RICA | FRANCE | GERMANY | INDIA | SOUTH AFRICA | SPAIN | THAILAND | UK | USA

© 2020 Campbell Scientific, Inc. | 04/29/2020

# CR1000X Specifications



Datalogger

Electrical specifications are valid over a -40 to +70 °C, non-condensing environment, unless otherwise specified. Extended electrical specifications (noted as XT in specifications) are valid over a -55 to +85 °C non-condensing environment. Recalibration is recommended every three years. Critical specifications and system configuration should be confirmed with Campbell Scientific before purchase.

System specifications ..................... 1

Physical specifications ................... 1

Power requirements ..................... 1

Power output specifications ............ 2

Analog measurement specifications ... 2

Pulse measurement specifications ...... 4

Digital input/output specifications ..... 4

Communications specifications ......... 5

Standards compliance specifications ... 5

Warranty .................................... 5

Terminal functions ........................ 6

## System specifications

**Processor**: Renesas RX63N (32-bit with hardware FPU, running at 100 MHz)

**Memory**:

- Total onboard: 128 MB of flash + 4 MB battery-backed SRAM
  - Data storage: 4 MB SRAM + 72 MB flash (extended data storage automatically used for auto-allocated Data Tables not being written to a card)
  - CPU drive: 30 MB flash
  - OS load: 8 MB flash
  - Settings: 1 MB flash
  - Reserved (not accessible): 10 MB flash
- Data storage expansion: Removable microSD flash memory, up to 16 GB

**Program Execution Period**: 1 ms to 1 day

**Real-Time Clock**:

- Battery backed while external power is disconnected
- **Resolution**: 1 ms

- **Accuracy**: ±3 min. per year, optional GPS correction to ±10 µs

**Wiring Panel Temperature**: Measured using a 10K3A1A BetaTHERM thermistor, located between the two rows of analog input terminals.

## Physical specifications

**Dimensions**: 23.8 x 10.1 x 6.2 cm (9.4 x 4.0 x 2.4 in); additional clearance required for cables and wires.

**Weight/Mass**: 0.86 kg (1.9 lb)

**Case Material**: Powder-coated aluminum

## Power requirements

**Protection**: Power inputs are protected against surge, over-voltage, over-current, and reverse power. IEC 61000-4 Class 4 level.

**Power In Terminal**:

- **Voltage Input**: 10 to 18 VDC
- **Input Current Limit at 12 VDC**:
  - 4.35 A at -40 °C
  - 3 A at 20 °C
  - 1.56 A at 85 °C
- 30 VDC sustained voltage limit without damage.

**USB Power:** Functions that will be active with USB 5 VDC include sending programs, adjusting data logger settings, and making some measurements. If USB is the only power source, then the CS I/O port and the 5V, 12V, and SW12 terminals will not be operational.

**Internal Lithium Battery**: AA, 2.4 Ah, 3.6 VDC (Tadiran TL 5903/S) for battery-backed SRAM and clock. 3-year life with no external power source.

**Average Current Drain**:

Assumes 12 VDC on POWER IN terminals.

- **Idle**: <1 mA
- **Active 1 Hz Scan**: 1 mA
- **Active 20 Hz Scan**: 55 mA
- **Serial** (RS-232/RS-485): Active + 25 mA
- **Ethernet Power Requirements**:
  - **Ethernet 1 Minute**: Active + 1 mA
  - **Ethernet Idle**: Active + 4 mA
  - **Ethernet Link**: Active + 47 mA



**CAMPBELL SCIENTIFIC** AUSTRALIA | BRAZIL | CANADA | CHINA | COSTA RICA | FRANCE | GERMANY | SOUTH AFRICA | SPAIN | THAILAND | UK | USA

© 2014, 2020
Campbell Scientific, Inc.
June 16, 2020

**Vehicle Power Connection**: When primary power is pulled from the vehicle power system, a second power supply OR charge regulator may be required to overcome the voltage drop at vehicle start-up.

## Power output specifications

### System power out limits (when powered with 12 VDC)

| Temperature (°C) | Current Limit[1] (A) |
|---|---|
| −40° | 4.53 |
| 20° | 3.00 |
| 70° | 1.83 |
| 85° | 1.56 |
| [1] Limited by self-resetting thermal fuse | |

### 12 V and SW12 V power output terminals

12V, SW12-1, and SW12-2: Provide unregulated 12 VDC power with voltage equal to the Power Input supply voltage. These are disabled when operating on USB power only.

| SW12 current limits | |
|---|---|
| Temperature (°C) | Current Limit [1] (mA) |
| −40° | 1310 |
| 0° | 1004 |
| 20° | 900 |
| 50° | 690 |
| 70° | 550 |
| 80° | 470 |
| [1] Thermal fuse hold current. | |

### 5 V and 3.3 V

5V: One regulated 5 V output. Supply is shared between the 5V terminal and CS I/O DB9 5 V output.
- **Voltage Output**: Regulated 5 V output (±5%)
- **Current Limit**: 230 mA

### C as power output

- C Terminals:
  - **Output Resistance ($R_O$)**: 150 Ω
  - **5 V Logic Level Drive Capacity**: 10 mA @ 3.5 VDC
  - **3.3 V Logic Level Drive Capacity**: 10 mA @ 1.8 VDC

### CS I/O pin 1

**5 V Logic Level Max Current**: 200 mA

## Voltage excitation

VX: Four independently configurable voltage terminals (VX1-VX4). When providing voltage excitation, a single 16-bit DAC shared by all VX outputs produces a user-specified voltage during measurement only. VX terminals can also be used to supply a selectable, switched, regulated 3.3 or 5 VDC power source to power digital sensors and toggle control lines.

| | Range | Resolution | Accuracy | Maximum Source/Sink Current[1] |
|---|---|---|---|---|
| Voltage Excitation | ±4 V | 0.06 mV | ±(0.1% of setting + 2 mV) | ±40 mA |
| Switched, Regulated | +3.3 or 5 V | 3.3 or 5 V | ±5% | 50 mA |
| [1] Exceeding current limits causes voltage output to become unstable. Voltage should stabilize when current is reduced to within stated limits. | | | | |

## Analog measurement specifications

16 single-ended (SE) or 8 differential (DIFF) terminals individually configurable for voltage, thermocouple, current loop, ratiometric, and period average measurements, using a 24-bit ADC. One channel at a time is measured.

### Voltage measurements

Terminals:
- **Differential Configuration**: DIFF 1H/1L − 8H/8L
- **Single-Ended Configuration**: SE1 − SE16

**Input Resistance**: 20 GΩ typical

**Input Voltage Limits**: ±5 V

**Sustained Input Voltage without Damage**: ±20 VDC

**DC Common Mode Rejection**:
- > 120 dB with input reversal
- ≥ 86 dB without input reversal

**Normal Mode Rejection**: > 70 dB @ 60 Hz

**Input Current @ 25 °C**: ±1 nA typical

**Filter First Notch Frequency ($f_{N1}$) Range**: 0.5 Hz to 31.25 kHz (user specified)

Analog Range and Resolution:

| Notch Frequency ($f_{N1}$) (Hz) | Range[1] (mV) | Differential with Input Reversal | | Single-Ended and Differential without Input Reversal | |
|---|---|---|---|---|---|
| | | RMS (µV) | Bits[2] | RMS (µV) | Bits[2] |
| 15000 | ±5000 | 8.2 | 20 | 11.8 | 19 |
| | ±1000 | 1.9 | 20 | 2.6 | 19 |
| | ±200 | 0.75 | 19 | 1.0 | 18 |
| 50/60[3] | ±5000 | 0.6 | 24 | 0.88 | 23 |
| | ±1000 | 0.14 | 23 | 0.2 | 23 |
| | ±200 | 0.05 | 22 | 0.08 | 22 |
| 5 | ±5000 | 0.18 | 25 | 0.28 | 25 |
| | ±1000 | 0.04 | 25 | 0.07 | 24 |
| | ±200 | 0.02 | 24 | 0.03 | 23 |

[1] Range overhead of ~5% on all ranges guarantees that full-scale values will not cause over range

[2] Typical effective resolution (ER) in bits; computed from ratio of full-scale range to RMS resolution.

[3] 50/60 corresponds to rejection of 50 and 60 Hz ac power mains noise.

**Accuracy** (does not include sensor or measurement noise):

- 0 to 40 °C: ±(0.04% of measurement + offset)
- −40 to 70 °C: ±(0.06% of measurement + offset)

**Voltage Measurement Accuracy Offsets:**

| | Typical Offset (µV RMS) | |
|---|---|---|
| Range (mV) | Differential with Input Reversal | Single-Ended or Differential without Input Reversal |
| ±5000 | ±0.5 | ±2 |
| ±1000 | ±0.25 | ±1 |
| ±200 | ±0.15 | ±0.5 |

**Measurement Settling Time:** 20 µs to 600 ms; 500 µs default

**Multiplexed Measurement Time:**

Measurement time = INT(multiplexed measurement time • (reps+1) + 2ms

| Example fN1[1] (Hz) | Differential with Input Reversal | Single-Ended or Differential without Input Reversal |
|---|---|---|
| | Time[2] (ms) | Time[2] (ms) |
| 15000 | 2.04 | 1.02 |
| 60 | 35.24 | 17.62 |
| 50 | 41.9 | 20.95 |
| 5 | 401.9 | 200.95 |

[1] Notch frequency (1/integration time).

[2] Default settling time of 500 µs used.

## Resistance measurement specifications

The data logger makes ratiometric-resistance measurements for four- and six-wire full-bridge circuits and two-, three-, and four-wire half-bridge circuits using voltage excitation. Excitation polarity reversal is available to minimize dc error.

**Accuracy:**

Assumes input reversal for differential measurements RevDiff and excitation reversal RevEx for excitation voltage <1000 mV. Does not include bridge resistor errors or sensor and measurement noise.

- 0 to 40 °C: ±(0.01% of voltage measurement + offset)
- −40 to 70 °C: ±(0.015% of voltage measurement + offset)
- −55 to 85 °C (XT): ±(0.02% of voltage measurement + offset)

## Period-averaging measurement specifications

**Terminals:** SE1-SE16

**Accuracy:** ±(0.01% of measurement + resolution), where resolution is 0.13 µs divided by the number of cycles to be measured

**Ranges:**

- Minimum signal centered around specified period average threshold.
- Maximum signal centered around data logger ground.
- Maximum frequency = 1/(2 * (minimum pulse width)) for 50% duty cycle signals

| Gain Code Option | Voltage Gain | Minimum Peak to Peak Signal (mV) | Maximum Peak to Peak Signal (V) | Minimum Pulse Width (µs) | Maximum Frequency (kHz) |
|---|---|---|---|---|---|
| 0 | 1 | 500 | 10 | 2.5 | 200 |
| 1 | 2.5 | 50 | 2 | 10 | 50 |
| 2 | 12.5 | 10 | 2 | 62 | 8 |
| 3 | 64 | 2 | 2 | 100 | 5 |

## Current-loop measurement specifications

The data logger makes current-loop measurements by measuring across a current-sense resistor associated with the RS-485 resistive ground terminal.

**Terminals**: RG1 and RG2

**Maximum Input Voltage**: ±16 V

**Resistance to Ground**: 101 Ω

**Current Measurement Shunt Resistance**: 10 Ω

**Maximum Current Measurement Range**: ±80 mA

**Absolute Maximum Current**: ±160 mA

**Resolution**: ≤ 20 nA

**Accuracy**: ±(0.1% of reading + 100 nA) @ -40 to 70 °C

## Pulse measurement specifications

Two inputs (P1-P2) individually configurable for switch closure, high-frequency pulse, or low-level AC measurements. See also Digital input/output specifications (p. 4). Each terminal has its own independent 32-bit counter.

> **NOTE:**
> Conflicts can occur when a control port pair is used for different instructions (`TimerInput()`, `PulseCount()`, `SDI12Recorder()`, `WaitDigTrig()`). For example, if C1 is used for `SDI12Recorder()`, C2 cannot be used for `TimerInput()`, `PulseCount()`, or `WaitDigTrig()`.

**Maximum Input Voltage**: ±20 VDC

**Maximum Counts Per Channel**: $2^{32}$

**Maximum Counts Per Scan**: $2^{32}$

**Input Resistance**: 5 kΩ

**Accuracy**: ±(0.02% of reading + 1/scan)

### Switch closure input

**Terminals**: C1-C8

**Pull-Up Resistance**: 100 kΩ to 5 V

**Event**: Low (<0.8 V) to High (>2.5 V)

**Maximum Input Frequency**: 150 Hz

**Minimum Switch Closed Time**: 5 ms

**Minimum Switch Open Time**: 6 ms

**Maximum Bounce Time**: 1 ms open without being counted

### High-frequency input

**Terminals**: C1-C8

**Pull-Up Resistance**: 100 kΩ to 5 V

**Event**: Low (<0.8 V) to High (>2.5 V)

**Maximum Input Frequency**: 250 kHz

### Low-level AC input

**Minimum Pull-Down Resistance**: 10 kΩ to ground

**DC-offset rejection**: Internal AC coupling eliminates DC-offset voltages up to ±0.05 VDC

**Input Hysteresis**: 12 mV at 1 Hz

**Low-Level AC Pulse Input Ranges**:

| Sine wave (mV RMS) | Range (Hz) |
|---|---|
| 20 | 1.0 to 20 |
| 200 | 0.5 to 200 |
| 2000 | 0.3 to 10,000 |
| 5000 | 0.3 to 20,000 |

## Digital input/output specifications

Terminals configurable for digital input and output (I/O) including status high/low, pulse width modulation, external interrupt, edge timing, switch closure pulse counting, high-frequency pulse counting, UART[1], RS-232[2], RS-422[3], RS-485[4], SDM[5], SDI-12[6], I2C[7], and SPI[8] function. Terminals are configurable in pairs for 5 V or 3.3 V logic for some functions.

> **NOTE:**
> Conflicts can occur when a control port pair is used for different instructions (`TimerInput()`, `PulseCount()`, `SDI12Recorder()`, `WaitDigTrig()`). For example, if C1 is used for `SDI12Recorder()`, C2 cannot be used for `TimerInput()`, `PulseCount()`, or `WaitDigTrig()`.

**Terminals**: C1-C8

**Maximum Input Voltage**: ±20 V

**Logic Levels and Drive Current**:

| Terminal Pair Configuration | 5 V Source | 3.3 V Source |
|---|---|---|
| Logic low | ≤ 1.5 V | ≤ 0.8 V |
| Logic high | ≥ 3.5 V | ≥ 2.5 V |

### Edge timing

**Terminals**: C1-C8

---

[1]Universal Asynchronous Receiver/Transmitter for asynchronous serial communications.

[2]Recommended Standard 232. A loose standard defining how two computing devices can communicate with each other. The implementation of RS-232 in Campbell Scientific data loggers to computer communications is quite rigid, but transparent to most users. Features in the data logger that implement RS-232 communication with smart sensors are flexible.

[3]Communications protocol similar to RS-485. Most RS-422 sensors will work with RS-485 protocol.

[4]Recommended Standard 485. A standard defining how two computing devices can communicate with each other.

[5]Synchronous Device for Measurement. A processor-based peripheral device or sensor that communicates with the data logger via hardwire over a short distance using a protocol proprietary to Campbell Scientific.

[6]Serial Data Interface at 1200 baud. Communication protocol for transferring data between the data logger and SDI-12 compatible smart sensors.

[7]Inter-Integrated Circuit is a multi-master, multi-slave, packet switched, single-ended, serial computer bus.

[8]Serial Peripheral Interface - a clocked synchronous interface, used for short distance communications, generally between embedded devices.

Maximum Input Frequency: ≤ 1 kHz

Resolution: 500 ns

## Edge counting

Terminals: C1–C8

Maximum Input Frequency: ≤ 2.3 kHz

## Quadrature input

Terminals: C1–C8 can be configured as digital pairs to monitor the two sensing channels of an encoder.

Maximum Frequency: 2.5 kHz

Resolution: 31.25 μs or 32 kHz

## Pulse-width modulation

Maximum Period: 36.4 seconds

Resolution:

- 0 – 5 ms: 83.33 ns
- 5 – 325 ms: 5.33 μs
- > 325 ms: 31.25 μs

# Communications specifications

Ethernet Port: RJ45 jack, 10/100Base Mbps, full and half duplex, Auto-MDIX, magnetic isolation, and TVS surge protection.

Internet Protocols: Ethernet, PPP, RNDIS, ICMP/Ping, Auto-IP (APIPA), IPv4, IPv6, UDP, TCP, TLS (v1.2), DNS, DHCP, SLAAC, Telnet, HTTP(S), FTP(S), POP3/TLS, NTP, SMTP/TLS, SNMPv3, CS I/O IP

Additional Protocols: CPI, PakBus, PakBus Encryption, SDM, SDI-12, Modbus RTU / ASCII / TCP, DNP3, custom user definable over serial, UDP, NTCIP, NMEA 0183, I2C, SPI

USB Device: Micro-B device for computer connectivity

CS I/O: 9-pin D-sub connector to interface with Campbell Scientific CS I/O peripherals.

SDI-12 (C1, C3, C5, C7): Four independent SDI-12 compliant terminals are individually configured and meet SDI-12 Standard v 1.4.

RS-485 (C5 to C8): One full duplex or two half duplex

RS-422 (C5 to C8): One full duplex or two half duplex

RS-232/CPI: Single RJ45 module port that can operate in one of two modes: CPI or RS-232. CPI interfaces with Campbell Scientific CDM measurement peripherals and sensors. RS-232 connects, with an adapter cable, to computer, sensor, or communications devices serially.

CPI: One CPI bus. Up to 1 Mbps data rate. Synchronization of devices to 5 μS. Total cable length up to 610 m (2000 ft). Up to 20 devices. CPI is a proprietary interface for communications between Campbell Scientific data loggers and Campbell Scientific CDM peripheral devices. It consists of a physical layer definition and a data protocol.

Hardwired: Multi-drop, short haul, RS-232, fiber optic

Satellite: GOES, Argos, Inmarsat Hughes, Irridium

# Standards compliance specifications

View EU Declarations of Conformity at www.campbellsci.com/cr1000x.

Shock and Vibration: MIL-STD 810G methods 516.6 and 514.6

Protection:

- Wiring panel: IP40
- Measurement module when connected to the wiring panel: IP65

EMI and ESD protection:

- Immunity: Meets or exceeds following standards:
  - ESD: per IEC 61000-4-2; ±15 kV air, ±8 kV contact discharge
  - Radiated RF: per IEC 61000-4-3; 10 V/m, 80-1000 MHz
  - EFT: per IEC 61000-4-4; 4 kV power, 4 kV I/O
  - Surge: per IEC 61000-4-5; 4 kV power, 4kV I/O
  - Conducted RF: per IEC 61000-4-6; 10 V power, 10 V I/O
- Emissions and immunity performance criteria available on request.

# Warranty

Standard: Three years against defects in materials and workmanship.

Extended (optional): An additional four years. against defects in materials and workmanship, bringing the total to 7 years.

## Terminal functions

### Analog input terminal functions

| SE<br>DIFF | 1 H | 2 L | 3 H | 4 L | 5 H | 6 L | 7 H | 8 L | 9 H | 10 L | 11 H | 12 L | 13 H | 14 L | 15 H | 16 L | RG1 | RG2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Single-Ended Voltage | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Differential Voltage | H | L | H | L | H | L | H | L | H | L | H | L | H | L | H | L | | |
| Ratiometric/Bridge | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Thermocouple | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Current Loop | | | | | | | | | | | | | | | | | ✓ | ✓ |
| Period Average | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | |

### Pulse counting terminal functions

| | P1 | P2 | C1-C8 |
|---|---|---|---|
| Switch-Closure | ✓ | ✓ | ✓ |
| High Frequency | ✓ | ✓ | ✓ |
| Low-level Ac | ✓ | ✓ | |

### Analog output terminal functions

| | VX1-VX4 |
|---|---|
| Switched Voltage Excitation | ✓ |

### Voltage Output

| | C1-C8[1] | VX1-VX4 | 5V | 12V | SW12-1 | SW12-2 |
|---|---|---|---|---|---|---|
| 5 VDC | ✓ | ✓ | ✓ | | | |
| 3.3 VDC | ✓ | ✓ | | | | |
| 12 VDC | | | | ✓ | ✓ | ✓ |

[1] C terminals have limited drive capacity. Voltage levels are configured in pairs.

### Communications terminal functions

| | C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 | RS-232/CPI |
|---|---|---|---|---|---|---|---|---|---|
| SDI-12 | ✓ | | ✓ | | ✓ | | ✓ | | |
| GPS | PPS | Rx | Tx | Rx | Tx | Rx | Tx | Rx | |
| TTL 0-5 V | Tx | Rx | Tx | Rx | Tx | Rx | Tx | Rx | |
| LVTTL 0-3.3 V | Tx | Rx | Tx | Rx | Tx | Rx | Tx | Rx | |
| RS-232 | | | | | Tx | Rx | Tx | Rx | ✓ |
| RS-485 (Half Duplex) | | | | | A- | B+ | A- | B+ | |

| Communications terminal functions | C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 | RS-232/CPI |
|---|---|---|---|---|---|---|---|---|---|
| RS-485 (Full Duplex) | | | | | Tx- | Tx+ | Rx- | Rx+ | |
| I2C | SDA | SCL | SDA | SCL | SDA | SCL | SDA | SCL | |
| SPI | MOSI | SCLK | MISO | | MOSI | SCLK | MISO | | |
| SDM[1] | Data | Clk | Enabl | | Data | Clk | Enabl | | |
| CPI/CDM | | | | | | | | | ✓ |

[1] SDM can be on either C1-C3 or C5-C7, but not both at the same time.

Communications functions also include Ethernet and USB.

| Digital I/O terminal functions | C1-C8 |
|---|---|
| General I/O | ✓ |
| Pulse-Width Modulation Output | ✓ |
| Timer Input | ✓ |
| Interrupt | ✓ |
| Quadrature | ✓ |





# Global Sales & Support Network
*A worldwide network to help meet your needs*



## Campbell Scientific regional offices

### Australia
*Location:* Garbutt, QLD Australia
*Phone:* 61.7.4401.7700
*Email:* info@campbellsci.com.au
*Website:* www.campbellsci.com.au

### Brazil
*Location:* São Paulo, SP Brazil
*Phone:* 11.3732.3399
*Email:* vendas@campbellsci.com.br
*Website:* www.campbellsci.com.br

### Canada
*Location:* Edmonton, AB Canada
*Phone:* 780.454.2505
*Email:* dataloggers@campbellsci.ca
*Website:* www.campbellsci.ca

### China
*Location:* Beijing, P. R. China
*Phone:* 86.10.6561.0080
*Email:* info@campbellsci.com.cn
*Website:* www.campbellsci.com.cn

### Costa Rica
*Location:* San Pedro, Costa Rica
*Phone:* 506.2280.1564
*Email:* info@campbellsci.cc
*Website:* www.campbellsci.cc

### France
*Location:* Vincennes, France
*Phone:* 0033.0.1.56.45.15.20
*Email:* info@campbellsci.fr
*Website:* www.campbellsci.fr

### Germany
*Location:* Bremen, Germany
*Phone:* 49.0.421.460974.0
*Email:* info@campbellsci.de
*Website:* www.campbellsci.de

### India
*Location:* New Delhi, DL India
*Phone:* 91.11.46500481.482
*Email:* info@campbellsci.in
*Website:* www.campbellsci.in

### South Africa
*Location:* Stellenbosch, South Africa
*Phone:* 27.21.8809960
*Email:* sales@campbellsci.co.za
*Website:* www.campbellsci.co.za

### Spain
*Location:* Barcelona, Spain
*Phone:* 34.93.2323938
*Email:* info@campbellsci.es
*Website:* www.campbellsci.es

### Thailand
*Location:* Bangkok, Thailand
*Phone:* 66.2.719.3399
*Email:* info@campbellsci.asia
*Website:* www.campbellsci.asia

### UK
*Location:* Shepshed, Loughborough, UK
*Phone:* 44.0.1509.601141
*Email:* sales@campbellsci.co.uk
*Website:* www.campbellsci.co.uk

### USA
*Location:* Logan, UT USA
*Phone:* 435.227.9120
*Email:* info@campbellsci.com
*Website:* www.campbellsci.com



PRODUCT

GPS16X-HVS

GPS Receiver with Integrated Antenna



# Position and Time

Precision time synchronization

## Overview

The GPS16X-HVS is a global positioning system (GPS) receiver that provides position, velocity, and timing information. Campbell Scientific configures the GPS16X-HVS and modifies its cable so that the receiver can more easily interface with our data loggers.

## Benefits and Features

❯ Supports real-time WAAS or RTCM corrections for accuracy of 3 to 5 m

❯ Attaches directly to a CR300-series, CR6, or CR1000X, regardless of functionality

❯ Connects directly to a CR800, CR850, CR1000, or CR3000 datalogger when PPS time-synchronizing functionality is not used.

❯ Processes data from up to 12 satellites depending on the number of satellites viewable above the horizon

❯ Allows the data logger clock to be set to the highly accurate GPS time

❯ Configured by Campbell Scientific to output RMC and GGA data strings at 38400 bps

❯ Extremely accurate timing pulse (PPS) can be used to synchronize time between the data logger and other instruments

## Detailed Description

The GPS16X-HVS, manufactured by Garmin International, consists of a receiver and an integrated antenna. It receives signals from orbiting Global Positioning System (GPS) satellites and then uses the signals to calculate position and velocity. The GPS16X-HVS also provides a highly accurate one-pulse-per-second (PPS) output for precise timing measurements.

Default settings are typically used. The default settings and options are changed using GPS16 software, which is available, at no charge, from the Garmin website (www.garmin.com).

Additional hardware is required to connect the GPS16X-HVS to the computer running the GPS16 software (see Ordering Information for more information).

By default, the instruction expects the GPS unit to be set up at 38400 baud, outputting the GPRMC and GPGGA sentences once per second. The data logger expects the start of the second to coincide with the rising edge of the PPS signal. If there is no PPS signal or if the required sentences come out at

For comprehensive details, visit: www.campbellsci.com/gps16x-hvs



less than once per second, the data logger will not update its clock.

GPS units with lower baud rates can be used with the GPS instruction, but the baud rate has to be set for the relevant Com port it is to be connected to either in the data logger settings or by including a SetStatus command after the BeginProg instruction in the program (for example, SetStatus("BaudrateCOM4",19200)). Baud rates below 2400 bps will not work, as the GPS unit will not be able to transmit the two GPS sentences once per second reliably. Similar problems can be encountered even at higher baud rates if too many optional GPS strings are selected to be output.

## Specifications

| | |
|---|---|
| Receiver | WAAS enabled. 12 parallel channel GPS receiver continuously tracks and uses up to 12 satellites (up to 11 with PPS active) to compute and update the position. |
| Update Rate | Factory set to 1 s between updates. (Programmable from 1 to 900 s.) |
| PPS Output | 1 Hz pulse; 1 μs accuracy (Width factory set to 100 ms.) |
| Baud Rate | Factory set to 38400 bps. |
| Operating Temperature Range | -30° to +80℃ |
| Storage Temperature Range | -40° to +80℃ |
| Operating Voltage Range | 8 to 40 Vdc |
| Current Drain | 65 mA active (@ 12 Vdc) |
| Velocity Accuracy | 0.1 knot RMS steady state |
| Cable Length | 4.57 m (15 ft) |

| | |
|---|---|
| Diameter | 9.1 cm (3.58 in.) |
| Height | 4.2 cm (1.65 in.) |
| Weight | 332 g (12 oz) |

| Position Accuracy (95% typical) | |
|---|---|
| GPS Standard Positioning Service (SPS) | < 15 m |
| DGPS (USCG/RTCM) Correction | 3 to 5 m |
| DGPS (WAAS) Correction | < 3 m |

| Acquisition Times | |
|---|---|
| Reacquisition | < 2 s |
| Hot | ~1 s (all data known) |
| Warm | ~38 s (initial position, time and almanac known, ephemeris unknown) |
| Cold | ~45 s |

For comprehensive details, visit: **www.campbellsci.com/gps16x-hvs** 

Campbell Scientific, Inc.  |  815 W 1800 N  |  Logan, UT 84321-1784  |  (435) 227-9120  |  www.campbellsci.com
AUSTRALIA | BRAZIL | CANADA | CHINA | COSTA RICA | FRANCE | GERMANY | INDIA | SOUTH AFRICA | SPAIN | THAILAND | UK | USA
© 2020 Campbell Scientific, Inc. | 12/02/2020





## SVS-603HR Wave Sensor

The SVS-603HR Wave Height Sensor is an augmented version of the highly accurate SVS-603 wave sensor that reports heading, wave height, wave period and wave direction via RS-232 or logs to its on-board data logger. The SVS-603HR represents a new generation in accuracy and completeness for wave sensing electronics whose features include:

- Very low power consumption; fits the smallest power budget
- Very small footprint; sold packaged or as bare PCB
- Sensors account for 3-D motion, rotation and compass heading in all dimensions to cover nine degrees of freedom
- Sophisticated onboard electronics provide near-real-time wave statistics
- Variable sample set size (256, 512, 1024, 2048 or 4096)
- On-board temperature compensation
- On-board data logger capable of logging as much as twenty years of wave data, depending on desired outputs.
- Easy configuration to match your exact sensing rate and output requirements
- Readily interfaced with transmitter using NMEA or other configurable data output
- Sampling rates from 1 to 8Hz (user configurable)



The SVS-603HR can be used to replace existing sensors, to upgrade existing buoys, or to add wave sensing capabilities to even the most compact buoys. Among the wave data that are available as outputs from the sensor are:

- Significant wave height in meters ($H_s$)
- Wave period in seconds
- Wave direction in degrees from north
- North, east and up displacement time series
- First-5 Fourier wave coefficients
- Maximum wave height ($H_{max}$)
- Wave period at $H_{max}$
- Wave energy
- Spectrum (raw or processed)
- Heading in degrees
- Custom outputs as required

Other outputs or data manipulations can be incorporated via firmware updates or through calculations on the available data stream. The SVS-601 Power Controller (shown above) is also available.





1.734.426.8978  |  info@seaviewsystems.com  |  www.seaviewsystems.com  |  © 2021





| Output Formats: | Hex code defined output parameters |
|---|---|
| | NMEA |
| | First-5 Fourier coefficients |
| | Wave energy spectrum |
| Accuracy Metrics: | |
| Hs <1% | No upper limit on Hs (-25 to +25 m) Resolution 0.001 m |
| Period <1% | 1.5 – 30 sec, Resolution 0.001 sec |
| Wave Direction ±2º * | Range 0-360º; Resolution 0.001º |
| Heave <1% | Range ±20m, Resolution 0.01m |
| Available Ports and Slots: | RS232 Adjustable baud rate (2.4-115.2 kbps) |
| | USB Micro-B |
| | Micro-SD |
| Dimensions: | 53.5mm length |
| | 68mm width |
| | 23mm height (w/connector) |
| Weight: | Bare board: 1.4oz/40g |
| | In enclosure: 15oz/425g |
| Power Requirements: | 151mW@12V |
| | 138mW@5V |
| | 5-30VDC |
| Temperature: | Operating: -30C to 80C Storage: -40C to 85C |

* Dependent on orbital buoy motion





The above two figures show significant wave height (Hs) comparisons for the SVS-603/HR and AWAC sensors for waves measured in the Great Lakes over a 2.5-month period.



# SeaView Systems SVS-603 References and Certifications

SeaView's SVS-603 Wave Sensor is the worldwide leader in compact, comprehensive, low power wave sensors. The SVS-603 has been deployed on a wide range of buoy hulls ranging from less than 0.75 meters to 6.0 meters hull diameters and other platforms including autonomous vehicles. It has recorded 15m waves on an ocean buoy during a typhoon and also tenths of a meter on a drifting ice floe in the Arctic Ocean. The SVS-603 wave sensor has been deployed near-shore and open-ocean around the world as well as in many Great Lakes deployments.

"After careful comparison with a bottom mounted AWAC sensor, SeaView's SVS-603 has been shown to be accurate, reliable and economical and has motivated us to upgrade the wave sensors in all of our buoys for the 2018 season. Our clients and customers have high expectations for accuracy and reliability and the SVS-603 allows us to provide accurate, up-to-date measurements of wave conditions." Ed Verhamme, **LimnoTech** (USA)

"When paired with the SVS-603 wave sensor (the NexSens CB-Series line of data buoys) delivers real-time wave observation data at a price point that was not commercially available until now." Paul Nieberding, **Fondriest Environmental** (USA)

"Because of the extremely low power requirements and wide operating voltage range of this technology we can implant this into small platforms that traditionally could not carry the battery and solar panel requirements of last generation sensors."

"Deployments approaching three years in duration recorded waves greater than 10m. We are really happy with your product."

"In a comparison with the SeaView SVS-603 mounted directly on a dedicated wave buoy, the results produced by the SVS-603 provide a very good match at a fraction of the cost, with much lower power consumption, smaller form factor, and greater mounting flexibility."

"The SVS-603 provides reliable, robust data. The model implementations devised by SeaView do a great job of reducing or eliminating the anomalies that often occur with more basic algorithms."

**Customers include:**

Cawthron Institute

Mobilis

Planet Ocean

Teledyne Benthos

LimnoTech

University of Alaska (Fairbanks)

Sino Instruments

National Taiwan University

Observator

InnovaSea

National Oceanic and Atmospheric Administration (NOAA)

Great Lakes Environmental Research Lab (NOAA - GLERL)

TechWorks



| | | |
|---|---|---|
| Fetch Ingenierie | Booz Allen Hamilton | Superior Watershed Partnership |
| Cooperative Institute for Great Lakes Research (CIGLR) | Lockheed Martin | nke Instrumentation |
| | Tridel Meteorology | |
| Ocean Origo AB | Zhejiang Titan Technologies Corp | NexSens Technology |
| ETech UAE | NRS Mühendislik A.Ş | Oceasian Technology Co LTD |
| NOAA - Chesapeake Bay | Korea Institute of Ocean Science and Technology | Seatech Co LTD |
| Michigan Tech University | | |

**and many more…**

The SVS-603 Wave Sensor is manufactured in a state-of-the-art, US-located facility that is certified to the following standards:

**ISO13485: Medical Device Industry standard**

Certified ISO13485:2016 specifies a comprehensive and demanding quality management system for the manufacture of medical devices, guaranteeing conformity with the necessary regulatory requirements for medical PCB assembly.

**AS9100: Aerospace Industry standard**

AS9100D "Quality Systems Aerospace – Model for Quality Assurance in Design, Development, Production, Installation, and Servicing" is the international standard for manufacturing for the aerospace

industry.

**ITAR Registered: Defense Industry standard**

Enforced by the Department of State, ITAR is a set of regulations controlling the export and import of defense-related materials. It restricts access to information for the design and building of sensitive military and intelligence technologies.

**ISO9001: Quality Management System**

The most widely recognized standard is the ISO9000 series, a basic quality management system that can be used in industries of any size, anywhere in the world. Registration to ISO9001:2015 illustrates an effective quality management system with a strong customer focus.



- Temp sensor
- 4x Ø8,2 fastening holes
- Pressure sensor
- Titanium screws
- Indicator light



523 (short housing 308)
119 · 404 (short housing 189)
360 (short housing 145)



- Center transducer (optional)
- Water ground point
- POM (Delrin)head
- POM (Delrin)housing
- POM (Delrin)endbell
- Pressure release valve

| Part no: 650146 (N2032-258) | Part no: 650133 (N2032-214) | Part no: 650134 (N2032-215) | Part no: 650135 (N2032-216) |
|---|---|---|---|
| Signature 250-500 Endbell Straight 2xMCBH+PR | Signature 250-500 Endbell 2xMCBH+PR | Signature 250-500 Endbell Souriau+PR | Signature 250-500 Endbell Souriau+PR+MCBH |
| 6 pin + 2 pin water blocked MCBH bronze (SubConn) and pressure release valve | 6 pin + 2 pin water blocked MCBH bronze (SubConn) and pressure release valve | 7 pin Souriau REC10 M bronze and pressure release valve | 7 pin Souriau REC10M bronze, pressure release valve and 6 pin water blocked MCBH bronze (SubConn) |

**CURRENT AND WAVE MEASUREMENTS IN THE OCEAN, LAKE AND LABORATORY**

All dimensions in mm.



Nortek AS
Vangkroken 2
1351 Rud, Norway
Tel: +47 6717 4500
E-mail: inquiry@nortek.no



www.nortek-as.com
True innovation makes a difference

Case 3:20-cv-04302-WHA   Document 41-6   Filed 09/08/25   Page 109 of 163
PageID #: 337

# Technical Specifications

| Water Velocity Measurements | |
|---|---|
| Profiling Range*: | 200m |
| Cell Size: | 1-8 m |
| Min. Blanking: | 0.5 m |
| Max # Cells: | 200 |
| Velocity Range (along beam): | User selectable 2.5 or 5.0 m/s |
| Minimum Accuracy: (inquire for more accurate firmware or hardware versions) | 1% of measured value ± 0.5 cm/s |
| Velocity Resolution: | 0.1 cm/s |
| Max Sampling Rate: | 1 Hz |
| Max Sampling Rate Five beams: | 1 Hz (4 beam + AST) |
| *) Maximum range depends on transmit power and acoustic scattering conditions | |

| AD2CP Measurement modes* | |
|---|---|
| Single or Concurrent: | Average and Waves/Ice |
| *) US Patent 8223588 | |

| Echo Intensity | |
|---|---|
| Sampling: | Same as Velocity |
| Resolution: | 0.5 dB |
| Dynamic Range: | 70 dB |
| Transducer Acoustic Frequency: | 250 kHz |
| Number of Beams: | 5; 4 slanted at 20°, 1 vertical at 500 kHz(optional) |
| Beam Width: | 2.3° (slanted) 2.2° (vertical) |

| Sensors | |
|---|---|
| **Temperature:** | **Thermistor Embedded in Head** |
| Temp. Range: | -4 to +40 °C |
| Temp. Accuracy/Resolution: | 0.1 °C/0.01°C |
| Temp. Time Response: | 2 min |
| **Compass:** | **Solid State Magnetometer** |
| Accuracy/Resolution: | 2° for tilt <30°/0.01° |
| **Tilt:** | **Solid State Accelerometer** |
| Accuracy/Resolution: | 0.2° for tilt <30°/0.01° |
| Maximum Tilt: | Full 3D |
| Up Or Down: | Automatic Detect |
| **Pressure:** | **Piezoresistive** |
| Standard Range: | 0-500 (inquire for options) |
| Accuracy/Precision: | 0.1% FS / Better than 0.002% of full scale |

| Data Communications | |
|---|---|
| Ethernet: | 10/100 Mbits Auto MDI-X TCP/IP, UDP, HTTP protocols Fixed IP/DHCP client/AutoIP, UPnP |
| Serial: | Configurable RS-232/RS422 300-1250000 bps |
| Recorder Dowload Baud Rate: | 20 Mbit/s (Ethernet only) - 1 GByte in 6 minutes |
| Controller Interface: | ASCII command interface with telemetry options over Telnet and serial interface. Complete data download over standard Ethernet FTP. Telemetry file downloadable over serial interface. See interface manual for more information. |

| Data Recording | |
|---|---|
| Capacity (Standard): | 16 GB/optional 64GB |
| Data Record: | 86 bytes + 4 x Nbeams x Ncells |
| Mode: | Stop when full |

| Real Time Clock | |
|---|---|
| Accuracy: | ±1 min/year |
| Clock Retention in Absence of External Power: | 1 year. Backup battery recharges automatically when the instrument is powered. |

| Software | |
|---|---|
| Operating System: | Windows® 7 or later |
| Functions: | Deployment planning, start with alarm, data retrieval, conversion to ASCII and Matlab format. |
| Online Data: | Collection and graphical display. |

| Power | |
|---|---|
| DC Input: | 15-48 VDC |
| Maximum Peak Current: | 1.5 Amp |
| Max. Average Consumption at 1Hz: | 15W |
| Typical Average Consumption*: | 400mW |
| Sleep Consumption: | 100uA, power depends on supply voltage |
| Transmit Power Per Beam: | 4-200W, adjustable levels |
| Ping Sequence: | Multiplexing or parallell |
| *) 10 min. average current profile, 1cm/sec horizontal Precision, Max cell size, max power level and long range mode. See deployment SW for other configurations. | |

| Environmental | |
|---|---|
| Operating Temperature: | –4°C to 40°C |
| Storage Temperature: | –20°C to 60°C |
| Shock and Vibration: | IEC 60068-1/IEC60068-2-64 |
| Depth Rating: | 300 m |

| Batteries | |
|---|---|
| Internal: | Single alkaline 540Wh or lithium 1800 Wh |
| External: | Single or double alkaline 540Wh or lithium 1800 Wh (External battery cans have a depth rating of 500 m) |
| Duration: | The battery consumption is a complex function of the instrument configuration. Please consult the Signature Deployment Software for more information. |

| AST/Altimeter option | |
|---|---|
| Frequency: | 500 kHz |
| Max distance: | 170 m |
| Precision: | 2 cm |

| Ice Measurement Option | |
|---|---|
| Parameters: | Ice thickness, speed and direction, echo sounder data |

| Wave Measurement Option | |
|---|---|
| Maximum Depth: | 150 m |
| Height Range: | -15 to +15 m |
| Accuracy/Resolution (Hs): | <1% of measured value / 2cm |
| Accuracy/Resolution (Dir): | 2° / 0.1° |
| Period Range: | 2-50 s |
| Cut-Off Period(Hs): | 25m depth; 2 sec 50m depth; 2 sec 100m depth; 2.2 sec 150m depth; 2.7 sec |
| Cut-off Period (dir): | Please inquire |
| Sampling Rate (Velocity and AST): | 1 Hz |

| Materials | |
|---|---|
| Standard Model: | Delrin® with titanium bolts. Reinforced polyure-thane transducer cups |

| Connectors | |
|---|---|
| See GA drawings | |

| Dimensions and weight | |
|---|---|
| Weight in Air: | 18,5Kg (short housing 17,1Kg) |
| Weight in Water: | 1,5Kg (short housing 5,2Kg) |
| Weight Alkaline Battery: | 5,0Kg |
| Weight Lithium Battery: | 3,9Kg |





TS-432-en-12.2015



twitter.com/nortek news        facebook.com/Norteknews        youtube.com/Nortekinfo





**NortekMed S.A.S.**
ZJ Toulon Est
67, Avenue Frédéric Joliot-Curie
BP 520, 83078 Toulon Cedex 09
Tel: + 33 (0) 4 94 31 70 30
Fax: +33 (0) 4 94 31 25 49
E-mail: info@NortekMed.com

**NortekUK**
Regus International House,
Southampton International Business Park,
George Curl Way,
Southampton,
SO18 2RZ, UK
Tel: +44 (0) 1428 751953

**NortekUSA**
27 Drydock Avenue,
Mailbox 32, Boston,
MA 02210-2377
Tel: 617-206-5750
Fax: 617-275-8955
E-mail: inquiry@nortekusa.com

**Nortek China**
Rm 1702
Software Building, No. 172
Minjiang Rd
Qingdao.
China
Tel: +86-532-85017270
Fax: +86-532-85017270

**Nortek B.V.**
Schipholweg 333a
1171PL Badhoevedorp
Nederland
Tel: +31 20 6543600
Fax: +31 20 6599830
email: info@nortek-bv.nl

**Nortek Brasil**
Rua Domingues de Sá 386 casa 101 Icaraí
24220-091 Niterói – RJ
Brasil
Tel: +55 (21) 4126-5954
Fax: +55 (21) 85046798
E-Mail nortek@nortekbrasil.com.br

# Aquadopp Z-Cell 600 kHz





## Up to 40 m current profiling range and no blanking; ideal for mean and boundary current measurements

Need to collect accurate 3D currents very near the seabed or sea surface, in addition to a full water-column profile?

The Z-Cell (Zero Cell) Aquadopp allows current measurement to start right at the instrument's level through an innovative approach: it has side-looking beams fully integrated into the instrument's head, effectively removing the blanking distance normally applicable to ADCPs.



CURRENT PROFILER

# Aquadopp Z-Cell 600 kHz

## Highlights

✓ Up to 40 m current profiling range

✓ Capable of measuring surface or bottom currents

✓ Ideal for mean current measurements

## Applications

✓ Mounted on bottom frames, with ability to also measure near-bed currents

✓ Mean flow measurements with high focus on ease of use and simplicity

✓ Measurements in flow regimes with strong variations in flow speeds

✓ Studies of tidal currents

✓ Measurements of combinations of waves and currents

✓ Mounted on surface buoys, with the ability to also measure surface currents

CURRENT PROFILER

# Aquadopp Z-Cell 600 kHz



## Technical specifications

| ⟶ Water velocity measurements | |
|---|---|
| Maximum profiling range | 30-40 m |
| Cell size | 1-4 m |
| Minimum blanking | 0.50 m when profiling; 0 m when Z-Cell enabled |
| Maximum number of cells | 128 |
| Measurement cell position | N/A |
| Default position (along beam) | N/A |
| Velocity range | ±10 m/s |
| Accuracy | ±1% of measured value ±0.5 cm/s |
| Velocity precision | Consult instrument software |
| Maximum sampling rate (output) | 1 Hz |
| Internal sampling rate | 3 Hz |
| ⟶ Echo intensity (along slanted beams) | |
| Sampling | Same as velocity |
| Resolution | 0.45 dB |
| Dynamic range | 90 dB |
| Transducer acoustic frequency | 600 kHz |
| Number of beams | 2 |
| Beam width | 3.0° |
| ⟶ HR option | |
| Maximum profiling range | N/A |
| Cell size | N/A |
| Minimum blanking | N/A |
| Maximum number of cells | N/A |
| Range/Velocity limitations | N/A |

CURRENT PROFILER

# Aquadopp Z-Cell 600 kHz



| → HR option | |
|---|---|
| Accuracy | N/A |
| Max. sampling rate | N/A |
| **→ Z-Cell option** | |
| Cell zero acoustic frequency | 2 MHz |
| Maximum profiling range | 0.4-0.9 m |
| Number of beams | 3 |
| **→ Sensors** | |
| Temperature: | Thermistor embedded in head |
| Temp. range | -4 to +40 °C |
| Temp. accuracy/resolution | 0.1 °C/0.01 °C |
| Temp. time response | 10 min |
| Compass: | Magnetometer |
| Accuracy/resolution | 2°/0.1° for tilt < 20° |
| Tilt: | Liquid level |
| Accuracy/resolution | 0.2°/0.1° |
| Maximum tilt | 30° |
| Up or Down | Automatic detect |
| Pressure: | Piezoresistive |
| Range | 0-100 m (inquire for options) |
| Accuracy/precision | 0.5% FS / 0.005% of full scale |
| **→ Analog inputs** | |
| No. of channels | 2 |
| Supply voltage to analog output devices | Three options selectable through firmware commands: 1) Battery voltage/500 mA, 2) +5 V/250 mA, 3) +12 V/100 mA |
| Voltage input | 0-5 V |
| Resolution | 16-bit A/D |



CURRENT PROFILER

# Aquadopp Z-Cell 600 kHz

⟶ Data recording

Capacity                         9 MB, can add 4/16 GB

CURRENT PROFILER

# Aquadopp Z-Cell 600 kHz



| ⟶ Data recording | |
|---|---|
| Data record | 9*Ncells + 32 bytes |
| Diagnostics record | N/A |
| Wave record | Nsamples * 24 + 60 bytes |
| Mode | Stop when full (default) or wrap mode |

| ⟶ Real-time clock | |
|---|---|
| Accuracy | ±1 min/year |
| Backup in absence of power | 4 weeks |

| ⟶ Data communications | |
|---|---|
| I/O | RS-232 or RS-422 |
| Communication baud rate | 300-115200 Bd |
| Recorder download baud rate | 600/1200 kBd for both RS-232 and RS-422 |
| User control | Handled via "Aquadopp" software, ActiveX®function calls, or direct commands with binary or ASCII data output |

| ⟶ Connectors | |
|---|---|
| Bulkhead (Impulse) | MCBH-8-FS |
| Cable | PMCIL-8-MP on 10 m polyurethane cable |

| ⟶ Software | |
|---|---|
| Functions | Deployment planning, instrument configuration, data retrieval and conversion (for Windows®) |

| ⟶ Power | |
|---|---|
| DC input | 9-15 V DC |
| Maximum peak current | 3 A |
| Avg. power consumption | 0.06 W |
| Sleep current | < 100 μA |
| Transmit power | 0.3-20 W, 3 adjustable levels |

| ⟶ Batteries | |
|---|---|
| Battery capacity | 50 Wh (alkaline or Li-ion), 165 Wh (lithium), Single or dual |

CURRENT PROFILER

# Aquadopp Z-Cell 600 kHz



| → Batteries | |
|---|---|
| New battery voltage | 13.5 V DC |
| → Environmental | |
| Operating temperature | -5 to +40 °C |
| Storage temperature | -20 to +60 °C |
| Shock and vibration | IEC 721-3-6 |
| EMC approval | IEC 61000 |
| Depth rating | 300 m |
| → Materials | |
| Standard model | POM and polyurethane plastics with titanium fasteners |
| → Dimensions | |
| Maximum diameter | 100 mm |
| Maximum length | ~550 mm (single battery), +110 mm (double battery) depending on head configuration |
| → Weight | |
| Weight in air | 2.9 kg |
| Weight in water | 0.4 kg |
| → Options | |

1) Alkaline, lithium or Li-ion external batteries, 2) Inquire for different head configurations





PRODUCT

# METSENS500
## Compact Weather Sensor for Temperature, RH, Barometric Pressure, and Wind with Compass



# Measures 5 Common Meteorological Parameters

Includes a compass

## Overview

The MetSENS500 compact weather sensor measures wind speed and direction via an ultrasonic sensor, as well as air temperature, relative humidity, and barometric pressure, in a single, combined instrument mounted inside three double-louvered, naturally aspirated radiation shields with no moving parts. An integrated electronic compass allows the MetSENS500 to provide accurate, relative wind direction measurements without being oriented in a particular way,

making installation easier. WMO average wind speed and direction and gust, temperature, relative humidity, barometric pressure, absolute humidity, air density, and wet bulb temperature data are provided. The MetSENS500 is compatible and easily integrated with the MeteoPV Solar Resource Platform and any Campbell Scientific data logger using SDI-12, RS-485, ModbusRS-485, or NMEA RS-232.

## Benefits and Features

❯ Quality measurements

❯ Fast and simple to install

❯ Compact, integrated design

❯ Lightweight and robust

## Specifications

| | |
|---|---|
| Measurements Made | Air temperature, barometric pressure, relative humidity, wind direction, and wind speed. |
| Sampling Rate | 1 Hz |
| Digital Communication Modes | Serial RS-232, RS-485, SDI-12, NMEA, Modbus, ASCII |
| IP Rating | 66 |
| Compliance | CE, RoHS |
| Operating Temperature Range | –40° to +70℃ |

| | |
|---|---|
| Operating Voltage | 5 to 30 Vdc |
| Typical Current Drain @ 12 Vdc | ❯ 25 mA (continuous high mode) ❯ 0.7 mA (eco-power mode; 1 hour polled) |
| Weight | 0.7 kg (1.5 lb) |
| **Air Temperature Measurement** | |
| Measurement Range | –40° to +70℃ |
| Resolution | 0.1℃ |
| Accuracy | ±0.3℃ (@ 20℃) |

For comprehensive details, visit: www.campbellsci.com/metsens500



## Relative Humidity Measurement

| | |
|---|---|
| Measurement Range | 0 to 100% |
| Resolution | 0.1 |
| Accuracy | ±2% @ 20℃ (10 to 90% RH) |

## Barometric Pressure Measurement

| | |
|---|---|
| Measurement Range | 300 to 1100 hPa |
| Resolution | 0.1 hPa |
| Accuracy | ±0.5 hPa (@ 25℃) |

## Wind Speed Measurement

| | |
|---|---|
| Measurement Range | 0.01 to 60 m s$^{-1}$ |
| Accuracy | ❯ ±3% (up to 40 m s$^{-1}$)<br>❯ ±5% (up to 60 m s$^{-1}$) |

| | |
|---|---|
| Resolution | 0.01 m s$^{-1}$ |
| Starting Threshold | 0.01 m s$^{-1}$ |

## Wind Direction Measurement

| | |
|---|---|
| Measurement Range | 0° to 359° |
| Accuracy | ±3° (up to 60 m s$^{-1}$) |
| Resolution | 1° |

## Compass

| | |
|---|---|
| Measurement Range | 0 to 359° |
| Resolution | 1° |
| Units of Measure | Degrees |
| Accuracy | ±3° |

For comprehensive details, visit: www.campbellsci.com/metsens500



Campbell Scientific, Inc.  |  815 W 1800 N  |  Logan, UT 84321-1784  |  (435) 227-9120  |  www.campbellsci.com

AUSTRALIA | BRAZIL | CANADA | CHINA | COSTA RICA | FRANCE | GERMANY | INDIA | SOUTH AFRICA | SPAIN | THAILAND | UK | USA

© 2020 Campbell Scientific, Inc. | 11/03/2020



PRODUCT

# CS120A
## Atmospheric Visibility Sensor



# High-Performance Visibility Measurements

**Competitive price**

## Overview

The CS120A uses tried-and-tested, infrared forward-scatter technology, and it uses the proven 42° scatter angle to report meteorological observable range (MOR) for fog and snow in the range of 5 to 75,000 m (16.4 to 246,063 ft). It combines a high specification with a very competitive price. The CS120A is ideal for stand-alone applications or in combination with automatic weather stations in road, aviation, solar-energy, and wind-energy environments.

For aviation applications, users can be assured that the CS120A complies with UK CAA, FAA, and ICAO guidance and meets or exceeds all recommendations and specifications. (This includes CAP437, CAP670, and CAP746.)

The CS120A is certified by Deutscher Wetterdienst as suitable for use to control wind turbine obstruction light systems as specified by 506/04, General Administrative Rules for the Identification of Aircraft Obstructions.

## Benefits and Features

❯ High performance sensor at a competitive price

❯ Sensor design minimizes airflow disruption at measurement volume

❯ Incorporates automatic dew and hood heaters for all-weather operation

❯ Simple field calibration using optional calibration kit

❯ Low power—suitable for remote application

❯ Automatic status check for faults or window contamination

❯ Type certified for aviation use by the German Meteorological Service, Deutscher Wetterdienst (DWD)

## Detailed Description

Compared to many such sensors, the CS120A design means that visibility is being measured in a relatively clean space because the position of the heads and body minimize disturbance of the airflow at the measurement volume.

The CS120A uses continuous high-speed sampling, which improves the accuracy of the measurements taken during mixed weather such as rain and hail, while providing reliable

readings during more stable events such as fog and mist. High-speed sampling also allows the sensor to better respond to suddenly changing conditions.

The CS120A has several design features that keep its optics clean. Downward-facing optics minimize dirt and snow

For comprehensive details, visit: **www.campbellsci.com/cs120a**



buildup. Low-powered heaters prevent the formation of dew, and a higher-powered heater prevents the formation of ice.

The sensor is very power efficient, drawing just 3 W during normal operation including the dew heaters; power can be reduced further by reducing the sample rate and manual control of the heaters.

Two configurable alarm outputs are provided and, via relays, these can drive external warning systems such as lights and foghorns. They can also be used to switch the intensity of wind turbine warning lights depending upon current visibility levels.

## Specifications

| | |
|---|---|
| Signal Type/Output | RS-232, RS-485 |
| Measurement Description | Meteorological Observable Range (MOR) |
| Maximum Reported Visibility | 75 km (46.6 mi) |
| Minimum Reported Visibility | 5 m (16.4 ft) |
| Accuracy | 〉 ±15% at 10,000 to 15,000 m (32,808.4 to 49,212.6 ft)<br>〉 ±20% at 15,000 to 75,000 m (49,212.6 to 246,063 ft)<br>〉 ±8% at < 600 m (< 1968.5 ft)<br>〉 ±10% at 600 to 10,000 m (1968.5 to 32,808.4 ft) |
| Resolution | 1 m (3.3 ft) |
| Mounting | Stainless-steel V-bolt bracket that attaches to a pole with a 32 to 52.5 mm (1.25 to 2 in.) outer diameter |
| Electronics Supply Voltage | 7 to 30 Vdc |
| Total Unit Power | < 3 W while sampling continuously (including dew heaters) |
| Standards | Frangible masts are available to customer requirements to meet ICAO recommendations (typically placing the sample volume at 2.5 m [8.2 ft]). |
| Sensor Dimensions | 540 x 640 x 246 mm (21.26 x 25.2 x 9.7 in.) including mount |
| Sensor Weight | ~3 kg (6.6 lb) depending on mounting system |

### Optical/Pulse

| | |
|---|---|
| LED Center Wavelength | 850 nm |
| LED Spectral Bandwidth | ±35 nm |
| Light Pulse Rate | 1 kHz |

### Environmental

| | |
|---|---|
| Operating Temperature Range | -25° to +60℃ (standard) |
| Extended Operating Temperature Range | -40° to +70℃ (This extended version is available as a special. Contact Campbell Scientific for more information.) |
| Operating Humidity Range | 0 to 100% |
| Sensor Sealing | Rated to IP66 |
| Wind Speed | Up to 60 m s$^{-1}$ |
| Sensor Heater Threshold | 〉 > 40℃ (dew heater off)<br>〉 < 35℃ (dew heater on)<br>〉 < 5℃ (hood heater on)<br>〉 > 15℃ (hood heater off) |

### DSP & Dew Heaters

| | |
|---|---|
| Power | 2 x 0.6 W (total of 1.4 W) for dew heater |
| Typical Current Consumption @ 12 Vdc | 〉 200 mA (dew heaters active, RS-232 communications)<br>〉 200 mA (continuous sampling, dew heaters active)<br>〉 110 mA (continuous sampling, dew heaters disabled)<br>〉 21 mA (no sampling, dew heaters disabled) |

### Hood Heater

| | |
|---|---|
| Supply Voltage | 24 V dc or ac |
| Power | 2 x 30 W (total of 60 W) |

### Interface

| | |
|---|---|
| Serial Interface | RS-232 or RS-485, 8 bit data bytes, 1 stop bit |
| Serial Data Rates | 1200 to 115,200 bps (38,400 bps default rate) |

For comprehensive details, visit: www.campbellsci.com/cs120a


Campbell Scientific, Inc. | 815 W 1800 N | Logan, UT 84321-1784 | (435) 227-9120 | www.campbellsci.com
AUSTRALIA | BRAZIL | CANADA | CHINA | COSTA RICA | FRANCE | GERMANY | INDIA | SOUTH AFRICA | SPAIN | THAILAND | UK | USA
© 2020 Campbell Scientific, Inc. | 07/28/2020



# CCFC
**Outdoor Observation and Surveillance Field Camera**

## 18x Optical Zoom and Auto Focus
### Multiple lens positions available for each capture event

## Overview

The CCFC Field Camera is a high-quality, high-resolution zoom camera specifically designed for remote outdoor applications. It captures high-quality photos and video in wide-angle and zoom during the day and night.

## Benefits and Features

> 18x optical zoom lens
> Auto focus lens
> Up to 15 preset lens positions
> Infrared LEDs for night photos (captures images under almost any lighting conditions)
> Normalized difference vegetation index (NDVI) image capture capability

> Easy-to-use web interface
> Controlled by internal timer, motion detector, web page, or datalogger
> Window defroster
> Type 3 anodized camera body that allows use in corrosive environments
> Wide temperature range (-40° to +60°C)

## Technical Details

### Wi-Fi Camera Access

The camera's Wi-Fi access can be controlled using a smartphone from the safety of the ground. The CCFC features a web interface that makes setup and configuration easy. The interface works on any desktop or mobile browser and contains built-in tips. The camera capture and retrieval modes are highly configurable, enabling even the most advanced users complete control of settings.

### High-Quality Still Images and Video

The camera can produce still images of up to 5 megapixels and video up to 720p. The camera's image and video capture trigger modes include two independent self timers, as well as external triggers, such as datalogger control, motion detection, and web page control. This flexibility makes the CCFC an ideal camera for a wide variety of outdoor observation and surveillance applications. The camera has a 16 GB outdoor-rated internal memory.

### Camera Zoom and Auto Focus

The CCFC comes with a high-quality 18x optical zoom lens and an upgraded image sensor (when compare to the CC5MPX camera model). Users can designate up to 15 preset lens positions to capture images or video from different zoom lengths for each capture event. The camera's auto focus features enables it to automatically re-focus at each zoom length so each trigger event captures a collection of clear photos and video.



## Normalized Difference Vegetation Index (NDVI)

NDVI uses visible and near-infrared light to show the health of vegetation. Healthy vegetation mostly absorbs visible light and reflects near-infrared light. While, unhealthy or sparse vegetation reflects more visual light and absorbs more infrared light. The following images show both a standard and an NDVI image of the same location.



In the photo on the left, it is easy to see lots of green trees but it is hard to pick out where unhealthy or dead vegetation is present. The photo on the right shows mostly red indicating healthy vegetation; the sick, dead trees are yellow, which indicates unhealthy vegetation.

All NDVI photos have the bar along the bottom of the image for reference. Colors on the far right (closer to +1.0) are heathier while colors on the left are unhealthy or not vegetation (closer to -1.0).

### Getting Images and Video

The camera can send images and video directly to a desktop or the images can be published to the web using various communications options. Images and video taken by the camera can be delivered to you from remote locations via cellular modem, Ethernet 10/100, RS-232, RS-485, satellite, and PakBus. The camera can be configured to act as a webcam that publishes images and video directly to a website using various communications devices. The CCFC comes with 16 GB of internal memory to store captured media.

## Specifications

❯ Operating Temperature: -40° to +60°C
❯ Weight: 2.38 kg (5.25 lb)
❯ Length: 28.4 cm (11.2 in)
❯ Height: 13.0 cm (5.1 in)
❯ Width: 13.2 cm (5.2 in)
❯ Clock Accuracy: ±2 min/year (-40° to +60°C)
❯ Ingress Protected (IP) 67
❯ Operating Power: 9 to 30 Vdc
❯ View EU Declaration of Conformity documentation for CCFC at: www.campbellsci.com/ccfc
❯ CCFC accessories: www.campbellsci.com/order/ccfc

### Current Drain

❯ Average: 250 mA (excludes defroster and IR LEDs)
❯ Maximum Momentary Peak: 400 mA
❯ Defroster On: 1.5 A
❯ IR LEDs On: 700 mA
❯ Quiescent (off power mode): <1 mA
❯ Deep Sleep Power Mode: < 6 mA

### Lens

❯ Focal Length: 4.70 to 64.6 mm
❯ Field of View: 4° to 67.3°
❯ Zoom ratio: 18x

### Cable

❯ Maximum Recommended Length:
 • Power and I/O Cable: 20 m (65 ft)
 • Ethernet Cable: 70 m (230 ft)
❯ View EU Declaration of Conformity documentation for cables at: www.campbellsci.com/ccfccbl1-l

### Media Capture (photo and video)

❯ Image or Video Capture Triggers: Two independent self timers; external trigger; motion detection; web page control
❯ Programmable Still Image Resolutions (JPEG): 2592 x 1944; 1280 x 960; 1280 x 720; 640 x 480; 640 x 352; 320 x 240; 320 x 176
❯ Video: Capable of up to 720P for 1280 x 720 (MPEG4), 640 x 480 (MJPEG), 320 x 240 (MPEG4)
❯ Video Frame Rate Options: 30, 15, and 7.5 frames per second
❯ Photo and Video Capture Time From Wake:
 • Partially On and Deep Sleep Modes: 10 s
 • Off Mode: 90 s

 Campbell Scientific, Inc. | 815 W 1800 N | Logan, UT 84321-1784 | (435) 227-9120 | www.campbellsci.com
USA | AUSTRALIA | BRAZIL | CANADA | CHINA | COSTA RICA | FRANCE | GERMANY | SE ASIA | SOUTH AFRICA | SPAIN | UK

© 2016, 2018
Campbell Scientific, Inc.
July 31, 2018

**Orsted**
**Metocean Data Collection**
**Trawl Resistant Bottom Mount**



# AWAC
Acoustic Wave And Current Profiler



CURRENT AND WAVE MEASUREMENTS IN THE OCEAN, LAKE AND LABORATORY



Nortek AS
Vangkroken 2
1351 Rud, Norway
Tel: +47 6717 4500
Fax: +47 6713 6770

www.nortek-as.com
True innovation makes a difference



# AWAC
## A STANDARD IN OCEAN WAVE MEASUREMENTS

The Nortek Acoustic Waves and Currents (AWAC) sensor is a current profiler and directional wave system in one unit. Nortek has shipped more than 1700 AWACs worldwide since the launch of the first generation unit over a decade ago. The instrument has since revolutionized subsurface wave measurements.

   

The AWAC is well suited for both autonomous data collection and as part of a real-time data telemetry system. Subsurface deployment means the instrument is always protected from harsh weather, vandalism, and ship traffic. The small, yet rugged instrument is suitable for multi-year operation in tough environments. Plastic and titanium parts avoid corrosion. The AWAC is available in three transmit frequencies for operational ranges spanning 2m to 100m.

## Trusted Wave Measurements

The AWAC is in use for online and stand-alone applications all over the world. In Europe, researchers have employed dozens of AWACs to evaluate and improve coastal wave models. In Asia, port and harbor authorities trust AWACs to survive and provide excellent data during typhoon conditions. The AWAC has become a reference system for wave measurements after numerous meticulous comparisons with buoys.

Nortek provides the AWAC as part of a turnkey solution for long-term monitoring.  This includes durable connectors and long cables, integrated acoustic modems, a verified internal wave processor, and online processing and data display software.

The AWAC of today has seen over a decade of development, continually being optimized with enhanced features. These include rapid pinging, narrow acoustic beams to provide the best time and space resolution, adaptive tracking algorithms to accommodate large variations in depth and low power consumption for long endurance deployments.

The AWAC can be mounted in subsurface buoys to add wave measurements to long moorings or to avoid burial and excessive tilt in soft sediments. Nortek's validated and patented SUV technology (US patent 7,352,651) makes accurate wave measurements and high resolution surface currents attainable in deep water as well as areas with

Case 2:14-cv-08925-MRP-AS  Document 21-3  Filed 09/03/14  Page 125 of 163  PageID #: 354

## Wave Height



Acoustic Surface Tracking (AST)

Sampling of orbital Velocities

Pressure as independent wave parameter

## Wave Direction



The AWACs extraordinary wave height measurements are a result of the extensively validated and optimized Acoustic Surface Tracking (AST) algorithms. AST estimates the distance to the surface by echo-ranging with the vertically oriented transducer. This method circumvents the depth limitations imposed by bottom mounted pressure and velocity measurements and allows the instrument to capture 1 to 50 second period waves. Moreover, AST gives you the ability to derive wave parameters based on times series analyses such as Hmax, H1/10, and Tmean.  Time series analysis is included in the Nortek wave processing software.

Wave direction is calculated by combining AST with orbital velocity measurements that have adaptively been sampled in a large cell located near the surface.  If the AWAC is mounted in a non-moving frame or structure, Nortek uses the maximum likelihood method applied to the three velocities and the surface position to estimate all directional wave parameters and spectra. and spread. Nortek's patented SUV processing can be used to calculate all the same directional estimates from an AWAC on a subsurface buoy.

## Tidal Elevation



0.1% Full Scale

## Current Profile



The AWAC pressure data are suitable for measuring the tidal elevation from a fixed bottom mounted structure. Nortek recently extended the option to upgrade the AWAC pressure sensor to an absolute accuracy of 0.1% of full scale, or 5 cm for a 50 m sensor.  This pressure sensor is temperature compensated and the tidal changes only span a small portion of the full-scale range. Therefore, accuracy of the change in tidal elevation is normally twice that of the absolute accuracy, or around 2.5 cm for a 50 sensor.

The AWAC uses the three slanted beams to measure the current profile over a range determined by the acoustic frequency. Large transducers transmit narrow acoustic beams and provide accurate data. The AWAC will alternate between wave data collection and current profiling. If the wave data collection is longer than the interval between current profiles, the AWAC will skip a current profile to ensure continuous wave data. Please contact Nortek if concurrent wave and current information is required.

Case 1:20-cv-00302-MR Document 39-5 Filed 09/09/2025 Page 126 of 163
PageID #: 355

# Real Time Data Collection

Most Nortek products can be used either in stand-alone or online mode. In stand-alone mode, data is collected to the internal recorder, and the power comes from external batteries. In an online system, data are transferred to a shore station using one or more communication links.



Cable
Acoustic modem
Radio
IP modem

✅ **Cables:** Nortek provides rugged polyurethane cables with optional titanium connectors. Data may be transferred over cables of up to 5000m. An interface box installed on shore protects the AWAC from surges and converts the supply voltage to 48V. A DCDC converter in the instrument reduces the voltage back to 15V.

✅ **Acoustic modems:** In combination with the ProLog internal processor, it is possible to transfer wave and current data over short distances underwater using acoustic modems provided by Nortek.

✅ **Radio and IP modems:** Radio communication relies on line-of-sight and can be used to transfer AWAC data from an offshore buoy to shore or from a point along the coast further inland. In areas with adequate cellular communication, IP modems may be used to transfer data.

✅ **AOS:** It is possible to integrate the AWAC with the Nortek Autonomous Online System and view the resulting data in a hosted web environment.

## ProLog

The ProLog consists of a powerful processor and a 4 GB SD-card recorder laid out on a separate circuit board that fits inside the AWAC. The processor takes the raw data from the AWAC, runs the directional wave processing algorithms and outputs the processed data in ASCII (NMEA) or binary format. This makes the ProLog ideally suited for online applications where data transfer rates are limited, as when using acoustic modems or satellites. The NMEA format also facilitates the integration of the AWAC with 3rd party external controllers.



## Nortek offers a full suite of software with the AWAC



**AWAC-AST** is included with all AWAC deliveries. It features a simple interface used to configure the instrument for deployment, retrieve the data, and convert the raw data to ASCII.



**Quickwave** provides the functionality of Storm in a non-graphical environment. A wave processing module embedded in a DLL is available for those who wish to write their own real time software.»



**Storm** provides a full graphical interface to view the raw wave data and current profiles, perform QA/QC, and plot the directional and non-directional wave parameters.



**SeaState** is designed for configurations where there is direct communication. It collects, processes, records and displays data in real-time as a series of graphical images, which are suitable both for engineering and scientific applications. SeaState accepts both raw data and processed wave data from a ProLog internal processor.

## 1MHz

  

## 600kHz

  

## 400kHz

  

## Platform Mount (1MHz and 600kHz)

Contact Nortek for additional transducer configuration options designed
to mount on coastal, offshore, or marine renewable energy structures.

  

| System | |
| --- | --- |
| Acoustic frequency: | 1MHz, 600kHz or 400kHz |
| Acoustic beams: | 4 beams, one vertical, three slanted at 25° |
| Vertical beam opening angle: | 1.7° |
| Operational modes: | Stand-alone or online monitoring |

| Current Profile | |
| --- | --- |
| Maximum range: | 30m (1MHz), 50m (600 kHz), 100m (400kHz)* |
| Depth cell size: | 0.25 – 4.0m (1MHz) |
| | 0.5 – 8.0m (600kHz) |
| | 1.0 – 8.0m (400kHz) |
| Number of cells: | Typical 20–40, max. 128 |
| Maximum output rate: | 1Hz |
| *)depends on local conditions | |

| Velocity measurements | |
| --- | --- |
| Velocity range: | ±10 m/s horizontal, ±5 m/s along beam |
| Accuracy: | 1% of measured value ±0.5 cm/s |

| Doppler uncertainty | |
| --- | --- |
| Current profile: | 1cm/s (typical) |

| Wave measurements | |
| --- | --- |
| Maximum depth: | 35m (1MHz), 60m (600 kHz), 100m (400kHz) |
| Data types: | Pressure, one velocity along each beam, AST* |
| Sampling rate (output): | 2 Hz velocity, 4 Hz AST* (1MHz), |
| | 1 Hz velocity, 2Hz AST* (600kHz), |
| | 0.75 Hz velocity, 1.5Hz AST* (400kHz) |
| No. of samples per burst: | 512, 1024, or 2048. Inquire for options |

| Wave estimates | |
| --- | --- |
| Range: | -15 to +15m |
| Accuracy/resolution (Hs): | <1% of measured value/1cm |
| Accuracy/resolution (Dir): | 2° / 0.1° |
| Period range: | 0.5 - 50s (1MHz), 1 - 50s (0.6MHz), |
| | 1.5 - 50s (0.4MHz) |

| Depth(m) | cut-off period (Hs) | cut-off period (dir) |
| --- | --- | --- |
| 5 | 0.5 sec | 1.5 sec |
| 20 | 0.9 sec | 3.1 sec |
| 60 | 1.5 sec | 4.2 sec |
| 100 | 2 sec | 5.0 sec |

| Sensors | |
| --- | --- |
| Temperature: | Thermistor embedded in housing |
| Range: | −4°C to 40°C |
| Accuracy/ Resolution: | 0.1°C/0.01°C |
| Time constant: | <5 min |
| Compass | Magnetoresistive |
| Accuracy/Resolution: | 2°/0.1° for tilt <15° |
| Tilt: | Liquid level |
| Maximum tilt: | 30°, AST* requires <10° instrument tilt |
| Up or down: | Automatic detect |
| Pressure: | Piezoresistive |
| Standard range: | 0–50 m (1MHz) / 0-100m (0.6MHz) / |
| | 0-100m (0,4MHz) |
| Accuracy: | 0.5% of full scale. Optional 0.1% of full scale. |
| Resolution: | 0.005% of full scale |

| Transducer configurations | |
| --- | --- |
| Standard: | 3 beams 120° apart, one vertical |
| Platform mount: | 3 beams 90° apart, one at 5° |

| Materials | |
| --- | --- |
| Standard: | Delrin and polyurethane plastics with titanium screws |

| Connectors: | |
| --- | --- |
| Bulkhead (Impulse): | MCBH-2-FS, MCBH-8-FS, optional Birns 3K-7-OR-CA |
| Cable: | PMCIL-8-MP, Optional Birns |

| Environmental | |
| --- | --- |
| Operating temperature: | −4°C to 40°C |
| Storage temperature: | −20°C to 60°C |
| Shock and vibration: | IEC 721–3–2 |
| Depth rating: | 300m |

| Dimensions: | |
| --- | --- |
| | See drawing |
| Weight in air: | 7.3 kg (0.4MHz), 6.2 kg (0.6MHz), 6.1 kg (1MHz) |
| Weight in water: | 3.6 kg (0.4MHz), 2.9 kg (0.6MHz & 1MHz) |
| Canister for 2*36D pack with Alkaline batteries: | In air 17,2kg, in water 7,8kg |
| Canister for 2*36D pack with Lithium batteries: | In air 14,4kg, in water 5kg |
| Canister for 1*36D pack with Alkaline batteries: | In air 10,5kg, in water 4,3kg |
| Canister for 1*36D pack with Lithium batteries: | In air 9,1kg, in water 2,9kg |

| Analog Inputs | |
| --- | --- |
| Number of channels: | 2 |
| Supply voltage to analog output devices: | Three options selectable through firmware commands: |
| | • Battery voltage/500mA |
| | • +5V/250mA (default) |
| | • +12V/100mA |
| Voltage Input: | 0-5V |
| Resolution: | 16 bit A/D |

| Data Recording | |
| --- | --- |
| Capacity(standard): | 9MB (standard), 4GB upgrade option |
| Profile record: | Ncells×9 + 120 |
| Wave record: | Nsamples×24 + 1KB |

| Data Communication | |
| --- | --- |
| I/O: | RS 232 or RS 422 |
| Communication baud rate: | 300–115200 |
| Recorder download baud rate: | 600/1200 kBaud for both RS232 and RS422 |
| User control: | Handled via «AWAC» software,  or ActiveX® controls. «SeaState» for online systems. |
| Output formats: | Output formats: NMEA, Binary. Prolog provides same types also for processed wave and current data. |

| Power | |
| --- | --- |
| DC input: | 9-18 VDC |
| Peak current: | 3A |
| Power consumption: | Transmit power: 1–30W, 3 adjustable levels |
| Sleep consumption: | 1 mW (RS232) |
| | 5 mW (RS422) |

| Real time clock | |
| --- | --- |
| Accuracy: | ± 1min/year |
| Backup in absence of power: | 1 year |

| Online Cable | |
| --- | --- |
| Polyurethane jacket, Shore D hardness, 13mm in diameter.  Maximum RS422 communication distance 5km when used with interface box. | |

| Online Projects | |
| --- | --- |
| Nortek can provide long cables, radio/telephone communication equipment, acoustic modems, etc., that can meet the requirements of your specific project. | |

*) AST = Acoustic Surface Tracking



TS-010-en-10.2014

 twitter.com/norteknews    facebook.com/Norteknews    youtube.com/Nortekinfo

NortekMed S.A.S.
Z.I Toulon Est
67, Avenue Frédéric Joliot-Curie
BP 520, 83078 Toulon Cedex 09
Tel: +33 (0) 4 94 31 70 30
Fax: +33 (0) 4 94 31 25 49
E-mail: info@NortekMed.com

NortekUK
Tresanton House
Bramshott Court
Bramshott
Hants
Tel: +44- 1428 751 953

NortekUSA
27 Drydock Avenue,
Mailbox 32, Boston,
MA 02210-2377
Tel: 617-206-5750
Fax: 617-275-8955
E-mail: inquiry@nortekusa.com

青岛诺泰克测量设备有限公司
地址：中国青岛香港西路69号
汇融广场 1302
邮编- 266071
Tel: 0532-85017570, 85017270
Fax: 0532-85017570

Nortek B.V.
Schipholweg 333a
1171PL Badhoevedorp
Nederland
Tel: +31 20 6543600
Fax: +31 20 6599830
email: info@nortek-bv.nl

Nortek Brasil
Av. Nilo Peçanha nº 50,
grupo 2910 – Centro - Rio de Janeiro -
RJ – Cep 20020-906.
Tel: +55 (21) 4126-5954
Cel: +55 (21) 85046798
E-Mail nortek@nortekbrasil.com.br



RBR*solo³* D

# SMALL DEPTH RECORDER

**20M READINGS ON A SINGLE AA BATTERY**



The RBR*solo³* D is a compact, lightweight, and versatile single channel logger. The logger offers flexible measurement schedules, standard sampling up to 2Hz, and optionally up to 32Hz. It also features large memory, more power for extended deployments, and USB-C download for large data files.

# FEATURES



Compact and lightweight



Any AA battery



Up to 32Hz sampling



USB-C download



Cabled RBR*coda³* variant available

## The RBR*solo³* D recorder is available in the following configurations:

▶ RBR*solo³* D      up to 2Hz continuous sampling
▶ RBR*solo³* D|fast16      up to 16Hz continuous sampling
▶ RBR*solo³* D|fast32      up to 32Hz continuous sampling
▶ RBR*solo³* D|tide16      up to 16Hz bursts with tidal averaging
▶ RBR*solo³* D|wave16      up to 16Hz bursts with wave analysis

The RBR*solo³* D makes it easy to configure the optimum sampling regime for your measurements whether the recorder is moored, towed, or profiling. The large data storage capacity and fast download ability facilitate long deployments with high sampling rates. A dedicated desiccant holder makes it simple to replace desiccant before each deployment. Dataset export to Matlab, Excel, OceanDataView®, or text files makes post processing with your own algorithms effortless.

rbr-global.com

# RBR

## MEASURE THE BLUE PLANET

RBR*solo³* D



# SMALL DEPTH RECORDER

## COMPACT, ACCURATE, DEPENDABLE

- Compact and lightweight
- Any AA battery
- Up to 32Hz sampling
- USB-C download
- Cabled RBR*coda³* variant available

## General Information

### Physical

| | |
|---|---|
| Power: | Any AA cell |
| Communication: | USB-C |
| Clock drift: | ±60 seconds/year |
| Depth rating: | up to 1,000m (RBR*solo* D), or up to 10,000m |
| Diameter: | 25.4mm |
| Length: | ~210mm (RBR*solo³* D|deep) |
| Sample capacity: | 20M readings |
| Housing: | OSP (RBR*solo³* D) Titanium (RBR*solo³* D|deep) |

### Depth

| | |
|---|---|
| Range (OSP): | 20 / 50 / 200 / 500 / 1000m* |
| Accuracy: | ±0.05% full scale (FS) |
| Resolution: | <0.001% FS |
| Time constant: | <10ms |
| Typical stability: | 0.05% FS |

*Recommended depth for wave measurements less than 50m

## Sampling rates and Autonomy

### RBR*solo³* D

| Sampling rate: | 24hr to 1s, and 2Hz | | |
|---|---|---|---|
| Autonomy: | Rate | Duration | # samples |
| | 5s | 4.9 years | 30M |
| | 2Hz | 62 days | 10M |

### RBR*solo³* D|fast16

| Sampling rate: | 24hr to 1s, and 2Hz, 4, 8, and 16Hz | | |
|---|---|---|---|
| Autonomy: | Rate | Duration | # samples |
| | 16Hz | 44 days | 60M |

### RBR*solo³* D|fast32

| Sampling rate: | 24hr to 1s, and 2Hz, 4, 8, 16, and 32Hz | | |
|---|---|---|---|
| Autonomy: | Rate | Duration | # samples |
| | 32Hz | 24 days | 60M |

### |tide16

| Sampling rate: | 24hr to 1s, and 2, 4, 8, or 16Hz |
|---|---|

### |wave16

| Sampling rate: | 24hr to 1s, and 2, 4, 8, or 16Hz |
|---|---|

## RBR Ltd

+1 613 599 8900
info@rbr-global.com
rbr-global.com



# SBE 37-SI
## MicroCAT CT(D)



The SBE 37-SI MicroCAT is a high-accuracy conductivity and temperature (pressure optional) recorder with Serial interface (RS-232 or RS-485) and memory. Externally powered, it can be used for moored applications requiring fast sampling. The MicroCAT is useful as a stand-alone monitoring device and is easily integrated with other instrumentation platforms.

Data is output in real-time and can be recorded in memory; memory capacity exceeds 530,000 samples. Measured data and derived variables (salinity, sound velocity, depth, density) are output in engineering units.

## Features

- Moored Conductivity, Temperature, and Pressure (optional), with user-programmable sampling — 6-sec to 6-hour intervals, or continuous (1.0 sec without pressure, 1.5 sec with pressure).
- RS-232 or RS-485 interface.
- Internal memory, external power.
- Expendable anti-foulant devices for bio-fouling protection.
- 350 m plastic or 7000 m titanium housing.
- Seasoft® V2 Windows software package (setup, data upload, and data processing).
- Field-proven MicroCAT family, with more than 10,000 instruments deployed.
- Five-year limited warranty.

## Components

- Unique internal-field conductivity cell permits use of expendable anti-foulant devices, for long-term bio-fouling protection.
- Aged and pressure-protected thermistor has a long history of exceptional accuracy and stability.
- Optional strain-gauge pressure sensor with temperature compensation is available in eight ranges (maximum depth 7000 m).



**SBE 37-Si MicroCAT**

## Options

- Plastic (350 m) or titanium (7000 m) housing.
- RS-232 or RS-485 interface.
- No pressure, or strain-gauge pressure sensor in one of 8 ranges.
- XSG or wet-pluggable MCBH connector.
- No factory-supplied mount, wire mounting clamp and guide, or brackets for mounting to a flat surface.

### Measurement Range

| | |
|---|---|
| Conductivity | 0 to 7 S/m (0 to 70 mS/cm) |
| Temperature | -5 to 45 °C |
| Optional Pressure | 20 / 100 / 350 / 600 / 1000 / 2000 / 3500 / 7000 (meters of deployment depth capability) |

### Initial Accuracy

| | |
|---|---|
| Conductivity | ± 0.0003 S/m (0.003 mS/cm) |
| Temperature | ± 0.002 °C (-5 to 35 °C); ± 0.01 °C (35 °C to 45 °C) |
| Optional Pressure | ± 0.1% of full scale range |

### Typical Stability

| | |
|---|---|
| Conductivity | 0.0003 S/m (0.003 mS/cm) per month |
| Temperature | 0.0002 °C per month |
| Optional Pressure | 0.05% of full scale range per year |

### Resolution

| | |
|---|---|
| Conductivity | 0.00001 S/m (0.0001 mS/cm) |
| Temperature | 0.0001 °C |
| Optional Pressure | 0.002% of full scale range |

| | |
|---|---|
| **Acquisition Time** | 1.0 - 2.6 sec/sample (see manual) |
| **External Power** | 0.5 Amps at 8.5-24 VDC |
| **Memory Capacity** | 530,000 samples CTD |
| **Housing, Depth Rating, & Weight** (without pressure sensor or clamps) | Plastic: 350 m, 2.2 kg in air, 1.2 kg in water<br>Titanium: 7000 m, 2.9 kg in air, 1.9 kg in water |



Without Mounting Hardware

With Wire Mounting Clamp and Guide

Specifications subject to change without notice. ©2014 Sea-Bird Scientific. All rights reserved. Rev. November 2014



**Sea-Bird Electronics**
+1 425-643-9866
sales@seabird.com
www.seabird.com

# iBCN

- **NOVATECH™ Iridium® beacons**
- **Superior lifetime**
- **Rugged and innovative design**
- **Iridium® and Bluetooth configuration**

 **TRACKING & MONITORING**



> NOVATECH™ products have been proven throughout the world's oceans and trusted around the globe for over 40 years.

The iBCN is the next-generation of NOVATECH™ Iridium® beacons, designed for tracking and locating assets. Rated to 7,500 m (24,600 ft), the self-contained submersible beacons use the bi-directional capabilities of the Iridium® satellite telemetry system, allowing end users to receive near real-time GPS location of their asset.

Designed to meet unique deployment needs, the iBCN offers five battery housing options: self-contained, remote head, OEM, and extended battery life with the option of lithium or alkaline batteries. The NOVATECH™ Iridium® beacons provide peace of mind for those unpredictable deployments.

# iBCN

## TECHNICAL SPECIFICATIONS

### ELECTRONICS
• Iridium 9603 - Short Burst Data Transceiver
• GPS Telit SE880: Ultra-sensitive receiver, 48 Channel SiRFstarIV™

### PROGRAMMING INTERFACE
• Local Configuration
  Bluetooth SPP (Serial Port Profile) communication via Windows application
• Over-The-Air Configuration, Bi-directional Iridium SBD communication

### ENVIRONMENTAL
• Operating Temperature: -30°C to +70°C (-22°F to 158°F)
• Storage Temperature: -40°C to +85°C (-40°F to +185°F)
• Ocean Depth Rating: 7,500 m (24,600 ft)
• Storage Life: 24 months

### PHYSICAL
• Hull Material: Titanium (Grade 2)
• Cap Material: PEEK and Titanium (Grade 5)
• Color: Natural

| Features | OEM | iBCN | iBCN-3 | iBCN-7 | iBCN-RH |
|---|---|---|---|---|---|
| Model N° | MMI-513-00000 | MMI-513-12000 | MMI-513-22000 | MMI-513-32000 | MMI-513-41100 |
| Dimensions (Battery Hull) | | 13.15" x 1.13" (335 mm x 28.7 mm) | 9.0" x 2.0" (228.5 mm x 50.8 mm) | 18.56" x 2.0" (471.4 mm x 50.8 mm) | 18.50" x 1.70 (470 mm x 43.0 mm) |
| Dimensions (Electronics Enclosure) | 2.18" x 2.20" (55,4 mm x 58,9) | 2.18" x 2.20" (55,4 mm x 58,9 mm) | 2.18" x 2.20" (55,4 mm x 55,9 mm) | 2.18" x 2.20" (55,4 mm x 55,9 mm) | 6,0" (1,83 m) Remote head cable |
| Mass in air (with batteries) | 0.22 lb (0,49 kg) | 1.78 lb (0.81 kg) | 3.30 lb (1.5 kg) | Alkaline 7.82 lb (3.55 kg) Lithium 7.05 lb (3.2 kg) | 5.94 lb (2.7 kg) |
| Mass in water (with batteries) | 0.24 lb (0.11 kg) | 1.11 lb (0.50 kg) | 2.0 lb (0.91 kg) | Alkaline 5.40 lb (2.45 kg) Lithium 4.62 lb (2.1 kg) | 3.55 lb (1.61 kg) |
| Hull Material | | Titanium (Grade 2) | Titanium (Grade 2) | Titanium (Grade 2) | Hard anodized aluminum |
| Cap Material | | Titanium (Grade 5) | Titanium (Grade 5) | Titanium (Grade 5) | |
| Battery | | 9 x CR123A Lithium | 3 x "D" cells Lithium | 7 x "D" cells Alkaline or Lithium | 6 x "C" cells Alkaline |
| On/Off Control | | Magnetic reed switch | Magnetic reed switch | Magnetic reed switch | Magnetic reed switch & pressure switch |
| Activation | | Surface sense (conductivity) GPS satellite check | Surface sense (conductivity) GPS satellite check | Surface sense (conductivity) GPS satellite check | Surface sense (conductivity) & pressure switch, GPS satellite check |
| Lifetime | | 2 years after being submerged for 1 year; 24 hour reporting once surfaced | 7 years after being submerged for 1 year; 24 hours reporting once surfaced | Alkaline: 11 years after being submerged for 1 year; 24 hours reporting once surfaced. Lithium: 19 years | 4 years after being submerged for 1 year; 24 hours reporting once surfaced |
| Options | | Optional remote head configuration | Optional remote head configuration | Optional remote head configuration | Optional remote head configuration |



21 Thornhill Drive, Dartmouth, Nova Scotia  B3B 1R9 CANADA
Tel: +1 902 468-2505  |  Email: sales@metocean.com

**metocean.com**

DEC. 2016 — V1.0.0

# MB-07
# SURFACE MARKER BUOY

The MB-07 is the latest rotationally moulded mooring marker buoy. This buoy is primarily designed for use in inshore coastal applications.  Shown as a marker buoy it is normally supplied in yellow although green and red lateral marks are available. The MB-07 can be provided in either 90cm or 135cm heights. The MB-07 can be provided with an optional Internal Radar Reflector and self contained solar powered navigation light

## Specifications:

|  | MB-07-90 | MB-07-135 |
| --- | --- | --- |
| Diameter  mm | 700 | 700 |
| Overall height mm | 900 | 1350 |
| Overall weight Kgs | 16.5 | 25 |
| Focal Plane Height mm (typical) | 707 | 1185 |
| Buoyancy kgs | 110 | 110 |
| Optional integral ballast kgs | 25, 35, 45 | 25, 35, 45 |



**Mooring Steel Work**

- **Galvanised Steel Eye plate**

**Float**

- **Rotationally moulded virgin specially formulated extra high UV stabilised polyethylene**
- **Internal ballasting of the buoy if required to allow use of lightweight rope moorings..**

**Lantern (Optional)**

- **Sealite SL 15 LED Compact lantern.**

**Radar Reflector (Optional)**

- **Echomax MIDI radar reflector giving a peak RCS of up to 216 metres square reflection moulded into top mark**

**Mooring**

- **To achieve the best results for stability and self righting the buoy must have a minimum of 30Kgs of mooring rope/chain weight suspended below the buoy**

MB-07 iss B  Nov 2015

**Appendix B:  Technical Specifications, RADAC WG5 Wave Monitoring Radar**

# WAVEGUIDE DIRECTION
## WG5 SERIES

Remote monitoring of wave direction, wave height, wave period and tide



processing unit

radars

The new WaveGuide is the latest and most technically advanced radar from Radac. This accurate wave monitoring system is an easy to use, reliable and robust device to measure tide, wave direction, wave height and wave period. The new radar is capable of maintaining a high level of precision and accuracy in harsh environmental conditions and is particularly suited to marine and offshore installations.

## KEY FEATURES

- *0 - 360° wave direction*
- *0 - 60 m wave height*
- *Highly accurate*
- *Maintenance free*
- *Optional ATEX / IECEx*

## NEW FEATURES

- *Measuring at 10 Hz*
- *Network connected*

With an array of three radars, the elevation of the sea surface is measured at three positions. These positions form a virtual triangle at the water surface by pointing one radar perpendicularly downwards and tilt the other two. Knowing the slope of the water surface and the phase relations between the three positions, the wave direction can be calculated.

The radars measure the distance to the water surface 10 times per second. In all wind and wave conditions the accuracy for water level is proven to be below 1 cm. The wave data are sent to the processing unit via a network link. The processing unit facilitates data acquisition, data processing, data presentation and remote service. Data can be locally stored on an external USB drive, or distributed through two serial ports as well as over the network. Any device connected to the (private) network can access the web-based user interface.



Elektronicaweg 16b
2628 XG Delft
The Netherlands
T +31 15 890 32 03
info@radac.nl
www.radac.nl

We are a Dutch company, based in Delft. Since 1996, we develop, manufacture and market the WaveGuide. We are proud that our professional systems are trusted across the industry. Our main clients include oil companies, offshore wind farm operators, port operators and shipping companies.



RADAC
level, tide and wave monitoring

# WAVEGUIDE DIRECTION
## WG5 SERIES

## SPECIFICATIONS

| Heave | | |
|---|---|---|
| | Range: | 2 - 75 m to surface |
| | Accuracy: | ± 3 mm [1] |
| | Frequency: | 10 Hz |

| Water level | | |
|---|---|---|
| | Accuracy: | ± 1 cm [2] [3] |
| | Processing: | 10 sec, 1 min, 5 min or 10 min |
| | Interval: | 1 min |

| Wave height | | |
|---|---|---|
| | Range: | 0 - 60 m |
| | Accuracy: | ± 1 cm [3] |
| | Processing: | SWAP [4] (per 20 min data block) |
| | Interval: | 1 min |

| Wave period | | |
|---|---|---|
| | Range: | 1 - 100 s |
| | Accuracy: | ± 50 ms [3] |
| | Processing: | SWAP [4] (per 20 min data block) |
| | Interval: | 1 min |

| Wave direction | | |
|---|---|---|
| | Range: | 0 - 360° |
| | Accuracy: | ± 2° [3] |
| | Processing: | SWAP [4] (per 20 min data block) |
| | Interval: | 1 min |

### COMPACT VERSION: WG5-DR-CP (includes 3 radars + 1 processing unit)
**Specifications per radar**

| Mechanical | | |
|---|---|---|
| | Dimensions: | Ø 265 x 245 mm |
| | Weight: | 12.5 kg |
| | Material: | Stainless steel, AISI 316L |



| Electrical | | |
|---|---|---|
| | Power: | 24 - 64 VDC, 65 - 240 Vac, 8 W |
| | Frequency: | 10 GHz (X-band) |
| | Modulation: | Triangular FMCW |
| | Emission: | 0.1 mW max. (Far below acceptable limits for exposure to the human body) |

| Environmental | | |
|---|---|---|
| | Temperature: | -40 °C to 65 °C |
| | Humidity: | 0 - 100 % |
| | Ingress Protection: | IP67 |

### EXPLOSION PROOF VERSION: WG5-DR-EX (includes 3 radars + 1 processing unit)
**Specifications per radar**

| Mechanical | | |
|---|---|---|
| | Dimensions: | 217 x 319 x 379 mm (d x w x h) |
| | Weight: | 14.4 kg (excl. antenna 2.8 kg) |
| | Material: | Chromatized aluminum |



| Electrical | | |
|---|---|---|
| | Power: | 24 - 65 VDC, 65 - 240 Vac, 8 W |
| | Frequency: | 10 GHz (X-band) |
| | Modulation: | Triangular FMCW |
| | Emission: | 0.1 mWatt max. (Far below acceptable limits for exposure of the human body) |

| Environmental | | |
|---|---|---|
| | Temperature: | -40 °C to 65 °C |
| | Humidity: | 0 - 100 % |
| | Ingress Protection: | IP67 |
| | Safety: | ATEX, II 1/2 G Ex d [ia Ga] IIB T6 Ga/Gb |

| Processing unit | | |
|---|---|---|
| | Dimensions: | 170 x 172 x 85 mm (d x w x h)(19" rack mounting available) |
| | Com ports: | 2x RS232 |
| | Network: | 3x Ethernet |
| | USB: | 2x USB 2.0 |
| | Power: | 24 - 48 VDC, 4.8 W |
| | Temperature: | -20 °C to 65 °C |
| | Cooling: | No fan required |

**1)** Valid for a still water surface.
**2)** For a water surface with waves.
**3)** The accuracy of the wave parameters is not limited by the radar sensor, yet it is defined by the stochastic nature of sea-surface measurements.
**4)** SWAP is the Standard Wave Analysis Program, in accordance with the applied standards of the Dutch Ministry of Infrastructure and Environment and of the International Association of Oil and Gas producers.



# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

REVOLUTION WIND, LLC,

        *Plaintiff,*

    v.

DOUG BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior;

UNITED STATES DEPARTMENT OF THE
INTERIOR;

MATTHEW GIACONA, in his official capacity
as Acting Director of the Bureau of Ocean Energy
Management;

BUREAU OF OCEAN ENERGY
MANAGEMENT;

KENNETH STEVENS, in his official capacity as
Principal Deputy Director Exercising the
Delegated Authorities of the Director of the
Bureau of Safety and Environmental Enforcement;
and

BUREAU OF SAFETY AND
ENVIRONMENTAL ENFORCEMENT,

        *Defendants.*

Case No.: 1:25-cv-02999-RCL

## DECLARATION OF PAUL MURPHY IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION AND STAY PENDING REVIEW

Pursuant to 28 U.S.C. § 1746(2), I, Paul Murphy, declare as follows:

1.      I am employed by Orsted North America Inc. ("Ørsted") as the Senior Engineering,

Procurement, and Construction ("EPC") Director for the commercial-scale Revolution Wind Farm

and Revolution Wind Export Cable (together, the "Project"). Ørsted and its affiliate companies

develop, construct, and operate offshore and onshore wind farms, solar farms, energy storage

facilities, and bioenergy plants, and provide energy products to their customers.  The Project is

owned by Revolution Wind, LLC ("Revolution Wind"), which is a joint venture indirectly owned

in equal part by Ørsted and an investment joint venture partner.

2.     I have been employed at Ørsted as the Senior EPC Director and have held

leadership roles in delivering the Project since 2018.  In my capacity as the Senior EPC Director,

I lead project design, procurement, and construction.  Collectively, I have worked on the Project

for approximately 7 years, and I have over 15 years of professional experience in development and

construction of first-of-their kind U.S. offshore wind projects.  I obtained my Bachelor of Science

in Bioengineering from Syracuse University in 2002 and completed a Master of Science in Civil

Engineering at Carnegie Mellon University in 2004.  In 2010, I earned a Master of Science in

Technology and Policy with an Energy Concentration from the Massachusetts Institute of

Technology.

3.     From 2010 to 2018, I served in key roles, including as Vice President for Operations

and Engineering at Deepwater Wind, where I was prominently involved in the development,

construction, operations, and asset management for the Block Island Wind Farm, the first operating

U.S. offshore wind project.

4.     As Senior EPC Director, I am and have been involved in and aware of numerous

aspects of the Project, including: full project engineering, procurement and construction scopes,

master schedule, capital expenditures ("CAPEX"), risks and Quality, Health, Safety and

Environment.

5.     I have reviewed the August 22, 2025, order that Bureau of Ocean Energy

Management's ("BOEM") Acting Director issued to Revolution Wind "to halt all ongoing

2

activities related to the Revolution Wind Project on the outer continental shelf" ("Stop Work Order"). I am personally familiar with the Project's construction history and status as well as the ongoing impacts of the Stop Work Order and future harm from the Stop Work Order if not enjoined or stayed. Based upon my experience and familiarity with the Project, judicial relief is required by the beginning of the last week of September 2025 to avoid significant Project delays, which could ultimately result in cancellation of the Revolution Wind Project.

6. I execute this Declaration in support of Revolution Wind's Motion for a Preliminary Injunction and Stay Pending Review based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto. I am over 18 years of age and competent to testify about the matters set forth herein.

### A. Overview of the Project

7. The Project involves the construction and operation of an approximately 704-megawatt ("MW") commercial-scale offshore wind energy facility with 65 wind turbine generators ("WTGs"), two offshore substations, and associated inter-array cabling between the WTGs, as well as an export cable to bring electricity to the electric grid. The Project's WTGs are located in federal waters on the U.S. Outer Continental Shelf ("OCS"), within the area covered by BOEM Renewable Energy Lease No. OCS-A 0486, held by Revolution Wind, LLC, in the Atlantic Ocean approximately 15 miles east of Block Island, Rhode Island, and approximately 15.7 miles from Newport, Rhode Island. A map showing the Project area is provided below. Revolution Wind had been constructing, and would operate and maintain, the Revolution Wind Export Cable to deliver the generated electricity from the Revolution Wind Farm to the existing Davisville

3

Substation in North Kingstown, Rhode Island, which connects to the transmission system managed

by ISO New England.[1]



8.      Revolution Wind has executed five power purchase agreements ("PPAs") under

three separate procurements corresponding to certain energy and Renewable Energy Certificates

(RECs) generated by the Project: (1) two October 2018 PPAs with utilities in Connecticut for

approximately 200 MW of energy and RECs; (2) one December 2018 PPA with utilities in Rhode

Island for approximately 400 MW of energy and RECs; and (3) two November 2019 PPAs with

utilities in Connecticut for approximately 104 MW of energy and RECs.

---

[1] BOEM, Record of Decision Revolution Wind Project Construction and Operations Plan at 8,
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-
activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_Redacted.pdf.

4

9.      Revolution Wind has already spent or committed approximately $5 billion to date to plan, permit, develop, design, manufacture, and construct this Project.  If the Project is cancelled, Revolution Wind anticipates that it would also incur more than $1 billion in breakaway costs, for a total of over $6 billion in costs to the Project.  Additionally, Revolution Wind would forgo billions of dollars of revenue under its PPAs over the lifetime of the Project.

## B.      Current Construction Status

10.      The Project includes onshore and offshore construction activities, and construction of the Project is approximately 80% complete.  More specifically, at the time the Stop Work Order was issued on August 22, 2025: all of the Project's 67 monopile foundations[2] had been installed on the OCS, and pile-driving was complete; the array cables had been installed at 34 of the 65 wind turbine sites; the utility export cables (two cables, each approximately 39 miles for a total of 78 miles) from the shore landing in Quonset, Rhode Island to the northern offshore substation had been fully installed; the interlink export cable (approximately eight miles) that connects the two offshore substations was close to being fully installed, with the only remaining scope being to pull the interlink export cable into the southern offshore substation once that substation's installation has been completed; approximately 70% of the Project's WTGs had been fully constructed; and the onshore substation was more than 85% complete, with equipment installed and commissioning activities underway.  The following figure, taken from the Project's Construction and Operations Plan, gives a sense of the Project's monopile foundations, which extend from below the seafloor to above the ocean's surface.[3]

---

[2] There are 65 monopiles for WTGs and one each for each offshore substation, for a total of 67.
[3] Revolution Wind Farm Construction and Operations Plan (March 2023) at 56, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution%20Wind%20COP%20Volume%201%20March%202023_v2_508c_Section_4.4.3.1_Redacted.pdf.



**Monopile**

11.     Construction of the Project has been underway for more than two years.  Before the
Stop Work Order was issued, the Project had made significant progress, and both onshore and
offshore construction activities were ongoing.  Onshore activities began in August 2023 and have
included work related to the Project's onshore transmission cable and construction of a new
interconnection station and substation.[4]  Offshore construction began in January 2024 with seabed
preparation work.  Monopile foundation installation for the Project's 65 WTGs and two offshore
substations stations began in May 2024, and concluded in August 2025, with all 67 of the Project's
monopile foundations now installed.  The first WTG was installed almost a year ago, in September
2024.  As noted above, at the time the Stop Work Order was issued, approximately 70% of the

---

[4] Revolution Wind, Construction Updates: Week of August 28, 2023,
https://orstedcdn.azureedge.net/-/media/www/docs/corp/us/revolution-wind/rev-windweekly-
status-
report8282023.pdf?rev=e9c40846d2814a8bbd1bac5f09c99788&hash=3C6D1E22575E7049A7E
57F17CA9554D2.

WTGs had been fully constructed. Prior to the issuance of BOEM's Stop Work Order, the remainder of the WTGs were scheduled to be installed before the end of the year.

12. The Project's cable installation is also substantially complete, as its two export cables have been installed, and the interlink export cable that connects the two offshore substations is close to being fully installed. The Project includes inter-array cables between the wind turbines that will deliver power from the WTGs to the offshore substation. Prior to the issuance of BOEM's Stop Work Order, installation of the inter-array cables was also underway; more than half had been installed with the remainder scheduled to be installed by the end of the year.

13. One of the Project's two offshore substations has been fully installed, and is prepared to be commissioned, and the Project's second offshore substation was partially installed at the time of the Stop Work Order. Specifically, each fully installed offshore substation consists of a monopile foundation, a modular support frame that provides the structural transition support between the monopile foundation and the topside, and the topside itself. For the second offshore substation, both the monopile foundation and the modular support frame have been installed. The final lift to install the second offshore substation's topside had been scheduled for the week of August 25, 2025, and the substation was to be prepared for commissioning later this fall. The topside for the second offshore substation, which weighs over 3,000 tons, is now waiting idle atop a specialized heavy transport vessel, the White Marlin. A photograph of the substation atop the White Marlin is included below.



14.     Prior to the Stop Work Order, Revolution Wind was on schedule to complete offshore physical installation by the end of 2025 using key installation vessels, described below, that are currently under contract.  This work includes installation of the topside and preparation for commissioning of the Project's second offshore substation (including completion of installation of the interlink export cable), installation and preparation for commissioning of the Project's remaining as-yet-uninstalled WTGs, and installation of 31 remaining inter-array cable sections.

15.     Consistent with the terms of the Stop Work Order, all work on the OCS related to the Project has been halted except for activities that are necessary to prevent impacts to health, safety, and the environment, and to comply with the conditions of approval for the Project.

16.     Revolution Wind has kept the public aware of construction activities, including through a website[5] and "Mariners Briefing" listserv, as well as Local Notice to Mariners issued regularly.

---

[5] https://revolution-wind.com/construction-updates.

### C. Threats to Project Feasibility if the Stop Work Order is Not Stayed or Enjoined

17.     As described below, Revolution Wind is injured by its inability to construct the Project. Revolution Wind's inability to construct the Project is directly caused by the Stop Work Order, which prevents Revolution Wind from constructing and finalizing the Project, causing financial and contractual burdens, creating delay in Revolution Wind's development of the Project, and depending on the length of delay, potentially jeopardizing the Project entirely. Accordingly, absent immediate judicial relief, there are several ways that BOEM's Stop Work Order will result in imminent, irreparable harm that threatens the viability of Revolution Wind's business.

#### 1.     The Stop Work Order Increases Costs that Could Derail the Project

18.     Revolution Wind has entered into contracts for the manufacture, transport, and installation of Project components during specific times of the year and has taken other steps in reliance on its approvals. Revolution Wind conservatively[6] estimates that it is currently losing more than $2 million per day or more than $16 million per week on installation and manufacturing contracts—for example, day rates for idle vessels—without any certainty that construction work will be permitted to resume.

19.     Revolution Wind has sequenced its construction schedules to ensure efficient usage of scarce resources, such as specialized transport and installation vessels, for the Project. Construction of large-scale offshore wind projects requires the use of specialized vessels. These vessels are in limited supply and in high demand, with limited or no availability to work beyond

---

[6] This estimate contains zero contingency for unforeseen and unknown costs (such as additional demobilization, maintenance and remobilization costs for vessels that have been unexpectedly stood down). Furthermore, the estimate assumes that vessels that are under contract for the project but provisionally assigned to other work—and thereby (temporarily) not charged to the Project—will never return to the Project, even after that other work is completed. In fact, if the Project becomes liable for additional vessels' day rates, the Project's daily burn rate could increase substantially.

the contracted reservation dates.  Given this extreme scarcity, these vessels are normally scheduled years in advance.

20.     There are several primary vessels that are needed to transport and install the Project's offshore components: the Scylla[7], a specialized vessel designed to install offshore wind turbines; the aforementioned White Marlin[8], a specialized heavy transport vessel used to transport the second offshore substation; the Crowley 455-8[9], a barge to carry WTG components from New London, Connecticut, to the Project site; two tug boats to transport that barge; the Seaway Aimery[10], an array cable installation vessel; and the Harvey SUB-SEA[11], a support vessel used to support initial commissioning of WTGs.  Installation of the Project's second offshore substation topside also requires a specialized heavy lift crane vessel (Bokalift 2)[12], which was scheduled to perform the final lift to install the second offshore substation's topside during the week of August 25, 2025.  In addition to these primary vessels, there are numerous support vessels currently under contract that are used to transport personnel and materials.  In all, there were 18 vessels mobilized for Revolution Wind as of the date of the Stop Work Order, many of which are now idle as a result of the Stop Work Order.

21.     The more than $2 million dollars that Revolution Wind conservatively estimates it is currently losing on a daily basis due to the Stop Work Order includes the day rates and other capital expenditures required to maintain this fleet of idled vessels.  Furthermore, many of the key

---

[7] https://www.cadeler.com/vessels/wind-scylla.

[8] https://boskalis.com/media/vqcf4grq/white-marlin.pdf.

[9] The following page shows the "feeding" transportation solution used by the Crowley 455-8 for South Fork Wind, which is also being used for the Revolution Wind Project: https://www.crowley.com/lp/feeding-solution/.

[10] https://www.seaway7.com/vessels/seaway-aimery/.

[11] https://harveygulf.com/wp-content/uploads/2024/12/Harvey-Sub-Sea-Rev-0.pdf.

[12] https://boskalis.com/media/cafdcmsf/bokalift-2.pdf.

10

specialized vessels have latest vessel availability date limitations, meaning that the vessels may not be available after certain dates to conduct the construction. Even if Revolution Wind were able to secure replacement vessels in the future, which is uncertain given their scarcity and the high demand for them, the associated costs would be higher, in part because of the costs of potential mobilization from Europe or Asia. This means that Revolution Wind's daily losses would begin to increase significantly. Thus, the lack of contracted vessels, particularly when coupled with worsening weather conditions offshore during the winter, presents a significant risk to the Project, as I describe in more detail below.

22.     As a result of the Stop Work Order, Revolution Wind will also have to overcome significant logistical constraints (and incur costs) and pay to store Project components that may not be installed this year because of the Stop Work Order, including the offshore substation topside that now sits idle atop the White Marlin in the Atlantic Ocean. It is currently unclear if the offshore substation topside can be placed in storage. Weighing over 3,000 tons, the offshore substation topside was designed only to be lifted off the White Marlin and onto the already-installed offshore substation foundation and modular support frame. The White Marlin has a latest vessel availability date of December 15, 2025. There is currently no solution to offload the topside from the White Marlin to another port or vessel/barge for storage, which would require securing an alternative port/vessel and designing a lift to ensure the quality and integrity of the offshore substation topside for this alternative lift prior to the December 15 White Marlin latest vessel availability date, all while maintaining compliance with applicable laws and regulations (*e.g.*, the Jones Act). Any delay will only increase costs, while the Project would be unable to generate revenue to offset those additional costs.

23.     The Stop Work Order has also led to delays and idling with respect to onshore activities that support offshore construction on the OCS.  Construction of the offshore components of the Project requires a significant amount of support from onshore facilities and workers.  The Project's WTG marshalling facilities (where Project components are received, prepared for installation, and loaded onto barge and tug vessels to be transported for installation) are located at New London State Pier in Connecticut, a facility in which the Connecticut Port Authority, the State of Connecticut, and Revolution Wind's parent companies have invested hundreds of millions of dollars in order to create the only active offshore wind marshalling terminal in the northeast United States with unobstructed access to the ocean.[13]  Here, predominantly union workers were preparing WTGs for offshore installation.  Work at the New London State Pier is currently idle due to the Stop Work Order, with no loadout possible and insufficient space for deliveries of further components (also creating additional logistical challenges and disrupting the Project's supply chain).

24.     Prior to the Stop Work Order, Revolution Wind was preparing for its final campaign of inter-array cable installation offshore that was set to start in early September from the Port of Providence, Rhode Island.  Due to the Stop Work Order, those preparations teams have been idled.

25.     In the immediate term, Revolution Wind conservatively estimates that the Stop Work Order is causing losses of more than $2 million per day or more than $16 million per week to the Project.  These costs are expected to increase the longer the Stop Work Order remains in

---

[13] Connecticut Port Authority, State Pier Infrastructure Improvements Project, available at https://statepiernewlondon.com/.

place, significantly increasing once replacement vessels are required—assuming it were possible to secure them—due to the higher costs associated with them, as explained above.

### 2. The Project's Construction Schedule is Constrained By the PPAs, Which Could Be Terminated if the Project is Delayed

26.     Each of the PPAs between Revolution Wind and the Connecticut and Rhode Island utilities include deadlines by which the Project's Commercial Operation Date must be achieved, with no current mechanism for Revolution Wind to request further extensions.  After these deadlines the utility buyer would have a unilateral right to terminate the PPA.  Those deadlines are as follows: (1) the two 2018 Connecticut PPAs (for 200MW) require a Project Commercial Operation Date by December 31, 2026; (2) the 2018 Rhode Island PPA (for 400MW) requires a Project Commercial Operation Date by January 15, 2027; and (3) the two 2019 Connecticut PPAs (for 104MW) require a Project Commercial Operation Date by November 27, 2027.  Because achievement of the Project Commercial Operation Date under the PPAs requires the Project to have completed construction and performance testing, and to be capable of regular commercial operation (among other requirements), the relevant deadlines for each stage of the complex, sequential construction processes are imminent.

27.     If the Stop Work Order is allowed to remain in place, the Project will experience significant, costly construction delays that may prevent Revolution Wind from achieving commercial operations within the time required under some or all of the PPAs.  At a minimum, delays can cause the Project to incur daily liquidated damages of $100 per MW-hour of the contract maximum amount (for example, $40,000 per day in liquidated damages under the Rhode Island PPA) for up to a total of 365 days.  More importantly, if the delays caused by the Stop Work Order resulted in Revolution Wind missing the deadlines in the PPAs and the PPAs were to be

terminated, it would create enterprise-level threats, the loss of billions of dollars in foregone revenue, forfeiture of $28 million of posted credit support in the aggregate, and reputational harm.

28.     Prior to the Stop Work Order, Revolution Wind's construction schedule accounted for a Commercial Operation Date in November 2026.  Therefore, even a relatively brief delay could push the operational date of the Project into 2027, beyond the deadlines in three of the Project's PPAs (the two 2018 Connecticut PPAs and the 2018 Rhode Island PPA) rendering the Project potentially unviable.

### 3.     The Stop Work Order Will Result In the Loss of Vessels Needed for Construction and Creates Cost Delays that Threaten Project Cancellation If It Is Not Stayed

29.     Critically, Revolution Wind's contracts for Project construction vessels include latest vessel availability date provisions.  Under these provisions, if Project work is not complete by the specified latest vessel availability date, the contracted vessels are able to depart to work on other projects.  As a result, if there are schedule delays, the vessels may be required to depart the site for other contractually-scheduled commitments without completing work.  If Revolution Wind cannot use the vessels because of the Stop Work Order, Revolution Wind will nonetheless be required to pay for the vessels' time spent idling due to the Stop Work Order.  In addition, Revolution Wind would need to try and secure additional vessel capacity to complete the unfinished works, which would come with significant cost and schedule uncertainty (because, as described above, specialized vessels are in limited supply and often are contracted years in advance) and it is unknown whether the required vessels could be obtained.  And, even if replacement vessels could be obtained, their costs would be higher, as explained above.  For example, the White Marlin—the specialized heavy transport vessel on which the second offshore substation topside currently sits—has a last vessel availability date of December 15, 2025.  The Seaway Aimery, which is necessary for remaining array cable installation, has a last vessel

14

availability date of December 31, 2025. The Bokalift 2, a heavy-lift vessel that is necessary for installation of the second offshore substation's topside, has a last vessel availability date of November 9, 2025, with a potential option to extend to December 31, 2025; however, to receive this extension, Revolution Wind must coordinate with and confirm alignment with neighboring offshore wind projects and commit to an extension by September 9, 2025. In addition to the Bokalift 2 (currently available until November 9), installation of the offshore substation topside also requires the White Marlin (available until December 15). But even if Revolution Wind could make vessel arrangements, it would be of marginal utility because weather conditions are likely to limit the window for installation of the substation to September or early October, as described below.

30. Significant schedule delay due to vessel unavailability could result in Project termination because delay will cause the Project to miss critical milestones, with no guarantee when the necessary vessels would be available again. Thus, the Project may be cancelled because there are no vessels to build it.

31. The longer BOEM's Stop Work Order remains in place, the more likely it is that, even if the Order is lifted, there will be compounding delays to the Project that threaten its viability. Weather is a significant factor in determining the Project's construction schedule and, if offshore construction is pushed into the winter months when the weather worsens, there will be additional delays. For example, a WTG that requires approximately three days to install in the summer could take five to ten days to install in the winter due to worsening weather. This is because poor weather can prevent the floating barge from mooring against the WTG installation vessel (Scylla), and because of the need to have multiple moorings if the weather conditions worsen during the transfer of WTG components from the floating barge to the Scylla.

32.     Delays caused by worsening weather are highly likely to have an adverse impact on Project feasibility with respect to the installation and preparation for commissioning of the second offshore substation.   In ideal weather conditions, substation installation requires approximately five days, including one day to moor the vessel, lift the substation from the barge, and set down the substation on a modular support frame, and four days to weld and finalize the substation.  However, offshore substation installation requires calm weather to install (*e.g.*, suitable wave period, direction, and size, and suitable wind speed).   Looking ahead to November and December, historic weather data for those months indicates that there are very few windows of time to install the substation topside based on suitable weather conditions (*i.e.*, wave period, direction, and size).  Even in October, historical weather data suggests that these suitable window will start to decrease.   Accordingly, the farther out from the end of September or beginning of October installation of the substation topside is pushed, the more challenging the weather and seas become, and the less likely it is that there will be a suitable weather window to complete installation in 2025.

33.     If installation of the substation topside cannot be completed in 2025, Revolution Wind would lose access to the specialized vessels needed to complete offshore construction of the Project including the specialized vessels to install the topside (*e.g.*, White Marlin and Bokalift 2) and then the subsequent vessels to install the array cables and pull the inter-link cable (*e.g.*, Seaway Aimery) into the topside.  In this case, in 2026, Revolution Wind would need to secure equivalent specialized vessels to first install the topside in a suitable weather window (*e.g.*, after April/May 2026) and then secure alternative specialized vessels for scopes after the topside install to install array cables and pull in the inter-link cable into this offshore substation.  There is a critical and significant risk that Revolution Wind would not be able to resecure the necessary specialized

vessels to complete the installation in 2026 and commission the Project (*i.e.*, to meet the deadlines for three of the PPAs) threatening viability of project and enterprise.  For this reason, it is critical that installation of the topside be allowed to move forward by the beginning of the last week of September to avoid the increasing risk of bad weather preventing installation.

34.     Furthermore, unless the Stop Work Order is stayed or lifted soon, it is unlikely that Revolution Wind can complete inter-array cable installation prior to the last available dates of the vessel required for this installation.  Revolution Wind currently has scheduled the installation of remaining inter-array cables over a 2.5-month period from September 1 to the middle of November.  If the Stop Work Order is stayed or lifted by the beginning of the last week of September, that would give Revolution Wind until approximately early-to-mid-December to complete this work.  Even in that circumstance, the extremely narrow window leaves no room for delay, particularly given the worsening winter weather conditions.  The last date of availability for the Seaway Aimery, the vessel necessary for this installation, is December 31, 2025.  Accordingly, if the Stop Work Order remains in place after the last week of September, it becomes increasingly unlikely that the cable installation would be able to be completed in 2025.  In addition, Cable Lay Vessels are highly specialized vessels that are typically booked over a year in advance.  It is currently uncertain when Revolution could secure an alternative vessel to complete the array cable scope and thus threatening viability of project and enterprise.

35.     Accordingly, if the Stop Work Order is not lifted by the beginning of the last week of September, there is a risk that the Project cannot be completed before the final commercial operation date deadlines in three of the Project's PPAs.  Revolution Wind currently has no mechanism for extending those deadlines, and the PPAs would be subject to termination,

significantly threatening the financial viability of the entire Project and posing an existential risk to the Project, and thus to Revolution Wind.

**D.   Possible Alternatives Would Not Cure Revolution Wind's Irreparable Harms**

36.   Revolution Wind has been and is continuing to explore possible alternatives to mitigate the irreparable harm that BOEM's Stop Work Order is causing and will continue to cause imminently.

37.   It is doubtful whether any offshore components of the Project, which is now 80% constructed, complete, could be decommissioned and repurposed for other projects.  The Project's WTGs have been and are continuing to be built (i) with smaller dimensions and therefore lower capacity than newly designed projects are likely to use, and (ii) specifically for the U.S. market at 60 Hz, so they cannot be used in any other global market in their current form.  WTG monopile foundations will not be able to be reused either, as they are not structurally capable of being installed again and are location specific.  In addition, future projects built with larger WTGs will require correspondingly larger WTG monopile foundations.  Accordingly, if Revolution Wind was forced to decommission the monopile foundations, they would ultimately be scrapped.  Converting the WTGs would also be cost-prohibitive because of the costs of converting the frequency, as well as the significant storage costs that Revolution Wind would incur while waiting for the WTGs to be repurposed.  The cables are not project-specific, but their re-sale value is minimal and, once installed, they cannot be reused, including for other projects.

**E.   Important Project Benefits**

38.   Over the lifetime of the Project, Revolution Wind anticipates it will pay $178 million in rents and operating fees to the federal government.  The vast majority of this sum will be foregone by the federal government if the Project cannot move forward due to the Stop Work Order.

18

39.     The Project is currently estimated to generate hundreds of millions of dollars in state tax revenue over its lifetime, and that public value would likewise be lost if the Project is cancelled.

**F.     Relief From BOEM's Stop Work Order Is Needed By the Beginning of the Last Week of September 2025**

40.     For these foregoing reasons, judicial relief is required by the beginning of the last week of September 2025 to avoid significant Project delays and potential cancellation of the Revolution Wind Project.  Providing preliminary injunctive relief against the Stop Work Order and vacating the unlawful agency action will redress the injuries described above because Revolution Wind will be able to complete its previously-approved, lawful construction of the Project.

Case 1:25-cv-02039-RCL    Document 25-3   Filed 09/05/25   Page 20 of 20
Case 2:25-cv-00394-MSM-PAS    Document 21-3   Filed 09/12/25   Page 159 of 163
PageID #: 388

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true

and correct.

Executed on September 5, 2025, at Providence, Rhode Island.

_____
Paul Murphy

# Exhibit C



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT



**ATTORNEY GENERAL**
**PETER F. NERONHA**

September 3, 2025

**By Hand Delivery and Electronic Mail**

Douglas J. Burgum
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

Pamela Bondi
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

Matthew Giacona
Acting Director
Bureau of Ocean Energy Management
1849 C Street, NW
Washington, D.C. 20240

Kenneth Stevens
Principal Deputy Director
Bureau of Safety and Environmental
Enforcement
18349 C Street, NW
Washington, DC 20240

Governor Dan McKee
Office of the Governor
82 Smith Street
Providence, RI  02903

Governor Ned Lamont
Office of the Governor
210 Capitol Avenue
Hartford, CT 06106

Re:     *Outer Continental Shelf Lands Act Notice of Intent to Sue for Violations of OCSLA Relating to Revolution Wind*

Dear Secretary Burgum, Attorney General Bondi, Acting Director Giacona, Principal Deputy Director Stevens, Governor McKee, and Governor Lamont:

The States of Connecticut and Rhode Island intend to sue the Department of the Interior (DOI), the Secretary of the Interior, the Bureau of Ocean Energy Management (BOEM), and the Acting Director of BOEM (collectively, Agency Defendants) for violating the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331, *et seq.*, in connection with the Revolution Wind project. On August 22, 2025, Acting Director Giacona issued a Stop Work Order to the company developing Revolution Wind requiring it to halt all construction. That Order fails to comply with OCSLA, its implementing regulations, and associated requirements for wind development projects on the Outer Continental Shelf.

Secretary Burgum, Attorney General Bondi, Acting Director Giacona, Principal Deputy Director
Stevens, Governor McKee, and Governor Lamont
September 3, 2025
P a g e | **2**

The Stop Work Order violates OCSLA, including because it orders that all work stop on the
Project without making the necessary finding that either: (1) the Project creates "a threat of serious,
irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property,
to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human
environment"; 43 U.S.C. 1334(a)(1); or (2) a suspension is "necessary to comply with judicial decrees
prohibiting some or all activities under [the] lease" or "is necessary for reasons of national security
or defense"; 30 C.F.R. § 585.417. The Stop Work Order also violates OCSLA and its regulations by
ignoring the statute's clear mandate that DOI and BOEM follow its procedures to administer the
Outer Continental Shelf leasing and permitting program.

This letter serves as the States' notice of intent to file suit under 43 U.S.C. § 1349(a).
Pursuant to 43 U.S.C. § 1349(a)(2)(A), this notice is provided in writing under oath. We declare
under penalty of perjury that the foregoing is true and correct.

Moreover, pursuant to 43 U.S.C. 1349(a)(3), the Stop Work Order immediately harms the
States' legal interests in the "expeditious and orderly development."

Sincerely,

Sarah W. Rice
Deputy Chief of the Civil Division
The State of Rhode Island
Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
srice@riag.ri.gov

Evan O'Roark
Deputy Solicitor General
The State of Connecticut
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5318
evan.oroark@ct.gov

Secretary Burgum, Attorney General Bondi, Acting Director Giacona, Principal Deputy Director
Stevens, Governor McKee, and Governor Lamont
September 3, 2025
P a g e  | **3**

## Service List

| | |
|---|---|
| Douglas J. Burgum<br>Secretary of the Interior<br>U.S. Department of the Interior<br>1849 C Street, NW<br>Washington, D.C. 20240 | United States Department of the Interior<br>1849 C Street, NW<br>Washington, D.C. 20240 |
| Matthew Giacona<br>Acting Director<br>Bureau of Ocean Energy Management<br>1849 C Street, NW<br>Washington, D.C. 20240 | Bureau of Ocean Energy Management<br>1849 C Street, NW<br>Washington, D.C. 20240 |
| Pamela Bondi<br>Attorney General of the United States<br>U.S. Department of Justice<br>950 Pennsylvania Ave., NW<br>Washington, DC 20530 | Kenneth Stevens<br>Principal Deputy Director<br>Bureau of Safety and Environmental<br>Enforcement<br>18349 C Street, NW<br>Washington, DC 20240 |
| Governor Dan McKee<br>Office of the Governor<br>82 Smith Street<br>Providence, RI  02903 | Governor Ned Lamont<br>Office of the Governor<br>210 Capitol Avenue<br>Hartford, CT 06106 |