# Exhibit 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF RHODE ISLAND;<br>STATE OF CONNECTICUT; and<br>KATHERINE DYKES, Commissioner of the<br>Connecticut Department of Energy and Environmental<br>Protection,<br><br>        Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR; DOUGLAS BURGUM, Secretary of the<br>Interior, in his official capacity; BUREAU OF OCEAN<br>ENERGY MANAGEMENT; MATTHEW GIACONA,<br>Acting Director of Bureau of Ocean Energy<br>Management, in his official capacity; BUREAU OF<br>SAFETY AND ENVIRONMENTAL ENFORCEMENT;<br>and KENNETH STEVENS,<br>Principal Deputy Director of the Bureau of Safety and<br>Environmental Enforcement, in his official capacity,<br><br>        Defendants. | C.A. No. 1:25-cv-00439 |

## DECLARATION OF TODD A. BIANCO

I, Todd Anthony Bianco, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am over the age of 18. I know the following facts based on my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Administrator of Energy and Economic Policy of the Rhode Island Public Utilities Commission ("RIPUC" or the "Commission"). My job duties include the development and implementation of Commission policy, with a particular focus on Rhode Island's energy policy as it relates to electric and gas utilities, including the regulation of energy

1

and clean energy procurement and system investment. I have worked in similar positions at the Commission since joining the office in 2014.

3. I also lead the administration of Rhode Island's Renewable Energy Standard. I have served in this role since April 2014.

4. In addition to my work with the Commission, I also served for nearly seven years as a Coordinator for the Rhode Island Energy Facility Siting Board, the body with jurisdiction over the siting of major energy facilities. In that role I advised the Board on procedure, historical records, developing issues, and general policy.

### Background on the Rhode Island Renewable Energy Standard

5. Rhode Island law and policy encourages a shift towards low-emission and renewable energy sources for the State's electricity supply. For instance, the 2021 Act on Climate sets greenhouse gas emission reduction mandates. *See* R.I. Gen. Laws § 42-6.2-9.

6. Rhode Island's Affordable Clean Energy Security Act (RI ACES), was enacted in 2014 and aims to utilize coordinated and competitive processes in the New England region to encourage a multi-state or regional approach to energy procurement that, among other things, advances the objectives of achieving a reliable, clean-energy future that is consistent with meeting regional greenhouse gas reduction goals at reasonable cost to ratepayers. R.I. Gen. Laws § 39-31-2.

7. The State also mandates participation in the Regional Greenhouse Gas Initiative. *See* R.I. Gen. Laws §§ 23-82-1–23-82-7.

8. In 2004, Rhode Island passed its Renewable Energy Standard ("RI RES") to protect the public health and the environment and to promote the general welfare of the State. *See* R.I. Gen Laws §§ 39-26-1–39-26-10, as enacted June 29, 2004, and amended most recently

2

on June 27, 2022.

9. After amendments in 2022, RI RES requires 100% of Rhode Island's obligated retail electricity consumption to be sourced from eligible renewable energy resources by 2033 (with a slower rate of increase in the renewable fraction for certain supply contracts signed prior to July 1, 2022). R.I. Gen. Laws § 39-26-4(a)(14). Specifically, the RI RES requires "Obligated Entities," which include companies that sell electrical energy at retail to Rhode Island end-use customers, with the exception of Clear River Electric and Water District and Block Island Utility District, to obtain a certain minimum percentage of the electricity they sell at retail from eligible renewable energy resources. R.I. Gen. Laws § 39-26-4(a). The law sets minimum percentages for each year from 2007 to 2033, with the percentages increasing over time (and with a 1.5% increase each year for certain supply contracts signed prior to July 1, 2022). *Id.*

10. RIPUC is charged with implementing and administering RI RES, including by determining the eligibility of renewable energy generators and verifying their production, as well as overseeing compliance with RI RES requirements. *See* R.I. Gen. Laws § 39-26-6.

11. There are two ways Obligated Entities can comply with their RI RES requirements: they can either acquire and officially settle eligible NE-GIS certificates ("Certificates") for compliance with the RI RES or make alternative compliance payments ("ACP") to the State's Renewable Energy Development Fund to meet all or some of their compliance obligation. *See* R.I. Gen. Laws § 39-26-4(d)-(e).

12. Each Certificate reflects a megawatt-hour of electricity produced by a generator registered with the New England Power Pool Generation Information System (NEPOOL-GIS). *See* https://nepoolgis.com/about/.

13. The NEPOOL-GIS tracks the generation of all registered power generators and

issues (or "mints") one Certificate that is permanently associated with a specific generation unit for each megawatt-hour (MWh) of electrical energy generated. When an electric generator registered with the RIPUC as a Renewable Energy Resource generates 1 MWh of energy, NEPOOL GIS mints a Certificate for that unit and the Certificate is tagged as Rhode Island RES compliant. For the purposes of this Declaration, I will refer to Rhode Island eligible Certificates as Rhode Island Renewable Energy Certificates, or "RI RECs", and the larger market of Certificates compliant with other states' requirements as "RECs."

14. NEPOOL-GIS also tracks the final settlement or retirement of RECs. When a REC is retired in a NEPOOL-GIS account associated with retail consumption, that REC establishes the generation attributes for a MWh of consumption. Thus, when an Obligated Entity retires a RI REC in their NEPOOL-GIS account associated with the retail energy consumption they served in Rhode Island, the RIPUC recognizes 1 MWh of retail consumption as sourced from an eligible renewable energy resource. Thus, an account that served 100 MWh of retail energy and with 50 RI RECs would be recognized as 50% renewable by the RIPUC, regardless of where the actual energy may have come from in physical space.

15. NEPOOL-GIS mints Certificates once per quarter, after which each Certificate can be traded during defined periods leading up to the end of the trading year on June 15 each year. See https://nepoolgis.com. Certificate holders can trade the Certificates in an unregulated market; NEPOOL-GIS merely tracks the transfers and settlement (ultimate retirement) of Certificates.

16. Obligated Entities subject to the RI RES file annual compliance documents, which are reviewed by the RIPUC and approved once it is ensured that the entity has settled the appropriate number of eligible RI RECs in their respective NEPOOL-GIS accounts or made the

appropriate ACPs.

17. Obligated Entities can "bank" RI RECs by acquiring more than are needed to satisfy their yearly requirements, capped at 30% of the current year's obligation, in which case the RI RECs remain valid to satisfy that Obligated Entity's RI RES obligations for two years, although they can no longer be traded and transferred. *See* 810 R.I.C.R. 40-05-2.8(D)(2).

18. Over the past decade, most obligated entities subject to the RI RES have almost entirely satisfied their obligations by the end of the trading year by settling RI RECs in their NEPOOL-GIS account associated with their RI retail customers' consumption.

19. Over that same time period, the trading price for RI RECs has been well below the cost of Rhode Island ACPs, which is set by statute and adjusted annually in relation to the Consumer Price Index. *See* R.I. Gen. Laws § 39-26-2. The Rhode Island ACP is set at $86.19 for compliance year 2025.

20. According to The Narragansett Electric Company d/b/a Rhode Island Energy's ("RIE") most recent projection in Commission Docket 25-05-EL, the expectation was that 2025 RI RECs would cost $39.75.

21. With Revolution Wind expected to come online in 2026, my expectation, particularly concerning the next three years, was that Obligated Entities would continue to predominantly meet their RI RES obligations through the settlement of RI RECs. I am less certain given the instability that would be caused by a delay or loss of Revolution Wind's RI RECs entering the market.

22. The recent nature of large-scale renewable development in New England is such that a significant amount of capacity additions occur as part of regulated utility programs and long-term contracts, known as power purchase agreements. It is typical for these programs to

require the seller (a renewable resource owner) to transfer title and ownership of energy and RECs produced by the facility at a fixed rate to the buyer (a regulated utility) for a long period, such as 15 to 20 years.

23. In Rhode Island, RIE executes long-term power purchase agreements for renewable power, subject to RIPUC approval. These utility activities provide fixed payments in exchange for energy and RECs, among other products when applicable. Thus, the execution of power purchase agreements provide long-term hedges on energy and RI RECs for RIE.

24. Although RIE's approximately 500,000 retail customers may choose their retail energy supplier, of which approximately 150,000 do choose a non-regulated energy supplier, RIE is still the electric distribution utility company, and delivers that retail energy supply over its distribution system.

25. Renewable power purchase agreements are part of RIE's regulated distribution business, and as such all (approximately) 500,000 retail distribution customers contribute to supporting those power purchase agreements and stand to benefit from the power purchase agreements. Thus, the market benefits and costs of the energy and RI REC hedges established through these programs are passed from RIE to all distribution customers.

26. At the moment, the amount of RI RECs obtained through programs and long-term contracting act as a hedge on market price increases and market price volatility for RIE's approximately 500,000 retail distribution customers is less than the amount of RI RECs needed to supply the annual demand to meet the RI RES. Thus, RIE ratepayers generally are currently exposed to changes in the New England market price for RECs.

### Expected Effect of Revolution Wind Project

27. The Revolution Wind project has an expected nameplate capacity of 704 MW of electric power once it is operational, with 400 MW benefitting Rhode Island through a 20-year power purchase agreement (the "PPA") between Revolution Wind (then DWW REV I, LLC) and The Narragansett Electric Company (now d/b/a Rhode Island Energy) ("RIE"). *See* Commission Docket No. 4929, Direct Testimony of Brennan and Domenica, Schedule NG-1 (available at https://ripuc.ri.gov/eventsactions/docket/4929page.html ).

28. The RIPUC reviewed and approved the PPA by vote on May 28, 2019, and with a written order (Order 23609) published on June 7, 2019.

29. The PPA also entitles RIE to all the RI RECs associated with the output of the contracted 400 MW once Revolution Wind is operational.

30. Per the PPA, this is expected to supply RIE with 1,631,795 MWh of energy and the corresponding 1,631,795 RI RECs.

31. Per the PUC's most-recently published forecasts in the Annual RI RES Report in May 2024, the RI RECs created by Rhode Island's portion of Revolution Wind are expected to account for more than half of required RI RECs for compliance with the RI RES in compliance year 2026.

32. The addition of Revolution Wind's generating capacity is expected to lower the overall price of electricity in the New England area for two reasons. First, the additional generating capacity and actual energy output is expected to lower electricity market prices as a matter of supply and demand. Similarly, the project is also expected to contribute additional RI RECs, and lower the price of RECs in New England, again as a matter of supply and demand.

33. The above downward price effects are expected to lower prices paid by end-users

in the region, including Rhode Island.

34. Rhode Island Energy's approved RI RES Procurement Plan, the cost of which is passed on to Rhode Island Energy's supply customers, relies on the expectation that Revolution Wind would begin operating in 2026.

35. Although RIE customers are hedged against REC market prices increases and price volatility, RIE's renewable portfolio is not larger than the expected demand for RI RECs, even with the addition of the RI RECs from the 400 MW of contracted nameplate capacity with Revolution Wind.

36. Therefore, Rhode Island customers whose supply is required to comply with the RI RES would remain exposed to the regional REC market and price fluctuation therein.

37. Thus, if the regional REC market moves downward with the additional supply provided by Revolution Wind, Rhode Island customers whose supply is required to comply with the RI RES would save money, and if prices trend upward, Rhode Island customers would pay more.

### Expected Effects of Delay in Project Timeline

38. All RIE's distribution customers are expected to receive net revenue from Revolution Wind's RI RECs and energy over the life of the contract. *See* Commission Docket No. 4929, Direct Testimony of Brennan and DiDomenico, Schedule NG-5 (available at https://ripuc.ri.gov/eventsactions/docket/4929page.html ). This value would be lost absent completion of the project.

39. Even a relatively brief delay in the project timeline stands to have significant consequences, because the large-scale Revolution Wind project will significantly increase the supply of RI RECs and regional RECs. As noted above, this would have a downward impact on

REC pricing, creating a benefit for Rhode Island customers whose supply is required to comply with the RI RES.

40. Any delay in the start of operation for Revolution Wind will necessarily result in a loss of valuable renewable energy and RECs that would otherwise be available in the market for the compliance year in which the generation would have occurred.

41. Delay or cancelation of the Revolution Wind project also removes a significant portfolio hedge expected via the long-term contract (the PPA). This hedge was reviewed and approved by the PUC through review of the PPA in RIPUC Docket No. 4929.

42. In reviewing and approving the 2025 RES Procurement Plan to ensure that incremental costs associated with RI RES compliance would be prudently incurred, the Commission reviewed RIE's projections for RI REC requirements and supply through 2037 for its supply customers, including the expectation that RIE would need to make spot market purchases of RI RECs for future years until Revolution Wind came online, but would then find itself able to consider banking RI RECs or making other financially-advantageous sales of valuable RECs into the REC spot market.

43. Delay or cancelation of Revolution Wind frustrates long-term planning for compliance with the RI RES, and would require a significant change of course as of 2026.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on September 17, 2025 in Warwick, RI.

                                                    *[signature]*

                                         Todd A. Bianco
                                         Rhode Island Public Utilities Commission
                                         Administrator of Energy and Economic Policy