# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF RHODE ISLAND, *et al.*,<br><br>  Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>  Defendants. | C.A. No. 1:25-cv-00439-MSM-PAS |

## BRIEF AMICUS CURIAE OF CLIMATE JOBS RHODE ISLAND
## IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Richard F. Griffin, Jr.
*pro hac vice motion pending*
Bredhoff & Kaiser, PLLC
805 Fifteenth Street, NW, Suite 1000
Washington, DC 20005
(202) 842-2600
rgriffin@bredhoff.com

Carly B. Iafrate, #6343
Law Office of Carly B. Iafrate, PC
408 Broadway, 1st Fl.
Providence, RI 02909
(401) 421-0065
ciafrate@verizon.net

*Counsel for Amicus*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................1

INTEREST OF AMICUS ....................................................................................................2

ARGUMENT .....................................................................................................................2

The Public Interest Favoring A Preliminary Injunction Here Includes the Amicus Coalition Members' Substantial Resource Commitment to Training Workers to Work on Revolution Wind, and Interrupted and Potential Lost Employment For the Workers They Have Trained Who Have Been Gainfully Employed on Revolution Wind......................................................2

I.   The Administrative Procedure Act Requires That, When Considering Regulatory Change, Agencies Must Address Adverse Effects on the Livelihood of Workers and Investments in Training Workers—Preventing Those Adverse Effects is in the Public Interest..................................................................................................................2

II.  The Offshore Wind Energy Industry Needed Skilled Workers and Training Programs to Provide Workers with the Specific Skills Necessary to Work in the Industry. ............4

III. Amicus' Coalition Members Committed Substantial Resources to Develop the Necessary Training Programs to Provide Workers with Skills Specific to the Offshore Wind Energy Industry.........................................................................................6

IV.  Trained Workers Obtained Transformative Jobs in the Offshore Wind Energy Industry, with Good Wages and Benefits, Frequently Working Under the Terms of Project Labor Agreements...........................................................................................8

V.   Defendants' Stop Work Order Idled Trained Workers and Rendered Amicus' Investments in Training Programs Nugatory..............................................................11

CONCLUSION.................................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*,
507 U.S. 218 (1993) ...........................................................................................8

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ...........................................................................................2

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025) ...............................................................................3

*Columbia Gas Transmission, LLC v. 84.53 Acres of Land, More or Less,*
*In Calhoun, Marshall, Ritchie, Tyler, & Wetzel Cntys.*,
310 F. Supp. 3d 685 (N.D. W.Va. 2018) ............................................................4

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ...............................................................................................2

*Louisiana v. Biden*,
622 F. Supp. 3d 267 (W.D. La. 2022) .................................................................3

*Massachusetts v. Nat'l Insts. of Health*,
770 F. Supp. 3d 277 (D. Mass. 2025)
*judgment entered*, No. 25-CV-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025) ...............3

*Sierra Club v. U.S. Army Corps of Eng'rs*,
990 F. Supp. 2d 9 (D.D.C. 2013) ........................................................................4

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) ..............................................................................3

*Thakur v. Trump*,
No. 25-CV-04737, 2025 WL 1734471 (N.D. Cal. June 23, 2025) ........................3

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ...............................................................................................3

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
778 F. Supp. 3d 440 (D.R.I. 2025) ......................................................................3

**Other Authorities**

*Trump Attacks on Offshore Wind Threaten 15,000 New England Jobs*,
Bloomberg Law, September 19, 2025 ............................................................10, 12

*Community Benefits Snapshot: Block Island Wind Farm Community Benefits Agreement*, World Res. Inst. (Jan. 31, 2025), https://www.wri.org/ snapshots/community-benefits-snapshot-block-island-wind-farm-community-benefits-agreement ...........................8

*Energy Secretary Granholm Announces Ambitious New 30GW Offshore Wind Deployment Target by 2030*, Dep't of Energy (Mar. 29, 2021), https://perma.cc/9SAH-RT5J...............................................................................................4

Jeremy Stefek et al., Nat'l Renewable Energy Lab'y, *U.S. Offshore Wind Workforce Assessment* (2022).............................................................................................5, 6

Lara Skinner et al., Cornell Univ. Sch. of Indus. & Lab. Rels., *Building a Just Transition for a Resilient Future: A Climate Jobs Program for Rhode Island* (2022).............5

Lara Skinner et al., Cornell Univ. Sch. of Indus. & Lab. Rels., *Climate for Change: A Complete Climate Jobs Roadmap for New York City* (2022)................................................5

Matt Shields et al., Nat'l Renewable Energy Lab'y, *The Demand for a Domestic Offshore Wind Energy Supply Chain* (2022) ......................................................4, 6

*North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor*, Ørsted (May 5, 2022), https://us.orsted.com/news-archive/ 2022/05/national-offshore-wind-agreement.............9, 10

North America's Building Trades Unions, Comment on Bureau Of Ocean Energy Management's Proposed Sale Notice: *Atlantic Lease Sale 8 For Commercial Leasing For Wind Power On The Outer Continental Shelf In The New York Bight* (Aug. 13, 2021), https://www.regulations.gov/comment/BOEM-2021-0033-0074 .................8

Revolution Wind, *Governor McKee, Congressional Delegation, Mayor Smiley Mark New Phase of Offshore Wind Construction Hub at ProvPort* (May 1, 2023), https://revolution-wind.com/news/2023/05/new-phase-of-offshore-wind-construction-hub-at-provport ..................................................................................................7

Turn Forward, *Offshore Wind Work Opens Doors* (YouTube, Jul. 23, 2023), https://www.youtube.com/ watch?v=Q4DIbnJc7jk .................................................9

Washington Post, *Judge deals Trump's war on wind its first major setback*, September 9, 2025, https://www.washingtonpost.com/climate-environment/2025/09/22/trump-wind-energy-revolution-rhode-island/ ...............................11

## INTRODUCTION

On August 22, 2025, with 80% of the many-years-in-the-making Revolution Wind offshore wind project complete, 70% of the 65 wind turbine generators fully installed, $5 billion expended, approximately 1,200 workers engaged in direct construction and related support activities, and numerous specialty vessels maneuvering the remaining enormous turbines and other necessary components into place, the Defendants issued an arbitrary Stop Work Order on a project they had spent the last several years defending in court. The Plaintiffs' Complaint, Motion for a Preliminary Injunction, and supporting Memorandum and Exhibits persuasively demonstrate that the Plaintiffs are likely to succeed on the merits, that the Stop Work Order irreparably harmed them and their citizens, that the balance of the equities is strongly in their favor, and that the public interest supports a preliminary injunction.

Amicus Climate Justice Rhode Island ("CJRI") is a coalition of Rhode Island labor and community groups whose coalition members have committed substantial resources to training the skilled workforce needed 1) to build and maintain offshore platforms, windmills, and turbines, including those of Revolution Wind, and 2) to construct the infrastructure necessary to support offshore wind energy development and specifically to support Revolution Wind. Amicus submits this brief in support of Plaintiffs' Motion to bring to the Court's attention particular interests the Defendants ignored in their ill-considered, arbitrary Stop Work Order: the interests of coalition members, who have committed substantial resources to training Revolution Wind's offshore wind energy workers, and the interests of those trained workers, seeking sustainable employment to support themselves and their families, who have spent countless hours developing the necessary skills to perform the complicated, rewarding, and often dangerous work of constructing and maintaining offshore wind farms. Protecting those interests is a compelling reason why a preliminary injunction here is in the public interest.

1

## INTEREST OF AMICUS

Amicus Climate Jobs Rhode Island ("CJRI") is a program of the Rhode Island Institute for Labor Studies and Research, a tax-exempt 501(c)(3) organization. CJRI is a broad coalition of labor, environmental, and community partners committed to a just transition to an equitable, pro-worker, pro-climate green economy, and educating the public on the renewable energy means to that transition. CJRI's coalition members represent hundreds of workers in Rhode Island currently building out Rhode Island's port infrastructure, constructing wind farms—in particular, Revolution Wind—and operating and maintaining wind turbines after they are built. CJRI's coalition members have invested substantial time and money creating and utilizing training programs specific to the offshore wind industry, and have trained workers constructing Revolution Wind. Many individual workers have spent their own time and resources learning skills to equip them to work on Revolution Wind and for future employment on the many jobs that the industry has promised to bring to Rhode Island.

## ARGUMENT

**The Public Interest Favoring A Preliminary Injunction Here Includes the Amicus Coalition Members' Substantial Resource Commitment to Training Workers to Work on Revolution Wind, and Interrupted and Potential Lost Employment For the Workers They Have Trained Who Have Been Gainfully Employed on Revolution Wind.**

**I.    The Administrative Procedure Act Requires That, When Considering Regulatory Change, Agencies Must Address Adverse Effects on the Livelihood of Workers and Investments in Training Workers—Preventing Those Adverse Effects is in the Public Interest.**

Agency action which "makes worthless substantial past investment incurred in reliance upon the prior rule" is arbitrary and capricious. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 220 (1988) (Scalia, J., concurring). Agencies must consider the reliance interests of regulatory beneficiaries when changing rules, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–31 (2020), including the reliance interests of workers "whose careers and livelihoods were upended" by the

agency's change of course. *Thakur v. Trump*, No. 25-CV-04737, 2025 WL 1734471, at *7 (N.D. Cal. June 23, 2025).

There is considerable recent precedent within the First Circuit for considering such reliance interests. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92, 99 (1st Cir. 2025) (agencies must consider "all relevant impacts of cutting off funding"); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025) (requiring agency to consider "staff laid off" and "projects halted" as reliance interests); *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 309 (D. Mass. 2025) ("Beyond the institutions, the reliance interests are plenty, ranging from the researchers who chose to conduct research at certain institutions with the understanding that they would be supported, to the students who will no longer be admitted to these institutions, to the local communities that will suffer from the loss of community-based programming."), *judgment entered*, No. 25-CV-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In their brief supporting the Motion for a Preliminary Injunction, Plaintiffs point to the job losses that would result if Revolution Wind "goes under" as a result of the Stop Work Order[1] as one aspect demonstrating irreparable harm under the

---

[1] "Revolution Wind supports about 1,200 jobs in Connecticut and Rhode Island alone. Dykes Decl., Dkt. No. 21-2, ¶ 57. If those jobs are lost because Revolution Wind goes under, the States' economies inevitably will suffer. *Id.* at Dykes Decl. ¶¶ 57, 64. See *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (finding irreparable state harm where compliance with federal rule may increase unemployment due to the permanent closure of power plants); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 297 (W.D. La. 2022) (finding irreparable harm where "Plaintiff States are also claiming damages through loss of jobs")." Dkt. No. 21, at 40.

four-part preliminary injunction analysis. Amicus submits this brief to describe briefly the reliance interests of the CJRI coalition members and the Revolution Wind workers so that the Court can also include consideration of those interests in its review of the overall public interest served by a preliminary injunction here. *See, for example, Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 42 (D.D.C. 2013) (strong public interest in the jobs and economic growth construction will create); *Columbia Gas Transmission, LLC v. 84.53 Acres of Land, More or Less, In Calhoun, Marshall, Ritchie, Tyler, & Wetzel Cntys.*, 310 F. Supp. 3d 685, 696 (N.D. W.Va. 2018) (recognizing benefit to public of job creation).

## II.  The Offshore Wind Energy Industry Needed Skilled Workers and Training Programs to Provide Workers with the Specific Skills Necessary to Work in the Industry.

Here, the people who relied on the agencies' actions—and whose interests were not considered in the Defendants' Stop Work Order—include those workers who sought training in offshore wind-specific skills, as well as the organizations providing the training. By way of background, the previously established national goal of developing 30 gigawatts of offshore wind by 2030 would "support approximately 77,000 jobs in industry and surrounding communities."[2] Reaching this goal would require the installation of 2,100+ wind turbines, 2,100+ foundations, 6,200 kilometers of array cables and 5,200 kilometers of export cables, as well as 5 wind turbine installation vessels ("WTIVs"), 10 feeder barges, 58 crew transfer vessels ("CTVs"), 11 service operation vessels ("SOVs")., and 4 cable-laying vessels ("CLVs") by 2030. Matt Shields et al., Nat'l Renewable Energy Lab'y, *The Demand for a Domestic Offshore Wind Energy Supply Chain* 16 (2022) ("Supply Chain Report").

---

[2] *Energy Secretary Granholm Announces Ambitious New 30GW Offshore Wind Deployment Target by 2030*, Dep't of Energy (Mar. 29, 2021), https://perma.cc/9SAH-RT5J.

In fact, even installing 15 gigawatts of offshore wind by 2040 "could create 220,158 direct jobs," and up to 85,617 additional manufacturing jobs over a total of 18 years. Lara Skinner et al., Cornell Univ. Sch. of Indus. & Lab. Rels., *Climate for Change: A Complete Climate Jobs Roadmap for New York City* 40 (2022). Offshore wind was projected to provide 33,425 direct jobs in Rhode Island alone. Lara Skinner et al., Cornell Univ. Sch. of Indus. & Lab. Rels., *Building a Just Transition for a Resilient Future: A Climate Jobs Program for Rhode Island* 25 (2022).

Wind development requires workers to fill 113 unique roles, many of which require extensive, offshore-wind-specific training. These include roles across five major segments of the industry: development (including "site assessment, plant design, financing, project management, and permitting review"), manufacturing and supply chain ("the jobs to fabricate and assemble components, subassemblies, parts, and materials from multiple tiers of the manufacturing process," ranging "from engineering and component design to factory-level workers working production lines"), ports and staging ("terminal crews, logistics, and management-related roles located portside" as well "laborers and trade workers who support offshore wind plant construction and installation"), maritime construction ("the marine crew, engineers, and construction crews"), and operations and maintenance ("wind technicians and associated operating plant management"). Jeremy Stefek et al., Nat'l Renewable Energy Lab'y, *U.S. Offshore Wind Workforce Assessment* (2022) ("Workforce Report").

For example, all monopile and transition piece installation positions are "specific" to the wind "foundation installation process." *Id.* at 24. Turbine technicians are "specially trained in the particular turbine package," while cable installation requires "hydrographer certification" and "offshore-specific" training. *Id.* at 25, 26. Specialized equipment with powerful hydraulic tighteners is used to fasten the kinds of bolts used on the large wind turbines. High-Torque Training

teaches workers the proper use of this specialized equipment to minimize the possibility of bolt shearing from an overtightened bolt, or a loosening from an undertightened bolt. When these bolts are supporting equipment worth many millions of dollars, each and every bolt be properly fastened.

The prior administration emphasized the "immediate need for workforce development" by "[e]ducational institutions, unions, [original equipment manufacturers], and developers." Supply Chain Report at 42. These institutions heeded the call: As of October 2022, they were already offering 44 training programs across the country. Workforce Report at ix. For example, six of the seven maritime academies in the US "offer[ed] or develop[ed] offshore-wind-specific courses or programs." *Id.* at 37. Seven community colleges offered or planned to offer "curricula specifically focused on offshore wind energy." *Id.* at 33. And beyond that, more than fifty universities offered "offshore wind energy courses." *Id.* at 38. Several unions began to develop a "training center," "apprenticeship program," sponsored maritime academy training, or made training investments. *Id.* at 35–36.

### III. Amicus' Coalition Members Committed Substantial Resources to Develop the Necessary Training Programs to Provide Workers with Skills Specific to the Offshore Wind Energy Industry.

Amicus actively participated in the ramped-up training necessary to prepare the skilled workforce for the offshore wind energy industry in Rhode Island and committed substantial resources to the effort. Patrick Crowley, CJRI Co-Chair, details in his declaration (attached to this memorandum as Attachment 1) the training activities of CJRI's coalition members in Rhode Island.

> Our coalition members have invested time and money creating and utilizing training programs for the workers they represent that are specific to the offshore wind industry. These include trainings and certifications from the Society of Professional Rope Access Technicians, Helicopter Underwater Egress Training, and Rhode Island's own Global Wind Organization (GWO) accredited Basic Safety Training center, brought to the state through the dedicated efforts of the Rhode

Island Building and Construction Trades Council in partnership with Building Futures and the Community College of Rhode Island (CCRI).

Crowley Decl. ¶ 7. Ørsted, the international offshore wind developer that is a partner in the Revolution Wind joint venture, participated in funding the Basic Safety Training Center. Revolution Wind, *Governor McKee, Congressional Delegation, Mayor Smiley Mark New Phase of Offshore Wind Construction Hub at ProvPort* (May 1, 2023), https://revolution-wind.com/news/2023/05/new-phase-of-offshore-wind-construction-hub-at-provport.

The Global Wind Organization (GWO) Mr. Crowley references in his declaration is a non-profit body that sets international standards for safety training in the wind energy industry. Its standards are created by the wind energy industry, and encompass a series of specific training modules, required to be taken under GWO accredited programs. Possession of a GWO training certificate issued by an accredited program is a requirement for those seeking employment in the offshore wind industry. The requirement was established by developers - the training ensures that workers seeking employment will be capable of performing high-quality work safely on an offshore wind farm. See generally the materials available on the Global Wind Organization website, https://www.globalwindsafety.org/.

Crowley further describes the training efforts:

In addition, the GWO training that members of our coalition, including the International Brotherhood of Electrical Workers Local 99, International Union of Painters and Allied Trades Local 195, Iron Workers Local 37, the Laborers International Union of North America, and the United Brotherhood of Carpenters have worked to develop at CCRI includes specific modules in Working at Heights, Manual Handling, First Aid, Sea Survival, and Fire Awareness – training that is required to work on offshore wind projects.

Crowley Decl. ¶ 8. For the CCRI curriculum, see also https://www.ccri.edu/workforce/programs/renewableenergy/.

IV. **Trained Workers Obtained Transformative Jobs in the Offshore Wind Energy Industry, with Good Wages and Benefits, Frequently Working Under the Terms of Project Labor Agreements.**

Once trained in amicus-sponsored programs, workers obtained gainful employment in the offshore wind energy industry. The industry's use of Project Labor Agreements ("PLAs") on many projects assured that those performing offshore wind energy work had good jobs, were paid prevailing wages, and were provided health care and pension benefits. PLAs are comprehensive labor-management collective bargaining agreements covering all the work to be done on large construction projects. *See generally Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993) ("Boston Harbor").[3]

In Rhode Island, the Block Island Wind Farm, a commercial wind farm generating clean energy for 17,000 Rhode Island homes, was constructed pursuant to a PLA "guaranteeing approximately 300 jobs for 10 different building trade unions and 30 unionized contractors and subcontractors during project construction." *Community Benefits Snapshot: Block Island Wind Farm Community Benefits Agreement*, World Res. Inst. (Jan. 31, 2025), https://www.wri.org/

---

[3] "PLAs are generally negotiated by the entity that controls contracting for the project and a council of labor organizations that represent all the trades that will be employed on the project. Through PLAs, the parties set standard work rules, establish various forums for communication and coordination, and prevent work stoppages with no-strike, no-lockout provisions, and speedy dispute-resolution mechanisms. They also set standard pay and benefit rates for each trade and address labor supply issues through provisions that commit the signatory unions to use their job referral procedures to ensure a steady supply of highly skilled workers. Both union and nonunion workers can register for referrals, and typically any contractor – union or nonunion – may bid for work on a covered project, as long as they agree to abide by the agreement and thereby to be held to the same standards." North America's Building Trades Unions, Comment on Bureau Of Ocean Energy Management's Proposed Sale Notice: *Atlantic Lease Sale 8 For Commercial Leasing For Wind Power On The Outer Continental Shelf In The New York Bight*, at 2 (Aug. 13, 2021), https://www.regulations.gov/comment/BOEM-2021-0033-0074. State and local governments have recognized that PLAs have significant value for government-sponsored projects: their project-long no strike, no-lockout clauses are a safeguard against the disruption that stems from labor disputes, and they ensure that the work is performed with a high quality, well-trained workforce.

snapshots/community-benefits-snapshot-block-island-wind-farm-community-benefits-agreement.

The Block Island job made a huge difference in Rhode Island workers' lives. Oronde Hale, a member of Iron Workers Local 37 who worked on the Block Island Wind Farm, stated: "When the [wind] turbines were starting to get built, I knew I wanted to be on that list so I could save up enough money to buy a house. If it wasn't for that one job, I can't say I'd be where I am right now. It got us out of . . . borderline poverty to middle class. What offshore wind means to me is clean energy and financial freedom for the guys working on them." Turn Forward, *Offshore Wind Work Opens Doors*, at 0:18–0:48 (YouTube, Jul. 23, 2023), https://www.youtube.com/watch?v=Q4DIbnJc7jk.

And, in 2022, North America's Building Trades Unions ("NABTU") entered into a PLA, the National Offshore Wind Agreement ("NOWA"), with Ørsted, a leading offshore wind energy developer, covering "all of Ørsted's contractors and subcontractors that will perform offshore windfarm construction from Maine down to Florida." Ørsted announced:

> [T]he National Offshore Wind Agreement (NOWA) sets the bar for working conditions and equity, injects hundreds of millions of dollars in middle-class wages into the American economy, creates apprenticeship and career opportunities for communities most impacted by environmental injustice, and ensures projects will be built with the safest and best-trained workers in America.

*North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor*, Ørsted (May 5, 2022), https://us.orsted.com/news-archive/2022/05/national-offshore-wind-agreement. NABTU President Sean McGarvey concurred:

> The signing of this unprecedented agreement is historic for America's workers and our energy future. NABTU's highly trained men and women professionals have the best craft skills in the world. This partnership will not only expand tens of thousands of career opportunities for them to flourish in the energy transition but also lift up even more people into the middle-class.

*Id.*[4]

Revolution Wind is being constructed under the terms of the NOWA. The NOWA sets standard workweek and workday lengths for all covered employees, allowing contractors to plan work on the project well in advance. The NOWA also sets forth the wages and benefits for covered employees, allowing contractors to predict their labor costs in advance. Employees covered by the NOWA earn family-sustaining compensation, ranging from $55.00 to $140.88 per hour in total wages and benefits.

Rhode Island workers have clearly benefited from working under the terms of the NOWA on Revolution Wind. As Patrick Crowley relates:

> Prior to the Stop Work Order for Revolution Wind, these skilled building trades workers, including those represented by a number of unions that are CJCI coalition members, have worked over 1.7 million hours on the Revolution Wind project. Those hours have enabled workers employed on the Revolution Wind project to earn over $107.3 million in wages and over $53.7 million in health and pension contributions, for total compensation so far in excess of $161 million.

Crowley Decl. ¶ 10.

As one specific example, "Ironworkers on the project earn about $76 an hour with pension and health benefits, typically working 84-hour weeks on four-week rotations, according to David Langlais of the Iron Workers union." Bloomberg Law, *Trump Attacks on Offshore Wind Threaten 15,000 New England Jobs*, September 19, 2025.

In sum, the offshore wind energy industry, and Revolution Wind specifically, have provided trained workers with transformative jobs, at high wages, with excellent benefits, and those workers

---

[4] See also Declaration of Melanie Gearon, Dkt. No. 21-3, ¶ 45, describing the Ørsted-NABTU National Offshore Wind Agreement, as well as, *inter alia*, a project labor agreement with the Rhode Island Building and Construction Trades Council covering advance foundation component construction, as well as work on the onshore cable route and onshore substation.

had every reason to believe the governmental and industry promises that such work opportunities would continue and expand.

## V.  Defendants' Stop Work Order Idled Trained Workers and Rendered Amicus' Investments in Training Programs Nugatory.

In her declaration, Melanie Gearon, Ørsted's Head of Northeast Permitting, succinctly described the workplace consequences of the Stop Work Order: "The Stop Work Order has already disrupted the work of many, and if the Project is delayed or cancelled these jobs will be lost." Gearon Decl., Dkt. No. 21-3, ¶ 46. While in *Revolution Wind, LLC v. Burgum*, 1:25-cv-02999, (D.D.C.), Judge Lamberth has preliminarily enjoined the Stop Work Order, Dkt. No. 36, allowing work to proceed for the moment, the Defendants have not withdrawn the Stop Work Order, and have not committed to not seeking a stay of his Order or to not appealing it. Moreover, in response to Judge Lamberth's Order, a Department of Interior spokesperson issued a widely reported written statement.

> "As a result of the Court's decision today, Revolution Wind will be able to resume construction as BOEM [the Bureau of Ocean Energy Management] continues its investigation into possible impacts by the project to national security and prevention of other uses on the Outer Continental Shelf," said a statement from the agency, which said it "remains committed to ensuring that prior decisions are legally and factually sound."

"Judge deals Trump's war on wind its first major setback," Washington Post, September 9, 2025, https://www.washingtonpost.com/climate-environment/2025/09/22/trump-wind-energy-revolution-rhode-island/. Thus, the Stop Work Sword of Damocles continues to hang over Revolution Wind.

This uncertainty will decimate offshore wind energy workers' prospects for a better life. Moreover, Revolution Wind workers' earnings greatly benefited the Rhode Island communities in which they lived; without good jobs performing offshore wind construction and maintenance those workers will not be making the purchases that support local businesses.

Patrick Crowley describes the consequences of the Stop Work Order as follows:

> Prospects of future employment—good jobs, paying living wages, providing health care, and retirement security—for Rhode Island workers are being taken away without any justification or consideration of those workers' interests, and may not be recoverable. As a result of the chilling effect of the Stop Work Order, the training of additional workers with the necessary skills to do the complex work required in the offshore wind industry is jeopardized, and Rhode Island workers are questioning whether they should commit their future to this industry – meaning that, even if the industry comes back and Revolution Wind has resumed construction, American workers will not be available to do these jobs – essentially ceding work in this growing global industry to workers from other countries.

Crowley Decl. ¶ 12.

> As one specific example:

> Cesar Lima never gave much thought to the politics of offshore wind. Most days, the ironworker focused on his shift 15 miles out at sea, climbing turbines and watching dolphins gliding past his vessel off the coast of Rhode Island.
> That changed when President Donald Trump's administration ordered work to stop on the Revolution Wind project a month ago . . . .
> "I just came here to work for my family and I don't really pay attention to all the political stuff," Lima said, adding that he was confused why the White House would stop the Revolution project when it's already 80% completed. "If the work stops and it keeps going like this, it's going to hurt us."

Bloomberg Law, <u>Trump Attacks on Offshore Wind Threaten 15,000 New England Jobs</u>, September 19, 2025.

The future of the Community College of Rhode Island training program described *supra* also hangs in the balance:

> The school has already trained nearly 200 students in skills such as first aid, fire awareness and special instruction for working at heights and living at sea for extended periods. The majority of course participants are union electricians and iron workers, according to Rosemary Costigan, president of the Community College of Rhode Island, which hosts the training facility on its campus.
> "These are good-paying jobs, sustainable wages that the workers can have," Costigan said. "We were on the precipice of actually expanding out and being able to recruit to a wider student audience."

*Id.*

Training programs "jeopardized" or "on the precipice," good jobs idled, prospects for future offshore wind employment in doubt—the Defendants were obligated to weigh these workplace consequences when considering whether to order work on Revolution Wind to stop. They clearly failed to do so.

## CONCLUSION

Nowhere in the August 22, 2025 Stop Work Order is there any mention of the adverse impact the Order would have on the legions of workers working on Revolution Wind who spent considerable time and effort to acquire the complex array of skills necessary to work in the offshore wind energy industry, nor is there any demonstrated consideration of the potential loss of the highly paid jobs Revolution Wind provided. The Stop Work Order also ignored the reliance interests of those institutions that, like Amicus' coalition members, developed and administered the training programs required to ready those workers to perform work on offshore wind energy projects, including Revolution Wind. Protecting these ignored, important reliance interests adds support to the Plaintiffs' persuasive arguments that enjoining the Defendants' Stop Work Order is in the public interest. This Court should grant the Plaintiffs' Motion for a Preliminary Injunction.

Dated: September 25, 2025          Respectfully submitted,

                                      */s/ Carly B. Iafrate*
                                      Carly B. Iafrate, #6343
                                      Law Office of Carly B. Iafrate, PC
                                      408 Broadway, 1st Fl.
                                      Providence, RI 02909
                                      (401) 421-0065
                                      ciafrate@verizon.net

                                      Richard F. Griffin, Jr.
                                      *pro hac vice motion pending*
                                      Bredhoff & Kaiser, PLLC
                                      805 Fifteenth Street, NW, Suite 1000
                                      Washington, DC 20005

(202) 842-2600
rgriffin@bredhoff.com

*Attorneys for Amici*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 25, 2025, the foregoing was served on all counsel of record via the Court's ECF system.

<u>/s/ <i>Carly B. Iafrate</i></u>
Carly B. Iafrate
