# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF RHODE ISLAND, et al.,

                    Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, et al.,

                    Defendants.

Case No. 1:25-cv-00439-MSM-PAS

**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

## INTRODUCTION

This Court should decline to rule on the States' motion for preliminary injunctive relief. This case challenges a stop work order that the Bureau of Ocean Energy Management ("BOEM") issued for the Revolution Wind offshore wind energy project. As explained in Federal Defendants' pending motion to transfer venue, the company that is subject to that order (Revolution Wind) has also challenged the BOEM order in the U.S. District Court for the District of Columbia ("D.D.C."). And D.D.C. has entered the same relief the States seek here—a preliminary injunction allowing Revolution Wind to proceed with construction. Comity, judicial economy, and the interests of justice all favor transferring the States' case to join the company's suit and deferring to D.D.C. to rule on the States' motion for a preliminary injunction.

If this Court rules on the States' motion, it should either deny the motion or hold it in abeyance. D.D.C.'s injunction means there is no imminent harm to the States that would warrant a follow-on preliminary injunction. And the States are also unlikely to succeed on the merits of their suit.

## BACKGROUND

### I.    Wind Energy Development on the Outer Continental Shelf

This case involves a wind energy project on the Outer Continental Shelf ("OCS"). The OCS consists of the submerged lands beneath the ocean, generally from 3 to 200 miles seaward of the coastline. *Ctr. for Biological Diversity v. Jewell*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a). Under the Outer Continental Shelf Lands Act ("OCSLA"), the United States holds these lands as a "vital national resource reserve" that "should be made available for expeditious and orderly development, subject to environmental safeguards." *Id.* § 1332(3).

1

The Department of the Interior has statutory authority to approve wind energy development on the OCS, which is governed by OCSLA and Interior's implementing regulations. *See* 43 U.S.C. § 1337(p)(1)(C) (authorizing the Secretary of the Interior to "grant a lease, easement, or right-of-way" for activities that "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas"); *id.* § 1337(p)(8) (authorizing the Secretary to "issue any necessary regulations to carry out this subsection"); *see also id.* § 1334(a) ("The Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions.").

In granting Interior that authority, Congress directed that "[t]he Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for" multiple criteria. *Id.* § 1337(p)(4). Among them are: "protection of national security interests of the United States" and "prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas." *Id.* § 1337(p)(4)(F), (I). Interior regulations delegate to BOEM the responsibility to implement § 1337(p)(4). *See* 30 C.F.R. § 585.102(a).

Under BOEM's renewable energy regulations and lease terms, a lease issued under OCSLA does not itself authorize development. *Id.* § 585.200(a). A lessee must first assess the site, obtain BOEM's approval of a site assessment plan, and obtain BOEM's approval of a Construction and Operations Plan ("COP"). *Id.* §§ 585.600, 585.605–585.613, 585.620–585.628.

## II. Factual Background

The Revolution Wind Project is an offshore wind energy project that has been under construction in federal waters off the coast of Rhode Island. Compl. ¶ 1, Dkt. No. 1. Revolution Wind

2

submitted an initial COP for the Project to BOEM in 2020 and subsequently submitted several updated versions of the COP. Bureau of Ocean Energy Mgmt., Record of Decision: Revolution Wind Farm & Revolution Wind Export Cable Project Construction & Operations Plan 3 (Aug. 21, 2023) ("ROD") (Ex. B to Decl. of Adam Suess). BOEM reviewed the COP under several statutes, including OCSLA. *Id.* at 1. BOEM issued a ROD to approve the COP with modifications in August 2023, and sent Revolution Wind a letter of approval in November 2023. *See generally id.*; Decl. of Adam Suess ¶¶ 5–6, Sept. 12, 2025 (attached to this brief) ("Suess Decl."). The COP, as approved, contemplates construction of up to 65 wind turbine generators, inter-array cables, two offshore substations, and other offshore and onshore components. ROD 22.

In January 2025, the President issued a Presidential Memorandum entitled, "Temporary Withdraw of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects." 90 Fed. Reg. 8363 (Jan. 20, 2025) ("Presidential Wind Memo"). Section 1 of that Memorandum instructs the Secretary of the Interior to "conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases." *Id.* The review directed by Section 1 of the Presidential Wind Memo prompted Interior to review the Revolution Wind Project. *See* Suess Decl. ¶ 15.

In May 2025, in M-Opinion 37086, Interior withdrew M-Opinion 37067 interpreting § 1337(p)(4), reinstated a prior M-Opinion (M-37059), and prompted BOEM to review its approval of the Revolution Wind Project.[1] Suess Decl. ¶¶ 12, 15; Ex. I to Suess Decl. BOEM's 2023 approval of the Revolution Wind COP relied on M-Opinion 37067, which stated that § 1337(p)(4)

---

[1] M-Opinions are legal interpretations by Interior that are binding on all Departmental offices and officials. They can only be overruled or modified by the Interior Solicitor, Deputy Secretary, or Secretary. 209 Interior Departmental Manual 3.2(A)(11).

of OCSLA "does not require the Secretary to ensure that the goals [enumerated in that section] are achieved to a particular degree, and she retains wide discretion to determine the appropriate balance between two or more goals that conflict or are otherwise in tension." ROD 5–6 (quoting M-Opinion 37067); *see also* ROD B-2 & n.1 (same). Using that interpretation, Interior "determined that the Project will comply with [BOEM's] regulations and that the proposed activities will be carried out in a manner that provides for … the [] factors listed is subsection [1337](p)(4) of OCSLA." ROD B-2. The current M-Opinion (M-37086) provides that:

> the proper scope of the phrase "prevention of interference with reasonable uses" is such that, when evaluating whether a proposed activity would conflict with an existing use, the Secretary is required "to act to prevent interference with reasonable uses in a way that errs on the side of less interference rather than more interference."

Ex. I to Suess Decl. at 2. The current M-Opinion further provides that "any [ ] Departmental action taken in reliance on the now withdrawn M-Opinion 37067[ ] should be re-evaluated." *Id.* at 3.

In accordance with the Presidential Wind Memo and M-Opinion 37086, Interior has been reviewing its prior approval of the Revolution Wind COP. Suess Decl. ¶ 15. During that review, "concerns [ ] have arisen … related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in [ ] subsection [1337(p)(4)] of OCSLA." Order, ECF No. 1-1. Thus, on August 22, BOEM's Acting Director issued an order ("BOEM Order") directing Revolution Wind to "halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf [ ] to allow time for [BOEM] to address" those concerns. *Id.* Under the BOEM Order, Revolution Wind was directed to "not resume activities until BOEM informs [it] that BOEM has completed its necessary review." *Id.*

On September 4, Revolution Wind, LLC filed suit in the District Court for the District of Columbia, challenging the BOEM Order. Compl. for Declaratory & Injunctive Relief, *Revolution*

*Wind, LLC v. Burgum*, No. 1:25-cv-2999-RCL (D.D.C. Sept. 4, 2025), Dkt. No. 1. Later that day, the States filed the present suit. On September 5, Revolution Wind moved for a preliminary injunction in D.D.C. against the BOEM Order. Pls.' Mot. for Prelim. Inj. & Stay Pending Rev., *Revolution Wind* Dkt. No. 9. The States waited twelve more days to move this Court for preliminary injunctive relief. *See* Dkt. No. 21. That same day (September 17), Federal Defendants moved to transfer the States' case to D.D.C. to join the company's suit. Dkt. No. 22. The motion to transfer venue has been fully briefed since October 8. While the parties were briefing that motion, D.D.C. (Judge Lamberth) ruled from the bench at a September 22 hearing, granting Revolution Wind's motion for preliminary injunctive relief. Order Granting Preliminary Injunction, *Revolution Wind* Dkt. No. 36 ("D.D.C. PI Order") (also filed on the docket here at Dkt. No. 27-1).

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Voice of the Arab World. v. MDTV Med. News Now*, 645 F.3d 26, 32 (1st Cir. 2011). Rather, it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citation omitted). A plaintiff seeking a preliminary injunction must establish four elements: (1) a likelihood of irreparable harm absent injunctive relief; (2) a likelihood of success on the merits; (3) a balance of hardships that tips in their favor; and (4) that the public interest weighs in favor of granting the injunction. *See id.*; *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010). The burden in moving for a preliminary injunction "is a heavy one: Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Dunkin' Donuts Franchised Restaurants, LLC v. ABM Donuts, Inc.*, No. 11-270 S, 2011 WL 6026129, at *2 (D.R.I. Oct. 4, 2011) (internal quotation marks omitted) (quoting *Friends of Magurrewock, Inc. v. U.S. Army Corps of Eng'rs*,

498 F. Supp. 2d 465, 369 (D. Me. 2007)).

## ARGUMENT

The Court should decline to rule on the States' motion, transfer the case to D.D.C., and allow that court to determine the effect of its preliminary injunction on the States' motion. Should this Court decide to rule on the States' motion, the motion should be denied. D.D.C.'s injunction means that there is no imminent harm to the States that warrants further injunctive relief. And in any event, the States are unlikely to succeed on the merits of their case.

**I.      The Court Should Decline to Rule on the States' Motion and Should Transfer the Case.**

The Court should withhold any ruling on the States' motion for preliminary injunctive relief and transfer the case to D.D.C. As explained in Federal Defendants' motion to transfer venue, Dkt. No. 22, Revolution Wind has separately challenged the stop work order in D.D.C. before Judge Lamberth. *Revolution Wind v. Burgum*, No. 1:25-cv-2999-RCL (D.D.C.). And Judge Lamberth has already preliminarily enjoined the BOEM order. D.D.C. PI Order. That fact both underscores the need to transfer venue and counsels in favor of letting the transferee court rule on the States' motion. *See, e.g.*, *Lopez v. United States*, No. 25-cv-2408-TJK, 2025 WL 2193001, at *3 (D.D.C. Aug. 1, 2025) (despite pending motion for preliminary relief, transferring case to District of Arizona where other cases challenging same agency action were being heard and where preliminary injunction proceedings were already calendared).

*First*, the States' desire to proceed with their motion for preliminary relief underscores the need to avoid inconsistent judgments (if not preliminary injunctions). Judge Lamberth "enjoined" Federal Defendants "from imposing the [stop work order] until such time as the Court orders otherwise," and "from enforcing the Stop Work Order." *See* D.D.C. PI Order 2. The States request "[a] preliminary injunction lifting the Stop Work Order." States' Mot. 2. Though perhaps subtle,

6

orders by separate courts providing different terms subjects Interior to uncertainty in complying with the courts' orders.  And this is not a situation in which the States' alleged harm emanates from the BOEM Order independently of that for Revolution Wind.  Rather, the States' alleged harm is entirely derivative of Revolution Wind's ability (or inability) to continue construction.

The concerns associated with competing cases would compound as the cases proceed.  Suppose, for example, Judge Lamberth rules in Revolution Wind's favor on the merits of the company's case, but the parties are able to negotiate the terms of a court-order remedy.  That agreement (and any resulting order from Judge Lamberth) would be meaningless because Federal Defendants (but not Revolution Wind) would still be bound by any injunction issued in this case.  Those concerns evaporate if both cases and all the parties are before the same court.

*Second*, the States are not harmed by deferring a ruling on their motion for preliminary relief until it can be decided by the transferee court.  As explained below, the BOEM Order is already preliminarily enjoined, so the States are not suffering any harm (now or in the foreseeable future) from the BOEM Order.  And given D.D.C.'s injunction, it is unlikely that Judge Lamberth would decline to extend it to the States' case upon arrival in D.D.C.  In opposing our request to hold their present motion in abeyance, the States articulated a concern about potential appeals (and motions for stay pending appeal) of Judge Lamberth's order.  *See* Dkt. No. 29.  Of course, a month has now passed since Judge Lamberth's order and no party has appealed, let alone sought a stay of that order during an appeal.  But in any event, the States' concern only highlights why the States' and Revolution Wind's cases should be before the same court.  There could be no race to the circuit if both cases are before Judge Lamberth.  The States' case should be transferred to D.D.C. and any ruling on the States' motion for preliminary relief should be deferred until that court can rule upon it.

## II.     The States No Longer Face Harm from the Stop Work Order and Have Not Other-wise Met Their Burden.

If the Court rules on the States' motion, it should deny the motion because, given Judge Lamberth's injunction, the States are not facing any imminent irreparable harm.  "[P]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."  *Karmue v. Remington*, No. 17-cv-107-LM-AKJ, 2017 WL 7101162, at *1 (D.R.I. June 27, 2017), *R&R adopted*, 2018 WL 611422 (D.R.I. Jan. 29, 2018) (quoting *Voice of the Arab World*, 645 F.3d at 32).  The movant "must show that the injury complained of is of such imminence that there is a 'clear and present need for relief to prevent irreparable harm.'"  *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991) (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  "Plaintiffs seeking preliminary injunctive relief face an uphill battle and must demonstrate 'that irreparable injury is likely in the absence of an injunction.'"  *Colorado v. U.S. Dep't of Health & Hum. Servs.*, 1:25-cv-00121-MSM-LDA, 2025 WL 1426226, at *19 (D.R.I. May 16, 2025) (quoting *Winter*, 555 U.S. at 22).

The States do not face imminent irreparable harm from the BOEM Order because the project developer to whom the order was issued has already obtained preliminary injunctive relief. The States' alleged harm here derives from Revolution Wind's inability to proceed with construction.  But construction can now proceed (and has been able to proceed for the last month).  Even if Revolution Wind had not already obtained preliminary relief and resumed construction, the States have not met their burden to prove irreparable harm.  The lack of imminent irreparable harm is a sufficient basis to deny Plaintiffs' motion. *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d

68, 73-74 (1st Cir. 2004).

### A. The States Do Not Face Imminent Irreparable Harm Because the Stop Work Order Has Already Been Enjoined.

Neither Rhode Island nor Connecticut faces imminent irreparable harm from the BOEM Order because that order has already been enjoined. Revolution Wind is free to resume construction on the Revolution Wind Project, and BOEM is barred from enforcing the stop work order while Revolution Wind pursues its claims. At this point, the States simply seek to bootstrap the preliminary injunctive relief that the project developer—*the entity subject to the BOEM Order*—has already obtained.

Revolution Wind's ability to resume construction undercuts all the States' irreparable harm arguments. States' Mot. 32. The States argue, relying on documents filed by Revolution Wind in D.D.C., that suspension of work past September 22 would have resulted in cascading construction delays. *Id.* Revolution Wind argued those delays would have threatened Revolution Wind's ability to complete the project in time to meet deadlines in its power purchase agreements. *Id.*; Ex. B to Decl. of Sarah Rice (Decl. of Paul Murphy). But Revolution Wind obtained an order on September 22 preliminarily enjoining enforcement of the BOEM Order. D.D.C. PI Order.

With Revolution Wind having resumed construction, the States' entire irreparable harm argument evaporates. The States cannot establish "that irreparable injury is likely in the absence of an injunction" from this Court because the BOEM Order is enjoined and Revolution Wind is again under construction. *Colorado*, 2025 WL 1426226, at *19 (quoting *Winter*, 555 U.S. at 22). D.D.C.'s injunction lasts until Revolution Wind's case can be decided on the merits. D.D.C. PI Order 2. There is no reason to think this state of affairs will change before the States' claims could be heard on the merits, which should take approximately the same amount of time to litigate as Revolution Wind's case given their substantial overlap. Contrary to the States' assertion, there is

9

no reason to think it will "take years" to litigate this case, as it will be resolved on cross-motions for summary judgment based on an administrative record, not trial.  States' Mot. 32.  But even if these proceedings are lengthy, the BOEM Order has been preliminarily enjoined for the duration of proceedings on Revolution Wind's substantially similar claims, so the States' concerns on this issue are unfounded.

The timing of the States' preliminary injunction motion also undercuts any claim that they continue to face potential irreparable harm.  Relying on the declarations Revolution Wind filed in support of its preliminary injunction motion, the States argued they would face irreparable harm if construction was not allowed to resume by September 22.  States' Mot. 32.  But the States did not file their motion for a preliminary injunction until September 17—more than three weeks after the Order was issued, a week and a half after Revolution Wind moved for a preliminary injunction in D.D.C., and just days before September 22.  Nor did the States seek to expedite briefing on their motion beyond the two weeks provided for in Local Rules.  Local Civil Rule 7(a)(3)-(4).

The States' delay in seeking preliminary relief implies that either: (1) the harm the States (as opposed to Revolution Wind) allegedly faced by September 22 was not truly irreparable; or (2) the States believed Revolution Wind would obtain a preliminary injunction and that injunction would be sufficient to alleviate any harm the States faced.  Either justifies denying the States' motion.  *See Voice of the Arab World*, 645 F.3d at 35 (delay in seeking relief "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury" (quoting *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995))); *Doe v. Trustees of Dartmouth College*, 597 F. Supp. 3d 511, 514 (D.N.H. 2022) (plaintiff's "own delay in asserting to the Court that he in fact hopes to return to school [by a

certain date] suggests he will not actually suffer irreparable harm if he is not allowed to return by that date").

The caselaw that the States rely on regarding parallel preliminary injunctions is inapposite. In opposing Federal Defendant's motion to hold their preliminary injunction motion in abeyance, the States cited some cases granting parallel preliminary injunctions. Pl. States' Opp'n to Defs.' Mot. 2-3, Dkt. No. 29. But each of those cases involved a rulemaking or other action of general applicability that directly impacted the party (or the work of the party) seeking the follow-on injunction. *See Whitman-Walker Clinic v U.S. Dep't of Health and Human Servs.*, 485 F. Supp. 3d 1, 10 (D.D.C. 2020) (challenge by health care providers to rule revising prior rule that had provided care access protections to certain individuals).[2]

In denying Federal Defendants' motion to hold the States' preliminary injunction motion in abeyance, the Court cited *California v. Health & Human Services*, 390 F. Supp. 3d 1061, 1065 (N.D. Cal. 2019) ("*California II*"). *See* Text Order (Oct. 1, 2025). But that case only illustrates our point. The matter involved a challenge by several states to final rules that created religious and moral exemptions to the Affordable Care Act's contraceptive mandate. *California II*, 390 F. Supp. 3d at 1063. The court entered a preliminary injunction against implementation of the rules.

---

[2] *See also CASA v. Trump*, No. 25-cv-201, 2025 WL 2257625, at *1 (D. Md. Aug. 7, 2025) (class action by children born on U.S. soil to Executive Order on birthright citizenship); *NW. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 41, 46 (D.D.C. 2020) (challenge by legal services providers to rule changing fees for certain immigration applications); *Cook City v. McAleenan*, 417 F. Supp. 3d 1008, 1030 (N.D. Ill. 2019) (challenge by public hospital system and service provider organization to immigration rule redefining "public charge"); *Cal. v. Health & Hum. Servs.*, 390 F. Supp. 3d 1061, 1063–64 (N.D. Cal. 2019) (challenge by States running health care programs to rule creating exemptions for contraceptive mandate); *Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 605 (D. Md. 2019) (challenge by local government providing health services to rule amending requirements for funding of family planning services); *California v. Azar*, 385 F. Supp. 3d 960, 696 (N.D. Cal. 2019) (same by state government and service provider); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018) (challenge by states and individuals to end of Deferred Action for Childhood Arrivals program).

*Id.* at 1063–64.  The court based its finding of harm in issuing that injunction on the premise that a loss in contraceptive coverage in health plans would result in economic harm to states because they would fund substitute services.  *See California v. Health & Human Servs.*, 351 F. Supp. 3d 1267 (N.D. Cal. 2019) ("*California I*") (underlying preliminary injunction opinion in same case, relying in part on prior appellate court decision *California v. Azar*, 911 F.3d 558, 571–73, 581 (9th Cir. 2018)), *vacated*, 977 F.3d 801 (9th Cir. 2020).  After the court issued its preliminary injunction, another State (Oregon) intervened as an additional plaintiff.  *California II*, 390 F. Supp. 3d at 1064.  In the interim, however, the Eastern District of Pennsylvania had issued a universal injunction, which, at least while in place, would have covered Oregon.  *Id.*  The court nonetheless extended its prior injunction to cover the plaintiff-intervenor Oregon.  *See id.* at 1065–66.

The agency action at issue in *California* was a regulation of general applicability that would apply in each State.  Each state's alleged harm derived independently from the regulation, regardless of any other state's harm or any other state's success in litigation—each state would have been responsible for the expenditures within that state.  As with the other cases the States have cited in this case, the party obtaining the follow-on injunction (Oregon) was suffering harms independent from (not derivative of) the party who obtained the first injunction.

The BOEM Order, by contrast, is an informal adjudication directed at one entity: Revolution Wind.  The BOEM Order does not regulate Rhode Island's or Connecticut's conduct in any way.  Instead, the States' alleged harms flow only from Revolution Wind's inability to continue construction.  The States' alleged harms are thus captured entirely by the preliminary relief that Revolution Wind has already obtained.  Consider the following hypothetical, which illustrates the difference between this case and the cases the States rely on. Assume Revolution Wind decided on its own to stop construction on the Project and to drop its suit challenging the BOEM Order. If that

happened, the States would not have some stand-alone irreparable harm that would justify a preliminary injunction *against the federal government*. *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011) ("[i]t would make little sense for a court to conclude that a plaintiff has shown irreparable harm when the relief sought would not actually remedy that harm" and citing cases holding the same); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 80-81 (D.D.C. 2013) (denying preliminary injunction where plaintiff's alleged harm "d[id] not flow directly from the requirements of the [challenged] Final Rule but [was] instead based on independent market variables such as how [] customers and/or retail consumers might react."). Indeed, the States would likely not even have standing to challenge the BOEM Order in that scenario due to causation and redressability issues.

In sum, Plaintiffs will not suffer any imminent irreparable harm in the absence of this Court granting a preliminary injunction because Revolution Wind already obtained one. There is no "presently existing threat of serious harm" that would justify an injunction. *Sierra Club*, 769 F. Supp. at 422. If factual circumstances change, the States could again move for preliminary relief based on those facts. But because there is currently no "imminent threat of irreparable harm if an injunction is not issued[,]" the States' motion should be denied. *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 370 (D. Mass. 2020).

**B.    The States Have Not Otherwise Established Irreparable Harm.**

Even setting aside that Revolution Wind has already obtained the relief the States seek, the States' motion does not otherwise meet their burden of establishing irreparable harm *to the States*.

The States put forward several theories of irreparable harm. None justify the Court issuing a duplicative preliminary injunction.

*First*, the States argue that the BOEM Order frustrates their public policy goals, but they do not establish that their described frustrations constitute irreparable harm that justifies issuance of preliminary injunction. As an initial matter, the States have not proven that the BOEM Order would prevent them from meeting their policy goals. Rhode Island argues "[d]elay or cancellation of Revolution Wind frustrates long-term planning for compliance with the Rhode Island Renewable Energy Standard, and would require a significant change of course." States' Mot. 33. Rhode Island gives short shrift to this referenced potential change in course, however, and fails to explain how an alleged harm that could potentially be addressed by a change in course is irreparable. Connecticut complains that it "has been counting on the clean energy that Revolution Wind promises to supply since at least 2021, when it incorporated the project into its Integrated Resource Plan." *Id.* at 34. But BOEM did not approve the COP for Revolution Wind until 2023. Connecticut does not explain how uncertainty was tolerable for purposes of its Plan in 2021 but is intolerable now. *See Scotts Valley Band of Pomo Indians v. Burgum*, 1:25-cv-00958 (TNM), 2025 WL 1639901, at *5 (D.D.C. June 10, 2025) ("[I]f [] contracts did not rely on the [agency's] decision, then they also are not harmed by the [agency] suspending part of it."). And Connecticut recognizes that "[o]n its own . . . Revolution Wind will not achieve the State's climate change and renewable energy requirements[.]" Dykes Decl. ¶ 21.

Further, the cases that the States cite regarding state sovereignty and ability to enforce state statutes do not support the issuance of a preliminary injunction where a state challenges only the

federal government's regulation of a separate private party.[3]  In *Abbott v. Perez*, 585 U.S. 579 (2018), for example, court orders "effectively direct[ed] [Texas]" not to use its own legislatively enacted districting plans in running its elections.  *Id.* at 584.  *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001), was a dispute regarding whether land qualified as "Indian country" under the Indian Gaming Regulatory Act.  The case thus implicated Kansas's jurisdiction and "w[ould] affect the sovereign rights and regulatory powers of all involved."  *Id.* at 1228.  *West Virginia v. EPA*, 669 F. Supp. 3d 781, 811 (D.N.D. 2023), concerned a dispute between federal and state jurisdiction under the Clean Water Act.  And in *Tennessee v. U.S. Dep't of Education*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022), the plaintiff states alleged that federal legal interpretation and related guidance of general applicability conflicted with state statutes.  *Id.* at 841 ("Plaintiffs suffered an immediate injury to their sovereign interests when Defendants issued the challenged guidance, as Defendants' guidance and several of Plaintiffs' statutes conflict.").

These cases are not analogous here—no state statute has been enjoined or found unlawful, Rhode Island's and Connecticut's regulatory power and jurisdiction are not at issue, the BOEM Order imposed no obligation on either state, and the terms of the BOEM Order do not conflict with any state statutes the States have identified.  Rather, the BOEM Order regulates a private party developing a project on a federal lease in federal waters.  That the States allegedly may be impacted by the actions of that private party does not transform this case into one about the States' sovereignty or authority to enforce their laws.  *Cf. Hodel v. Va. Surface Mining & Reclamation Ass'n,*

---

[3] *Allco Fin., Ltd. v. Klee*, 861 F.3d 82, 106 (2d Cir. 2017) did not discuss irreparable harm.  *See* States' Mot. 34.

*Inc.*, 452 U.S. 264 (1981) (drawing distinction between federal regulation of private parties and regulation of "States as States" in considering claim under the Tenth Amendment).

*Second*, the States argue that they will experience more pollution without Revolution Wind, and that "[e]ach day that the Stop Work Order delays completion of Revolution Wind adds a day that New England will experience irreparable pollution." States' Mot. 36. But that claim is far too speculative. The States have not provided sufficient analysis showing that alleged reduced pollution attributable solely to the Revolution Wind project would prevent tangible, irreparable harm to the States. This is not a case like *California v. Bureau of Land Management*, 286 F. Supp. 3d 1054 (N.D. Cal. 2018), where plaintiffs sought to enjoin an activity that was itself causing pollution. *See* States' Mot. 35. "[A] preliminary injunction is not warranted by" the States' "speculative forecast of anticipated harm." *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, No. 1:22-cv-11091-IT, 2023 WL 3660689, at *4 (D. Mass. May 25, 2023) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996)).

*Third*, the States point to a variety of economic harms, but none of these arguments have merit. The States do not explain how the BOEM Order—issued to one project—irreparably jeopardizes the States' independent initiatives. The States do not meaningfully explain, for example, how the Order damages the "Cambridge Innovation Center." States' Mot. 37. Indeed, the declaration of William Cox states he has "seen companies start to withdraw from their leases at CIC" because "starting in January, some saw their projects being delayed or terminated entirely." Cox Decl. ¶ 13. But the BOEM Order was not issued until August 22 and was not directed at any projects other than Revolution Wind. Similarly, the Cox declaration references other unnamed "future projects whose permits have now been revoked" in discussing a port in East Providence. *Id.* ¶ 16. And while the States reference the Connecticut Wind Collaborative, the declaration of

Kathryn Dykes does not actually connect that collaborative in any way to Revolution Wind or the BOEM Order.  Dykes Decl. ¶ 35.

The States also do not establish that their allegedly increased electricity bills would justify a preliminary injunction.  To justify a preliminary injunction, "economic harm [must] be significant."  *Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012); *see also Scotts Valley*, 2025 WL 1639901, at *3-4 (applying this principle to alleged economic damages to a federally recognized tribe).  Connecticut "estimates that its agencies paid roughly $63,000,000 for electricity in 2023[.]"  States' Mot. at 38.  But it also states that this estimate "is not a complete account" and is simply intended to "underscore[] that the State is a significant ratepayer[.]"  Dykes Decl. ¶ 55.  Connecticut does not state how much less it would anticipate paying for electricity with Revolution Wind online.  That delta is a critical (and missing) element.

Nor do injuries to third parties, such as loss of jobs, justify a preliminary injunction. "[T]he issuance of a preliminary injunction requires a showing of irreparable harm *to the movant* rather than to one or more third parties."  *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) (emphasis in original).  The States cite *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016), as "finding irreparable state harm where compliance with [a] federal rule may increase unemployment[.]"  States' Mot. 40.  But the Fifth Circuit said that the "Petitioners ha[d] raised threatened harms … including unemployment" that would be irreparable in that case.  *Texas*, 829 F.3d at 434.  Texas was not the only Petitioner, and in seeking a stay pending review, Texas did not identify unemployment as an alleged irreparable harm in its briefs.  Mot. of Pet'rs State of Texas et al. 16-19, *Texas v. EPA*, No. 16-60118 ("*Texas*") (5th Cir. Mar. 17, 2016), Dkt. No. 80; Letter Br. 14, *Texas* (5th Cir. June 1, 2016), Dkt. No. 187.  The loss of jobs appears to have been raised

in briefs filed by companies, a union, and/or business associations.  Joint Mot. to Stay Final Rule 19, *Texas* (5th Cir. Mar. 3, 2016), Dkt. No. 19; Joint Letter Br. of Non-State Pet'rs & Pet'r-Intervenors 13, *Texas* (5th Cir. June 1, 2016), Dkt. No. 192.  And the States' assertion that, "if [] jobs are lost because Revolution Wind goes under," their "economies inevitably will suffer" is vague and speculative.  States' Mot. 40.

The States' alleged investments are similarly deficient.  The Dykes Declaration does not monetize the investments made during the solicitation process.  Dykes Decl. ¶¶ 18-19.  And with respect to the States' investment in the State Pier Terminal in New London, Connecticut did not redevelop the pier just to support Revolution Wind.  Rather, it states it has made investments "[t]o support Revolution Wind *and other offshore wind projects*[.]"  Dykes Decl. ¶ 36 (emphasis added).  The Dykes Declaration does not state Connecticut would not have made that investment absent Revolution Wind.  *See generally id.*  And the cases that the States rely on for their alleged harm to grid reliability involved federal actions potentially affecting already-operating sources of electrical generation, not speculative assumptions regarding the impacts of future available sources.  *See Texas*, 829 F.3d at 410; *Kentucky v. EPA*, No. 23-3216, 2023 WL 11871967, at *1 (6th Cir. July 25, 2023).

The States have not demonstrated irreparable harm that would warrant preliminary relief.  And because the States have not demonstrated irreparable harm, the balance of the equities also does not weigh in favor of a preliminary injunction.

## III.    The States Are Unlikely to Succeed on the Merits of Their Case.

The States' motion should also be denied because they have not met their burden to demonstrate a likelihood of success on the merits of their case.  The States raise two arguments: (1) BOEM acted arbitrarily and capriciously, States' Mot. 22–27; and (2) BOEM did not have

authority under OCSLA to issue the Order, States' Mot. 27–31. We address the latter argument first.

### A.    OCSLA Provided BOEM with Authority for the Order.

BOEM was within its authority to issue the stop work order. BOEM issued the Order under 43 U.S.C. § 1337(p)(4). Paragraph (p)(4) is stated in the present tense: "The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for" the enumerated criteria. *Id.* This includes "protection of national security interests" and "prevention of interference with" other reasonable uses of the area in question. *Id.* § 1337(p)(4)(F), (I); *see also id.* § 1337(p)(6)(B) ("The Secretary shall require the holder of a lease, easement, or right-of-way granted under [§ 1337(p)] to … (B) comply with such other requirements as the Secretary considers necessary to protect the interests of the public and the United States[.]"). In accordance with the statute, BOEM regulations require that a lessee "[c]onduct all activities authorized by the lease or grant in a manner consistent with the provisions of [43 U.S.C. § 1337(p)]." 30 C.F.R. § 585.105(h).

In another context, the Supreme Court has recognized that, when Congress grants the Secretary of the Interior general powers over the management of public land, that administrative authority exists unless statutorily narrowed. *See Boesche v. Udall*, 373 U.S. 472, 476–77 (1963). And when, as here, Congress grants an agency the statutory power to approve an action under certain factors, the agency necessarily maintains the inherent authority under that statute to temporarily stop implementation of the approved action where the agency has concerns about statutory compliance. *See Gun South, Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989). For example, in *Gun South*, the Eleventh Circuit concluded that, despite previously issued permits, the Bureau of Alcohol, Tobacco, and Firearms had the inherent authority under the governing statute to suspend the importation of firearms while it reassessed whether importation should be allowed under the

19

relevant statute. *Id.* at 859–60, 862; *see id.* at 862–63 (citing cases); *see also Nat'l Min. Ass'n v. U.S. Dep't of the Interior*, 177 F.3d 1, 9–10 (D.C. Cir. 1999) (Office of Surface Mining Reclamation and Enforcement "retains 'implied' authority to suspend or rescind improvidently provided permits because of its express authority to deny permits in the first instance.").

Here, Interior holds oversight authority under § 1337(p)(4) for the duration of Revolution Wind's lease. The statute does not limit the Secretary's consideration of the subsection's factors to only situations in which the Secretary is deciding whether to approve an activity in the first instance. 43 U.S.C. § 1337(p)(4) ("The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for . . . .").

The Secretary's oversight authority in § 1337(p)(4) is clearly applicable here. BOEM is undertaking a review of the Revolution Wind Project pursuant to the Presidential Wind Memo. Suess Decl. ¶ 15; BOEM Order 1. As part of that review, Interior identified "concerns related to" the ongoing oversight factors in § 1337(p)(4) and issued the Order to "ensure compliance" until "BOEM has completed its necessary review." BOEM Order 1; *see also* Seuss Decl. ¶ 14. The BOEM Order is not permanent; it is only intended to allow BOEM time to finish its review.

The States argue that any BOEM authority here is limited to the circumstances in 43 U.S.C. § 1334(a)(1) and in regulations related to suspension of leases. States' Mot. 29. But § 1334(a)(1) references suspensions and temporary prohibitions as topics on which the Secretary must issue regulations. *See* 43 U.S.C. § 1334(a) ("The regulations prescribed by the Secretary under this subsection shall include, but not be limited to, provisions—(1) for the suspension or temporary prohibition of any operation or activity . . . ."). Indeed, § 1334(a) largely focuses on the Secretary's rulemaking authority. *See id.* ("The Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations

as may be necessary to carry out such provisions."). Section 1334(a) does not place limits on the Secretary's authority to act under § 1337(p)(4). And BOEM did not act to suspend Revolution Wind's lease here. Regulatory authority governing lease suspensions is not implicated.

BOEM had the authority to issue the Order and the States are unlikely to succeed on their claims alleging the contrary.

### B.    BOEM Considered the Relevant Factors and Articulated Its Reasoning.

The States next argue that the BOEM Order was arbitrary and capricious. States' Mot. 22–27. Specifically, the States claim that BOEM did not articulate any reasoned basis for the Order, did not explain what the States view as a change in position, and did not consider reliance interests on the prior COP approval. *See id.*

The APA authorizes a reviewing court to "hold unlawful and set aside" final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). "The APA standard affords great deference to agency decision making and the agency's action is presumed valid." *Mass. Dep't of Telecom. & Cable v. FCC*, 983 F.3d 28, 34 (1st Cir. 2020) (cleaned up).

"Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, *Colorado*, 145 S. Ct. 1497, 1511 (2025) (citing *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

The First Circuit "find[s] agency action to be arbitrary and capricious when the agency relies on improper factors, fails to consider pertinent aspects of the problem, offers a rationale contradicting the evidence before it, or reaches a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Littlefield v. Dep't of*

*the Interior*, 85 F.4th 635, 643 (1st Cir. 2023) (cleaned up).  Judicial review occurs on the agency's administrative record, and courts are to "uphold an agency determination if it is supported by any rational view of the record."  *Id.* (cleaned up).  The court may not substitute its judgment for that of the agency and must uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned.  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *Upper Blackstone Water Pollution Abatement Dist. v. EPA*, 690 F.3d 9, 20 (1st Cir. 2012).

The BOEM Order provided an adequate explanation of its reasoning and was supported by the information before BOEM.  Given the nature of the Order—in which BOEM was not changing any prior agency action—the change-in-position doctrine is irrelevant and there was no need to consider reliance interests.

*First*, the BOEM Order reasonably explained its bases.  The Order disclosed that Interior, consistent with the Presidential Memorandum, is undertaking a review of Revolution Wind's lease activities.  BOEM Order 1.  The Order informed Revolution Wind that BOEM had identified "concerns related to the protection of national security … and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas."  *Id.*  And the Order disclosed the authority under which BOEM issued it, 43 U.S.C. § 1337(p)(4).  BOEM Order 1. There is no APA problem with this "reasonable, albeit brief" explanation.  *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007).

The States cite two cases to support an argument that BOEM did not provide a reasoned basis.  *See* States' Mot. 23.  But *McDonnell Douglas* was simply reciting the standard.  *See McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004).  The court's analysis did not relate to the depth of the agency's explanation.  *See id.* at 1187–93.  And

in *Louisiana v. Biden*, 622 F. Supp. 3d 267, 295 (W.D. La. 2022), the agency did not provide any explanation at all for its action (a pause on oil and gas leasing) other than citing an executive order.

But even if the Court determines that the Order did not adequately explain BOEM's reasons, the proper remedy is to seek further explanation from BOEM. *See Sierra Club v. Marsh*, 976 F.2d 763, 773 (1st Cir. 1992). That could occur before a ruling on the merits: "The administrative record may be supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature. The new material, however, should be explanatory of the decisionmakers' action at the time it occurred. No new rationalizations for the agency's decision should be included." *Id.* at 772–73 (cleaned up). BOEM has here provided further explanation. *See* Suess Decl. ¶¶ 8, 10, 11, 14. Judge Lamberth did not wrestle with the additional explanation provided in the Suess Declaration, instead concluding that that they were *post hoc* explanations. *See* D.D.C. PI Order at 41. But the grounds stated in the Suess Declaration are the same as those stated in the Order: concerns with national security and other uses of the waters. With or without that further explanation, the States are unlikely to succeed on the portion of their claim alleging inadequate explanation.

*Second*, BOEM made a rational connection between the facts found and the choice made. This claim will turn on whether BOEM's administrative record supports its decision. *Dep't of Commerce v. New York*, 588 U.S. 752, 780 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." (citations omitted)).

BOEM concluded that Revolution Wind needed to stop work while BOEM addressed concerns that arose during BOEM's ongoing review of the Project. BOEM Order 1. Specifically, BOEM identified "concerns related to the protection of national security" and "prevention of

interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas." *Id.* The administrative record will demonstrate the reasonableness of that conclusion. As explained in the Suess Declaration, BOEM based the Order on its concern that there is a continuing failure by Revolution Wind to enter final agreements on national security issues and conflicting uses of federal waters—agreements that the COP approval assumed Revolution Wind would enter. Suess Decl. ¶¶ 8, 10, 11. There is no dispute that, as of the time of the BOEM Order, those formal agreements were still outstanding. Here again, Judge Lamberth relied exclusively on the face of the BOEM Order and did not engage with the evidence showing that the formal agreements have yet to be obtained by Revolution Wind.

*Third*, the change-in-position doctrine is irrelevant here, and there was thus no requirement that BOEM consider Revolution Wind's reliance interests. The change-in-position doctrine permits agencies to change existing policies so long as they recognize the change, reasonably explain it, and consider serious reliance interests. *FDA v. Wages & White Lion Inv., LLC*, 145 S. Ct. 898, 917 (2025). The doctrine "asks two questions." *Id.* at 918. The first is whether the agency has in fact changed its position by, for example, acting inconsistently with a prior position or reversing a former view "as to the proper course." *Id.* (citation omitted). If that first question is answered in the affirmative, the second question asks whether the agency recognized that it was changing its position and explained the new policy. *Id.* (citation omitted).

BOEM has not changed any position with respect to Revolution Wind. Yes, it has stated concerns that have come to light as part of its ongoing review and issued a stop-work order. But BOEM's review of lease activities is ongoing. BOEM has not rescinded or modified Revolution Wind's lease or the prior approval of the COP. Those agency actions remain in place; there is no

24

need to explain a non-existent change in position.  BOEM's concern is that Revolution Wind has not yet fully implemented several of the conditions in its COP approval.

Thus, BOEM was also not required to consider reliance interests.  That is because the need to consider reliance interests is a part of the change-in-position doctrine.  *Wages & White Lion*, 145 S. Ct. at 917 (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)).  As explained above, the doctrine is not applicable here.  The States are unlikely to succeed on the merits of their case.

## CONCLUSION

The Court should decline to rule on the States' motion for preliminary relief and transfer the case to the District Court for the District of Columbia.  Should the Court decide to rule on the motion, the motion should be denied.  The BOEM Order is already enjoined; the States are therefore not facing any imminent harm from that Order.  And in any event, the States have failed to otherwise prove irreparable harm and are unlikely to succeed on the merits of their case.


October 22, 2025

Respectfully submitted,

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment & Natural Resources Division

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General
Environment & Natural Resources Division

 *s/ Kristofor R. Swanson*
KRISTOFOR R. SWANSON
(Colo. Bar No. 39378)
 *s/ Amanda K. Rudat*
AMANDA K. RUDAT
Natural Resources Section

Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
(202) 598-1937 (Swanson)
(202) 532-3201 (Rudat)
kristofor.swanson@usdoj.gov
amanda.rudat@usdoj.gov

*Attorneys for Federal Defendants*