UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF RHODE ISLAND; STATE OF CONNECTICUT; and KATHERINE DYKES, Commissioner of the Connecticut Department of Energy and Environmental Protection, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, Secretary of the Interior, in his official capacity; BUREAU OF OCEAN ENERGY MANAGEMENT; MATTHEW GIACONA, Acting Director of Bureau of Ocean Energy Management, in his official capacity; BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT; and KENNETH STEVENS, Principal Deputy Director of the Bureau of Safety and Environmental Enforcement, in his official capacity, <br><br> Defendants. | C.A. No. 1:25-cv-00439 |

**PLAINTIFF STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

Unable to justify their actions on the merits, Defendants' opposition primarily argues that this Court should forego deciding the States' motion and instead transfer the case to the District of Columbia. Defendants have already made this argument (Dkt. No. 22); it is fully briefed and irrelevant here. There are many reasons to keep this case—brought by Rhode Island to protect a Rhode Island project—in the District of Rhode Island, as the States have already explained (*see* Dkt. No. 33). But Defendants raise it again now to offer this Court a chance to punt the issue of whether a preliminary injunction is warranted. The States urge the Court to decline Defendants'

invitation and keep this case at home. Regardless, that issue is not relevant to the determination of whether to grant the States' motion for a preliminary injunction.

Defendants' attacks on the substance of the States' motion for a preliminary injunction lack merit. With regard to imminent, irreparable harm, the Defendants point only to complaints about the timing of the States' complaint, (irrelevant) factual-line drawing about the applicability of the many cases affirming parallel preliminary injunctions, and the bald assertion that the States' harms are too speculative or vague. But notably, Defendants do not cite any case denying a preliminary injunction based on a twelve-day "delay" in filing, provide any caselaw where a preliminary injunction was denied because an injunction was in place in another jurisdiction, or dispute that the States' harms will occur—instead neatly ignoring testimony and nitpicking only the precision with which the States are able to quantify them.

Defendants' argument about the likelihood of the States' success on the merits fares no better. Simply put, the Outer Continental Shelf Lands Act (OCSLA) does not permit Defendants to issue a Stop Work Order without any due process after approving a project. Defendants can review the project, and there are regulations in place that can be followed if there are national security concerns or violations of the lease. The Stop Work Order, however, is an ultra vires action unmoored from that statutory authority. Defendants also wrongly assert that their Order halting a fully permitted and vetted project that was 80% complete somehow was not a change in the agency's position. To the contrary, that drastic reversal is the embodiment of arbitrary and capricious agency action, and Defendants' attempt to justify it through *post hoc* rationalizations is unavailing.

## A. The States Have Suffered, and Without Continued Relief Will Suffer, Irreparable Harm from the Defendants' Illegal Stop Work Order.

As a threshold matter, no authority cited by Defendants supports their claim that a days-long delay in filing the instant motion for preliminary injunction somehow defeats the States' irreparable harm showing. *See* Opp. at 10-11 (citing *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 36 (1st Cir. 2011) ("multi-year" dispute preceded three-month delay after dispute escalation); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (nine-month delay in filing suit, followed by additional four-month delay in requesting preliminary injunction); *Doe v. Trs. of Dartmouth Coll.*, 597 F. Supp. 3d 511, 514 (D.N.H. 2022) (two-month delay in filing suit followed by plaintiff assenting to additional two-month delay for preliminary injunction hearing)). None of their remaining arguments fare better.

### 1. The D.D.C. Injunction does not provide complete relief to the States.

Defendants have provided no authority, because there is none, that supports their contention that a preliminary injunction issued by another court in another circuit, for the benefit of non-parties, is sufficient to displace a showing of irreparable harm in this case. Opp. 9-13. The "complete relief" afforded to other parties in a far-flung judicial proceeding can only serve to "advantag[e]" the States here "incidentally," *Trump v. CASA, Inc.* 606 U.S. 831, 851 (2025); it does not provide the States complete relief.

In *CASA*, the Supreme Court offered an example that is particularly applicable here—an imagined injunction against a neighbor's music awarded in one neighbor's suit against the offending night-owl. *Id*. That scenario is factually analogous to this one, where the Stop Work Order is a single action with widely felt effects—from the next-door neighbor to down the block. While such an injunction "will necessarily benefit the defendants' surrounding neighbors too . . . , that benefit is merely incidental." *Id*. at 852 (cleaned up). "[O]nly the plaintiff can enforce the

3

judgment" and, therefore, "[i]f the nuisance persists, and another neighbor wants to shut it down, she must file her own suit." *Id.* Here, the States must too be able to seek enforceable preliminary relief in the event that Defendants continue their unlawful behavior in the future. "Revolution Wind's ability to resume construction," Opp. at 9, purely at the grace of the current preliminary injunction, is still at risk of appeal.

There is no categorical rule barring plaintiffs from seeking relief from harm that will occur but for the entrance of a preliminary injunction merely because the harm has temporarily ceased or has been deferred. By contrast, while the preliminary injunction standard prohibits "[s]peculation or unsubstantiated fears of what may happen in the future" from serving as the basis for irreparable harm, *In re Rare Coin Galleries, Inc.*, 862 F.2d 896, 902 (1st Cir. 1988), future harm may nevertheless serve as the basis for an irreparable harm finding when there is evidence presented that it will occur, *We the People PAC v. Bellows*, 40 F.4th 1, 26 (1st Cir. 2022) (although preliminary injunction could not prevent current harm to petition drive, preliminary injunction still warranted where there was evidence of harm to a future petition drive). And regular principles of mootness also give guidance that plaintiffs need not rely on the voluntary cessation of illegal behavior without a judicially enforceable restraint when the behavior has only halted as a result of litigation. *E.g.*, *New York v. Trump*, 769 F. Supp. 3d 119, 133-34 (D.R.I. Mar. 6, 2025), *appeal filed*, No. 25-1236 (1st Cir.). So too must it be that plaintiffs need not rely on the action of other courts and other plaintiffs, and *CASA* reaffirmed that they cannot.

Defendants' attempt to hand-wave away the many cases where district courts have issued parallel injunctions based on a supposed factual distinction between those cases and this one is unconvincing. Opp. at 11. Defendants assert, with no citation to any judicial reasoning in support, that all parallel injunctions have only been issued against rules or regulations of general

4

applicability that directly affect plaintiffs. But the one case Defendants discuss at length, *California v. Health & Human Services*, reasoned that a preliminary injunction "in a different circuit that could be overturned or limited at any time—does not negate" the propriety of granting an additional, parallel injunction. 390 F. Supp. 3d 1061, 1066 (N.D. Cal. 2019). And, like in *We the People PAC*, the *California* court concluded that Oregon's injury, while "contingent" on a future event (dissolution of an injunction) was not "speculative" and was "sufficiently imminent" because the "Third Circuit could alter the injunction at any moment." *Id.* Other courts have also reasoned that parallel injunctions proceeding in separate circuit courts can be beneficial and necessary to secure parties' full rights. *See, e.g., Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 81 (D.D.C. 2020); *Regeneron Pharms., Inc. v. United States Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29 at 41 n.4 (S.D.N.Y. 2020). The same circumstance applies here because the D.C. Circuit could alter the injunction at any moment.

    Apart from the lack of legal reasoning as to why there is some difference between enjoining an illegal rule of broad application versus an illegal action with a wide blast radius, like this one, Defendants have also supplied no logical reasoning to support such a distinction. The Stop Work Order, while targeted at a single entity, "applies" in Rhode Island and Connecticut in the sense that its effects are directly felt in Connecticut and Rhode Island, and in a way that is separate and apart from the effects and harm felt by Revolution Wind.

    For example, the Stop Work Order has harmed the States beyond jeopardizing the Revolution Wind project. The uncontroverted testimony is that the Order will "deter other companies from investing in Rhode Island and bringing their businesses [to Rhode Island]." Cox Decl. ¶ 10. And, after the Stop Work Order, "meetings with developers and supply chain

companies that were eager" to work with the Rhode Island Commerce Corporation on their future projects dried up, with those eager to meet "no longer in contact" with Rhode Island officials. *Id.* ¶ 14. Even more specifically, since the Stop Work Order, conversations with developers interested in developing a port in East Providence have also halted. *Id.* ¶ 16. Likewise, in Connecticut, the "Stop Work Order is likely to undermine investor confidence and set a chilling precedent for future projects," hurting Connecticut's investments. Dykes Decl. ¶ 63.

Through this undisputed testimony, the States have established that the Stop Work Order itself, without any further action by Revolution Wind, LLC, is itself likely to have a direct and immediate effect on Rhode Island and Connecticut goodwill in their economic development endeavors. Impairment of goodwill is a classic irreparable injury. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (injury to goodwill often "not easily measured or fully compensable in damages" and therefore irreparable); *see also New York v. Trump*, 133 F.4th 51, 73 (1st Cir. 2025) ("impediments to [States'] planning, hiring, and operations" constitute irreparable harm).

### 2. The States Have Established Irreparable Harm.

The States have demonstrated with competent evidence that they are likely to suffer irreparable harm in numerous ways, and Defendants have presented no evidence to counter the States evidence of irreparable harm. Instead, Defendants choose to ignore or mischaracterize the testimony that has been submitted. For example, with respect to public policy goals, Defendants merely assert by fiat that it is not harmful for a project that has served as cornerstone of multiple public policy decisions over the course of years to be untimely halted and delayed. Opp. 13-24. Contrary to Defendants' bare assertions, like the court orders in *Abbott v. Perez*, 585 U.S. 579 (2018) did to election maps, Defendants' Stop Work Order effectively directed Connecticut and

Rhode Island to abandon their long-term energy plans. Dykes Decl. ¶ 25 (Integrated Resource Plan relied on Revolution Wind's timely completion); Kearns Decl. ¶ 34 (no readily available alternatives to meet Renewable Energy Standard mandates); Bianco Decl. ¶ 41, 42 (describing unwanted changes in approved electricity procurement plan and renewable energy credit purchase plans caused by Stop Work Order).

Without any support, Defendants contest the States' demonstration that a delay will have an imminent, irreparable effect on greenhouse gas emissions and climate change. But contrary to Defendants' bald assertion, the Stop Work Order is "itself causing pollution." Opp. at 16. "Any day of delay" in the Revolution Wind project means that "New England, including Connecticut, will experience more pollution" than it would have otherwise. Babbidge Decl. ¶ 20. This expert conclusion, based on thirty years of knowledge regarding the New England regional electric system and air pollution dynamics, *see id.*, is not "speculative." Opp. at 16.

Defendants again point to no legal principle or decision that would support their contention that large-scale job loss among state residents does not constitute harm to the State. The States are not pointing to the 1,200 jobs at risk because of the significant and meaningful harm to the 1,200 individuals who hold those jobs or to their unions. Instead, the States have presented evidence that those job losses will cause "negative financial and social repercussions" for Connecticut, Dykes Decl. ¶ 57, and that loss of businesses at the ports will hinder "an entire supply chain of companies providing well-paid jobs" in Rhode Island, Cox Decl. ¶ 18. This evidence is not speculative, regardless of the evidence Texas presented or did not present in *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016). And despite the deep dive into the record in that case, Defendants do not address at all a similar pronouncement in *Louisiana v. Biden*, 622 F. Supp. 3d 267, 297 (W.D. La. 2022) (finding irreparable harm where "Plaintiff States are also claiming

damages through loss of jobs"). Quibbles with the testimony regarding state investment and impacts on the electrical grids, *see* Opp. at 18, is similarly unavailing where the States have shown a likelihood of the irreparable harm, Dykes Decl. ¶¶ 18, 36-38, 56 Cox Decl. ¶¶ 14-15, and there is no contrary evidence. Defendants have not identified why such harms cannot legally support a finding of irreparable harm.

The States thus have demonstrated through uncontroverted evidence that they will suffer irreparable harm without a preliminary injunction. Moreover, an injunction in the District of Columbia does not prohibit an injunction in the District of Rhode Island. Rather, as *CASA* informs, the complete relief that the States are entitled to requires an injunction in this case.

### B. The States Will Succeed On The Merits.

Defendants' argument that the States are unlikely to succeed on the merits distills down to: (1) 43 U.S.C. § 1337(p)(4) authorized them to issue the Stop Work Order; (2) The Stop Work Order was consistent with BOEM's prior position; and (3) the Suess Declaration and documents appended thereto sufficiently justify the Stop Work Order. Each argument is fatally flawed.

#### 1. 43 U.S.C. § 1337(p)(4) does not provide a legal basis for the Stop Work Order.

Absent statutory authority, Defendants' action is unlawful. 5 U.S.C. § 706(2)(C). Defendants attempt to pin their authority on 43 U.S.C. § 1337(p)(4). But nothing in that subsection justifies halting previously authorized activities.

Section 1337(p) authorizes the Secretary of the Interior to grant leases on the Outer Continental Shelf. *See* 43 U.S.C. § 1337(p)(1) ("The Secretary…may grant a lease . . . ."). It designates appropriate activities for which a lease can be granted, *id.* § 1337(p)(1)(A)-(E), grants authority to establish "payments to ensure a fair return to the United States for any lease", *id.* § 1337(p)(2), and mandates that leases are issued on a competitive basis, *id.* § 1337(p)(3). It also,

in Section (p)(4), which Defendants claim as their sole basis for issuing the Stop Work Order, enumerates twelve criteria the Secretary should considered when carrying out "any activity under this subsection." *id.* § 1337(p)(4). The only activities authorized under subsection (p) pertain to granting leases. Nothing in subsection (p)—or any other statute—contemplates the Secretary issuing a Stop Work Order without notice or due process. Thus, the statute that Defendants claim gave them the authority to issue the Stop Work Order does not.

Once the Secretary grants a lease, he may, of course, ensure compliance with its terms. That is why OCSLA directs the Secretary to establish regulations for suspending leases and proscribing prohibited activities. *See* 43 U.S.C. §§ 1334(a); 1337(p)(5), (8). And such regulations have been promulgated. *See* C.F.R. § 585.106, 585.417, 585.418. Those regulations provide a regulatory scheme that authorizes the Secretary, under certain circumstances, to halt a project. But Defendants do not attempt to invoke this regulatory authority. Even had they, there is no regulatory authority to issue a Stop Work Order in the manner done here—without notice or the chance to cure the supposed "concerns" with the project. The absence of a legal basis for the Stop Work Order alone is sufficient reason to determine that the States are likely to succeed on the merits.

**2. BOEM changed its position by issuing the Stop Work Order.**

Defendants' prior position was that construction on Revolution Wind may proceed, and its current position is that construction on Revolution Wind may not proceed. That is a change in position. Defendants even admit that they have changed course. They acknowledge that Department of the Interior recently changed its interpretation of the law. Def.'s Mot. at 3-4 (citing M-Opinion M-37086); *id.* at Ex. A ("Suess Dec."), at ¶ 12 (explaining how the reinterpretation of M-37086 resulted in change to implementing regulations). They also point to

9

the President's Wind Memo—a significant policy change—to justify their actions. Def.'s Mot. at 3-4; Suess Dec. at ¶ 15 (explaining that Presidential Wind Memo demands reevaluation of Revolution Wind's Construction and Operations Plan and lease).

Yet they also argue that their position on Revolution Wind has not changed and so they were free to disregard the States' reliance interests. Def.'s Opp. at 24. Defendants cite no caselaw to support their argument except for a recent Supreme Court case that merely outlines the change-in-position doctrine. *See* Def.'s Mot at 24 (citing *FDA v. Wages & White Lion Inv., LLC*, 145 S. Ct. 898, 917 (2025)). Their citation fails to include all the factors relevant to determining whether an agency has changed position. As the Supreme Court in that case stated, a change in position "occurs when an agency acts inconsistently with an earlier position, performs a reversal of its former views as to the proper course, or disavows prior inconsistent agency action as no longer good law." *Id.* at 918 (cleaned up).

All three occurred here. Defendants' earlier position, throughout the permitting process and 80% of the construction of the Revolution Wind project, was that Revolution Wind could be constructed in accordance with its lease. The Stop Work Order is inconsistent with that position. Likewise, its former views on the proper course were that Revolution Wind could be constructed in accordance with its lease terms, whereas its current position is the opposite. Additionally, Defendants' have disavowed the prior agency action—issuing a lease to Revolution Wind under the criteria of § 1337(p)(4)—by reinterpreting 43 U.S.C. 1337(p)(4). *See* Def.'s Mot. at 3-4 (explaining how Interior applies § 1337(p)(4) under its new interpretation of M-Opinion M-37086).

Defendants are forced to argue that no change in position occurred because they concede that they did not consider the States' reliance interests before issuing the Order. *See* Def.'s Mot.

10

at 24-25. Because a change in position clearly occurred here, that concession is fatal to their argument that the States will not prevail on the merits. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (cleaned up).

### 3. Defendants' *post hoc* justification does not provide a rational basis for issuing the Stop Work Order.

The Suess Declaration and accompanying documents, which purportedly provide Defendants' entire rationale for issuing the Stop Work Order, offer no rational basis for abruptly halting a years-long, mostly-complete, multi-billion-dollar project for an indefinite period of time. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"). But the Court should not even consider any purported rational connection because the Suess Declaration is merely an attempt to retroactively justify the Stop Work Order. *See Regents of the Univ. of Cal.*, 591 U.S. at 20 ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked *when it took the action*.") (emphasis added).

The sixteen paragraphs of the Suess Declaration advance two primary rationales for the Stop Work Order: (1) Interior has changed its position in how it will be reviewing leases and interpreting the regulations governing granting leases, *see* Suess Dec. ¶¶ 9, 12, 13, 15, and (2) purported non-compliance with two contingencies of Revolution Wind's lease, *see id.* ¶¶ 7, 8, 10, 14. The first rationale has already been debunked in the prior section—agencies cannot reverse their position without accounting for reliance interests. The Declaration also mentions a third

rationale stemming from letters by the National Oceanic Atmospheric Association (NOAA) from several years ago expressing concern about cod spawning. *See id.* at Ex. G, H.

Even if the Court credited the Suess Declaration, which it should not, there is no rational connection between the facts of the Suess Declaration—which basically amount to ongoing dialogue between Revolution Wind and Interior about a few lease contingencies and years-old concerns about cod spawning—and the choice to abruptly halt work on a multi-billion-dollar project that is 80% complete. The Declaration states that Revolution Wind, in 2025, submitted an annual report regarding its compliance. Suess Dec. at ¶ 10. Even if Defendants were unsatisfied with that report, submittal of a thorough compliance report demonstrates that Revolution Wind is not some non-responsive rogue actor that requires drastic remedial action. Moreover, Defendants did not provide any documented communication to Revolution Wind after Revolution Wind submitted its 2025 annual compliance report—let alone any communication that raised the purported concerns mentioned in the Suess Declaration. *See* Suess Dec. at Ex. A-J (no communication with Revolution Wind after January 31, 2025). Likewise, the Declaration's mention of cod spawning concerns is based on letters sent by NOAA to BOEM, not to Revolution Wind. *Id.* at ¶ 11. And Defendants do not explain how stopping construction on a project where the vast majority of underwater work is complete is a rational way of addressing cod spawning concerns. Indeed, Defendants' own evidence reveals that, even under a generous reading of the Declaration, it was arbitrary and capricious to take such extreme action.

But the Court should not even consider any of the purported bases for issuing the Stop Work Order because they are merely *post hoc* justifications. The Suess Declaration identifies very specific compliance issues known to both Defendants and Revolution Wind for years as the basis for the need issue the Order. But the Stop Work Order does not mention NOAA, the

12

Department of Defense, cod spawning, or any of the specific factual allegations that Interior has now retroactively provided to justify the Order. If the reason for the sudden shutdown was a failure to comply with specific actions that have already been discussed between the parties, it is implausible that the Order would not mention them and instead rely on the vague grounds of "concerns related to the national security interests of the United States and prevention of interferences with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas." Compl. at Ex. A ("Order"). Likewise, the cod spawning issue that has been discussed since the time of Revolution Wind's permitting was not plausibly the reason for including "protection of the environment" in the Order as part of a broad description of BOEM's mandate. *Id.* Rather, these are merely retroactively manufactured grievances aimed at fitting the unspecific language of the Order.

      That conclusion is supported not only by logical inference, but also by the plain language of the Order. BOEM issued the Order "to allow for *it to address* concerns that have arisen during the review that the Department is undertaking pursuant to the President's Memorandum . . . ." Order (emphasis added). If the Order was actually based on Revolution Wind's failure to comply with lease requirements or years-old cod spawning concerns, BOEM would have ordered work to stop to allow for *Revolution Wind to address* those concerns. The *post hoc* justification provided by the Suess Declaration was not "grounds that the agency invoked *when it took the action*." *Regents of the Univ. of Cal.*, 591 U.S. at 20 (emphasis added). And even if those grounds did exist, Defendants did not provide a "satisfactory explanation for its action," let alone

a "rational connection between the facts" and its extreme, arbitrary, and capricious response. *State Farm*, 463 U.S. at 43.[1]

In sum, the States will prevail on the merits because the Suess Declaration is an impermissible *post hoc* rationalization without rational connection to the Order, Defendants changed their position without accounting for reliance interests, and Defendants had no statutory to issue the Stop Work Order.

---

[1] The States reserve the right to refute the assertions in the Suess Declaration. They do not do so here because, as explained, the accuracy of the Suess Declaration and accompanying documents is not a factor the Court need consider at this time.

Dated: October 29, 2025

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: /s/ Sarah W. Rice
Katherine Connolly Sadeck (Bar No. 8637)
*Solicitor General*
Sarah W. Rice (Bar No. 10588)
*Assistant Attorney General*
Nicholas M. Vaz (Bar No. 9501)
*Special Assistant Attorney General*
Alex Carnevale (Bar No. 10724)
*Special Assistant Attorney General*
Leonard Giarrano IV (Bar No. 10731)
*Special Assistant Attorney General*
Judy M. Shih* (CA Bar No. 206394)
*Special Assistant Attorney General*
Maithreyi Ratakonda* (NY Bar No. 5060124)
*Special Assistant Attorney General*
Max Jordan Kober* (NY Bar No. 5911409)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
Tel.: (401) 274-4400
ksadeck@riag.ri.gov
srice@riag.ri.gov
nvaz@riag.ri.gov
acarnevale@riag.ri.gov
lgiarrano@riag.ri.gov
judy@statesunited.org
mai@statesunited.org
max@statesunited.org

*Counsel for the State of Rhode Island*

Respectfully submitted,

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: /s/ Benjamin Cheney
Michael K. Skold* (CT Bar No. ct28407)
*Solicitor General*
Matthew I. Levine* (CT Bar No. ct18898)
*Deputy Associate Attorney General*
Evan O'Roark* (CT Bar No. ct30562)
*Deputy Solicitor General*
Benjamin Cheney* (CT Bar No. ct29685)
*Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
Tel.: (860) 808-5316
michael.skold@ct.gov
matthew.levine@ct.gov
evan.oroark@ct.gov
benjamin.cheney@ct.gov

*Counsel for the State of Connecticut and Katherine Dykes*

*Admitted Pro Hac Vice

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of October 2025, I electronically filed the foregoing opposition using the CM/ECF electronic filing system, thereby causing it to be electronically transmitted to counsel for all parties of record.

/s/ Benjamin Cheney